UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

ALMA ENERGY, LLC                                        CASE NO. 07-70370
DEBTOR

PHAEDRA SPRADLIN, SOLELY IN HER CAPACITY AS
THE CHAPTER 7 TRUSTEE OF ALMA ENERGY, LLC,
AND THC KENTUCKY COAL VENTURE I LLC
PLAINTIFFS

VS.

DARRELL K. WILLIAMS, et al                             ADV. NO. 09-7005

DEFENDANTS / PLAINTIFFS

AND

DARRELL K. WILLIAMS
CROSSCLAIMANT / COUNTERCLAIMANT

VS:

PHAEDRA SPRADLIN, TRUSTEE, AND THC KENTUCKY
COAL VENTURE I LLC , et als.
DEFENDANTS

DARRELL WILLIAMS AMENDMENT

TO HIS ANSWER, CROSS, AND COUNTER CLAIMS

AND

RICO PLEADING STATEMENT

A. CHRONOLOGY OF ACTS VIOLATING RICO STATUTES

1. In early June 2006 Darrell Williams (hereinafter referred to as "Williams") contacted

his first cousin Tony Gannacone III ("Gannacone") who was a financial broker living in Boca

Raton, Florida. He asked Gannacone to find for him an individual or financial institution that

would invest at a minimum of twenty million dollars in a coal project in Pike County Kentucky

owned by Alma Energy LLC ("Alma"). Alma was in turn owned by Joe Street ("Street"), JB

Roulette ("Roulette"), and Darrell Williams' son, Nathan Williams ("Nathan").

2. Williams was not, and has not since been, a principal in Alma, or other companies

holding interests in coal properties, for the reason that he was on the AVS list. AVS is an

automated information system operated by the Federal Office of Surface Mining ("OSM").

Information on applicants, permittees, operators, application and permit records, as well as

unabated or uncorrected environmental violations, are maintained in this nationwide database for

OSM's Federal and State programs. The primary purpose of AVS is to assist OSM and States in

making a permit eligibility determination for applicants for surface coal mining permits. Section

510(c) of The Surface Mining Control and Reclamation Act of 1977 prohibits issuance of a new

permit to any applicant who owns or controls mining operations having unabated or uncorrected

violations anywhere in the United States until those violations are abated or corrected or are in

the process of being abated or corrected to the satisfaction of the agency with jurisdiction over

the violation.

3. As an individual listed on the AVS system, Williams could perform any services

related to coal interests, such as acquisition of leases for third parties, so long as he was not an

Owner and did not act as an Operator with respect to those interests. While acting on behalf of

Alma, Williams had identified several potentially lucrative coal properties that required capital

expenditures beyond the financial ability of Street and Roulett.

4. Six entities and individuals held independent interests in the existing and proposed coal

ventures, and stood to benefit from expansion or sale of their interests. Alma Energy LLC would

benefit from the acquisition of additional coal properties and from an increase in working capital.

Street and Roulett would benefit from the anticipated sale of their membership interests in Alma.

Darrell Williams would benefit individually by acting as an agent for any new coal venture.

Nathan's Welding LLC ("Nathan's Welding") would benefit as the independent entity which

held mining permits necessary for Alma's operations. Nathan Williams would benefit as a

member of Alma and as sole owner of Nathan's Welding.

5. Gannacone called Williams and said a friend of his in South Florida, Alan Myers

("Myers"), had contacted a friend of Myers who went by the nickname Ren. Gannacone was told

that Ren brokered large loans. In late June 2006 Gannacone met Ren at the Café Martorano in Ft.

Lauderdale, Florida, and was given a slip of paper on which was written the name and phone

number of the Defendant, Warren E. Halle ("Halle"). Ren was later identified as Reynolds

Maragni ("Ren"), a convicted felon and affiliate of the Colombo organized crime family

involved in illegal money laundering activities in Southern Florida.

6. Gannacone called Halle, and then asked Williams to contact him. In late June 2006

Williams phoned Halle and gave him a summary of Alma's plans for expansion. At the time

Williams was also seeking funding for the Alma Project from Koch Carbon and Peabody Coal

Trade, among others. Williams and an expert deep coal miner, Homer Preece ("Preece"), then

drove to Maryland to meet Halle at his office, located at 2900 Linden Lane, Silver Spring, MD

20910.

7. The meeting went well and the following Tuesday, Halle and his son Gerry Halle flew

to Charleston, West Virginia, to meet with Williams and Gannacone. The group traveled to Pike

County, Kentucky, and visited the Alma coal mines and other potential coal properties. At the

end of the tour Halle stated to Williams and Gannacone that he wanted to do a deal.

8. Halle asked Williams to recommend a good coal lawyer for the project. Billy Shelton ("Shelton"), a well known coal expert, was available. Shelton and Jim Pruitt ("Pruitt"), the attorney for Alma Energy, started working on a framework agreement. Halle sent a draft of the Shelton / Pruitt framework agreement to a Washington, DC, lawyer, Steven Snider ("Snider"), who drafted a revised framework, an LLC Agreement, and a Mining Agreement (collectively the "JV Agreements"). Snider had practiced corporate law for 25 years at the prestigious firm of Hale & Dorr, and was a senior partner along with Ms. Weinstein at Wilmer Hale.

9. The documents Snider drafted formed a joint venture called Kentucky Coal Venture I LLC ("KCVI"), with THC Kentucky Coal Venture LLC ("THC") as managing member and Alma as a limited member. Entities which Halle owns or controls, and individuals associated therewith, including but not limited to KCVI; THC; The Halle Companies ("Halle Companies"); WV Coal Venture I LLC ("WVCVI"); Kentucky Coal Venture II, LLC ("KCVII"); KWV Operations LLC ("KWV"); Consol Capital LLC ("Consol"); NextGen Coal ("NextGen"); Stephen Fleischman ("Fleischman"); Ken Adamson ("Adamson"); Gannacone; and Jodi Waber ("Waber") are collectively referred to herein as "Halle Related Entities".

10. In late July 2006 Halle spent a week with Ren riding motorcycles on the west coast. After he returned, Williams and Preece visited Halle in Silver Springs Maryland for the second time. Negotiations continued based on the terms of the Framework Agreement. Williams was told by Halle that Halle would honor in good faith his commitment pursuant to the terms of the revised Framework Agreement to "provide funding for the mining operations to be conducted by Alma as contractor to a joint venture company" over the next twenty years.

11. Based on the representations made by Halle, Williams and Alma broke off negotiations with other potential investors. On or about August 5, 2006, Alma, Williams,

Nathan, Street, Roulett, and Nathan's Welding were presented with the final revised Framework (Exhibit A), LLC (Exhibit B), and Mining (Exhibit C) Agreements

12. The JV Agreements called for Alma to mine and sell all the coal that the new Halle Related Entity KCVI owned or would acquire in the future in and around Pike County, Kentucky. If the JV Agreements had been honored in good faith, all parties would have benefited from the joint venture. Street and Roulett were to receive cash payments and future royalties in return for resigning as members of Alma and in exchange for the assignment of Alma's Leases to KCVI. Nathan's Welding would continue to hold the essential mining permits, which would increase in value as mining activity increased. Nathan Williams would benefit through his sole ownership, and activities on behalf, of Alma and Nathan's Welding.

13. Under the JV Agreements Darrell Williams was to be appointed as the Exclusive Agent for KCVI and had the specific responsibility to find more lucrative coal properties, perform due diligence work, and present new properties to Halle and KCVI. He would benefit from fees and commissions as Exclusive Agent for KCVI and from future work for Alma. In consideration for the promises by Halle, Williams agreed that neither he nor Alma would compete with Halle or Halle Related Entities during the term of the KCVI Joint Venture, represented to be twenty years, and for five (5) years thereafter. If Williams or Alma acquired coal interests for their own benefit during the joint venture or the five year period they were obligated to convey them to Halle at no cost.

14. On or about Saturday, August 5, 2006, THC, KCVI, and Halle transmitted to Alma, Darrell Williams, Nathan Williams, and Nathan's Welding the three JV Agreements, being the revised Framework Agreement, LLC Agreement, and Mining Agreement, by interstate electronic wire communications, namely internet email or by facsimile transmission over interstate

telephone lines. When Williams was presented with the Mining and LLC Agreements, he found

that they contained terms and representations that were inconsistent with the Framework

Agreement to be executed concurrently with those Agreements.

15. For example, the LLC gave Halle discretion regarding the amount of operating capital

he would provide to KCVI, and gave him the right to refuse to provide funds to KCVI. By

interstate telephone and email Halle, individually and on behalf of the Halle Related Entities,

promised and assured Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett that he

would exercise all discretionary powers in good faith for the benefit of KCVI, and for the benefit

of Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

16. Halle and the Halle Related entities knowingly and intentionally made materially

false, fictitious, and fraudulent statements and assurances in the Framework Agreement to Alma,

Williams, Nathan, Nathan's Welding, Street, and Roulett, on which Alma, Williams, Nathan,

Nathan's Welding, Street, and Roulett reasonably relied, to induce Alma, Williams, Nathan, and

Nathan's Welding to execute the JV Agreements, including the representation that:

**From the Framework Agreement:**

> "WHEREAS, ALMA and WILLIAMS desire to contract with HALLE,
> pursuant to the terms of this AGREEMENT, whereby HALLE will
> provide funding for the mining operations to be conducted by
> ALMA as contractor to a joint venture company, KENTUCKY COAL
> VENTURE I LLC (the "COMPANY) formed pursuant to the laws of
> the State of Delaware and owned by HALLE and ALMA as its sole
> members, in exchange for a portion of the gross revenues realized
> from the mining operations as described herein."...

17. Halle and the Halle Related entities knowingly and intentionally made materially

false, fictitious, and fraudulent statements and assurances in the LLC and Mining Agreements to

Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett regarding Alma's right to mine

and sell coal for twenty years as a member of KCVI, on which Alma, Williams, Nathan,

Nathan's Welding, Street, and Roulett reasonably relied, to induce Alma, Williams, Nathan,

Nathan's Welding, Street, and Roulett to execute the JV Agreements including, but not limited to

the following:

**From the Mining Agreement:**

"**2.2 Purposes**. This Agreement is entered into for the following purposes and for no others, and shall serve as the exclusive means by which each of the Parties accomplishes such purposes:

(a) to evaluate the possible Development and Mining of the Properties, and, if justified, to engage in Development and Mining;

(b) to engage in Operations on the Properties.

(c) to engage in marketing and sale of Products,

(d) to complete and satisfy all Legal Compliance obligations and Continuing Obligations affecting the Properties, and

(e) to perform any other activity necessary, appropriate, or incidental to any of the foregoing.

**2.3 Limitation**. Unless the Parties otherwise agree in writing, the Operations shall be limited to the purposes described in Section 2.2, and nothing in this Agreement shall be construed to enlarge such purposes or to change the relationships of the Parties as independent contractors and not partners (limited or general) or joint venturers. Except as expressly set forth herein, (i) Operator shall have no authority to enter into contracts on behalf of Owner, dispose of any Property or Asset or enter into any agreement to do the same, or otherwise bind Owner, or (ii) Owner shall have no authority to conduct, control, or carry out the Operations. Unless and until Owner enters into a Budget providing for such expenditure, in no event shall Owner be required to expend more than $4,704,554.75 pursuant to the terms of this Agreement.

**2.4 Term**. The term of this Agreement shall be for twenty (20) years from the Effective Date and for so long thereafter as Products are produced from the Properties on a continuous basis, and thereafter until all materials, supplies, equipment and infrastructure have been salvaged and disposed of, any required Legal Compliance is completed and accepted and the Parties have agreed to a final accounting, unless the Operations are earlier

terminated or this Agreement is otherwise terminated as herein provided. For purposes hereof. Products shall be deemed to be produced from the Properties on a "continuous basis" so long as production in commercial quantities is not halted for more than 365 consecutive days without the consent of the Parties.

3.1 Appointment. The Owner hereby appoints Alma as the Operator with overall management responsibility for Operations and operational control over the Mining and sale of Products. Alma hereby agrees to serve until it resigns as provided in Section 3.4, or withdraws in accordance with Section 6.3, or is removed as Operator following an Operator Event of Default."

18. Halle and the Halle Related entities knowingly and intentionally made materially false, fictitious, and fraudulent statements and assurances in the LLC and Mining Agreements to Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett regarding Williams right to be the Exclusive Agent of KCVI for twenty  years in and around Pike County, Kentucky, to find more lucrative coal properties for Halle and KCVI, on which Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett reasonably relied, to induce Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett to execute the JV Agreements  including but not limited to the following:

**From the Mining Agreement:**

"**8.1 Engagement of Williams.** Williams shall be the exclusive agent of the Owner for purposes of investigating and overseeing the future acquisition of additional mining properties, mining permits, leases, surface agreements, mining agreements, coal sales agreements, and any and all other necessary documents similar to the Assets related to the mining of materials similar to the Product, subject to the Owner's consent to such acquisitions, which may be withheld in the sole discretion of Owner. Williams understands and agrees that his obligations under the this Agreement will represent a full time commitment by him to the Owner of this Agreement and require he remain at or in the vicinity of the Properties and the Operations. Williams acknowledges that his interests in Owner granted on or about the date of this Agreement represent complete and adequate

consideration for his obligations undertaken pursuant to this Agreement.

**8.2 Scope of Obligation.** Williams shall use his best efforts to procure additional, profitable mining properties and operations for the Owner's consideration and approval throughout the term of the Agreement. In the event additional mining properties are procured and approved by the Owner pursuant to this Agreement: the Owner shall hold all such as Assets in the same manner as provided for herein.

**8.3 No Authority to Bind Owner.** Williams shall have no authority, express or implied, to bind the Company pursuant to the terms of this Agreement and shall not represent or warrant that he has such authority to any person or entity."

19. Halle and the Halle Related entities knowingly and intentionally made materially false, fictitious, and fraudulent statements and assurances to Williams, both oral and written in the Framework, LLC, and Mining Agreements, on which Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett reasonably relied to their detriment. The purpose was to induce Williams and Alma to execute the JV Agreements by Halle making statements and promises to act in good faith as a member of KCVI so as not to cause defaults whereby Halle would exercise the option contained in the LLC Agreement to acquire all of the interests of Alma in KCVI for the sum of one dollar ($1.00):

**From the LLC Agreement:**

"Limited Nature of Alma Membership: Representations of Alma. The Members agree that Alma is a Member of the Company solely for purposes of participating in certain distributions of cash and decisions regarding the sale of certain Company assets. Except as and to the extent expressly set forth in Sections 3.2, 3.3, and 8.3, Alma shall have no economic interest in the Company or its assets (including, without limitation, distribution of cash or allocations of gain and loss). Except as and to the extent set forth in Section 4.3 regarding any Property Sale, Alma shall have no right to control the operations and actions of Manager or the Company. In the event (i) Alma resigns, is deemed to resign, or withdraws as "Operator" pursuant to the provisions of the Mining Agreement

between Alma and the Company dated on or about the date hereof (as the same may be amended, the "Mining Agreement"), (ii) there exists any Operator Event of Default under the Mining Agreement, or (iii) is in default any of its obligations under this Agreement and such default continues for ten (10) business days (with regard to matters which may be cured by payment of money) or thirty (30) business days (with regard to any other matter): then Halle shall have the right, exercisable at any time thereafter at Halle's sole option, to acquire, or as Manager to cause the Company to acquire, all of the interests of Alma in and to the Company for the sum of one dollar ($1.00) and, in connection therewith, Alma shall be deemed to have released the Company, its Manager and its Members from and against all claims, known or unknown, past, present or future, arising from its membership in the Company and the Company's entry into the Mining Agreement, Alma represents and warrants to the Manager, Members and the Company that (i) all coal leases, surface leases, mining agreements, pending agreements and other agreements that allow Alma to produce and sell coal, sandstone and other mineral products from mining operations located in Pike County, Kentucky are listed on the attached Exhibit 1.11 (the "Rights"), (ii) Alma holds transferable title to all of (the Rights free and clear of all liens, claims, encumbrances, and other restrictions, and (iii) no default exists under the Rights or any agreements relating thereto, and all obligations of Alma in connection with the rights now due and payable have been satisfied in full."

20. Based on Halle's oral and written representations and assurances regarding his intentions, Williams had already abandoned potential alternate sources of financing. As of August 5, 2006, Halle knew or should have known that Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett were economically unable to continue mining operations without the Halle investment.

21. The promises and assurances of Halle to Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett that he would in good faith join in a joint venture with Alma and Williams to develop coal properties, were known at the time by Halle and the Halle Related Entities to be materially false, fictitious, and fraudulent statements and assurances, and were made to induce

Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett into executing the JV

Agreements. Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett relied on the

materially false, fictitious, and fraudulent statements and assurances, and based on those

statements and assurances, did in fact execute the agreements.

22. At the time of execution of the JV Agreements, Halle and the Halle Related Entities

had no intention of honoring fiduciary duties, acting in good faith, and exercising discretionary

powers for the benefit of KCVI, and thereafter engaged in wrongful acts described herein to

force Alma, Darrell Williams, Nathan Williams, and Nathan's Welding into default under the JV

Agreements, causing injury to each of the parties.

23. Under the JV Agreements, Alma, owned by Nathan Williams, and THC Kentucky

Coal Venture I ("THC"), owned by Halle, were to be designated as the sole members of the new

joint venture KCVI. Darrell Williams was a party to the JV Agreements as exclusive agent for

KCVI.

24. On August 5, 2006, Darrell Williams, Nathan Williams, Nathan's Welding, and Alma

executed the JV Agreements, and Halle paid Street and Roulette to relinquish their memberships

in Alma, leaving Nathan Williams as the sole member of Alma. Street and Roulett were paid by

Halle a total of $4,454,554.75 by interstate transfer of funds from Maryland to Virginia through

payment of two promissory notes owed by Street and Roulett to Grundy National Bank, Grundy,

Virginia:

| | |
|---|---|
| Grundy NB (Right Fork Payoff) | $1,513,222.59 |
| Grundy NB (Netley Deep Mine Payoff) | $1,916,332 16 |

And through an additional payment to a company owned by Street and Roulett:

| | |
|---|---|
| WestRiver Machinery / Joe Street & J.B. Roulett | $1,025,000.00 |

In exchange for the payments to Street and Roulett, Alma was required to assign to Halle the two coal leases under which it mined coal, appraised at the time to be worth $5,542,758. On August 5, 2006, Street signed an Assignment Agreement (Exhibit D) as managing member of Alma, transferring the Leases on which Alma mined and providing for transfer of a Permit Assignment between Nathan's Welding LLC and Alma.

25. On August 5, 2006, Halle and the Halle Related Entities received $5,542,758 in leases on which Alma mined coal (the "Pocahontas Leases") in exchange for payment of $4,454,554.75, resulting in a net book entry gain of $1,088,203.25 for Halle and the Halle Related Entities.

26. At the time they withdrew as members, Street and Roulett loaned Alma for the benefit of Williams the sum of $500,000 to be used as working capital, with Street and Roulett each retaining a future royalty of $2 per ton to repay the loan.

27. On or about August 9, 2006, Halle refused to provide necessary working capital for Alma under the terms of the Mining Agreement, with the specific intent of rendering Alma undercapitalized from the start of the parties contractual relationship. As a condition for funding the JV Agreements, with the knowledge and intent that Alma would be required to expend the working capital provided by Street and Roulett, Halle demanded that Williams, Alma, Nathan, and Nathan's Welding use the $500,000 to pay existing bills owed by Alma rather than use the funds as intended, for production expenses.

28. On or about August 11, 2006, Halle refused to provide necessary working capital under the terms of the Mining Agreement, with the specific intent of rendering Alma undercapitalized from the start of the parties contractual relationship. After payment of Alma's

then current accounts payable, $254.09 of the $500,000 was disbursed to Alma to use for current production expenses.

29. To meet operating requirements provided for under the LLC and Mining agreements, Alma and Darrell Williams informed Halle and KCVI that Alma required $1,400,000 for equipment, infrastructure, and working capital. Halle and the Halle Related Entities knew or should have known that the $1,400,000 requested was the minimum initial investment necessary to maintain and increase production from the Alma mines for the benefit of Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

30. The amount requested was approximately $400,000 greater than the value of the Leases transferred to KCVI by Alma, and represented the first net investment over appraised value of assets received by Alma. KCVI did in fact advance additional operating funds to Alma under the JV Agreements Programs and Budgets, and filed an unsecured claim in the Alma bankruptcy case (EDKY Case no. 07-70360) for a total of $707,804.47.

31. A portion of the funds advanced by Halle under the JV Agreements were used to develop a second mine (hereinafter referred to as "Little Ty") on the first partial Lease assigned to Halle and to maintain production at the first mine on the second Lease (hereinafter referred to as "Netley"). Halle and the Halle Related Entities knew or should have known that the funds advanced for the Netley project were not sufficient for the reason that the mine entrance had to be constructed at a difficult site during inclement fall and winter weather.

32. Halle knew or should have known that the projected costs were not sufficient due to factors beyond the control of Alma and Williams, and intentionally underfunded the Netley project to further constrict the cash flow of Alma; to cause the insolvency of Alma, Williams, Nathan Williams, and Nathan's Welding; and to cause Alma and Williams to default under the

JV Agreements, all to the detriment of Williams, Alma, Nathan, Nathan's Welding, Street, and

Roulett.

33. Production from the Alma mines was ongoing as of the August 9, 2006, JV

Agreements. After execution of the JV Agreements, KCVI received the gross proceeds from the

sale of coal and then calculated and distributed a percentage of those funds to Alma, for the

benefit of Alma, Nathan Williams, Nathan's Welding, Street, Roulett, and Williams acting as

agent for KCVI. At the instruction of Warren Halle, KCVI withheld 15% of gross sales as its

share of the sales proceeds.

34. Williams, Alma, Nathan Williams, and Nathan's Welding were told by Halle that this

was the correct amount to be withheld under the JV Agreements, which they believed to be true

based on the Halle and Halle Related Entities statements to them; prior negotiations; and the

accounting statements accompanying checks from KCVI to Alma.

35. In fact, after changes made between the Framework Agreement and the LLC and

Mining Agreements, the LLC Agreement provided that:

> "3.2 **Distributions of Cash Flow**. Cash Flow shall be distributed to and
> among the Members at such times as may be determined by the Manager
> (provided, with regard to distributions of Cash Flow arising from Product Sales,
> Manager shall use its commercially reasonable efforts to distribute such Cash
> Flow on the next business day following its receipt by the Company of the Daily
> Report (as defined in the Mining Agreement) setting forth such Product Sales and
> the report from the bank maintaining the Cash Management Account (as defined
> in the Mining Agreement) that such proceeds have been received) in the following
> amounts and order of priority:
>
> (a) first, until $500,000 in the aggregate has been distributed in
> accordance with this Section 3.2(a), to the extent such Cash Flow arises from
> Product Sales of coal, to Halle an amount equal to $0.50 per ton of all coal
> Product Sales from and after the date of this Agreement;
>
> (b) second, to the extent such Cash Flow arises from Product Sales of
> coal, 85% to Alma and 15% to Halle; provided, however: that, should Alma as
> Operator under the Mining Agreement fail to timely provide the Company with a

Daily Report as and when required under the Mining Agreement), all of the Cash Flow arising from Product Sales of coal that should have been reported in such Daily Report shall be forfeited by Alma and paid to Halle; and provided, further, that, with regard to each distribution of Cash Flow pursuant to a day's Product Sales of coal, the percentage of Cash Flow distributable to Halle pursuant to this Section 3.2(a) with regard to such day's Product Sales of coal shall increase by one percent (1%), and the percentage of Cash Flow distributable to Alma pursuant to this Section 3.2(a) for such day's Product Sales of coal shall decrease by one percent ( 1%), for every increase of two dollars ($2.00) in gross sales price of coal achieved by the Company over $60.00 per ton (by way of example. and not of limitation, if the Company achieves Cash Flow from Product Sales of coal at $70.50 per ton distributable to the Members pursuant to this Section 3.2(a), such Cash Flow shall be distributed 20% to Halle and 80% to Alma); and

(c) third, to the extent such Cash Flow arises from Product Sales of materials other than coal, 80% to Alma and 20% to Halle (provided, however, that, should Alma as Operator under the Mining Agreement fail to timely provide the Company with a Daily Report (as and when required under the Mining Agreement), all of the Cash Flow arising from Product Sales that should have been reported in such Daily Report shall be forfeited by Alma and paid to Halle); and

(d) fourth, the balance, if any, to Halle."

21. Cash Flow was defined in the LLC Agreement to be:

"3.1 Definitions. For purposes of this Agreement,

(a) "**Cash Flow**" means, with respect to any fiscal period, the sum of all cash receipts of the Company from operations and any and all other sources, including amounts released from reserves and capital contributions, but excluding Sale Proceeds, less the sum of the following amounts:

(i) cash disbursements for insurance, property and business taxes, legal expenses, sales or brokerage commissions, management expenses, utilities, repairs and maintenance, accounting, statistical or bookkeeping services or equipment, salaries, advertising and promotion, and any and all other items which are customarily considered to be "operating expenses";

(ii) payments of interest, principal and premium under any indebtedness of the Company, including without limitation (A) loans incurred by the Company, and (B) any mortgages or security agreements encumbering any assets of the Company;

(iii) payments made for capital construction, acquisitions, alterations or improvements at any of the properties; and

(iv) amounts reasonably set aside as reserves by the Manager for working capital, contingent liabilities or replacement or any of the expenditures described in clauses (i), (ii) and (iii) above, or as otherwise reasonably deemed necessary to meet the current or anticipated future needs of the Company.

(b) "Net Capital Investment" means for each Member as of any date, the amount by which such Member's aggregate capital contributions to the Company exceed the aggregate amounts previously distributed to such Member pursuant to Section 3.2(a) and 3.3(a) as of such date; provided, that in no event shall the Net Capital Investment for any Member be less than zero and provided, further, that after giving effect to its contribution of the Rights the aggregate Net Capital Investment of Alma shall be zero dollars ($0.00).

(c) "Sale Proceeds" means the excess of all cash receipts arising from the sale or other disposition of all or any portion of the assets of the Company (other than the sale of coal, sandstone or other mineral products ("Products") in the ordinary course of the Company's business (such sales, the "Product Sales"), or any proceeds realized from condemnation or other insured casualty, but excluding proceeds from business interruption insurance, if any, over the sum of: (i) the amount of cash disbursed or to be disbursed in connection with or as an expense of such sale or other disposition, (ii) the amount necessary for the payment of all debts and obligations of the Company arising from or otherwise related to such sale or other disposition or to which are then to be paid, and (iii) any amounts used for the purposes described in Sections 3.0l (a)(i), (a)(ii) or (a)(iii) above or reasonably set aside for the reserves described in Section 3.0l (a)(iv) above."

36. In the final draft of the LLC Agreement, the 15% of gross sales contained in the Framework Agreement had been changed to 15% of Cash Flow. While this change was beneficial to Williams and Alma, other terms contained in the Framework Agreement were changed in the LLC and Mining Agreements against the interest of Williams and Alma, including a $1 option to purchase Alma's membership interests. The Framework Agreement specifically provided that "The parties intend that this AGREEMENT survive the execution of the LLC AGREEMENT and the MINING AGREEMENT, provided, however, in the event that any provision of this AGREEMENT conflicts with any provision of the LLC AGREEMENT or the MINING AGREEMENT, the provisions of such other agreement shall supercede the

provisions of this AGREEMENT." Distributions under the LLC Agreement were clearly based on Cash Flow, not Gross Sales.

37. On November 20, 2007, this Court ruled with regard to the JV Agreements that:

"There is no ambiguity in the agreements, so who drafted the contracts is of no significance. It is clear that when the agreements are read together as a whole, they contemplate the 15% payment to come from cash flow.

Kentucky Coal Venture argues that Debtor's prior conduct shows that Debtor believed that the 15% payment was from gross sales. "Absent a showing of fraud, duress, or mistake, when two parties have a written contract that is clear and unambiguous, that contract is presumed to express the intent of the parties, and parol evidence is not admissible to vary, alter, or contradict the terms of that contract." Liberty Mut. Ins. Co. v. Ben Lewis Plumbing, Heating & Air Conditioning, Inc., 121 Md. App. 467, 710 A.2d 338 (1998). There is no disagreement that Maryland law controls here, and Maryland law clearly shows that Debtor's prior conduct is not admissible to contradict the terms of the clear and unambiguous agreements.

The evidence here is the agreements, and they contemplate the 15% payment to come from cash flow.

In consideration of the foregoing, the court finds that the agreement between the parties is that the 15% payment is to come from cash flow. It is HEREBY ORDERED that any payment to Kentucky Coal Venture will be determined based on cash flow pursuant to the agreements."

38. This Court ruled that "prior conduct is not admissible to contradict the terms of the clear and unambiguous agreements", and that under the terms of the clear and unambiguous agreements KCVI was entitled to 15% of Cash Flow, not Gross Sales as KCVI had been deducting. From the date of the JV Agreements to the date of the ruling of this Court, KCVI wrongfully deducted at least 15% of the gross sales price of coal sold by KCVI in an amount in excess of $750,000. A significant portion of the 15% of gross sales was, directly or indirectly, wrongfully invested by Halle related Entities in procuring and operating coal properties in Glen Alum and Logan West Virginia as described below.

39. From August 9, 2006, forward, the Halle Related Entities, including Kentucky Coal Venture I LLC, THC Kentucky Coal Venture LLC, Ken Adamson, Warren E. Halle, and other unknown employees and agents of the Halle Related Entities, conspired and engaged in a course of conduct that included fraudulent acts, knowing misrepresentations, tortious interference, bad faith acts, bad faith accounting practices, and other actionable conduct with the intent of causing the insolvency of Alma and Williams and defaults under the JV Agreements for the purpose of acquiring the Debtor's assets for less than fair market value and terminating Williams exclusive agency.

40. On or about the last week in August , 2006, Halle, individually and by and through the Halle Related Entities, breached the letter and spirit of the JV Agreements, in flagrant violation of the duty to act in good faith, by negotiating a coal deal in Pike County, Kentucky, with Joshua Enterprises, Inc., without the involvement of Williams, Alma, or KCVI. Counsel for KCVI, Billy Shelton, held an interest Joshua Enterprises with Ronald Bowling. The venture produced coal in Pike County Kentucky for the benefit of Shelton, Halle, and Halle Related Entities, to the detriment of Williams, Alma, Nathan Williams, and Nathan's Welding.

41. In the fall of 2006 the market prices for steam coal produced by KCVI from the Alma mines fell by almost 30%. Williams reacted quickly and notified Halle that a coal preparation plant would be needed so that the Netley coal could be washed and made cleaner, and therefore could be sold into the metallurgical market where market prices were stable at or above $70 per ton. Halle was informed that future marketing of the Alma coal as metallurgical grade would be necessary for Alma, Williams, Nathan, Nathan's Welding, Street, Roulett, KCVI, and Halle to continue to receive the return on sales they anticipated and had been enjoying, and for Alma and KCVI to remain profitable.

42. As the Managing Member of KCVI, THC and Halle agreed to consider purchasing coal preparation plants brought to their attention by Williams. Williams located and identified several plants as suitable to meet KCVI's needs. One facility, known as Point Rock, was owned by Central Appalachian Mining ("CAM"). The Point Rock opportunity was to lease the preparation plant, along with an additional coal mine known as "Tri-Star". The project would have been economically beneficial to all parties.

43. The Point Rock deal was lost because Halle and the Halle related Entities intentionally delayed their response regarding acquisition of the property for KCVI. The slow response was intended by Halle to constrict the cash flow of Alma and cause the insolvency of Alma, Williams, Nathan, and Nathan's Welding, and cause Alma and Williams to default under the JV Agreements.

44. Alma, Williams, Nathan, and Nathan's Welding considered the actions of Halle in refusing to provide capital funds necessary to make Alma profitable to be intentional bad faith refusals to make business decisions that a hypothetical reasonable prudent business person acting in good faith would have made.

45. Acting through THC and KCVI, Halle and the Halle Related Entities' intentional delay, and failure to perform actions that a reasonably prudent business person would perform, breached Halle's legal and fiduciary duty, and the legal and fiduciary duty of the Halle Related Entities as members of KCVI and as parties to the JV Agreements, and breached Halle and the Halle Related Entities' fiduciary duty to act in good faith with regard to KCVI, Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

46. In early fall 2006, Williams located another opportunity for Halle and KCVI through John Preston, an employee of Pocahontas Land company, known as the "Glen Alum" property.

The Glen Alum property contained reserves of approximately 27 million tons of metallurgical coal, with one mine located at Beech Creek, West Virginia and other mines near Wharncliffe, West Virginia. The Glen Alum property had mineral reserves located both in Pike County, Kentucky, and Mingo County, West Virginia. It also included a state of the art coal preparation plant and Norfolk Southern rail loadout.

47. John Preston referred Williams to Jim Bunn, a person who leased coal to Appalachian Fuels, the lessee / owner of the Glen Alum property. Williams advised Halle of the suitability of the property and, upon Halle's specific approval, Williams proceeded with due diligence, including obtaining engineering reports, securing coal orders, and negotiating with Appalachian Fuels.

48. Williams and Alma acquired and paid for a coal price forecast from a respected coal forecasting specialist, Hill and Associates. Hill and Associates projected the then current sales price for coal produced by Glen Alum (aka Appalachian Fuels, Min Inc., and Patton) to be approximately $70.00 per ton (Exhibit E):

**From the Hill and Associates report:**

"We believe that the current price for high-vol coals from Point Rock and Rawl are about $69 per ton. Our best estimate for the current price of the met coal at Appalachian Fuel's Min Inc property is about $70. All three operations have a history of selling met coal..."

49. Gross sales from the Glen Alum property alone were conservatively estimated by Williams to be two billion dollars ($75 per ton times 27 million tons) over the twenty year life of the project. Ownership of the Glen Alum plant by KCVI would have allowed KCVI to process coal mined by Alma, resulting in gross sales of over $200,000,000 from the much smaller Alma holdings. The price for metallurgical coal produced by Alma and Glen Alum has peaked as high

as $300 per ton, as the world economy recovers over the next twenty years the value of the Glen

Alum, Logan, and Alma coal properties is expected to increase dramatically.

50. Alma and Williams faithfully performed under the August JV Agreements, borrowing

additional funds and entering into leases with Gannacone, Dale Foard ("Foard"), and Jay Adkins

("Adkins") to buy several "spreads" of equipment so that Alma and KCVI could mine Glen

Alum and other properties identified by Williams.

51. After the Glen Alum project was presented to Halle on behalf of KCVI, and Williams

and Alma had expended large sums of money and many hours developing the project, Halle

purchased the Glen Alum property on or about December 20, 2006, in the name of another Halle

Related Entity that was not related to KCVI, in violation of the letter and spirit of the JV

Agreements between Williams and Halle. During this time period Halle also wrongfully acquired

for a Halle Related Entity other than KCVI another lucrative coal property in Logan WV owned

by Homes for Appalachia Inc.

52. Halle, Halle Related Entities, and the attorney for KCVI, Billy Shelton, intentionally,

falsely, and fraudulently alleged that Shelton had identified and "brought" the Glen Alum and

Logan projects to Halle's personal attention, not Alma or Williams (See KCVI attorney invoice

evidencing Williams actions on behalf of KCVI, Exhibit F). Shelton was the attorney for KCVI

from the date that it was formed, Alma and THC were the sole members, and any work on the

Joshua, Glen Alum, and Logan properties that he performed was in his fiduciary capacity as

attorney for KCVI.

53. Halle bought the Glen Alum and Logan properties through an entity believed to be

West Virginia Coal Ventures I LLC, a Delaware LLC formed on December 20, 2006, and not

through KCVI which at that time included Alma as a member and Williams as Exclusive Agent.

The Glen Alum preparation plant is in close proximity to KCVI and Alma mines, and would have provided a low cost "in-house" washing facility, allowing the conversion of steam coal into metallurgical grade coal, significantly increasing the profitability of KCVI and Alma to the benefit of Nathan and Darrell Williams, and thereby preventing defaults under the JV Agreements.

54. Under the August JV Agreements, as well as under statutory and common law, Halle had a legal, contractual, and fiduciary duty when he bought Glen Alum and Logan to buy them on behalf of KCVI for the benefit of KCVI, Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett,. Under the JV Agreements, as well as under statutory and common law, Halle and Halle Related Entities, both as "insiders" and otherwise, had no right or authority to purchase Glen Alum and Logan, and operate them, under any other entity for Halle's personal gain, to the detriment of KCVI, Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

55. As of August 20, 2010, Halle and Halle Related Entities continued to operate the Glen Alum mines, process coal in the preparation plant, and sell metallurgic grade coal under the name NextGen Coal. The website (www.ngcoal.com) maintained by the Halle Companies, describes the Glen Alum operations as follows:

> "**About Us**
> **Winning Combination**
> NextGen Coal is rich with history, while looking to the future. The Company revitalized the Glen Alum coal processing plant, strategically located on 15,000 acres in Wharncliffe, West Virginia.  The plant allows us to produce a product matching a wide variety of customer requirements. Glen Alum is a modern, integrated rail loadout, serviced by the Norfolk Southern Railroad, capable of processing 500 raw tons per hour. A total of six underground mines are permitted and we are prospecting three additional underground mines. The property includes one active surface mine. Seams on the Glen Alum property include Lower Alma, Pond Creek, Upper Cedar Grove, Lower Cedar Grove, Eagle, Hernshaw, Chilton, and Buffalo.

**Forward Thinking**

NextGen Coal implements cutting edge mining techniques while controlling costs to provide an exceptional product at a savings to our valued customers. Relationships and individual customer needs embody our sales philosophy. We strive to be flexible and efficient in order to provide our customers the coal blends they require at a competitive price. Today's customer demands compel us to work proficiently, safely, and with an ecologically sound approach. We are dedicated to operating in an environmentally responsible manner and also recognize that safety outweighs productivity gains. The "old guard" in the coal industry is being replaced and the global customer is the key driver of change. NextGen Coal will play a large part in that change.

**Well Positioned**

Our company is remarkably well positioned in a robust market that will continue to grow and meet the needs of our customers in both the steel and energy sectors. Coal is the backbone of our company and the greatest energy strength of the United States and the Central Appalachian region. According to the U.S. Department of Energy, one quarter of the world's coal reserves are found within the United States and the energy content of the nation's coal resources exceed that of the entire world's known recoverable oil. The highest quality metallurgical and coking coal is found right here in the Central Appalachian region and NextGen Coal, with its vast resources and reserves, is here to stay."

56. After Halle and Halle Related Entities wrongful actions of purchasing Glen Alum and Logan resulted in Alma being unable to make installment payments on the equipment, Halle and Halle Related Entities bought some of the spreads of equipment acquired by Williams and Alma at less than fair market value from Gannacone, Foard, and / or Adkins.

57. Glen Alum was a project "brought to" Halle and KCVI by Williams under the terms of the JV Agreements for the benefit of Alma and KCVI, and was developed by Williams and Alma during a time when Alma was a member of KCVI and Williams was the Exclusive Agent for KCVI. Williams notified Halle in a late winter 2006 personal meeting at the Pikeville / Pike County Airport conference room that Halle and Halle Related Entities were not acting in good faith under the JV Agreements, and were in fact committing fraud, economic coercion, and tortious interference against Williams, KCVI, Alma, Nathan, Nathan's Welding, Street, and Roulett. Williams complained in this meeting that Williams, KCVI, Alma, Nathan, Nathan's

Welding, and Halle were losing money due to the failure of Halle to approve an appropriate response to industry wide market conditions. Halle "corrected" Williams and said we aren't losing money, "you are".

58. In late November 2006 Halle transferred Ken Adamson, a 23 year employee of Halle's, to southern West Virginia to actively participate in the day to day operations of KCVI and Glen Alum. Adamson had a limited amount of experience in strip mining coal in Pennsylvania, some twenty-three years prior to the then current underground operations for which he was given management responsibility.

59. Adamson began intentionally interfering with Alma's daily operations, telling Alma's supervisor Anthony Preston ("Preston") how many men to work, what equipment to work, and what work schedules to follow. The orders given by Adamson to KCVI and Alma workers, in direct violation of the Mining Agreement, were either negligently or intentionally designed by Halle and the Halle Related Entities to reduce production at the Alma mines and create economic hardship for Alma, Williams, KCVI, Nathan, and Nathan's Welding.

60. In November 2006, Adamson began "auditing" the books of Alma and KCVI to verify the income and expenses of Netley and Little Ty. Alma provided all of the necessary documentation requested by Adamson, and after a complete evaluation, Adamson stated that he had forwarded the documentation to Kathy Jordan (an employee of Halle) and that he (Ken Adamson) "signed off" and had told Halle that everything was accounted for. A transcript of a recorded meeting with Ken Adamson shows that Adamson stated Williams was "up to date" with his records:

> "MR. WILLIAMS: "I understand that, and if you don't, well, the first thing in the morning me and you will get together, and I'll say "Ken right here's what I'm lacking on, on the invoice on, on those things", and –"

MR. ADAMS[ON]: "Because we are up to date, and you've come a hell of a long ways there, and so."

Mr. Adamson went on to say:

MR. ADAMS[ON]: "You've got to present something to him [Halle]. If not, he's, he's the type of guy. I mean, not just you. This is everybody he does business with. You let him start pushing you. He shoves, and he don't stop until you fall. Do you know what I'm saying? There has been people fight back, and made it with him.""
… … …

MR. ADAMS[ON]: "And Darrell is trying to pay them out of his account". I said, "I signed off. I okayed everything, and I'm. I'm 100 percent correct on okaying it, or I wouldn't have put my initials on it".

61. When Tony Gannacone, then working for Halle, was asked in a deposition about his review of records, he verified that he saw the receipts produced by Williams, but that he made no notations:

Q. Did -- did -- did this go over a period of a few days or --
I would say a day and a half.
Q. Okay. Both occasions, or a day and a half for each occasion?
A. For both. … … …
Q. Did you ever create an accounting document?
 A. No.

Williams believes that Gannacone illegally removed and concealed Alma documents on the instruction of Halle.

62. After wiring funds each week to Williams for Alma under the JV Agreements, Halle instructed Williams on or about November 2007 to send the receipts every 30 days. Then on or about December 2007 he declared Alma and Williams in default under the JV Agreements for not sending receipts every week. The fact that Halle approved, and KCVI wired, funds to Williams each week for four months to pay for Alma's and Williams' weekly expenditures,

evidenced the fact that Williams did in fact provide records and receipts to the Halle Related

Entities. Otherwise Halle would not have approved sending any funds to Williams.

63. In mid December 2006, Adamson began asking Williams if he would agree to be an

employee of Halle under the direct supervision of Adamson, relinquish his Exclusive Agent

status, and allow Alma to go out of business without paying existing creditors. Williams stated

that he would not do so; that he had contractual and ethical obligations to Street, Roulett, Preece,

Preston, Martin County Coal, Peabody Coal Trade, Nathan, Nathan's Welding, Alma, and

others, who received per ton fees or other benefits from coal produced by Alma, and to general

creditors of Alma Energy LLC.

64. In January, 2007, Halle and the Halle Related Entities alleged that Alma and

Williams were in default under the August JV Agreements due to mismanagement by Williams,

allegations which Alma, Williams, and Nathan strongly denied.  Halle and the Halle Related

Entities began making intentionally false, malicious, and fraudulent statements to the general

public and the Courts regarding Alma, Williams, Nathan, and Nathan's Welding including this

July 23, 2007, quote from a pleading filed by Roger Simmons and Billy Shelton in the Maryland

Federal District Court.

> "No business records whatsoever were included. Nathan Williams and Darrell
> Williams provided no financial statements. Despite their personal receipt of $5
> million in KCVI funds, Nathan Williams and Darrell Williams provided no
> documentation of their receipt or use thereof. Indeed, Nathan Williams and
> Darrell Williams produced no records showing their assets or other financial
> condition, whatsoever. Not a single check register, not a single cancelled check,
> not a single receipt for a money order, not a single promissory note, not a single
> deposit slip, not a single credit card record, not a single transactional record, not a
> single asset title, not a single deed, no receipts for mining equipment, no lease or
> rent payments, no royalty payments, not a single receipt for a cash outlay, nothing
> to show, hint or indicate in any way what Defendants did with the $5 million in
> funds."

65.  Halle and Halle Related Entities falsely claimed, both through officers, employees, and counsel for Halle and Halle Related Entities, Billy Shelton, Michael Gartland, and Roger Simmons, in this Court and in the Federal District Court for the State of Maryland, and to known and unknown individuals including but not limited to Street, Roullet, Hayden Fisher, and Gary Richard, that Alma, Nathan's Welding, Nathan Williams, and Darrell Williams owed Halle and Halle Related Entities approximately $5,000,000 secured by the assets of Alma, and that Darrell Williams and Nathan Williams were in "personal receipt of $5 million in KCVI funds".

66. In the record in this case Halle and Halle Related Entities repeatedly made the intentionally and knowingly false and fraudulent statements regarding the false and fraudulent claim, including "Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC (the "Debtor") that is owed approximately $5.0 million…". Well over twelve times this false and fraudulent statement, or its equivalent, was repeated by Halle Related Entities, even after Williams and Alma told Halle, the Halle Related Entities, and their counsel in writing that the statements were blatantly false and fraudulent, for example:

6/20/07 Docket #13 Motion to Dismiss Case, filed by Kentucky Coal Venture I, LLC.

"Comes now Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC (the "Debtor") that is owed approximately $5.0 million…"

6/20/07 Docket #14 Motion for Emergency Hearing on KCVI, LLC's Motion

"Comes now Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC (the "Debtor") that is owed approximately $5.0 million…"

6/22/07 Docket #18 Kentucky Coal Venture I, LLC's Motion for 2004 Examination

"Comes now Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC (the "Debtor") that is owed approximately $5.0 million…"

6/25/07 Docket #19 Kentucky Coal Venture I, LLC's Motion for Relief from Stay

"Comes now Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC (the "Debtor") that is owed approximately $5.0 million…"

6/26/07 Docket #25 Kentucky Coal Venture I, LLC's Motion to Reschedule

"Comes now Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC
(the "Debtor") that is owed approximately $5.0 million…"

7/18/07 Docket #39 Objection by Kentucky Coal Venture I, LLC Application to Employ

"Comes now Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC
(the "Debtor") that is owed approximately $5.0 million…"

7/20/07 Docket #43 Objection by Kentucky Coal Venture I, LLC

"Comes now Kentucky Coal Venture I, LLC ("KCVI"), a secured creditor of Alma Energy, LLC
(the "Debtor") that is owed approximately $5.0 million…"

67. In fact a similar statement was made in the latest filings by the Chapter 7 Trustee and

THC in this Court:

"Under both the Framework Agreement and Operating Agreement, THC agreed to and

did in fact infuse $4,704,554.75 of funds into a bank account maintained by the Debtor..." (09-

7005 Doc Number 73 Filed 04/12/10).

68. These statements were intentionally made by Halle and Halle related Entities

knowing that they were false. Halle's claim for $4,704,554.75 has been conclusively shown to be

false by the filing of a Proof of Claim against Alma by Halle in this Court in the amount of

$707,804.47 unsecured, and $300,000 for loans after August 2006 secured by property owned by

Nathan Williams and Nathan's Welding.

69. The sum of $4,704,554.75 was paid into the Trust Account of KCVI's attorney Billy

Shelton, and not "into a bank account maintained by the Debtor". It was paid in consideration of

transfer of $5,542,758 in leases to the Halle Related Entity, KCVI, and was not paid to the

benefit of Darrell or Nathan Williams. Every penny of the $4,704,554.75 was disbursed by

Shelton from his trust Account pursuant to a closing statement signed by Warren E. Halle:

| PROGRAM | | | | |
|---|---|---|---|---|
| Explore, develop and conduct mining operations at AE Right Fork Mine and Nelley Deep Mine | | | | |
| and sell all products produced by these activities, over the period commencing August, 2006 and ending August 31, 2007 | | | | |
| **BUDGET** | | | | |
| SOURCES | | | | |
| Owner Payments | | $4,704,554.75 | | |
| Operator Payments** | | $500,000.00 | | |
| Total Sources | | $5,204,554.75 | | |
| USES | | | | |
| Category | Date to be Expended | Total Amount | Owner Portion | Operator Portion |
| Acquire AE Right Fork (Payoff GNB Note) | August, 2006 | $1,513,222.59 | $1,513,222.59 | $0.00 |
| Acquire Nelley Deep Mine (Payoff GNB Note) | August, 2006 | $1,916,332.16 | $1,916,332.16 | $0.00 |
| Westriver & Partners Equipment Payoff | August, 2006 | $1,025,000.00 | $1,025,000.00 | $0.00 |
| Initial Production Startup Costs* | August, 2006 | $250,000.00 | $250,000.00 | $0.00 |
| Additional Production Startup Costs*** | As approved by Halle | $0.00 | $0.00 | $0.00 |
| Alma Energy LLC > This is balance that is left from 500K Operator Portion. | | $254.09 | $0.00 | $254.09 |
| Royal Machine Works** | | $7,882.00 | | $7,882.00 |
| Roger Petroleum** | | $16,894.00 | | $16,894.00 |
| Right Fork Energy** | | $138,017.00 | | $138,017.00 |
| Blizzards Ind Supply** | | $34,645.91 | | $34,645.91 |
| United Ind Supply** | | $92,307.00 | | $92,307.00 |
| Pruitt & DeBourben** | | $110,000.00 | | $110,000.00 |
| Tony Gannacone III** | | $100,000.00 | | $100,000.00 |
| | Total Uses | $5,204,554.75 | $4,704,554.75 | $500,000.00 |
| *Will be given to Operator from Owner as needed and approved by Owner. | | | | |
| ** Alma Energy Vendor Payables. | | | | |
| ***All additional production costs borne by Operator. | | | | |
| APPROVED | | | | |
| THC KENTUCKY COAL VENTURE I LLC | ALMA ENERGY, LLC | | | |
| By: THC Kentucky Coal Venture I LLC | | | | |
| | By: | | | |
| By: _Warren E Halle_ | Nathan Williams Member | | | |
| Warren E. Halle, Manager | | | | |

70. Only $254.09 was paid to Alma, not $4,704,554.75. Only $254.09 of the

$4,704,554.75 was under the control of Darrell Williams and Nathan Williams. The intentional

false and fraudulent statements of Halle and the Halle Related Entities were made to further their

scheme to force Williams, Alma, Nathan, and Nathan's Welding into insolvency and to cause

Williams and Alma to default on the JV Agreements. The false and fraudulent statements

regarding the amount owed by Alma to Halle and Halle Related Entities were knowingly made

by Halle and Halle Related Entities for the purpose of wrongfully acquiring the assets, including

contractual rights, of Williams, Alma, Nathan, Nathan's Welding, Street, and Roulett for less

than fair market value, for $1, all to the detriment of Williams, Alma, Nathan, Nathan's Welding, Street, and Roulett.

71. An entry on the closing statement shows the sum of $100,000 paid by Shelton to Gannacone for the purpose of paying him a commission for his services in obtaining the Halle investment in KCVI. Under KRCP Rule 1.2(d), a lawyer is prohibited from counseling or assisting a client in conduct that the lawyer knows is criminal or fraudulent. Paragraph (b) states a specific application of the principle set forth in Rule 1.2(d) and addresses the situation where a client's crime or fraud takes the form of a lie or misrepresentation. Ordinarily a lawyer can avoid assisting in a client's crime or fraud by withdrawing from the representation. Nonetheless, sometimes a lawyer is required to take more overt measures such as giving notice of the fact of withdrawal, disaffirming an opinion, document, affirmation or the like, to prevent the lawyer's services' being used to further the client's crime or fraud. In extreme cases, substantive law may require a lawyer to disclose information relating to the representation to avoid being deemed to have assisted in the client's crime or fraud. If the lawyer can avoid assisting a client's crime or fraud only by disclosing this information, then under paragraph (b) the lawyer is required to do so, unless the disclosure is prohibited by Rule 1.6. [See also, Rules 1.6(b), 1.13 (c) and 8.4(c).]

72. On or about August 9, 2006, Halle, Gannacone, and Shelton knew that the entry on the closing statement produced by Shelton and given to Williams was false. Gannacone testified in a deposition, and Shelton confirmed, that he did not receive $100,000. Shelton in fact disbursed $33,333.33 to Gannacone, and $66,666.66 to Robert Alan Myers by interstate wire transfer sent from Kentucky to a Wachovia Bank account in Jacksonville, Fl.

73. On or about August 9, 2006, Halle, Gannacone, and Shelton knew or should have known that the $66,666.66 sent by wire from Shelton's escrow account to Robert Alan [Allen]

Myers was in fact a payment to Reynolds "Ren" Maragni for services rendered to Halle. Halle

and the Halle Related entities, including Shelton, knew or should have known that Reynolds

Maragni was a convicted felon and was accused by the FBI of running money laundering

operations in South Florida for the Colombo Crime Family.

74. The intentional concealment of the recipient of funds at the closing denied Williams,

Alma, Nathan, Nathan's Welding, Street, and Roulett information that could have resulted in

their not closing the deal. The concealment by Halle and Shelton of the recipient of the funds

was in furtherance and aid of fraud on Williams, Alma, Nathan, Nathan's Welding, Street, and

Roulett.

75. In Florida, on or about February 9, 2007, some six months after the closing date,

Gannacone told Darrell Williams, Homer Preece, and Michael Branham that "Ren", the

individual who gave Halle's phone number to Gannacone who in turn gave it to Williams, was a

convicted Felon who had recently been released from a Federal Prison, and that Ren was a

member of organized crime.

76. A few days later during a heated phone conversation, Gannacone stated to Williams

that the initial 4.7 million in funds that Halle wired to Shelton in Kentucky from Halle in

Maryland was in fact 100% organized crime money, and stated these are not the kind of people

you want to "disappoint". Gannacone was apparently trying to physically threaten and instill fear

in Williams so that Williams would sign over his and Alma's lucrative rights in the August JV

Agreements to Halle, for whom Gannacone had brokered coal produced at Glen Alum.

77. Beginning in January 2007 the Halle Related Entities intentionally and wrongfully

withheld and/or delayed coal payments due to Alma for the benefit of Alma, Street, Roulett,

Nathan, Nathan's Welding, and Williams. Halle's fraudulent statements and misrepresentations

and intentional wrongful breaches of the August 2006 JV Agreements forced Alma and

Williams, into involuntary default of those agreements, all to the detriment of Williams, Alma,

Street, Roulett, Nathan, and Nathan's Welding. The most egregious fraudulent act of Halle and

the Halle Related Entities KCVI, Alma, Nathan Williams, and Darrell Williams, being Halle's

wrongful acquisition of Glen Alum for personal benefit causing economic damages to KCVI,

Williams, Alma, Nathan, Nathan's Welding, Street, and Roulett. If Halle had not breached his

fiduciary duty and fraudulently purchased Glen Alum in the name of KCVI, then KCVI, Alma,

Williams, Nathan, Nathan's Welding, Street, and Roulett would have been able to continuously

produce coal from 2006 to date and would be the parties instead of NextGen stating in 2010

"The highest quality metallurgical and coking coal is found right here in the Central Appalachian

region and NextGen Coal, with its vast resources and reserves, is here to stay", rather than

Halle's WV Coal Venture I LLC aka NextGen Coal.

   78. On February 16, 2007, at a time when Alma, Nathan Williams, and Darrell Williams

were insolvent due to Halle's refusal to release funds and other bad faith acts, Alma, Williams,

Nathan, and Nathan's Welding were economically coerced by Halle into signing a series of new

Agreements ("February JV Agreements"), each to the determent of Alma, Williams, Nathan,

Nathan's Welding, Street, and Roulett. Having no funds available to litigate and enforce their

contractual rights under the JV Agreements, and with no funds to continue ventilation and

prevent flooding in the mines, Alma, Williams, Nathan, and Nathan's Welding, under protest and

as a direct result of the economic coercion and threats, had no alternative except to sign the

agreements.

   79. The February JV Agreements included an Amended Mining Agreement that gave

Alma the right to wash its coal and load it onto rail at the Glen Alum Plant. Halle knew this was

absolutely critical to Alma's short and long term survival, and that Williams and Alma would be insolvent in days or weeks if the Glen Alum processing plant was not made available. The February JV Agreements also provided that Alma, to the benefit of Williams, Nathan, and Nathan's Welding, would receive $1.65 per ton for managing the Glen Alum property for the Halle Related Entity, WVCVI.

80. However the agreements damaged Alma, Williams, Nathan, and Nathan's Welding through the loss of valuable rights and privileges under the original August 2006 Framework, Mining, and LLC Agreements. Under the February JV Agreements, Alma was removed as a member of KCVI, with Halle being in full control and ownership of KCVI thereafter, and Williams relinquished his right to be Exclusive Agent, all to the detriment of Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

81. Alma and Williams had acquired two lucrative Coal orders, one from a former customer of Alma's, Tonawanda Coke Corporation ("Tonawanda"), and an order with Detroit Edison Energy / ABC Coke ("ABC"), which Williams intended to fulfill by Alma mining coal and washing it at the Glen Alum plant. Even though Alma and Williams would have received greater economic benefits under the original Agreements, the February JV Agreements, had they been honored by Halle and the Halle Related entities, would have allowed Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett to make a profit. The $1.65 per ton management fee was worth approximately $44,000,000 to Alma, Williams, and Nathan over twenty years. However, the purported benefits to Alma, Williams, Nathan, and Nathan's Welding were dependent on Halle's good faith honoring of the agreements.

82. As a direct and proximate result of Halle's wrongful withholding of funds; failure to honor contractual obligations; inclusion of contractual "poison pill" provisions which made it

impossible to obtain third-party financing; and failure to act in good faith, Alma, Williams, Nathan, and Nathan's Welding required immediate funds to continue safe operations at the Alma mines. As a part of the transactions related to the February JV Agreements, on February 16th, 2007, Alma, Nathan Williams, and Darrell Williams were forced to obtain a loan of $160,000.00 from Halle on a 120 day note secured by a mortgage which Halle placed on Nathan Williams' residence located on 59 Davis Branch Road, Stone KY, 41567.

83. After executing the February JV Agreements, and in anticipation of and preparation for management of Glen Alum by Williams and Alma under the February JV Agreements, Williams and Alma assembled an experienced team to manage the Glen Alum property. The team was headed by Sid Young III ("Young"). Young had been president of Sidney Coal (a division of Massey Energy, the largest producing coal operation in Pike County, KY) during its peak production years. Young had years of experience operating mines that produced millions of tons of coal per year, and was eminently qualified to manage the Glen Alum Properties.

84. Alma also provided the following supervisors for the Glen Alum property, P.A Heaberlin who had many years of experience managing coal operations in the Pike County Kentucky area; Preece, a Certified Mine Foreman who had over 30 Years of experience owning and operating coal mines in the Pike County Kentucky area; and Anthony Preston, a Certified Mine Foreman who had over 25 years experience.

85. Shortly after Halle was introduced to Young, Halle and Halle's employees attempted to have him break his relationship with Williams, Alma, and Nathan, go to work directly for Halle, and assist Halle in his unlawful and fraudulent scheme to force Alma out of business to the detriment of Williams, Alma, Nathan, Nathan's Welding, Street, and Roulett. In an affidavit Young stated in part:

"1. … I was hired as Alma Energy's Project Manager to manage the Glen Alum Properties which were owned by West Virginia Coal Ventures I, LLC.

2. During my short stay there I was asked to ride to Logan West Virginia with Warren Halle and other employees of Warren Halle to look at some other coal properties owned by Warren Halle. During the ride there, they talked about how their plans for the property over the next months were going to put Alma Energy out of business and that I should go to work with them. The group then opined that if I came on board with them, they would not need Alma nor would they have to pay the $1.65 per ton fee. I replied to them I was not interested.

3. They opined that they could stock pile Alma's Coal for a long time until some 3rd party coal was washed, and by dragging out Alma, then they would have no real obligation to pay Alma, and that not being paid in full would put Alma out of business…"

86. When Young refused to abandon his employment by Alma, and enter into a conspiracy with Halle and the Halle Related Entities, Halle's business Manager at Glen Alum, Ken Adamson, made his work environment so difficult that he was forced to quit. (See affidavit of Sid Young - Exhibit G). The intentional tortious interference with Alma and Williams contractual and business relationships with Young, fraudulent acts regarding management of Glen Alum under the February JV Agreements, and other unlawful activity of Halle and the Halle Related Entities prevented Alma and Williams from managing the Glen Alum project, resulting in loss of $1.65 per ton for a total estimated loss of $44,550,000 to Alma, Williams, Nathan, and Nathan's Welding.

87. In flagrant breach of his fiduciary, legal, and contractual obligations, Halle, through Adamson, urged the rest of the management team to quit working for Alma and Williams and to work directly for Halle at Glen Alum, all during the time Alma had the contractual right to manage the Glen Alum properties. In fact a critical number of the crew assembled by Williams'

left their employment and began working for the Halle Related Entities. The intentional tortious interference with Alma and Williams contractual and business relationships with the management team assembled by Williams and Alma, fraudulent acts regarding management of Glen Alum under the February JV Agreements, and other unlawful activity of Halle and the Halle Related Entities prevented Alma and Williams from managing the Glen Alum project, resulting in loss of $1.65 per ton for a total estimated loss of $44,550,000 to Alma, Williams, Nathan, and Nathan's Welding.

88. Under the Agreements between the Halle Related Entities and Alma and Williams, payment by KCVI to Alma was to be made the next business day following payment to KCVI by coal purchasers. Halle did what he told Sid Young he intended to do, he  intentionally and wrongfully delayed the washing of coal delivered by Alma to Glen Alum; delayed payments to Alma for coal as long as two weeks after his companies received payment; and in some instances refused payment altogether. The delay was for the express purpose of rendering Alma and Williams insolvent so that they would be forced to violate the JV Agreements.

89. A portion of the first coal Alma shipped to Glen Alum for transportation on the Tonawanda order was clean enough to be shipped without washing, as Alma had done in fulfilling a previous Tonawanda order during the winter of 2005.

90.  As manager and agent for Halle Related Entities, Adamson intentionally placed this clean coal in a sandstone rock haul road, not a coal stock pile as is industry practice, thereby intentionally reducing the quality of the coal by contaminating it with sandstone. Adamson later ordered the coal to be commingled with other coal which had not been washed, degrading the product from metallurgic grade coal worth $67.50 or more per ton to a steam coal product worth about $40.00 per ton.

91. Thereafter Adamson told Williams that KCVI was going to deduct approximately 1,000 tons of clean coal from Alma's sales at a rate of 100 tons per week, because the preparation plant owned by Halle and operated by a third party had fraudulently "lost" nearly 1000 tons of Alma's Coal. The same day Heaberlin (by then an employee of Halle) was fired by Adamson when Heaberlin disagreed with the deductions and withholding of payments to Alma and Williams.

92. Halle did in fact start wrongfully deducting 100 tons per week, sometimes taking 200 tons per week, as part of an intentional plan to keep Alma and Williams insolvent, to the detriment of Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

93. The intentional and wrongful tortious interference with Alma's management; fraudulent incorrect and slow coal payments; intentional fraudulent degradation of Alma's product; and other wrongful acts by Halle and the Halle Related Entities forced Alma and Williams into involuntary default of the February JV Agreements, all to the detriment of Williams, Alma, Street, Roulett, Nathan, and Nathan's Welding. The unlawful acts of Halle and the Halle Related Entities were the direct and proximate cause of Alma and Williams not having personnel to manage the Glen Alum project under the February JV Agreements, resulting in loss of $1.65 per ton for a total estimated loss of $44,550,000 to Alma, Williams, Nathan, and Nathan's Welding. Production has been continuous at the Glen Alum facility, with an estimated average of 100,000 tons of coal produced per month. The unlawful acts of Halle and the Halle Related Entities were the direct and proximate cause of Alma, Williams, Nathan, and Nathan's Welding not receiving almost $2,000,000 a year in operating fees, sufficient funds to upgrade Alma's mines and produce coal from the Pocahontas Leases.

94. On or about March 16, 2007, a set of amended JV Agreements ("March JV Agreements") was prepared by KCVI and Halle. The new Agreements were signed in mid-March and backdated by Halle to have a February 16th effective date. Alma, Williams, and Nathan agreed to execute the amended agreements, which were more favorable to Halle, under economic duress when Alma could not make its payments to contractors and could not make payments to provide for the immediate safety of the mines and miners.

95. Halle had in fact demanded that Alma and Williams sign the March JV Agreements before Halle would buy a welding truck from Nathan's Welding LLC that Nathan was forced to sell to generate funds necessary to pay miners, and provide for the safety of the mines and miners.

96. As a direct and proximate result of the wrongful, fraudulent, actions of Halle, including but not limited to delayed washing and shipping of coal, delayed payments, intentional incorrect payments, degrading of product, and tortious interference with Alma's management team, Alma was insolvent at the time that the March 16th agreements were signed.

97. Recognizing that Halle's pattern of fraud, tortious interference, and other unlawful conduct would continue, Williams increased his efforts to find financing to buy out Halle's interests. Williams had once again approached his cousin Gannacone in February, 2007. Halle wrongfully contacted Gannacone in an effort to cause him to stop helping Alma and Williams acquire a consolidation loan from a Miami Florida company (WSG Development), telling Gannacone in a phone conversation that he would end up with personal liability if Alma, Williams, and Nathan were successful in acquiring the loan.

98. Alma pursued the loan, with Williams, Preece, and a surface mining expert, Michael Branham, driving to Miami, Florida, and staying almost a week to meet with Gannacone and

WSG Development. They also met with Halle at one of his homes near Palm Beach, Florida. It is believed that during these meetings Halle tortiously interfered with the business relationship between Gannacone and Williams and Alma, offering to make Gannacone the sales agent for Glen Alum if he would assist Halle and the Halle Related Entities in their conspiracy to defraud Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett, and to cause Alma and Williams to remain insolvent.

99. During the meeting with Halle, Williams once again complained about Halle buying the Glen Alum and Logan properties for a company other than KCVI. Williams demanded that the Glen Alum and Logan properties be transferred to KCVI and Alma under the terms of the original Agreements so that Alma could make a profit, provide for critical ventilation and flood prevention, and repay all creditors. Halle told Alma that he had sold the Glen Alum plant. It was later determined that Halle had not in fact sold the plant, and that he was intentionally and fraudulently deceiving Alma and Williams to further his scheme to drive Alma out of business.

100. Due to the continuing wrongful actions of Halle, including the Halle Related Entity WVCVI hiring Alma and William's management team, Alma was again insolvent in April, 2007, so that Alma could not make its payments to contractors and could not make payments to insure the immediate safety of the mines and miners. Litigation was threatened in Maryland by Halle, and Alma had absolutely no funds to effectively defend against such litigation.

101. Alma was forced under economic duress to sign another Agreement dated April 11, 2007, ("April JV Agreement") whereby Alma gave up management rights to the Glen Alum property and the right to receive the $1.65 per ton fee, and surrendered its interest in KCVI to THC, all to the detriment of Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

This Agreement cost Alma, Williams, Nathan, and Nathan's Welding an estimated $44,550,000
in future management fees at the Glen Alum project.

102. Halle directly and proximately caused KCVI to breach the April JV Agreements
within 4 days of the signing, by intentionally restricting Alma's critical cash flow. Coal was
shipped from Netley's production to Peabody Coal Trade at the Hampden Coal Dock; the first
coal payment due to Alma from Netley's production was due on April 14th 2007; and Peabody
Coal Trade paid KCVI $19,141.14 on April 13th 2007. Halle, through KCVI, wrongfully
withheld Alma's coal sales proceeds until May 2, 2007, sending only a partial payment of
$11,000.00 prior to that date.

103. On May 22, 2007, Halle and Halle Related Entities filed a lawsuit against Alma,
Williams, Nathan, and Nathan's Welding alleging fraud in the Federal District Court for the
State of Maryland ("Maryland Case" - Case Number AW 07 CV 1339), and fraudulently and
falsely stated that Alma, Nathan's Welding, Nathan Williams, and Darrell Williams owed Halle
and the Halle Related Entities approximately $5,000,000 secured by the assets of Alma. The
allegation that $5,000,000 was unaccounted for and owed to Halle was blatantly false,
fraudulent, and constituted an abuse of process, as shown by the Halle Proof-of-Claim filed in
this bankruptcy case.

104. Paragraph 17 of the Complaint Halle fraudulently, outrageously, states: "Defendants
wholly failed to comply with their undertakings in the April 11 Agreement. To date they have
***failed to account for millions of dollars in monies that have been provided to them by KVI***.
They have wholly failed to meet production levels they promised and contracted to achieve. It
appears that the Defendants have diverted plaintiffs monies to their own private uses." [emphasis
added] This claim by Halle and the Halle Related Entities was intentional, knowingly false, and

fraudulent, as shown by the Proof of Claim filed herein by the Halle Related Entities, and

constituted an abuse of process.

105. Paragraph 22 of the Complaint continues the false and fraudulent statements: "KVI

has incurred *millions of dollars in losses in unaccounted for monies provided to Defendants*

and millions dollars of additional economic losses as a result of Defendants' utter failure to

operate KVI's coal properties in a competent, fair and proficient manner. WHEREFORE, KVI

demands judgment against Defendants jointly and severally in an amount to be determined at

trial, but in excess of $5,000,000, plus interest, costs, and attorneys fees." [emphasis added] This

claim by Halle and the Halle Related Entities was intentional, knowingly false, and fraudulent, as

shown by the Proof of Claim filed herein by the Halle Related Entities, and constituted an abuse

of process.

106. Furthermore, in Paragraph 17 *"They have wholly failed to meet production levels*

*they promised and contracted to achieve."* However in Paragraph 16 Halle stated "On April 11 ,

2007, the parties agreed as follows: (a) Alma and the Williamses agreed to achieve 28,000 clean

tons of production per month *within 60 days*;" [emphasis added] The Maryland Case was filed

on May 22, 2007, twenty days *before* the agreed 60 day production deadline.

107. Not content to wait for a default, Halle and the Halle Related Entities made the

prima facie false statement "They have wholly failed to meet production levels they promised

and contracted to achieve." The Halle and Halle Related Entities false and fraudulent complaint

constitutes abuse of process in its most egregious form.

108. Alma hired an attorney in Maryland, David Hoskins, for the limited purpose of

answering the Complaint and defending against pending motions for injunctions. Faced with the

necessity of defending a lawsuit in a foreign jurisdiction, and with virtually no money to pay

Hoskins to effectively defend the case in Maryland, Alma filed a Petition for Relief in

Bankruptcy on June 1, 2007 in this Court (Case number 07-70258).

109. Halle and KCVI, in violation of the automatic stay provided by Title 11, §362,

immediately began a pattern of tortiously interfering with Alma's business by discouraging and

intimidating Alma's mining contractor, trucking contractors, and coal buyers. Hall and KCVI

continued to refuse Alma the right to process coal at Glen Alum, even though there was no

economic risk to the Glen Alum facility as gross payment for the coal sold was sent first to

KCVI.

110. On June 22, 2007, Adamson, on behalf of Halle, placed a phone call to the contract

miner for Alma, Noah White, asking him to call Halle. After talking with Halle, Noah White

closed the Alma mine and has not since that date produced coal for the benefit of Williams,

Alma, Nathan, Nathan's Welding, Street, or Roulett.

111. In a phone conversation that same day, June 22, 2007, Noah White told Williams

that Halle strongly discouraged him from working for the Debtor-in-Possession, Williams, and

Nathan, and that Halle told White he would not be paid on any future coal he produced for Alma

at the Little Ty mine. This false and fraudulent statement constituted tortious interference by

Halle and the Halle Related Entities with the business relations of Alma, Williams, Nathan, and

Nathan's Welding.

112. On June 27, 2007, the first day Alma's Netley mine shipped coal after the Chapter

11 filing, Adamson called Avery Rife ("Rife"), a contract trucker and owner of Happy Trucking.

Rife told Adamson that he was trucking Netley's Coal to the Hampden Coal Dock, a third-party

coal buyer not affiliated with Halle. Adamson wrongfully and tortiously interfered with Alma

and Williams' business by telling Rife that Happy Trucking would not be paid for the coal he

was shipping, to which Rife replied that the Hampden Coal, not Alma, was going to pay Happy

Trucking's bill.

113. After Adamson knew where the Alma coal was being shipped, and that the buyer

was paying the trucking charges, Halle's attorney Shelton called Alma's coal broker, Peabody

Coal Trade, which worked with Hampden Coal on purchase of Alma's products.

114. The representative of the coal broker, Roger Ball, stated to Williams that he

interpreted the call to be an intimidating phone message, intended to keep Peabody and

Hampden from buying coal from the Debtor-in-Possession. This call was placed on Halle's

behalf to tortiously interfere with Alma and Williams selling coal in the normal course of

business.

115. Having previously been denied access to Halle's Glen Alum facilities, on June 6,

2007, Williams requested via interstate email that Stephen Fleischman, Vice President of Halle

Companies, make stockpile room for Alma's coal so that Alma could wash and load its coal, ship

it on the rail at Glen Alum as it had a right to do under the JV Agreements which had not been

voided, and receive $67.50 per ton, thereby rendering Alma profitable and able to meet its

obligations to its creditors.

116. The response Alma received was to tell Williams, Alma, and Nathan not to bring

any Coal to Glen Alum, again an action that was not in good faith, interfering with Alma's

contractual rights and denying it business which would have been profitable to Alma, Alma's

creditors, Williams, Nathan, Nathan's Welding, Street, Roulett, and Halle.

117. Halle and KCVI complained to this Court that Alma is inherently unprofitable

because it has a mining cost near $56.39 per ton. Using the figures calculated by Halle, had Alma

been allowed to wash and load its coal at Glen Alum when requested on June 6, 2007, Alma's

sale would have been profitable ($67.50 - $56.39 = approx gross profit of $11.11 per ton or $222,000 per month) and KCVI would have received their portion of the cash flow / sales price before Alma received any money.

118. Halle and the Halle related Entities wrongfully and illegally converted to their own use a portion in excess of $100,000 of Alma's share in the proceeds from one 50 car interstate trainload of coal delivered to Tonawanda for approximately $447,500 and one 50 car interstate trainload of coal delivered to ABC Coke for approximately $345,000. Unlawful conversion of the funds due to Alma damaged Williams, Nathan, Nathan's Welding, Street, and Roulett.

119. Alma never received the full amount of funds due to Alma from the Tonawanda and ABC shipments that were shipped by KCVI. Halle and the Halle Related Entities, including KCVI, which were in fact paid by the buyers on the interstate shipments of coal, with at least one of the payments being after the petition filing date of the bankruptcy case. Halle and the Halle Related Entities unlawfully converted that money to its own use, investing it in the Glen Alum project.

120. Halle and KCVI received funds from Hampden Coal on July 13, 2007 from the sale of coal produced by Alma, which were not paid to Alma until July 18, 2007, an intentional delay of the contractual overnight payment by Halle so that Alma could not meet its weekly payroll.

121. KCVI's intentional wrongful acts prior to and after the June 1, 2007, filing date of Alma's previous Chapter 11 case, including intentional violations of the automatic stay while it was in effect in that case, were the direct and proximate cause of Alma having been unable to maintain casualty and other insurance; unable to continue profitable operations; unable to pursue the Chapter 11 case; and unable to propose a plan of reorganization in case 07-70258, all to the detriment of Alma, creditors of Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

122. As a direct and proximate result of the wrongful actions of the Halle Related Entities, the Chapter 11 Case was dismissed when Alma was unable to maintain casualty and other insurance and was unable to pay its current expenses.

123. Shortly following dismissal of the Chapter 11 case, Williams completed negotiations with an experienced coal producer, William Detherage ("Detherage"), whereby his company, BSD1 LLC ("BSD1"), would provide Debtor-in-Possession financing for Alma in a new Chapter 11 and would provide contract mining services. Williams contacted Steven Singleton, a well respected businessman, and requested that he accept a management position so that he could apply his expertise in the coal business to Alma.

124. After dismissal of the first case, Halle sought a Temporary Restraining Order in the Maryland Case to remove Alma, Williams, Nathan, and Nathan's Welding from the premises. The Memorandum accompanying the motion attests to the fact that Halle and the Halle Related Entities believed they had attained their goal of causing the insolvency of Alma and knew that the restriction on cash flow caused by their wrongful acts had resulted in Alma, Williams, Nathan, and Nathan's Welding being unable to provide for the maintenance and safe operation of the mines. Roger Simmons, for Halle, told the Maryland Court - "Defendants do not have the financial reserves to continue operations and, therefore, cannot assure safety at the mines." The Motion for a Temporary Restraining Order in the Maryland Case allowing Halle to take possession of all of Alma's assets was the culmination of Halle and the Halle Entities abuse of process intended to force Alma and Williams out of business.

125. Lacking funds to defend the Maryland Case against Halle's wrongful and fraudulent attempts to declare Alma and Williams in default, Darrel and Nathan filed this second Chapter 11 Petition, Case Number 07-70370.

126. The meeting of creditors was scheduled for September 11, 2007, in Pikeville, Ky. The United States Trustee agreed for Darrell Williams to appear on behalf of Alma. On that same day Williams was to be deposed by Halle at Shelton's Pikeville office, so he parked the truck he was driving in the lot by Shelton's office.

127. Roger Simmons and Billy Shelton as counsel for Halle and the Halle Related Entities, and Stephen Fleischman as representative of The Halle Companies, knew that Darrell Williams drove the vehicle to the 341 meeting and deposition, and that it was owned by Nathan's Welding LLC. When Williams walked back to Shelton's office from the federal courtroom after the 341 meeting, the truck was gone. Inside the truck was a laptop computer with confidential Alma business records. Shelton denied any knowledge of what had happened to the vehicle.

128. Based on Shelton's denial of knowledge, Williams, Nathan, and Paul Snyder walked to the Pikeville Police Station. After about a half hour of waiting they were told that a repossession agent took the truck on the order of attorney Shelton's office. When Williams returned to Shelton's office, Shelton and Simmons stated that the vehicle had been "repossessed" to obtain repayment of a loan, and that Halle held a "security" interest in the vehicle.

129. On November 15, 2006, Nathan had signed a promissory note for $15,000 to a Halle Related Entity, with payment guaranteed by Alma. The executed Promissory Note listed the vehicle and referred to a Security Agreement that apparently was never executed. The security interest was not perfected pursuant to Maryland or Kentucky law, and there was no lien on the original Maryland or the subsequent Kentucky title.

130. Title to the truck (VIN 3GNFK16T21G258844) had been transferred from Maryland to Kentucky on January 8, 2007. Therefore given the unexecuted Security Agreement, the

unperfected lien, and the situation where a breach of the peace was likely, the "repossession"

was either negligently or knowingly unlawful.

131. Shelton and Simmons ignored demands for proof of a security interest. Halle was

contacted and he demanded that Williams or Nathan pay $5000 before the vehicle would be

returned to them. At the time the truck was the only transportation for Williams and his only

means of monitoring the Alma mine site, therefore he paid the ransom and the truck was returned

with his laptop. The act of demanding $5000 in exchange for return of the wrongfully seized

property under claim of legal right was an unlawful and fraudulent act in furtherance of Halle's

intention to cause Alma and Williams to be and remain insolvent.

132. Alma, Williams, Nathan, and Nathan's Welding brought the matter to the attention

of the Court. Shelton and Gartland did not attend the hearing, the first hearing which they had

not attended. Roger Simmons represented Halle and all Halle Related Entities except Gannacone

and Consol. When questioned by the Court about seizure of the truck Mr. Simmons made the

following false statements:

> 14  THE COURT: Were you in attendance at the deposition?
> 15  MR. SIMMONS: I was.
> 16  THE COURT: What have you since learned about it?
> 17  MR. SIMMONS: My understanding is that the vehicle
> 18  was one that was owned by Nathan's Welding. And I haven't gone
> 19  into the detailed nature of the transaction on it, but the
> 20  vehicle was never one owned by Alma. Mr. Williams at the time
> 21  asserted he had no connection with Alma. And in fact, he was
> 22  just there as historical representative of some of the facts
> 23  that happened.
> 24  I don't know as I stand here today what happened with
> 25  regard to who took the vehicle or who -- all I know is that it
> 1  was returned within an hour to Mr. Williams. And on the
> 2  deposition record he acknowledged a satisfactory agreement had
> 3  been reached on the whole issue. And I understood the issue at
> 4  the time and the day to be moot, but had there been any issue

5   about it --
6   THE COURT: It certainly comes dangerously close to
7   interfering with this Court's process in terms of a witness
8   attending a deposition in a hearing before this Court and you
9   interfere somewhat on the other side of the case deliberately
10  picks up the automobile of that witness certainly is pushing
11  the envelope clearly.
12  MR. SIMMONS: Again, as I've indicated to the Court,
13  the vehicle was promptly returned on terms that were agreeable
14  to both sides.
15  THE COURT: What were those terms?
16  MR. SIMMONS: My understanding is that he was given
17  -- there was like $8500 owed on the vehicle. He hadn't paid --
18  he had not paid on the vehicle for three months, and Mr.
19  Williams owed like $8500 on the vehicle, my understanding was
20  that he was given full, clean title -- or the entity was given
21  full, clean title for $5,000. So there's a $3500 discount.
22  THE COURT: Is there a lien on the title?
23  MR. SIMMONS: My understanding is that the way it was
24  structured was that the title was held by one of the companies
25  in Maryland -- I can't say as I stand here which one -- and
1   that the keys were held by it for the purpose of this type of
2   lien. So when Mr. Snyder says there was no lien, there was in
3   fact a security arrangement and an understanding among the
4   parties that if it fell into default on the loan that it would
5   be repossessed. And that's why the title and keys were left
6   with the Maryland entities.
7   THE COURT: So there was a lien on it, but the lien
8   wasn't perfected by filing --
9   MR. SIMMONS: I can't say -- I don't know for a fact
10  what the Kentucky liens are --
11  THE COURT: Is it licensed in Kentucky?
12  MR. SIMMONS: -- I don't know.
13  THE COURT: Is the vehicle licensed in Kentucky?
14  MR. SIMMONS: I'm not sure, Your Honor. I don't know
15  the answer. But I can get it for you.

133. First, Mr. Simmons led the Court to believe that the debt was not related to Alma,

when Alma had executed a guarantee of payment.

134. Second, Mr. Simmons states that "My understanding is that the way it was structured was that the title was held by one of the companies in Maryland." …"And that's why the title and keys were left with the Maryland entities." Then when asked by the Court if the vehicle was licensed in Kentucky he replied "I'm not sure, Your Honor" Directly contradicting his previous statement that the title was held by one of the companies. The vehicle was in fact titled in Kentucky and had Kentucky license plates clearly visible to the parties taking it.

135. The act of taking the truck was another abuse of process by Halle and the Halle Related Entities, intended to send a "message" to Nathan and Darrell Williams that Halle would take possession of property regardless of the fact that Williams was attending both a bankruptcy proceeding and a deposition.

136. The Halle Related Entities had dismissed Alma from the Maryland proceedings, but continued the action against Darrell Williams, Nathan Williams, and Nathan's Welding seeking entry of an order granting the Temporary Restraining Order -

"Defendant NATHAN'S WELDING, LLC, including its members, officers, agents, partners, servants, employees and attorneys, as well as Defendant NATHAN WILLIAMS and Defendant DARRELL WILLIAMS, and all persons in active concert or participation with them, be and are hereby, enjoined from:

(i) Entering, working on or in, or using in any way, the coal properties identified in the Second Amended Complaint, and Defendants shall accordingly vacate the premises within twenty four (24) hours of service of this Temporary Restraining Order;

(ii) Altering, discarding, destroying or removing any and all business records related to the coal mining business on Plaintiff's coal mining properties; and

(iii) Spending or using in any manner, any and all funds provided by Plaintiff to any one Halle sought transfer of the mining permits Spending or using

in any manner, any and all funds provided by Plaintiff to any one or more of the
Defendants for the business of developing Plaintiff's identified coal properties.

IT IS FURTHER ADJUDGED, ORDERED AND DECREED that
Nathan's Welding shall, within twenty-four (24) hours of the entry of this Order,
cause its managing member(s) and/or agents to appear at the offices of
Environmental Design Consultants, located at 43 Village Street, Pikeville,
Kentucky, whereby Nathan's Welding shall execute MPA 07 forms, "Application
to Transfer a Mine Permit," as well as any other instruments necessary to transfer
Nathan's Welding's Kentucky mining permits to the Plaintiff and/or its designee.

IT IS FURTHER ADJUDGED, ORDERED AND DECREED that
Nathan's Welding, Darrell Williams and Nathan Williams shall, within twenty-
four (24) hours of written request by Plaintiff, cause to be executed on its behalf
any and all documents or instruments necessary to transfer all permits and/or
licenses relating to Plaintiff's coal-mining operations to Plaintiff or its designee."

137. While it was not obvious to the Maryland District Court Judge, the relief demanded

by the Halle Entities, including barring Darrell and Nathan Williams from the Alma mine site;

requiring them not to enter, work on or in, or use in any way, the Alma coal properties; and

ordering the transfer of the Mining Permits to KCVI, would have literally put Halle in control of

all of the assets of Alma and put the debtor-in-possession permanently out of business. The

Motion by Halle was a flagrant violation of the automatic stay issued by this Court for the reason

that it surreptitiously sought to enjoin Alma's owners and employees from entering Alma's mine

site, and constituted an abuse of process in the Maryland Case.

138. Alma filed Adversary proceedings in the current case which were similar to actions

which had been filed in the earlier case. Adversary case 07-7025 sought damages against Halle

and the Halle Related Entities for the wrongful acts against Alma described herein. Adversary

case 07-7032 sought damages against Halle and the Halle Related Entities for intentional

violations of the Automatic Stay.

139. Halle and the Halle Related Entities responded to the claims by Alma with extensive requests for discovery that placed a severe burden on Alms, Williams, Nathan, and Nathan's Welding. The attorney for Alma, Paul Stewart Snyder, pursued the Adversary cases at what appears to have been a reduced fee rate. However it soon became clear that Alma, Williams, Nathan, and Nathan's Welding lacked funds to adequately prosecute the Adversary cases; defend the action in Maryland; defend an action filed by Halle against Nathan and Nathan's Welding in Pike County; and pursue reorganization in this Court. In fact Mr. Gartland later bragged to Alma that Halle had spent $1,000,000 in legal fees and would spend whatever it took to defeat Alma, Williams, Nathan, and Nathan's Welding – adding that the comment that "you can't beat a billionaire".

140. Alma, Williams, Nathan, and Nathan's Welding had no reasonable option but to seek a settlement with Halle and the Halle Related Entities. Halle, Alma, Williams, Nathan, and Nathan's Welding agreed to mediation before the Magistrate of the Maryland Federal District Court. The parties met with Magistrate William Connelly in late November, 2007, in the Greenbelt Division of the Federal District Court, Greenbelt, Maryland. Pursuant to the mediation hearing, Halle, Alma, Nathan Williams, and Darrell Williams reached a settlement on or about the evening of November 29, 2007.

141. The settlement agreed to by the parties provided that Halle would receive 25 cents on the marginal dollar for coal sold at a price of over $65 per ton. The parties announced to Magistrate Connelly that the settlement had been reached, and the mediation was officially concluded that evening, being memorialized in notes taken by the attorneys.

142. Mr. Halle spoke with Mr. Gartland by phone following the Mediation Hearing, and then offered excuses to Alma and Williams about being unable to sign that evening a settlement

term sheet memorializing the settlement, stating that Gartland could not prepare the printed

document until the next morning. When the settlement was reduced to writing by Halle the

following day, the amount Halle was to receive for coal sold over $65 a ton was unilaterally

doubled by Halle to 50 cents on the marginal dollar over $65.

143. This change in terms was not part of any mediation proceedings, and was not

negotiated as part of any settlement talks. Halle had fraudulently agreed to terms suitable to

Alma, Williams, Nathan, and Nathan's Welding during the mediation hearing, for the purpose of

terminating the mediation, and thereafter demanded doubled the premium agreed to by the

parties.

144. Alma, Williams, Nathan, and Nathan's Welding were being billed approximately

$200 to $250 per hour plus expenses by their attorneys. Halle knew that Williams and Alma had

no funds left to pay, or promise to pay, their attorneys to commence another mediation session,

let alone to fund litigation which Halle threatened to engage in for "years". Halle adamantly

stated that the increase to 50 cents was not negotiable.

145. Alma, Williams, Nathan, and Nathan's Welding had no ability to resist the

economic coercion by Halle and the Halle Related Entities, and agreed under vehement protest to

the unconscionable royalty. The day following termination of mediation Alma, Williams,

Nathan, and Nathan's Welding, under threat and coercion of continued litigation of the false and

fraudulent claims in the Maryland Court, executed a Draft Settlement Term Sheet document

presented to them by Halle.

146. In fact Williams, Alma, Nathan, and Nathan's Welding were left with no alternative

by Halle. Halle and the Halle Related Entities knew that as a direct and proximate cause of their

actions Williams, Alma, Nathan, and Nathan's Welding had no funds to defend the claims in

Maryland. As a direct and proximate cause of Halle's threat to continue litigation of his false and

fraudulent claims against Williams, Alma, Nathan, and Nathan's Welding in the Maryland Court,

Pike Circuit Court, and U.S. Bankruptcy Court, the Defendants Alma, Nathan, and Nathan's

Welding had no option but to agree under economic coercion to the unconscionable settlement

terms.

147. Based on oral representations by the parties to the Magistrate on November 29,

2007, that Settlement had been reached, the Maryland Court dismissed the Complaint of KCVI

with prejudice. Since Alma, Darrell Williams, Nathan Williams, and Nathan's Welding had no

funds to pay attorneys to file Counter or Cross Claims, no claims were filed by Alma, Darrell

Williams, Nathan Williams, and Nathan's Welding, or adjudicated by the Maryland Court,

against KCVI, Halle, or the Halle Related Entities.

148. Pursuant to the unconscionable terms of the Settlement Agreement, if the Alma coal

sold for $100 per ton, the extra 25 cent royalty would pay over $25,000,000 in additional

premium above the $25,000,000 (25 cent) agreed to in the mediation, plus $13,650,000 on the

base 7% royalty of $4.55 a ton. A conservative estimate of the payment to Halle for production

by Alma, Williams, Nathan, and Nathan's Welding on the Pocahontas Leases was over

$60,000,000, a 1000% return on investment for the Lessor - KCVI.

149. BSD1 had agreed to mine Alma coal for $45.50 per ton, marginally above its

production costs, with the expectation of perhaps earning $1 to $2 per ton in profit. If costs had

risen BSD1 would have done what many contract miners do, it would have sought Court

approval to purchase the coal it mined and resell it for a fair return to Alma and BSD1. Halle

knew or should have known that the 50 cents premium per marginal dollar would make it

impossible for Detherage and BSD1 to buy coal that it mined from Alma and sell it for a profit.

150. In addition Halle demanded, under threat and coercion of continued litigation of the false and fraudulent claims in the Maryland Court, that the Permits under which Alma mined, worth about 50 cents a ton, be transferred from Nathan's Welding to Alma. Halle knew that ownership of the permits made it possible for Halle to declare a default and stop any mining by BSD1 if Alma did not confirm a Reorganization Plan and was liquidated in Chapter 7. This fact increased the risk to BSD1 of investing time and money in the infrastructure of Alma's mines.

151. Had the permits remained in the name of Nathan's Welding a successor company, which could have been BSD1, might have obtained the Pocahontas Leases in a Chapter 7 liquidation and mined under the permits. Halle knew that BSD1 would need to invest at least $1.5 million in infrastructure and mining equipment to efficiently mine Alma, and that the terms of the Settlement Agreement obtained under threat and coercion of continued litigation of the false and fraudulent claims in the Maryland Court and elsewhere, made it impossible for BSD1 to honor its commitment to Alma. Halle and the Halle Related Entities used economic coercion to intentionally and tortiously interfere with the contractual relationship of Detherage and BSD1 with Alma, constituting abuse of process in the Maryland Case.

152. Halle and the Halle Related Entities told Alma and Williams that they wanted to meet with Detherage and BSD1 to determine whether or not BSD1 planned to advance funds and mine under the Court approved DIP Financing and Mining Agreements. At the meeting Detherage offered to invest in Alma and mine coal, paying Alma a fixed and industry standard 7% on coal sold by BSD1 under a Plan of Reorganization to be approved by the Court. At $100 per ton and $45.50 mining costs, that would have resulted in approximately $11,450,000, enough to repay Alma creditors and Halle. Furthermore Halle would have had the benefit of keeping

profits from the Glen Alum and Logan properties which rightfully belonged to Alma, Williams, Nathan, and Nathan's Welding.

153. Halle refused to consider the BSD1 offer. After Detherage left the meeting, Halle's response was stated by Gartland to all in attendance – "fire Detherage" or the litigation in Pike County, Maryland, and this Court would be ramped up by Halle. Halle and the Halle Related Entities later denied having instructed Alma in the presence of witnesses to "fire Detherage" or there would be no Settlement Agreement, disingenuously stating that it was Halle's desire that BSD1 honor the terms of the BSD1 Mining Agreement.

154. Williams and other participants confirmed that Mr. Gartland had said "fire Detherage". Furthermore, through economic coercion by threatening continued litigation of the false and fraudulent claims in the Maryland Court, Halle had made it impossible for BSD1 to invest, without the additional risk created by the Settlement Terms imposed by Halle on Alma, Williams, Nathan, and Nathan's Welding, and by the 50 cents on the marginal dollar over $65 per ton. Alma and Williams acquiesced to Halle's demands and caused the BSD1 Mining Agreement to be terminated.

155. On February 8, 2007, this Court approved a Settlement Agreement ("Settlement Agreement") substantially in the form negotiated and agreed to before the Maryland Magistrate, except that it called for the 50 cents on the marginal dollar above $65 per ton premium demanded after close of the mediation and included changes requested by the United States Trustee. Alma, Williams, Nathan, and Nathan's Welding acquiesced to the terms of the Settlement Agreement, and pursued approval by this Court, based on assurances by Halle and the Halle Related Entities that they would act in good faith under the Settlement Agreement to allow Alma to reorganize for the benefit of Williams, Nathan, Nathan's Welding, Street, and Roulett.

156. Halle and the Halle Related Entities had extorted from Alma, Williams, Nathan, and Nathan's Welding, Street, and Roulett, Detherage, and BSD1, a Settlement Agreement where:

a) Alma was required to pay Halle and the Halle Related Entities $4.55 per ton of mined coal *in addition to* royalties and fees paid to Pocahontas Land Company, Martin County Coal, Street, Roulett, and others on the same leases.

b) Alma was required to pay Halle and the Halle Related Entities fifty cents on the marginal dollar premium for coal sold over $65 per ton.

c) Nathan's Welding's was required to transfer to Alma and potentially to Halle, mining permits worth approximately $1,500,000.

d) Halle and the Halle Related Entities and their attorneys Shelton, Simmons, and Gartland were given releases from liability for their wrongful acts.

e) Waiver of Alma and William's rights and interest in Glen Alum and Logan.

At an average for metallurgical coal of $100 per merchantable ton, this agreement had a value of more than $60,000,000 to Halle.

157. After investigation it was determined that Halle and the Halle Related Entities violated the letter and spirit of the Settlement Agreement by false and fraudulent acts, tortious interference, and abuse of process during the time of negations and thereafter, including the following.

158. Tony Gannacone obtained a position on the Unsecured Creditor's Committee for his entity, Consol Capital LLC. As a member of the Committee, Gannacone proceeded to object to and oppose Alma's reorganization. Williams believed that Gannacone was acting in good faith on his own behalf and on behalf of Consol Capital, and not for any Halle Related Entity.

However in a deposition dated March 5, 2009, Troy Francisco, another member of the Committee, stated "Gannacone represented creditor Consol Capital ("Consol"), and being an unsecured creditor just as my company was, should have had similar interests to all other unsecured creditors. It appeared, however, that Gannacone supported the actions and positions taken by the Halle Group ("Halle") in opposition to Alma, which made no prudent business sense for him or any other creditor since Halle's interests were adverse to those of Consol and the other creditors. Halle held liens on the leases, equipment and permits, and if Halle had been successful in discharging Alma from bankruptcy and obtaining a Temporary Restraining Order in Maryland, all non-Halle unsecured creditor claims would be eliminated. It was in the best interests of the unsecured creditors for Alma to be restructured and reorganized consistent with the purposes of Chapter 11 of the bankruptcy code."

159. As a result of March, 2008, Depositions of Tony Gannacone, III; Jody Waber; and Mr. Robert Edourd of Integrity Coal Sales, Inc. ("Integrity"), Williams and Alma established, among other things, that on or before September 26, 2007, and thereafter:

a) Gannacone's corporation, Consol Capital, LLC, was doing business under the assumed name "NextGen Coal";

## APPLICATION FOR REGISTRATION OF FICTITIOUS NAME

DOCUMENT# G07269900268

Fictitious Name to be Registered:   NEXTGEN COAL

Mailing Address of Business:      1200 N. FEDERAL HIGHWAY
                                   SUITE 200
                                   BOCA RATON, FL  33432

Florida County of principal place of business:   PALM BEACH

FEI Number:

**FILED
Sep 26, 2007
Secretary of State**

Owner(s) of Fictitious Name:

CONSOL CAPITAL LLC
1200 N. FEDERAL HIGHWAY, SUITE 200
BOCA RATON, FL  33432    US
Florida Registration Number: L06000086586
FEI Number: 20-5486361

b) NextGen's office telephone number was the same as Stephen N. Fleischman's, Vice-President of The Halle Companies ("THC"), phone number and its website (www.ngcoal.com) listed THC's Maryland address as the address for NextGen Coal:

> Contact Us…
>
> Sales Office
> 1200 North Federal Highway
> Suite 200
> Boca Raton, FL 33432
>
> Phone:
> 561.210.8494
> Fax:
> 561.210.8493
>
> Sales Representatives:
> Tony Gannacone
> tgannacone@ngcoal.com
>
> Jodi Waber
> jwaber@ngcoal.com
>
> Corporate Office:
> 2900 Linden Lane
> Suite 300
> Silver Spring, MD 20910
>
> Phone:
> 301.495.1520
> Fax:
> 301.495.9452

c) The Halle Entities entered into contracts for the sale of Glen Alum produced coal to Integrity Coal Sales under the name NextGen Coal and Halle's Glen Alum facility does business as NextGen Coal;

d) NextGen's website indicates that it revitalized and operates the Glen Alum coal-processing facility and the related coal mines that were the subject of prior litigation between the parties to the Settlement Agreement;

e) In a deposition Mr. Robert Eduardo of Integrity Coal Sales, a major purchaser

of coal produced by Halle at the Glen Alum mines, stated:

> 17  "Q I notice in one of the pages,
> 18  Page 329, you have a note, "It's Darrell
> 19  Williams' coal, but we pay Halle." And then
> 20  Next Gen is in parentheses. Can you tell me
> 21  what that refers to?
> 22  A That's a note that I'm sending to
> 23  Greg, just kind of telling him that the coal
> 24  would load. "What is Darrell doing?" "Well,
> 25  Darrell has coal. It will load from Glen Allum.
> 2   It's Darrell's coal, but we pay Halle (Next
> 3   Gen)." He doesn't know. He may not be able to
> 4   put that completely together; Nex Gen and Halle,
> 5   it is synonymous. Next Gen [sic NextGen] is who we have the
> 6   contract with."

160. Halle and the Halle Related Entities fraudulently concealed from Alma, Williams,

Nathan, Nathan's Welding, Detherage, BSD1, and from this Court and the Federal District Court

in Maryland, the fact that Gannacone and ConSol Capital LLC, d/b/a NextGen Coal, were Halle

Related Entities. Furthermore, from the date of the first negotiations regarding the Settlement

Agreement forward, Halle and the Halle Related Entities violated the letter and spirit of the

Settlement Agreement through their proxies, Gannacone, Waber, NextGen, and Consol,

including the following filings by ConSol and by the Creditor's Committee when Gannacone

was a member thereof:

> 11/6/2007 (docket #162)   Objection Filed by Consol Captial, LLC, Tony
> Gannacone, III (RE: related document(s) 73 Motion to Dismiss Case, filed by
> Creditor Kentucky Coal Venture I, LLC). (Kennedy, Ellen) Modified on
> 11/7/2007

> 11/7/2007 (docket #163) See corrective entry #163 (kfa, ). (Entered: 11/06/2007)
> Corrective Entry PDF document appears to support the motion to dismiss filed
> 9/13/07 not oppose it as filed in ECF by Ellen Kennedy (RE: related document(s)

162 Objection filed by Interested Party Tony Gannacone, III, Creditor Consol Captial, LLC) (kfa, ) (Entered: 11/07/2007)

01/09/2008 (docket #194)  Objection Filed by Unsecured Creditors Committee (RE: related document(s) 184 Motion to Compromise Controversy under Rule 9019, Motion to Approve, filed by Debtor Alma Energy, LLC). (kfa) (Entered: 01/09/2008)

01/21/2008 (docket #196)  Supplemental Document Letter from Unsecured Creditors Committee, filed by Alma Energy, LLC (RE: related document(s) 173 Memorandum of Opinion,, Order (Generic), Order (Generic)). (Snyder, Paul) (Entered: 01/21/2008)

05/05/2008 (docket #326)  Response Filed by Consol Capital, LLC (RE: related document(s) 278 Objection to Claim filed by Debtor Alma Energy, LLC). (Attachments: # 1 Continuation of Main Document Affidavit of Tony Gannacone III) (Kennedy, Ellen) (Entered: 05/05/2008)

12/28/2008 (docket #51 – Adv 07-7025)  Motion to Dismiss Case, filed by Tony Gannacone III. Hearing scheduled for 1/10/2008 at 02:15 PM at Lexington Courtroom, 3rd Floor. (Attachments: # 1 Continuation of Main Document Exhibit A – Affidavit of Tony Gannaconne III# 2 Continuation of Main Document Exhibit B - Emails - exhibit to MTD# 3 Proposed Order) (Kennedy, Ellen) (Entered: 12/28/2007)

161. On March 10, 2008, Alma, for the benefit of Williams, Nathan, and Nathan's

Welding, filed a proposed disclosure statement (Docket ##240,241) with a hearing set for

approval on April 10, 2008.

162. On April 7, 2008, Halle and the Halle Related Entities filed an objection to the

Disclosure Statement (Docket #286), complaining that:

A. The "Litigation and Settlement" section of the Disclosure Statement is

confusing and way too long…

B. The "Personnel" section of the Disclosure Statement is deficient…

C. The "Economic Factors" section of the Disclosure Statement is way too long

and contains entirely too much information that is useless…

D. The "Leases and Production" section of the Disclosure Statement is devoid of

any meaningful information…

D. The "Claims Against the Debtor-In-Possession" section of the Disclosure

Statement is patently deficient… [There are two paragraphs labeled D in the Objection]

E. The "Information as to Estimated Future Earnings" section of the Disclosure

Statement is deficient…

F. The definition of "Debtor" and "Debtor-in-Possession" must be changed…

G. THC's claim under the Settlement Agreement must be separately classified…

H. The disclosures contained in the "Means for Performing the Plan" section of

the Disclosure Statement are inadequate…

163. Paragraph F of the Halle objection did in fact identify a typographical error that

could have been easily corrected. The other complaints in the Halle objection were trivial and

made in bad faith for the purpose of preventing Alma from proceeding with its reorganization for

the benefit of Williams, Nathan, Nathan's Welding, Street, Roulett, Detherage, and BSD1.

164. Halle and the Halle Related Entities active opposition to the Disclosure Statement

and Plan, at the first opportunity thirty days after approval of the Settlement Agreement, was a

bad faith, fraudulent, violation of the letter and spirit of the Settlement Agreement.

165. BSD1, which had been wrongfully damaged by Halle's inclusion of unconscionable

terms in the Settlement Agreement, also filed an objection. Other than the BSD1 objection, the

Halle Related Entities were the only creditors objecting to the Disclosure Statement.

166. The primary objection by Halle was that there was too much detail in Alma's

Disclosure Statement.  At or about the same time Halle and the Halle Related Entities began

"lobbying" the United States Trustees Office ("UST") to object to Alma's attempts to reorganize

and to press for conversion of the case to Chapter 7. In hearings Mr. Gartland was seen passing

documents to the UST and actively consulting with the attorneys for that Office. From the

positions taken by the UST, it was clear that the Halle and the Halle Related Entities made

misleading, false, and fraudulent statements to the UST in support of Halle's efforts to prevent

Alma from successfully reorganizing to the benefit of Williams, Nathan, Nathan's Welding,

Street, Roulett, Detherage, and BSD1.

167. On April 17, 2008, the UST filed an Objection to the Disclosure Statement (Docket

#303) that essentially mimicked the Objections filed by Halle and the Halle related Entities.

168. Halle and the Halle Related Entities conspired to cause economic damage to Alma,

Williams, Nathan, Nathan's Welding, Detherage, and BSD1 so that no entity would lend money

to or invest in Alma, Williams, Nathan, or Nathan's Welding, for the purpose of preventing

Alma from commencing mining and confirming a Plan of Reorganization. The wrongful acts of

Halle and the Halle Related Entities left Alma, Williams, Nathan, or Nathan's Welding with no

option other than to attempt to find an entity that would lend money to or invest in the mining

project.

169. Williams continued his active pursuit of potential investors and lenders, contacting

every entity that he believed might provide funding. When the entities did their due diligence,

and calculated the coerced amounts that Halle would receive under the Settlement Agreement

and the risk inherent in the terms included by Halle, they "ran" from the project.

The following represent some of the entities and individuals contacted by Williams,

Alma, or agents on behalf of Alma:

| |
|---|
| Acer Mittel - India |
| Greenbrier Minerals, Inc |
| Murray Energy |

| |
|---|
| Peabody Coal Trade |
| US Steel |
| 787 Capital |
| Arch Coal |
| B. G. Best Investment Bankers |
| Baron Group (USA) Limited |
| Bourne Capital |
| Consillium Partners |
| Diversified Mineral |
| Esser Steel (India) PTY |
| International Coal Group |
| Jim Booth Companies |
| Jim Walter Resources |
| Murphy Group |
| Newtech Mining |
| Om Capital (Thru Baron Group) |
| Oxford Mining, Inc |
| Phoenix Coal Corporation |
| Planck Energy Solutions International |
| Proformance |
| Reid Krackower |
| Traxys |
| Trinity Coal |
| Basic International Development Corp. |
| C Change Investments |
| Cliffs Natural Resources |

| |
| --- |
| Cumberland Resources, Inc |
| Essex Investments |
| Harland Cumberland Coal |
| Patriot Coal |
| RAS Capital Group, Inc. |
| Rhino Resources, Inc |
| Atlantic Leasco |
| Clarium & Fonders - A.J. Royan - Principal |
| Penn Virginia Corp. |
| Citygroup (Investment Banker) |
| Houlihan Lokey (Investment Banker) |
| Alpha Natural Resources |
| European Amnerican Capital Group |
| Imagin Natraul Resources (INR) |
| MEPCO, Inc |
| TerraNova Capital Partners, Inc. (U.S. Coal) |
| Vitol USA |

170. In February, 2008, Williams located a group of individual investors, the principal member of which was a Gary Richard ("Richard"). His attorney, Hayden Fisher ("Fisher"), and a Brent Morehouse ("Morehouse"), were also principal parties. These individuals, and other potential members, met several times with Williams in Pikeville, Kentucky, and did due diligence regarding Alma, Williams, Nathan, and Nathan's Welding.

171. The group reached the same conclusion as other potential investors, they concluded that the inherent risk, which was the direct and proximate result of terms included as a result of economic coercion by Halle and the Halle Related Entities, made it impossible for any traditional

lender or investor to fund Alma, Williams, Nathan, or Nathan's Welding. However Williams presented to them the possibility of a very high risk / reward structure whereby the group would lease equipment to Alma and purchase coal from Alma pursuant to a Court approved mining agreement similar to the BSD1 Mining Agreement.

172. Fisher and Richard reviewed the Settlement Agreement and emails from Halle and the Halle Related Entities stating that they would honor the Settlement Agreement in good faith. Based on the representations by Halle and the Halle Related Entities that they would honor in good faith the Settlement Agreement, several members of the group determined that they would invest in Alma and Williams' coal project. Several weeks of negotiation followed to craft a plan of operation that would reduce the high risk created by the terms included by Halle by economic coercion in the Settlement Agreement.

173. Paragraph 38 of the Settlement Agreement, addressed to "…Alma's Operator or any of its contractor's…", anticipates the industry standard mining of coal by "contract mining" companies. Given the history of Halle interfering with independent contract miners, Williams and Nathan determined that it was necessary for them to form a company to mine coal on the Pocahontas Leases, rather than to hire a third party company which might face interference and intimidation from Halle. Alma, Williams, Nathan, Nathan's Welding, Richard, Fisher, Morehouse, and other related individuals agreed that Williams and Nathan would form the corporation, and on March 20, 2008, Blackberry Energy LLC. ("Blackberry") was formed to be the contract miner for Alma.

174. A corporation, Pikeville Energy Group LLC, ("Pikeville") was formed on April 4, 2008, by Richards, Fisher, Morehouse, and other individuals, to invest and participate in the Alma project. Additional unrelated coal properties were presented to the investors by Williams in

an attempt to induce them to participate, and to reduce the risk presented to them by Halle and the Halle related Entities.

175.  Alma, Williams, Nathan, Nathan's Welding, Fisher, Richard, Morehouse, Blackberry, and Pikeville proceeded based on the specific representations by Halle and the Halle Related Entities in the Settlement Agreement (Exhibit H) that:

"Alma is solely responsible for resolving, paying and/or discharging all claims of the creditors in the Chapter 11 case." (Paragraph 12)

"Halle hereby acknowledges and agrees that Alma will be the operator with overall management responsibilities for operations and operational control over the mining and sale of the products related to the Right Fork I; Right Fork II (also known as Little Ty); and Netley Properties." (Paragraph 40)

"The operator has the authority and power to perform any activity necessary, appropriate, or incidental to the Mining and sale of Products." (Paragraph 41)

"Alma hereby agrees to serve as the Operator until it resigns or withdraws, is removed as an Operator following an Alma default as defined herein, or until the Product is exhausted or not economical to extract for a period in excess of 12 months." (Paragraph 42)

176. On April 25, 2008, Blackberry Energy LLC negotiated a sixty month coal purchase agreement for Alma's coal production to be sold to Pikeville Energy Group LLC for $64 per ton of merchantable coal delivered at the mine-site, which was sufficient to fund a Plan of Reorganization that paid all allowed claims in full. The proposed Plan paid 100 cents on the dollar to allowed creditors, and paid Halle $4.55 per ton, estimated to generate at least a $12,000,000 return on investment for Halle.

177. Based on Williams experience in the coal industry, research into historic price fluctuations, supply and demand of steam and met coal, Department of Energy forecasts, the theory of "market price bubbles", Alma seam properties, etc., Williams and Alma repeatedly represented to this Court and Creditors that "Domestic and international economic conditions, currency fluctuations, commodity speculation, and other factors should result in the sale price for coal being in the area of $65 per ton." Williams and Alma stated that there was a significant risk that the average per Alma Energy LLC Disclosure Statement ton price of merchantable coal over the prospective sixty month term of the proposed plan of reorganization would be less than $64.

178. Pikeville Energy was willing to assume the downside risk that the market value of the merchantable coal produced by Alma would in fact average less than $64 per ton if it had the upside benefits if the average was more than $64 per ton. Furthermore, Pikeville Energy, like BSD1 and other potential investors, viewed the fifty cents on the marginal dollar above $65 per ton extorted by Halle to be unconscionable. Management of Pikeville Energy was willing to take the downside risk based on elimination of the upside penalty and the assumption that Halle and the Halle Related Entities would honor their commitments under the Settlement Agreement. As will be discussed below, the average price of coal mined and sold by Alma did drop below $64 a ton, falling to around $45 a ton in 2009.

179. As a direct and proximate cause of Halle and the Halle Related Entities economic coercion and abuse of process, the terms of the Settlement Agreement left Alma and Williams with no choice but to agree to radically unconventional financing to obtain financing and reopen the mines to pay creditors 100 cents on the dollar. The alternative was for the case to be converted to Chapter 7 in May of 2008, with Halle and the Halle Related Entities obtaining at least $60,000,000 in potential coal profits (3,000,000 at $20 a ton profit) and as much as

$190,000,000 for a nominal payment to a Chapter 7 Trustee – a scenario that Halle did in fact

eventually cause to occur.

180. The agreement with Pikeville Energy allowed Alma to pay Creditor's IN FULL.

Following the commitment of Pikeville Energy to support Alma, Williams, Nathan, Nathan's

Welding, and Blackberry, on May 8, 2008, Alma filed a Third Amended Disclosure Statement

("May 7 Disclosure Statement" - Docket #330) and Plan (May 7 Plan - Docket #331). On May

10, 2008, Alma filed an Emergency Motion to Approve a Mining Agreement ("Interim

Blackberry Mining Agreement" - Docket #335).

181. Alma, Williams, Nathan, Nathan's Welding, Pikeville Energy, Fisher, Richard,

Morehouse, and other interested parties believed that the May 7 Plan met the requirements of the

Settlement Agreement and the U.S. Bankruptcy Code, and that Halle and the Halle Related

Entities could not in good faith oppose the Interim Blackberry Mining Agreement or the May 7

Plan. Alma included the following in its Disclosure Statement reflecting the necessity to acquire

Pikeville Energy's financial support: "If Pikeville Energy would default under the Coal Purchase

Agreement, or Blackberry Energy default under the Interim Mining and License Agreement,

Alma cannot be certain that it will be successful in mining and selling coal to other buyers at a

price sufficient to complete a confirmed plan of reorganization."

182. On May 14, 2008, Halle and the Halle Related Entities filed an Objection (Docket

##388,339) to Alma's Motion to approve the Blackberry Interim Mining Agreement and

commence operations. KCVI and THC disputed Alma's estimate concerning the current market

price for coal and objected to the Court that the price was too low. Halle and the Halle Related

Entitles were the only parties in interest objecting to the *interim* mining order which would have

allowed mining to commence under the terms of the Settlement Agreement. The objection was

not expected given the Settlement Agreement and the representations by Halle that it would allow Alma, Williams, Nathan, and Nathan's Welding to mine coal without interference.

183. In their Objection Halle and the Halle Related Entities made a series of misleading, false, and fraudulent statements which constituted abuse of process:

Halle Objection a) "The Debtor claims that it has vigorously pursued the reinstatement and transfer of the Permits to the Debtor, and has reached an understanding and agreement with the DNR regarding restarting the Debtor's mining operations under mineral leaseholds owned by KCVI. (Motion, ¶¶ 7-8). The Debtor has not submitted to the Court any evidence of its alleged agreement with the DNR."

This statement to the Court was intentionally misleading for the reason that Halle knew that mining could not commence until the Permits were reinstated, that permit holders names and status are available online, and that any party could contact the Department for Natural Resources if Alma or Blackberry commenced mining prior to reinstatement. Alma told the Court on May 14, 2008, that the Blackberry Permit would be issued that day or the next day, in fact it was issued May 15, 2008.

Halle and the Halle Related Entities knew or should have know that the Permit was pending and would be issued by May 15, 2008, by calling the Department for Natural Resources prior to the May 14 hearing. Halle and the Halle Related Entities either chose not to determine the status of the permit, or mislead the Court into believing they did not know the status, so that they could object based on the permit status. In either case the Halle and the Halle Related Entities actions constituted abuse of process.

Halle Objection b) "Nathan Williams is a twenty-one (21) year old welder, not a coal miner."

This objection is frivolous, Halle knew or could have easily determined that Nathan Williams held a Kentucky miner's license by calling the DNR Office of Mine Safety and Licensing. Beyond that, a member of a Limited Liability Corporation is not required to be a coal miner to own a coal mining operation.

Halle Objection c) "The Debtor has failed to submit any evidence to the Court with respect to the $1,496,000 allegedly advanced by Pikeville Energy Group, LLC to purchase mining equipment to be used by Nathan's Welding or Blackberry." And

Halle Objection d) "The Debtor has failed to submit any evidence to the Court proving that Pikeville Energy Group, LLC has spent and is currently spending any money to maintain the mines and ready them for coal mining operations."

Halle Objection e) "The Debtor has failed to submit any evidence of any agreement with Pikeville Energy Group, LLC concerning advancement of the funds necessary to restart the mines, which the Debtor is allegedly under no obligation to repay. The Debtor has also failed to submit any evidence concerning the ability of Pikeville Energy Group, LLC to provide the Debtor with 'all funds necessary to restart production.'"

Again these three similar objections were disingenuous, misleading, and trivial, intended to give the fraudulent impression to the Court that the Alma Mines were not ready to be reopened. Halle had stated in his Memorandum filed in the Maryland Case that Alma had $240 in the bank and no funds to maintain the mines. If mining equipment and money to maintain the mines and ready them for coal mining had not been provided by Pikeville Energy the mine would have failed the MSHA opening inspection on April 28, 2009. The record of the inspection is available to the public, and certainly was known to Shelton and Halle. The statements to this Court constituted an abuse of process.



### Inspection Activities Conducted

| This inspection was for a COAL operation. | | |
|---|---|---|
| Event Number : | 4173439 | |
| Type of Inspection : | Regular Safety and Health Inspection | |
| Begin Date : | 4/28/2008 | |
| End Date : | 6/30/2008 | |
| Number of Inspectors : | 2 | |
| Number of ROE Personnel : | 0 | |
| VPID Qualified? : | Inspection *will* be reflected in VPID. | |
| Total Hours Spent: | 124.25 | |
| On-Site Hours Spent: | 75.50 | |
| On-Site Breakdown: | MMU Pit Time: 29.00    Outby Area Time: 12.00    Surface Area Time: 25.25 On-Site Citation Writing Time: 9.25 | |
| ROE or Trainee/Supervisor Hours: | 0.00 | |
| Total VPID Hours: | 75.50 | |

**Inspection Activities**

| Active working sections inspected. | 1 | Idle working sections inspected. | 0 |
|---|---|---|---|

Halle Objection f) "The Debtor claims that 'Pikeville Energy assumed the risk that a successful reorganization plan would be possible and agreed to pay all costs and expenses of Alma in return for the right to purchase coal mined at the Alma mine sites.' (Motion, ¶ 17). The Debtor has submitted no document to the Court concerning this alleged agreement."

Again Pikeville Energy was available to testify as to its intentions, and the Interim Mining Agreement submitted to the Court spoke for itself.

Halle Objection g) "In return for allegedly financing $1,496,000 of equipment and covering the Debtor's weekly expenses with respect to its idled mines, Pikeville Energy Group, LLC is going to get the right to purchase coal for just $64.00 per ton for the next five years. (See Disclosure Statement Chapter 11 Amended May 7, 2008 [Doc. No. 331] (the "Disclosure Statement"), at page 55).1 That is well below today's market price of $100.00+ per ton for similar coal."

Alma, Williams, Nathan, and Nathan's Welding sought an Blackberry **Interim** Mining Agreement to commence mining until a Mining Agreement could be considered by the Court or included in a confirmed Plan of Reorganization. The statement against the Blackberry Interim Mining Agreement that "Pikeville Energy Group, LLC is going to get the right to purchase coal for just $64.00 per ton for the next five years." was false and an abuse of process.

Halle Objection h) "In its Third Amended Plan of Reorganization dated May 7, 2008 [Doc. No. 330] (the "Plan"), the Debtor represents that it has the right to mine an estimated 3,532,144 tons of merchantable coal under mineral leases owned by KCVI. (Plan at page 15 [Doc. No. 330]). At a net profit of $36.00 per ton ($100.00 minus $64.00 = $36.00), Pikeville Energy Group, LLC stands to earn a net profit of $127,157,184 on the 3,532,144 tons of the Debtor's alleged coal reserves. Also, Pikeville Energy Group, LLC is slated to get $2.00 per ton to reimburse it for the $1,496,000 of equipment it has allegedly purchased or obtained for use by Nathan's Welding and/or Blackberry."

Halle and the Halle Related Entities are complaining about the extremely high risk premium that Pikeville Energy demanded for investing under the terms of a Settlement Agreement that by any objective measure contained unconscionable terms heavily favoring Halle. The risk was enormous, as hindsight proves, and the premium was proportionate. The high

premium demanded by Pikeville Energy was directly and proximately caused by Halle and the

Halle Related Entities abuse of process; tortious interference; and fraud. For Halle and the Halle

Related Entities to complain about the situation they had created was without merit. Furthermore

the Plan proposed to pay all creditors IN FULL, and the Settlement Agreement specifically

granted Alma the right to commence mining and propose a Plan of Reorganization. Halle and the

Halle Related Entities opposition was in direct violation of the letter and spirit of the Settlement

Agreement.

Halle Objection i) "By the Motion, the Debtor seeks entry of an Order approving the

Interim Mining and License Agreement (the "License Agreement") attached to the Motion as

Exhibit A. The License Agreement provides that it is executed by and between the Debtor,

Blackberry and Nathan's Welding. The License Agreement, however, was executed by the

Debtor and Nathan's Welding, but not by Blackberry. (See License Agreement, Exhibit A to

Motion, page 15). In fact, the License Agreement does not even contain a signature block for

Blackberry."

Blackberry was willing to execute appropriate agreements, and the Court's Order

Approving would satisfactorily obligate Blackberry to comply with the terms of the Blackberry

Interim Mining Agreement..

Halle Objection j.) "Curiously, the Debtor failed to disclose the $64.00 per ton sales price

of the coal to be purchased by Pikeville Energy, LLC in the Motion."

Halle and the Halle Related Entities complain about lack of disclosure of that which they

obviously had no difficulty finding notice of. In addition to other clear notice of the terms, the

Disclosure Statement filed May 7, 2008, detailed the entire transaction, with the following bold

print Notice:

The two year historic average for spot prices for coal mined by Alma is significantly lower than current market prices, and is estimated to be approximately $53 per ton March 2006 to March 2008.

Alma estimates that the current market price for coal produced at its mine, and washed and sold on the metallurgical market, is $65 to $80 per clean ton loaded on rail. Domestic and international economic conditions, currency fluctuations, commodity speculation, and other factors should result in the sale price for coal being in the area of $65 per ton.

Alma has negotiated a five year coal purchase contract with Pikeville Energy Group LLC whereby Pikeville Energy agrees to pay Alma $64 per raw ton for its production (see Exhibit C).

This amount is sufficient to fund Alma's proposed plan of reorganization.

Halle Objection j) Halle states that "The Debtor candidly admits that it has had no income from operations during the pendency of this Chapter 11 case, which was commenced on August 13, 2007. (Motion, ¶ 1). According to Schedule B [Doc. No. 21] and the monthly operating reports filed by the Debtor [Doc. Nos. 262-265], the Debtor has had just $142.00 in the bank at all times after this case was filed."

The purpose of commencing mining was so that Alma would have income so that it fund a Plan of Reorganization. The acts by Halle and Halle Related Entities, including false statements, fraud, tortious interference, and abuse of process, were the direct and proximate cause of Alma's insolvency. Had Alma and KCVI owned and managed Glen Alum, and had Halle and Halle Related Entities allowed Alma to mine coal, Alma would not have been insolvent and Williams, Nathan, Nathan's Welding, Street, and Roulett would not have suffered damage.

Halle Objection k) "The sole basis for the need for an emergency hearing on the Motion is the Debtor's contention that "if operations are not started immediately, Pikeville Energy will be required to pay $10,000 per week for the mine to remain idle, wasting approximately $200,000 to $300,000 that is needed as a reserve for unexpected startup problems and related costs." (Motion, ¶ 25). The argument is a ruse because, according to the Debtor, 'Pikeville Energy has agreed to provide all funds necessary to restart production, with no obligation of the Debtor regarding said funds.'"

This is absurd logic, Pikeville Energy agreed to provide all funds necessary to restart production under the terms of the Settlement Agreement, it did not agree to have losses mount due to opposition by Halle and the Halle Related Entities to mining under the Settlement Agreement. Halle and the Halle Related Entities falsely and fraudulently stated to the Court and to other parties that Pikeville Energy would not receive compensation for its investments that benefitted Alma. These statements were blatantly misleading, false, and fraudulent. The Disclosure Statement and all other documents and statements by Alma, Williams, Nathan, Nathan's Welding, Pikeville, Blackberry, Fisher, Richard, and Morehouse unequivocally state that while Alma Energy LLC is under no obligation to repay Pikeville Energy Group LLC or Blackberry Energy LLC any of the funds expended by either entity for the benefit of Alma, "**both Pikeville Energy Group LLC and Blackberry Energy LLC have provided and will provide funds and services in return for payment for future services rendered to Alma by Blackberry Energy LLC and for the availability of coal necessary to fulfill contractual obligations."**

Alma, Williams, Nathan, Nathan's Welding, Pikeville, Blackberry, Fisher, Richard, and Morehouse never stated what Halle and the Halle Related Entities falsely and fraudulently stated

to the Court, that Pikeville and Blackberry were not expecting to profit from the contractual

relationship with Alma. Halle and the Halle Related Entities statements otherwise constituted an

abuse of process.

Halle Objection l) "The Debtor has not mined an ounce of coal for more than ten months,

nor has it earned a penny during the pendency of this case, which has moved at a snail's pace. In

October 2007, the Debtor claimed that its then contract miner, BSD1, LLC ("BSD"), was going

to begin mining coal within ninety to one hundred-twenty days. True to form, the Debtor's rosy

predictions of future mining operations never materialized, and it was forced to terminate BSD

as its contract miner. Now, after months and months of no mining operations, the Debtor claims

that it needs to immediately begin mining operations. The claim should fall on deaf ears."

Again, Halle and the Halle Related Entities complained vehemently to the Court that

Alma was not producing coal, and then complained as vehemently to stop Alma from producing

coal when it was is ready to begin production. This objection by Halle is particularly obnoxious

since there is a sixty day deadline under the Settlement Agreement from February 8, 2008, to

obtain funds for bonding. The acts by Halle and Halle Related Entities, including false

statements, fraud, tortious interference, and abuse of process, were the direct and proximate

cause of the "snail's pace". Furthermore the acts by Halle and Halle Related Entities, including

false statements, fraud, tortious interference, and abuse of process, were the direct and proximate

cause of the necessity to, as Halle demanded, "fire Detherage" and BSD1. Having provided

funds under the Settlement Agreement, Pikeville Energy expected no opposition from Halle to

the commencement of mining.

Halle Objection m) "The structure of the Debtor's proposed mining arrangement with

Nathan's Welding, Blackberry and Pikeville Energy Group, LLC makes no economic sense and

appears to be tainted by conflicts of interest on the part of the Debtor and Mike Francisco, the

Chairman of the Committee and an insider of Pikeville Energy Group, LLC. On April 4, 2008,

Pikeville Energy Group, LLC was organized under the laws of the Commonwealth of Kentucky,

as evidenced by the documents included in Exhibit 1 attached hereto, which documents were

obtained from the Kentucky Secretary of State's website.  Mike Francisco is the Registered

Agent of Pikeville Energy Group, LLC. He is also the Chairman of the Committee in this case.

In no document filed in this case is this fact disclosed to the Court, creditors or parties in

interest."

Halle admits that "From the documents filed by Pikeville Energy Group, LLC with the

Kentucky Secretary of State, ***one cannot tell who owns membership interests in such entity***. As

evidenced by the documents included in Exhibit 1, Pikeville Energy Group, LLC's principal

office is located at 183 Tollage Creek in Pikeville, Kentucky 41501. That just happens to be the

principal office of Pikeville Energy, Inc. (See the documents included in Exhibit 2 attached

hereto, which were obtained from the Kentucky Secretary of State's website and concern

Pikeville Energy, Inc.)." and then falsely and fraudulently states without qualification that "Mike

Francisco, … is an insider of Pikeville Energy Group, LLC, organized April 4, **2008**, based on

the fact that "The President and one of the Directors of Pikeville Energy, Inc. is "Troy L.

Francisco," which is Mike Francisco's real name." an unrelated corporation formed August 3,

**2003**, by Francisco and a Tony Justice.

With no factual basis whatsoever Gartland, Halle, and Halle Related Entities made the

following false and fraudulent statements to this Court that "Upon information and belief, Mike

Francisco owns membership interests in or is an insider of Pikeville Energy Group, LLC. …

Mike Francisco, the Chairman of the Committee and an insider of Pikeville Energy Group, LLC."

In an affidavit filed with the Court, On March 7, 2009, Francisco stated the following about the false and fraudulent statements to this Court by Halle and the Halle Related Entities, which constituted an abuse of process:

"…4. Similar to Mr. Pruitt, I was accused by Halle's bankruptcy attorneys of possessing an ownership interest in the Pikeville Energy Group LLC ("Pikeville") last May of 2008 when Alma sought to begin mining coal and selling it Pikeville and Halle opposed this effort. These false statements caused irreparable harm to me insofar as they suggested that I was serving on the committee despite a clear conflict of interest. I believe that Halle's attorneys leveled this patently untrue and reckless allegation for the sole purpose of disqualifying me from serving on the committee without basis."

Halle Objection n) "Even if the Court were to ignore the aforementioned conflicts of interest, the proposed mining arrangement makes no economic sense. The Debtor proposes to use Nathan's Welding as its contract miner on an interim basis until such time as the Permits are transferred to it, at which time the Debtor proposes to use Blackberry as its contract miner. Both Nathan's Welding and Blackberry are owned by Nathan Williams, who is also the sole member of the Debtor. Prior to Pikeville Energy Group, LLC's involvement, neither Blackberry nor Nathan's Welding owned any mining equipment, and Blackberry has never mined any coal, having just been organized on March 20, 2008."

Alma informed the Court that the Permit to Operate were to be issued to Blackberry on May 14 or 15, 2008. Halle and the Halle Related Entities knew or should have know that the Permit was pending and would be issued by May 15, 2008, by calling the Department for Natural Resources prior to the May 14 hearing. The Permit was issued May 15, 2008, and Blackberry

was the entity designated to mine the coal. The statement "Prior to Pikeville Energy Group,

LLC's involvement, neither Blackberry nor Nathan's Welding owned any mining equipment,

and Blackberry has never mined any coal, having just been organized on March 20, 2008." was

true but meaningless, as Alma specifically stated that Pikeville was providing the resources to

Blackberry necessary for it to commence mining on May 15,2008. If the resources and permits

had not been provided, Blackberry would simply not have commenced mining until they were,

however that was not the case. Alma, Blackberry, Pikeville, Williams, Nathan, Nathan's

Welding, Fisher, Richard, Morehouse, Street, and Roulett were, as they told this Court, ready to

commence mining on May 15, 2008, but for the false and fraudulent statements to this Court and

the UST by Halle and Halle Related Entities, which constituted an abuse of process.

Halle Objection o) "The Debtor props Pikeville Energy Group, LLC up to be a "white

knight." Nothing could be further from the truth. For its alleged agreement to purchase

$1,496,000 of equipment to be owned and used by Nathan's Welding and/or Blackberry, for

which it will receive $2.00 per ton on account of all coal mined and sold on behalf of the Debtor

(and thus repayment in full of the $1,496,000, and then some), the Debtor has agreed to sell

Pikeville Energy Group, LLC coal for the next five years at $64.00 per ton, which is at least

$36.00 per ton below the current market price. At current market prices, Pikeville Energy Group,

LLC therefore stands to make a net profit of more than $127,000,000.00 ($36.00 multiplied by

the Debtor's estimated 3,532,144 tons of coal reserves)."

Pikeville Energy agreed to provide $1,496,000 of equipment and the necessary

infrastructure and operating funds necessary to commence mining. Halle and the Halle Related

Entities had, through economic coercion, laced the Settlement Agreement with poison pills that

made it impossible for Alma to obtain conventional or even high risk financing from any source

other than Pikeville Energy. The Settlement Agreement provided that:

"dd. In the event of a Default (as defined in the Settlement Agreement) of

the Debtor that is not cured, pursuant to the cure period provided in the default

provisions, by the Debtor, Alma's Operator or any of its contractors, the Permits

shall be immediately transferred to a party designated by THC. An Assignment of

Permits (the "Permit Assignment") shall be entered into at the time the Settlement

Agreement is entered into, which Permit Assignment shall be held in escrow by

an escrow agent reasonably acceptable to the Debtor and THC, and which Permit

Assignment shall be immediately released upon the occurrence of a Default that is

not cured pursuant to the cure period provided in the default provision. To the

extent the Permit Assignment is not accepted by the Commonwealth of Kentucky,

the parties will promptly prepare all necessary documentation to effect the

transfer….

ff. An Alma Default shall be defined as the failure of the Debtor Alma's

Operator or any of its contractors, to:

(a) make or arrange for all payments required by leases, licenses, permits,

contracts and other agreements related to this Settlement Agreement;

(b) pay all taxes, assessments and like charges except taxes determined or

measured by the Debtor's sales revenue or net income and taxes, provided, that

the Debtor shall have the right to contest (in the courts or otherwise) the validity

or amount of any taxes, assessments or charges if the Debtor deems them to be

unlawful, unjust, unequal or excessive, or to undertake such other steps or

proceedings as the Debtor may deem reasonably necessary to secure a

cancellation, reduction, readjustment or equalization thereof, but in no event shall

Alma permit or allow title to the assets to be lost as the result of the nonpayment

of any taxes, assessments or like charges;

(c) apply for all necessary permits, licenses or approvals;

(d) comply with all applicable laws, ensure that its operations are

conducted in compliance with all applicable laws and ensure that all of its agents,

employees, subcontractors and other parties engaged in connection with the performance of the operations comply with all applicable laws;

(e) notify promptly THC or its designee of any allegations of violations of any laws or regulations governing the operation of the Debtor's business. In the event of any such violation to timely cure or resolve such violations on behalf of both parties through performance, payment of fines and penalties or both and the cost thereof shall be borne entirely by the Debtor;

(f) prepare and file all reports or notices required for or as a result of operations;

(g) prosecute and defend, all litigation or administrative proceedings rising out of operations. THC or its designee shall have the right to participate, at its own expense, in such litigation or administrative proceedings. THC or its designee shall approve in advance and in writing any settlement of any such litigation or proceedings;

(h) provide insurance listed in paragraph nineteen (19) of the Settlement term Sheet and written evidence of insurance at the request of THC or its designee.

The Debtor shall have ten (10) business days from the date of any lapse in coverage to perform all steps necessary to reinstate or obtain coverage from another carrier subject to the carrier's normal approval process;

(i) perform or cause to be performed all assessment and other work, and pay all governmental fees required by law in order to maintain the unpatented mining claims, mill sites and tunnel sites operated pursuant to this agreement;

(j) to timely record with the appropriate county and file with the appropriate United States Agency any required affidavits, notices of intent to hold and other documents in proper form attesting to the payment of governmental fees, the performance of assessment work or intent to hold the claims and sites, in each case in sufficient detail to reflect compliance with the requirements applicable to each claim and site;

(k) to continue operations and keep equipment in good working order; provided that failure to continue operating for less than 45 days which is caused by any breakdown of equipment shall not be deemed a default;

(l) keep and maintain and provide to THC basic documentation confirming coal production and coal sales and payment of government mandated charges, and all taxes royalties; or

(m) provide THC or its designee with access to, and the right to inspect and, at its cost and expense, copy all maps, drill logs and other drilling data, core, pulps, reports, surveys, assays, analyses, production reports, operations, technical, accounting and financial records, and other business information, to the extent preserved or kept by the Debtor or the operator or one of its contractors.

gg. The Debtor shall be provided a cure period of ten (10) business days commencing after written notice of default. except for subsection (h) and (k) for which no additional cure period shall be provided."

In addition Alma was required by its status as a Debtor-in-Possession to fund and confirm a Plan of Reorganization.

After due diligence, Pikeville, as well as all other potential investors, were painfully aware of the history of the business relationship between Halle and the Halle Related Entities and Alma, Williams, Nathan, Nathan's Welding, Detherage, BSD1, Street, and Roulett. The potential investors knew about the hornets' nest of claims between the parties, as well as the Settlement Agreement provisions that:

a) Alma was required to pay Halle and the Halle Related Entities $4.55 per ton of mined coal *in addition to* royalties and fees paid to Pocahontas Land Company, Martin County Coal, Street, Roulett, and others on the same leases.

b) Alma was required to pay Halle and the Halle Related Entities fifty cents on the marginal dollar premium for coal sold over $65 per ton.

c) Nathan's Welding's was required to transfer to Alma and potentially to Halle, mining permits worth approximately $1,500,000.

The situation created by Halle and the Halle Related Entities, included the requirement:

"cc. Upon completion of securing funds in good faith for necessary bonding, which shall occur no later than sixty (60) days from the date of signing of the Settlement Agreement,…"

which created a deadline of 60 days from what should be deemed to be the date of final approval of the Settlement Agreement to complete securing funds for necessary bonding.

Pikeville Energy was the only entity willing to invest in Alma, the only "white knight" for Alma, Alma's Creditors, Williams, Nathan, Nathan's Welding, Detherage, BSD1, Street, and Roulett. As a direct and proximate cause of Halle and the Halle Related Entities economic coercion and abuse of process, Alma and Williams were left with no alternative other than that offered by Pikeville Energy, Halle and the Halle Related Entities ignore the fact that Pikeville Energy offered Creditors of Alma 100 cents on the dollar of their claims. Due to the acts of Halle and Halle Related Entities in the subsequent Chapter 7 case which constitute abuse of process, unsecured creditors will receive, at most, a few pennies on the dollar of their claims.

Halle Objection p) "To make matters worse, the Debtor has been negotiating with Energy Coal Resources, Inc. ("Coal Resources") to sell it the coal to be purchased by Pikeville Energy Group, LLC for between $80.00 and $100.00 per ton, depending upon the quality of the coal. Why would the Debtor agree to sell coal to Pikeville Energy Group, LLC for $64.00 per ton and at the same time be negotiating to resell the same to Coal Resources for significantly more? KCVI, THC and Mr. Halle submit that such conduct evidences a conflict of interest on the part of the Debtor."

To sell coal at any price Alma had to remove the coal from the ground, process it, ship it, and sell it. Alma could not remove the coal without obtaining $1,400,000 in equipment and infrastructure plus what would turn out to be approximately an additional $1,500,000 in operating funds. That is why Alma agreed to sell coal to Pikeville Energy Group, LLC for $64.00 a ton. Halle and the Halle Related Entities allege a conflict of interest, if any it is a conflict with what would benefit Halle and what would pay creditors 100 cents on the dollar. Alma's duty lay with payment of Creditors, it had no duty whatsoever to increase the return on investment to Halle beyond payment of his claims in the bankruptcy proceeding. Nonetheless, Halle stood to receive $4.55 on every ton mined by Alma, some $16,071,255 by Halle's estimates, for doing nothing.

Halle Objection q) "KCVI, THC and Mr. Halle object to the proposed mining arrangement on the grounds that it makes no economic sense. The Debtor should be required to hire a contract miner which has all the equipment and resources necessary to mine the Debtor's estimated 3,532,144 tons of coal reserves, and save for the benefit of its creditors and estate in bankruptcy the $127,000,000 which it proposes to divert to Pikeville Energy Group, LLC. Alternatively, the Debtor should be required to put its coal out to bid to at least three potential legitimate and unaffiliated purchasers."

Halle and the Halle Related Entities stated to this Court that "The Debtor should be required to hire a contract miner" in the same document where they also stated that "…the Debtor has had just $142.00 in the bank at all times after this case was filed." According to Halle and the Halle Related Entities, Alma should post bonds required by the Settlement Agreement within 60 days, buy insurance, and otherwise manage the Alma mines, with $142 in the bank. Halle and the Halle Related Entities would have Alma hire a contract miner where, as shown by

Halle in the Settlement Agreement "By way of illustration, if the Debtor is charged $6.00 per clean ton to wash its coal at Glen Alum, and then sells the washed coal for $81.00, the gross sales price will be deemed to be $75 for the purpose of calculating the royalty and the royalty will be $9.55 per ton." Therefore the contract miner would receive $81.00 less $9.55, which equals $71.55, less about $10 per ton shipping to Glen Alum, leaving $61.55. The experienced contract miner, William Detherage, had already told Alma, Williams, and Halle that it would be almost impossible for any contract miner to make a profit under the economically coerced terms of the Settlement Agreement.

The Settlement Agreement also provides that "In addition, it is understood that this arrangement is not binding upon the Debtor to ship its coal to Glen Alum and is not binding on Glen Alum to accept and wash the Debtor's coal." If Halle refused to wash Alma's coal for a contract miner, as it had done in the past for Alma, the cost of transportation to other preparation plants would be prohibitive.

Pikeville Energy was the only entity willing to accept the risk, the direct and proximate cause of which was Halle and the Halle Related Entities wrongful acts, in return for the potential reward.. Furthermore, Alma, Williams, Nathan, Blackberry, and Pikeville Energy's agreements provided for payment IN FULL of all claims, there was no duty whatsoever to fund an estate in bankruptcy that exceeded the amount necessary to pay all claimants 100 cents on the dollar.

 Halle Objection r) "If the Debtor retains the $36.00 per ton which it proposes to gift to Pikeville Energy Group, LLC, the Debtor could fund a one hundred (100) cents on the dollar plan in less than fifteen months."

Halle and the Halle Related Entities repeatedly falsely characterized the amount that Pikeville Energy would receive as a "gift", when in fact it was in consideration of investment of

what would be more than $3,000,000 in a high risk venture. Halle and the Halle Related Entities did in fact fail to honor the terms of the Settlement Agreement, and Pikeville lost its investment. The loss of over $3,000,000 was not a "gift" to Pikeville.

In addition, Halle and the Halle Related Entities intentionally, falsely, and fraudulently state to the Court that Alma would retain $36 Alma sold the coal for $100 per ton. Under the Settlement Agreement, even if Alma could have paid for bonds and insurance and hired a contract miner, which it could not have done, Halle would have received 50 cents on the marginal dollar, or $18 or the $36 that Halle claimed would go to Alma.

Halle Objection s) "Under the Court-approved Settlement Agreement dated December 14, 2007, as supplemented and amended, the Debtor is obligated to pay THC fifty cents ($0.50) of every additional dollar ($1.00) increase in the sales price of its coal in excess of sixty- five dollars ($65.00) per ton. THC submits that the Debtor agreed to sell its coal to Pikeville Energy Group, LLC for just $64.00 per ton for the next five years to avoid paying THC the $0.50 per ton royalty on all coal sold for more than $65.00 per ton. The Court should not tolerate such conduct."

It was the inclusion of the 50 cent on the marginal dollar provision in the Settlement Agreement as a result of economic coercion by Halle that was intended by Halle and the Halle Related Entities to make it impossible for Alma to secure additional funds necessary to obtain bonds within 60 days, pay insurance, and fund equipment and infrastructure. The provision did in fact make it impossible for Alma, Williams, Nathan, Nathan Williams, Street, and Roulett to find investors and contract miners for a venture where Halle and the Halle Related Entities opposed every effort of Alma to mine coal. If an investors or contract miner had agreed to invest

$3,000,000 and pay Alma $80 or $100 per ton, with Alma receiving 50 cents on the marginal

dollar, Alma would have taken the offer. However no such investors or contract miner existed.

Halle Objection t) "The License Agreement was not signed by Singleton, but rather by

Nathan Williams."

The final objection was easily met by Singleton's willingness to sign what was not only

the best option for Alma, Williams, Nathan, and the creditors of Alma, but the only option.

184. Halle and the Halle Related Entities intentionally delayed approval of the

Blackberry Interim Mining Agreement past the June and the end of the yearly settlement period

when long term met contracts are being filled by coal brokers, for the purpose of reducing the

market for Alma's coal. As a direct and proximate result of Halle and the Halle Related Entities

tortious interference, false and fraudulent acts, and abuse of process, Halle believed that Alma,

Williams, Nathan, Nathan Williams, Street, and Roulett, would not be able to find investors or

contract miners willing to mine Alma's coal, and that Halle would obtain the Pocahontas Leases,

Permits, and Mines for $1. Williams found investors willing to take the risk that Halle and the

Halle Related Entities would honor the terms of the Settlement Agreement, so they formed

Pikeville Energy to fund the high risk venture for an appropriate reward. As stated herein, Halle

and the Halle Related Entities would honor the terms of the Settlement Agreement, and as a

result Pikeville Energy lost over $3,000,000; Williams and Nathan lost at least $60,000,000;

Street and Roulett lost over $10,000,000 combined; and BSD1 lost over $6,000,000.

185. On June 4, 2008, Alma, for the benefit of Williams, Nathan, Blackberry, Pikeville,

Fisher, Richard, and Morehouse, filed a Motion to Approve the Blackberry Interim Mining

Agreement for hearing before the Court on June 15, 2008. Alma filed supplements, revisions,

and memoranda to the Alma Disclosure Statement and Plan and the Blackberry Interim Mining

Agreement. Halle and the Halle Related Entities continued their tortious interference and abuse

of process, by falsely and fraudulently opposing, directly and through false and fraudulent

information provided to the UST, the Alma Disclosure Statement and Plan and the Blackberry

Interim Mining Agreement, all in violation of the letter and the spirit of the Settlement

Agreement.

186. On June 9, 2010, Halle and the Halle Related Entities filed a competing Chapter 11

Plan of Reorganization (Docket # 374) and Disclosure Statement (Docket #375) (Halle Plan").

The filing of the Disclosure Statement and Plan by Halle and the Halle Related Entities was in

direct, fraudulent, violation of the Settlement Agreement which provided that "i. The Debtor is

solely responsible for resolving, paying and/or discharging all claims of the creditors in the

above-captioned Chapter 11 case." and "k. The Debtor shall take all reasonable steps to

determine the allowability and validity of all claims filed in this Chapter 11 case."

187. The Halle Plan provided that all secured claims would be paid in full, unsecured

claims would be paid 75 cents on the dollar, and equity interests would be extinguished. The plan

essentially paid in full all claims that would be potential claims against the Pocahontas Leases,

all taxes owed with relation to the mines, and all administrative claims. It paid allowed

unsecured claims 75 cents on the dollar, but provided nothing for Nathan Williams or Darrell

Williams and Nathan's Welding. Given the market value of the coal interests, the Plan paid less

than the liquidation value of the assets to unsecured creditors and far less than the value of the

equity interest of Nathan Williams in Alma. The Plan also wrongfully eliminated future

royalties, fees, and earnings for the benefit of Williams, Nathan, Nathan's Welding, Street,

Roulett, Pikeville, Blackberry, Fisher, Richard, and Morehouse from the operation of Alma's

mines and the sale of Alma coal.

188. In contrast, the Alma Plan paid all creditors in full over a longer time period, and provided for payments to Nathan Williams' equity interest as sole owner of Alma and economic benefits for Williams, Nathan, Nathan's Welding, Street, Roulett, Pikeville, Blackberry, Fisher, Richard, and Morehouse.

189. On June 15, 2008, the Court heard the arguments of Halle and the Halle Related Entities in opposition to the Blackberry Interim Mining Agreement and in support of the Halle Plan. The Court granted the Blackberry Interim Mining Agreement on terms, and allowed Alma to proceed with its Plan of Reorganization.

190. The Court instructed Alma, Williams, Nathan, Pikeville, Blackberry, Halle and the Halle Related Entities to see if an accommodation could be reached between the parties after the June 15 hearing to allow for mining under the Blackberry Interim Mining Agreement without continuing opposition from Halle and the Halle Related Entities. At the time the market for metallurgical coal had increased to over $200 per ton for the quality of coal produced by Alma. Alma, Williams, Nathan, Pikeville, Blackberry, Halle, Shelton, and Fleischman met at the Lexington Bluegrass Airport.

191. The Halle Related Entities agreed to cease their wrongful opposition of Alma and Williams' plan to mine and sell coal, and to suspend pursuit of the Halle Plan, if Alma, Williams, Nathan, Pikeville, Blackberry, Fisher, Richard, and Morehouse would agree to a sales agreement (the "Coal Sales Agreement") whereby Halle Related Entities would buy Alma coal and resell it for a significant profit to Halle.

192. After the parties had agreed on general terms, Darrell Williams, Gary Richard, Stephen Fleischman, and Warren Halle remained in the private air terminal waiting room while

Troy Francisco, Billy Shelton, and Paul Snyder went outside. At that time Warren Halle

threatened Darrell Williams life, as described by Williams in his Deposition dated May 28, 2008:

Q1 State your name for the record, please?

A Darrell Williams.

Q2 And what's your address Mr. Williams?

A Uh, 199 Hillside Drive, Forest Hills, Kentucky

41527.

Q3 And your Social Security Number.

A XXX -XX -XXXX

Q4 And your date of birth?

A 7-19-63.

Q5 And, uh, did you attend a hearing in Lexington,

Kentucky, on, uh, last week?

A Yes.

Q6 What was the date?

A Uh, I think it was the 15th.

Q7 Of, uh, May?

A Yes.

Q8 Of 2008?

A Yes, sir.

Q9 And following that hearing, did you have an

occasion to, to travel to the, uh, Bluegrass Airport?

A Yes.

QI0 Now would you tell me the purpose for your trip to

Bluegrass Airport?

A Trying to work out a deal with Warren Halley,

between Alma Energy, Pikeville Energy, and Warren Halley, uh, so

that we could get our coal mines back in operation.

Qll And, uh, did you in fact have a meeting with

Mr. Halley?

A Yes, we did.

Q12 And would you, would you tell me where the

meeting occurred within the Bluegrass Airport ?

A At the Attack Air. It's general aviation.

Q13 Did you go upstairs to one of the, uh, conference

rooms?

A No, it was in the front lobby of the, uh --

Q14 Was Mr. Halley about to leave on his private plane

or trying to get a charter or something?

A Yes, yes, he was. Yes he was.

Q15 Okay. He was present in the Attack Air Lobby on

that occasion?

A Uh, Mike Francisco with Pike Technical Services,

Paul Snyder, and his attorney, Darrell Williams, myself, uh, Gary

Richards, uh, an investor,. uh, Steven Flashman, that works for

Warren Halley, and Warren Halley, and Billy Shelton.

Q16 Now were all of those people present at the

beginning of the meeting?

A Yes, I feel they were.

Q17 Okay, and, uh, did Mr. Halley make any

statements to you during that time?

A Uh, we negotiated a deal, and got close on the

economics. At that point, some people started leaving the lobby.

left the lobby, and went outside. Mike Francisco left, Paul Snyder

left, uh, Billy Shelton left.

Q 18 About what time of the day would that have been?

A I'm going to say it's, you know, five o'clock in the

evening maybe~ Uh, and Gary Richards stayed inside the terminal

and spoke with Warren Halley, and Steve Flashman for a while,

and then I walked back into the building, and then Warren Halley

did make a statement to me.

Q19 Okay, and when you walked back into the

building, who was present at that time?

A Gary Richards, and, uh, Steve Flashman, Warren

Halley, and myself.

Q20 Okay, and what statement did Warren Halley

make to you at that time?

A Mr. Halley stated that, "Darrell, if you don't take

this deal or you screw this deal up, you better have some good

insurance, because I'll have someone to kill you," and, uh, he just

didn't say it once. He kept kind of reiterating the fact, and, uh, he

basically said "You'll be driving down the road in your pickup

truck, and I'll have a coal truck take you out of this world," and,

uh,

that -- It, it, you know, the more he reiterated it, I kind of got, uh, I

got angry, and then I got, I got real verbal with him, and --

Q21 How many times did he say that to you?

A Uh, uh, just once that he would hire somebody to

kill me, but several different occasions of how it, how it could be

done, you know. You would be walking beside the road, and

somebody will run over you, or you will be in your truck driving

down the road, and --

Q22 Describe his demeanor at the time that he made

that. Was he angry?

A No, he was serious. I mean, I, I didn't take him to

be angry. I took him to be serious. Steve Flashman jumped in,

and said he was only kidding, but I didn't take it as a, as a joke.

Q23 Did you consider it a threat?

A It was a definite threat.

Q24 And did, did you, uh, experience fear as a result

of it?

A Absolutely. He is a billionaire. He could afford to

hire somebody to kill you, and, uh, I left out of the room, and went

back outside, and immediately told Alma's attorney, and Mike

Francisco what happened, and later Bud Richardson did confer

that it did happen.

----

And in the Affidavit of Gary "Bud" Richard on May 28, 2008

…..

Q14 Alright. Did you attend a subsequent meeting

that same day at the Bluegrass Airport?

A Yes, sir.

Q15 Where did that meeting take place?

A It was in the lobby of, uh, one of the, uh, uh, I

guess, private aircraft charter buildings.

Q16 Was there a general aviation building, Attack Air?

A That's, that's the one.

Q17 And, uh, did you -- How did you -- Did you travel

with someone from the, uh, Bankruptcy Court Building at the

Community Trust Building there downtown, out to Bluegrass

Airport? Did you travel with anyone?

A I traveled with Darrell Williams.

Q18 Okay, and when you arrived down at the Attack

Air, did you, uh, who was present in the lobby to Attack Air when

you and Darrell Williams went in?

Q19 It was Mike Francisco, uh, Paul Snider, uh,

Michael Gartland. Actually Mike Gartland was not there. I'm

sorry. Uh, it was, uh, Warren Halley, uh, and, uh, Billy Shelton.

Q20 Okay, and, uh, after a time did some of those

people leave the room?

A There, there were a number of different

conversations that we all had as a group, and then there were

individual one-on-one conversations throughout the meeting. Vh,

there was a little bit of a break in the meeting, and some people

went outside, and at that point I, I, I had some time to take to

Mr. Flashman, as well as Mr. Halley, and, uh, there were

numerous conversations going on, uh, at various times.

Q21 Did Mr. Halley make any kind, any comments

threatening Darrell?

A Absolutely.

Q23 That was your understanding at the time?

A Yes.

Q24 At the time that you were present and heard these

statements being made to your, to your business partner, Mr.

Williams, did, uh, you take those to have any affect on your

personal situation?

A There were no threats at all made directly to me

or towards me in any way, but with these comments being stated

directly to my business partner, uh, I mean, I was definitely

intimidated, because when somebody's threatening to kill your

business partner, uh, and he's also expressing that he's not above

doing that to you to, and so, you know, all I know is I've never

dealt with a billionaire before, and he's got the means to do pretty

much anything he wants with money, and he certainly likes to let

people know that.

----

And in the Affidavit of Troy Francisco on March 5, 2009

…..

"Last May of 2008, following the hearing where Halle's attorneys accused

me of possessing an ownership interest in Pikeville, I was present at the TAC Air

terminal located at Bluegrass Field. Representatives of Alma, Halle and Pikeville

had convened there for the purpose of attempting to reach a coal sales agreement

amongst them at the direction of the Court. I was outside the lobby of the General

I aviation building talking to Paul Synder, Alma's attorney, when Darrell

Williams and Gary Richard, an owner of Pikeville, walked outside of the building

and appeared visibly disturbed. These two individuals advised me that Warren

Halle had just threatened to have Darrell Williams killed if Pikeville and Alma

did not agree to accept the terms of a deal Halle had proposed or was attempting

to negotiate."

193. Gary Richard was frightened by the threat on Williams' life and intimidated by

statements to him by Mr. Gartland as Counsel for Halle:

"Q9 And in the course of that, did you attend a

hearing in the United States Bankruptcy, Fourth Eastern District

of Kentucky in Lexington Kentucky on June 15th, 2004, '08? I

mean 2008?

A Yes.

Q10 And, uh following that hearing, did you have an

encounter with any of the representatives of Warren Halley or

Warren Hall while you were still in the building that houses the

United States Bankruptcy Court in Lexington?


A Uh, yes, sir, I was not involved with most of the

conversation. Uh, but when Darrell had pointed to me and

mentioned that, uh, I had put in over a million and one-half

dollars in cash into this, uh, project, uh, Michael Gartland, uh,

just immediately, uh, got very close to me physically, and pointed

at me, and started saying, "Well, you're going to lose every penny

of that investment, and we're taking that money. Thanks a lot for

your contribution to our project," and, uh, it was uncalled for.

Nobody was really over excitable in the room. It was just, uh,

pretty aggressive.

Q11 And did you have counsel present?

A Uh, well Darrell was present. Uh, I'm not sure

who else was actually there.

Q 12 You didn't have anybody there representing you

when Gartland approached you like that?

A No.

Q 13 And, uh, he just made that statement to you there

in the building?

A Yes. There were a number of people all around,

but it was, it was kind of a quick and fast thing."

194. Shelton, Gartland, and Simmons, owed a duty to the Plaintiff not to breach, aid,

abet, or counsel the breach of a contract, agreement, or settlement in which the Defendants

participated in the drafting and execution; not to engage in false, fraudulent, misleading, or

deceptive acts or practices in the representation of their clients; and not to act with malice or in

bad faith with the intent to harm the Plaintiff.

195. Shelton, Gartland, and Simmons, violated those and other duties owed to the

Plaintiff by intentionally, in bad faith, and with malice violating the terms of the Settlement

Agreement, which was the direct and proximate cause of actual and consequential damages to

the Plaintiff.

196. Gartland and Shelton stated to Williams and Richard that Halle would continue to

oppose Alma and Williams in Bankruptcy Court unless the Coal Sales Agreement was signed.

Afraid that he would lose his $1.5 million investment in Pikeville Energy due to Halle and the

Halle Related Entities false and fraudulent acts and abuse of process, Gary Richard urged Alma,

Williams, and Nathan to agree to the Coal Sales Agreement, despite the protestations by

Williams that Halle would not honor the agreement in good faith.

197. Due to the Halle Entities wrongful and fraudulent interference with and opposition

to Alma's reorganization and mining plans, Williams and Alma had no funds to pursue litigation

and were economically and physically coerced into executing the Coal Sales Agreement.

After the negotiations, and in light of mounting economic pressures caused by the Defendant's refusal to honor the Settlement Agreement, Alma, Williams, and Nathan acquiesced to the demands of Halle, and Pikeville entered into an agreement with the Halle Entities on June 30, 2008, to sell the coal produced at the Alma mines to Halle Related Entities at $127.50 per clean ton. Halle then resold the coal for an estimated $180 per ton, for a per ton profit of over $50.

198. Alma, Blackberry, and Pikeville produced and sold coal to the Halle Entities under this agreement between July 1, 2008, and late November of 2008. At that time the coal market dropped dramatically, with recovery predicted to be six to twelve months in the future. When the market dropped the Halle Entities abruptly terminated the coal purchase agreement without notice, in violation of an express term that required a 30 day notice.

199. The Halle Related Entities honored the terms of the Coal Sales Agreement until the market for coal dropped, and then wrongfully and fraudulently refused to pay for coal produced at the Alma mines.

200. Termination without the required notice resulted in Pikeville, Blackberry, Alma, Williams, Nathan, Richard, Fisher, and Morehouse not having the funds necessary for Alma to secure the mines; provide for the environmental and safety obligations of the mine owner; and to shut them down for the twelve month period allowed under the Settlement Agreement.  Pikeville, Blackberry, Alma, Williams, Nathan, Richard, Fisher, and Morehouse were economically coerced by Halle into signing releases to receive part of the funds owed to them by the Halle Related Entities for the purpose of paying payroll and securing the mines.

201.  Halle contended that he could terminate the coal purchase agreement with Pikeville on the basis that the ARNU (rate of shrinkage of coal) specification in the contract had not been

met. Pikeville disputed this contention.  Subsequent thereto, Alma, Blackberry and Pikeville learned in the deposition of Mr. Edouard representing a purchaser of the coal, that as the end purchaser of the coal, Integrity Coal, did not have an ARNU specification in its contract and had never rejected any of the coal produced by Alma and Blackberry and sold by Pikeville to the Halle Entities. Furthermore, it was learned that Halle and the Halle Related Entities intentionally and fraudulently sampled Alma's coal so as to reduce the amount that Pikeville and Alma were paid by instructing Gilbert Coal Testing to screen off the 300 mesh and smaller product before doing an ash burn test on Alma Coal Samples, and to measure ARNU values where the value was not relevant to sales, all to further its unlawful economic gains and termination of the Coal Sales Agreement.

202. Halle, the Halle related Entities, Shelton, Gartland, and Simmons, knew that cancellation of the coal purchase agreement between Halle and Pikeville, without prior notice and in the midst of a significant market downturn, would be the proximate cause of severe economic consequences to Williams, Alma, Nathan, Pikeville, Blackberry, Fisher, Richard, Morehouse, Street, and Roulett, and threaten the viability of Alma's reorganization plan to the detriment of Williams, Alma, Nathan, Pikeville, Blackberry, Fisher, Richard, Morehouse, Street, and Roulett.

203. The unlawful termination was specifically calculated to cause this harm, as the Halle Entities continued to sell coal produced at their mines. If Halle, the Halle related Entities had acted in good faith, they would have renegotiated the purchase price with Pikeville and Alma, rather than intentionally causing economic damage to Williams, Alma, Nathan, Pikeville, Blackberry, Fisher, Richard, Morehouse, Street, and Roulett.

204.  Following the termination of the coal purchase agreement between Halle and

Pikeville, the Halle Entities resumed their efforts to prevent Alma from confirming a plan of

reorganization, in violation of the letter and spirit of the Settlement Agreement, all to the

detriment of Williams, Alma, Nathan, Pikeville, Blackberry, Fisher, Richard, Morehouse, Street,

and Roulett.

205.  Following the termination of the coal purchase agreement between the Halle

Entities and Pikeville, Pikeville and the Plaintiff began searching for alternative coal purchase

orders for Alma and the Plaintiff's benefit.  Alma and Pikeville reported to the Court that they

were in negotiations with purchasers of metallurgical grade coal, including Integrity Coal Sales

and others. It attached an email from Integrity to show that alternate purchasers were available:

-----Original Message-----

From: RobertEdouard@aol.com
To: AlmaEnergy@aol.com
Sent: Thu, 29 Jan 2009 3:24 pm
Subject: Coal Purchase Proposal
Attention: Mr. Darell Williams
Thanks for taking some time from your busy schedule to discuss your coal
products for Year 2009.

Integrity is very interested in purchasing coal from your group in 2009. Once we
settle our contractual business for Year 2009, we will be in touch with Alma
Energy.

Our goal will be to use your coal products as a component in our overall portfolio
of coals in which we market coals inland to domestic steel mills and plants. We
also are very well aware that we can use your coal products to be a viable
component in our coal blends that we export to various countries in the overseas
market.

Again, thanks for making the time and let's stay in touch.

Kind regards,
Robert Edouard
Buyer/Director - Metallurgical Marketing
Integrity Coal Sales, Inc.
Integrity International Corp.

Office: 631 467 6969
Fax: 631 467 7776
Cellular: 631 796 1375

206. Immediately upon learning of negotiations with Integrity Coal Sales, Halle and the

Halle Entities, and through Mr. Gartland, interfered with those negotiations for the purpose of

preventing Pikeville from securing a coal purchase order for the benefit of Williams, Alma,

Nathan, Pikeville, Blackberry, Fisher, Richard, Morehouse, Street, and Roulett. At the apparent

instigation of Gannacone, Gartland and Stephen Fleischman called Robert Eduardo of Integrity

Coal, and represented to him that Alma and the Plaintiff were dragging Integrity into a legal

proceeding and lawsuit. Gartland, on behalf of Halle and the Halle Related Entities, including

THC, fraudulently stated to this Court:

> "Good afternoon your honor, I'll speak just for THC, your honor, I'll first address
> what Mr. Fisher was discussing, I got a call from a creditor who is a creditor who
> voted on the plan, about the attachment to the motion to continue if you notice
> attached to document 506 this is an email from Eduardo, Robert Eduardo, of
> Integrity Coal Sales. This creditor called him to see if in fact there were any
> discussions between the debtor and Integrity about buying coal and that person
> told him no so I picked up the phone and had a discussion with him this morning
> and when he found out his exhibit A to the motion had been filed his email he was
> upset he said there are no ongoing discussions there have been no prices discussed
> and over the years Mr. Williams has contacted them about potentially selling coal
> and Mr. Williams has never followed through on anything he has promised to do
> but there are no discussions now this is one, this is the document, attached to the
> motion to continue, and I'm telling you, on the speaker phone with me was Kent
> Barber and Steve Fleischman, they all heard him say there are no discussions,
> period. Yet they're touting that they had the consent to file this in the pleading
> they filed today when in fact they didn't have his consent he was upset he said he
> was going to call Darrell Williams and said I'm having nothing to do with your
> entity because you had no business attaching my email to a pleading in a court
> filing so we did not call him with the intention of interfering we could care less
> about the relationship I just wanted to know if it was true whether or not there
> were any discussions it turns out there are no discussions and this is one of the
> creditors that Pikeville supposedly negotiated a contract with and that creditor
> called to testify would say, or this party would say false, there are no discussions,

period, end of story. So that was the sole purpose. To find out if I was being told
the truth or not, and apparently I was."

207. At the time Integrity was a major customer of Halle's Glen Alum mines. Halle and

Gartland knew or should have known that any call to Integrity by Halle or Halle Related Entities

would be viewed as a "complaint" by a customer that Integrity was negotiating to buy Alma

coal, and a "warning" that Integrity had been involved in a legal dispute.

208. Gartland, Halle, and the Halle Related Entities made the false and fraudulent

statement to this Court that "I just wanted to know if it was true whether or not there were any

discussions it turns out there are no discussions and this is one of the creditors that Pikeville

supposedly negotiated a contract with and that creditor called to testify would say, or this party

would say false, there are no discussions, period, end of story."

209. In his subsequent Deposition Eduardo outlined to Gartland the detailed discussions

that in fact had taken place:

> "8  Q Prior to May 16, 2008, had Darrell
>  9  Williams ever sold you any coal through any
> 10   entity?
> 11  A No.
> 12  Q At this point in time how long had
> 13  you known the individual, Darrell Williams?
> 14  A I think we first met Darrell when
> 15  he came to our offices here to show us that he
> 16  had production.
> 17  Q When was that?
> 18  A I'm not one hundred percent sure.
> 19  I think it might have been in 2005 or in 2006.
> 20  He came to the office here. We met here in this
> 21  room, and he gave us some indications that he
> 22  was going to have production. He had quality
> 23  specifications. He had maps of coal that he was
> 24  going to mine and produce. And based on the
> 25  quality, we had some interest in definitely

2   doing business with Darrell.

3   Nothing developed after that. And

4   then from then to 2008, here I am reaching out

5   to Mr. Williams trying to see where he is as far

6   as his coal production, to see if we can maybe

7   do some business together.

8   Q The first written contact is

9   May 16, 2008. And then can you tell us, what do

10   you think the next correspondence was based on

11   the documents you produced?

12   A I think I sent Darrell this e-mail

13   which is number 28, which has a May 16 date.

14   Q Right.

15   A I think after that I didn't hear

16   back from him. And then it looks like May 23, I

17   believe is the next correspondence.

18   Q Which page number are you looking

19   at now, sir?

20   A I believe that's 30.

21   Q Because there's two pages with

22   May 23, 2008, Pages 29 and 30. Both have the

23   same date at the bottom of the page.

24   A Right, 30 is first.

25   Q How do you know that?

2   A Because he says "Talk to me, Big

3   Guy." And I respond to him, "Greg is due in

4   today. I will explain to him your deal. I will

5   try to get back to you with a price, term of

6   deal, et al. If you don't hear from me by

7   three, please call. How was your meeting with

8   Joe? Where do we need to be on price?"

9   Then he responds in the next

10   e-mail, which is 29, "$150 to $160 FOB rail

11   car." So he is responding to that by e-mail. I

12   say -- and he gives me the specs and the price,

13   which is kind of what I need. I respond,

14   "Thanks for your reply. I will get to work and

15   get back to you."

16   Q Did you have any telephone

17   conversations with Mr. Williams between May 16

18   and May 23, or was it all in e-mails?

19   A I believe it was all in e-mails.

20   I don't see any reference here to any phone

21   conversation.

22   Q Let me ask you this: Looking at

23   Page 29, this is your handwriting on Page 29?

24   A Yes.

25   Q That's all your handwriting on

2   this page, right?

3   A Yes.

4   Q On the upper part where we see the

5   handwritten characters, there's some numbers?

6   A I'm not even quite sure what I was

7   writing there.

8   Q It says, "Greg, this will load

9   from Glen Allum," right?

10   A Right.

11   Q "It is Darrell Williams' coal,

12   but" -- what does that say?

13   A "But we pay Halle (Next Gen)."

14   Q Let's go back to Page 30. I want

15   you to explain to me, it talks about the deal

16   with Halle. What is that a reference to on

17   Page 30?

18   A I think that has to do with -- I

19   think that has to do with how Darrell was going

20   to move his production. I think he didn't have

21   a plant to load his coal, and I think the

22   closest plant was the PS Processing Plant on the

23   Norfolk Southern Railroad. And I think he had

24   come with -- came to an agreement to have his

25   coal loaded at that facility.

2   Even though you produce coal, you

3   have to have a place to load it. He has to find

4   a site where rail cars can come in and you can

5   load your coal onto on the Norfolk Southern

6   line, the railroad. He had to find a site to

7   lead it. I believe that's when he told me he

8   was going to load his coal at Halle's site.

9   Q Did he tell you at that time that

10   he actually had a deal with Mr. Halle to sell

11   him coal?

12   A I don't know.

13   Q After May 23, when is the next

14   time you see correspondence here? We already

15   talked about Page 31. Page 31 is the e-mail of

16   the 27th, right?

17   A Yes.

18   Q Attached to that were these coal

19   reports, I take it, the one dated December 15,

20   2006. Do you see that on Page 32?

21   A Yes.

22   Q That was an attachment to the

23   e-mail sent on Page 31, correct?

24   A Yes.

25   Q Also is that true with respect to

2    the page marked 33, was that part of the

3    attachment --

4    A -- Yes.

5    Q -- to the e-mail sent on the 27th?

6    A Yes. This is quality

7    specifications, which I can't determine anything

8    without seeing this information.

9    Q And then is that your handwriting

10   on Page 32 that says "Good" with some numbers

11   circled and "Right Fork"?

12   A No.

13   Q Whose handwriting is that?

14   A I don't know.

15   Q You have no idea who wrote that?

16   A No.

17   Q How about on Page 33 there's also

18   handwriting. It says "perfect," and then

19   there's some numbers circled and some arrows

20   drawn, it says "fair" next to them. Do you know

21   who wrote that?

22   A No.

23   Q That's not your handwriting?

24   A No.

25   Q Looking back at the documents that

2    you have produced, I think we have talked about

3    Pages 28 through 36, correct? We have gone

4    through those pages?

5    A Correct.

6    Q Let's turn to Page 27. It has a

7    date of Wednesday, May 21, 2008, at the bottom

8    of the page?

9    A Yes.

10   Q Can you tell me what this page is?

11   A This is an e-mail that came in

12   from Darrell. He says he has hi vol met coal,

13   six dry ash, .70 sulfur, 10,000 tons a month, NS

14   rail.

15   Q That would be the Norfolk

16   Southern?

17   A Yes. This is the pertinent

18   information.

19   Q Did you write back "Give me a

20   price in the car," or is that his writing?

21   A That is his writing.

22   Q What did you say?

23   A I write back "Please give me your

24   phone number to discuss. I sent you an e-mail

25   last week. Did you get it? I need mine origin

2    or district to determine -- actually, it looks

3    like he is finally replying to my e-mail. I say

4    "Please give me your phone number to discuss. I

5    sent you an e-mail last week. Did you get it?

6    I need mine origin or district to determine

7    freight and fuel surcharge before I can quote a

8    price. I also need to discuss term. Can we

9    discuss through June 2010?" And then I ask him

10   to call me and I give him the number.

11   Q I take it you had a conversation

12   with him, right?

13   A Yes, I believe we had a

14   conversation maybe the same day of May 21.

15   Q These are all of your handwritten

16   notes?

17   A Yes.

18   Q Below the typewritten information

19   on the document?

20   A Yes.

21   Q Looking at these notes, does it

22   refresh your memory as to what you discussed on

23   or about May 21?

24   A Yes. It looks like we discussed

25   how he was going to load his coal and when he

2    was going to load his coal, and how this deal

3    was going to be construed, and the markets that

4    the coal went to in the past, and an indication

5    on price, and the logistics and things that was

6    going to take place regarding how he was going

7    to load his coal.

8    Q Did he tell you about an

9    individual by the name of Gary Richard, Banner

10   Industries?

11   A Yes. Gary Richard, Banner

12   Industries was, I guess, supposed to be part of

13   this whole thing. Then there was Hayden Fisher,

14   who was supposed to be an attorney. Then that

15   the coal had gone to Tonawanda Coke and ABC Coke

16   and they loved the coal a year ago. I'm not

17   quite sure who Nathan Williams was. I think he

18   is part of the Alma Energy umbrella. There was

19   an indication that there was bankruptcy and will

20   honor what the court says.

21   Q What does that mean?

22   A I think that means that he was

23   telling me he was in bankruptcy and he is trying

24   to honor what the court says.

25   Q Okay.

2    A He gave me Alma Energy as the

3    address; P.O. Box 129, Hardy, Kentucky 41531.

4    He said that the agreement would be 30 days

5    after mine load date.

6    Q What does that mean?

7    A That means that after he loads the

8    coal, 30 days after that date we would have to

9    furnish payment. Under that it says "10,000

10  tons now, June 2008 late through December 2009,"
11  which means maybe 10,000 tons a month from June
12  2008 through December 2009 with the possibility
13  of increasing to 30,000 tons starting in August
14  2008.
15  In the middle it has a phone
16  number, (606) 625-2699. And then it says "The
17  deal will be with Halle." "Pay Halle," which
18  means if I buy the coal, I will pay Halle. The
19  coal would be coming from Darrell's operations,
20  10,000 tons. And it gives the quality right
21  under that; 60 percent dry ash, .70 dry sulfur,
22  34 to 36 dry vol, which is a very good quality
23  for hi vol coal. Thirty-four to 36 dry vol; he
24  didn't give me the ARNU, but he gave me the
25  fluidity which was 28,000.
2   Then he indicated that he wanted
3   me to send him some type of a purchase order
4  draft, and Pikeville Energy would play a role in
5  that. The payments will be signed to -- the
6  payments will be signed to Halle. Halle will be
7  the money. If no delivery, sue Pikeville. I'm
8  not sure what that meant. And then he gave me
9  an indication of pricing; $165 for the balance
10  of the year.
11  And he said Halle's role would be
12  washing the coal, loading the coal and factoring
13  the coal. On the very top it says "Joe Czul,
14  three p.m. meeting tomorrow," because he was --
15  Darrell was trying to not only market this coal
16  to Integrity, but also he was meeting with Joe
17  Czul, who is a company, kind of a competitor,
18  Logan and Canawa. Logan and Canawa is the name
19  of that company. He was meeting with him
20  tomorrow.
21  Q Where are they located?
22  A They are located in West Virginia.
23  Q You have heard of them before?
24  A Yes. They sell coal to India.
25  Q I take it Mr. Williams asked you

2  for a draft purchase order?

3  A Yes, Mr. Williams asked me for a

4  draft purchase order. That was on May 21. I

5  believe we had this conversation on May 21. I

6  have to assume that.

7  Q Right. And then on June 2, if you

8  look at Pages 25 and 26, it looks like you

9  e-mail him a draft purchase order, correct?

10  A Yes. Twenty-five is the e-mail

11  transmittal, which is dated May 29, which

12  indicates, "Here is the draft PO."

13  Q The purchase order is actually

14  drafted May 29?

15  A Yes; that is correct.

16  Q And it was for $150 NT. What does

17  NT mean?

18  A One hundred fifty dollars net ton

19  at the mine, which means when he puts the coal

20  in the car, I have to pay him $150 per net ton

21  based on these quality specifications.

22  Q Let me ask you this: Am I reading

23  this draft PO right; during July 2008 to

24  September 2009, he agreed to supply you with

25  150,000 net tons?

2  A This is a draft purchase order.

3  This is not a one hundred percent agreement.

4  This deal is not done. This is just a draft I'm

5  sending him.

6  Q But these are terms --

7  A These are terms. It would be

8   between July 2008 through September of 2009,

9   150,000 tons at $150.

10  Q Were these terms that were

11  discussed on the phone between you?

12  A Yes, these are the terms that are

13  generated from this conversation on 27, from

14  Page 27. The specs pretty much are going to be

15  the same as per discussion.

16  Q I notice on the draft purchase

17  order on the bottom it says, "General Terms and

18  Conditions contained on the reverse side are

19  incorporated by reference." We don't have the

20  reverse side of the purchase order, correct?

21  A Not on the draft, no, you don't.

22  Q So you sent the draft purchase

23  order on May 29, correct?

24  A Yes.

25  Q And did you hear back from

2   Mr. Williams?

3   A I sent it on the 29th, and I

4   didn't hear back from him. On June 12 I sent

5   another e-mail asking him --

6   Q "Do you have any comments?"

7   A "I hope all is well." I didn't

8   hear from him so I was hoping he was in good

9   health, number one. "Hope all is well." And

10  then I asked him "any comments on draft PO?"

11  Q You are reading from the page

12  marked as 23?

13  A Yes.

14  Q Pages 23 and 24 are a single

15  document, correct; it's a two-page e-mail,

16  correct?

17  A That is correct. I basically

18  asked for his comments after sending the PO

19  because I didn't hear back from him.

20  Q You also say in there, "Please

21  give me a call in the office to discuss." And

22  the phone number and extension, correct?

23  A Right. I also expressed if we

24  needed to change the term a little bit, we were

25  open to do that. He did express that he wanted

2   to do a two-year deal, and I told him we could

3   look at that as well.

4   Q Did he ever call you in response

5   to your e-mail of June 10?

6   A No. May 29 I didn't hear from

7   him. June 2 I sent an e-mail and I didn't hear

8   from him. June 19 I sent another e-mail.

9   Q That's marked as Page 22?

10   A Yes. That was another two weeks I

11   didn't hear from him. Page 22, which is my

12   June 17 e-mail, I make a reference to "I sent

13   you the draft PO as per your request and never

14   heard back from you. Can you please give us a

15   call."

16   Q He did neither, correct?

17   A No, I didn't hear back from him.

18   On July --

19   Q On July 25 you send yet another

20   e-mail?

21   A July 25 I sent him another e-mail.

22   Q That is Page 21, correct?

23   A Page 21, yes.

24   Q One-page document, right?

25   A Yes. I'm just asking him "is

2    there any coal available?"

3    Q Did he respond in writing or

4    orally?

5    A No.

6    Q December 12, 2008, Page 20, you

7    get an e-mail from him, correct?

8    A Yes.

9    Q It says "you need any hi vol?"

10   A Yes. I didn't hear from him. It

11   doesn't look like there was any response after

12   July 25, 2008. And then December 12, 2008, he

13   sends me an e-mail asking me do I need any hi

14   vol coal.

15   Q That is the first you heard from

16   Mr. Williams since the time you sent him the

17   draft purchase order?

18   A That is what -- yes.

19   Q He didn't call you?

20   A No, I don't have any recollection

21   of that.

22   Q He didn't e-mail you?

23   A No. I think everything was by

24   e-mail, because sometimes when I would call him,

25   I couldn't leave a voicemail. E-mail was the

2   best communication.

3   Q So that's Page 20. He sends you

4   an e-mail "do you need any hi vol coal?" The

5   next page, Page 19, you write back one word

6   "yes," correct?

7   A Yes.

8   Q That's on June 12?

9   A December 12, 2008.

10  Q December 12, 2008?

11  A Yes.

12  Q One-page e-mail, right, Page 19?

13  A Yes.

14  Q And then the next e-mail we have

15  looks like it's Page 18 on December 16, 2008,

16  correct?

17  A Yes.

18  Q And you are saying -- your subject

19  was "No Answer No Voicemail." "Darrell, I tried

20  to call you. No answer and no voicemail. Call

21  me." And you gave him your number; is that

22  correct?

23  A That is correct.

24  Q If you look at Page 17, it looks

25  like another e-mail dated December 17, 2008,

2   correct?

3   A Yes.

4   Q It's from Darrell to you, correct?

5   A Yes.

6   Q It doesn't look like there is a

7   message there?

8   A It's in the RE. It says, "You

9   need any hi vol? I am trying to call you. My

10  number is (606) 625-2699. Darrell."

11  Q I take it you called him in

12  response to the e-mail dated December 17, 2008?

13  A Yes. I think we had a

14  conversation.

15  Q What do you recall?

16  A I must have been asking him for a

17  full petrography and a full analysis of the coal

18  to --

19  Q What is the first word you used,

20  petrography?

21  A Petrography.

22  Q What is that?

23  A That's -- the coal that he has

24  goes in the steel market, the metallurgical

25  market, so I need to see the petrography of the

2  coal. It's just a portion -- it's a part of the

3  coal. It's just an analysis of the coal, but

4  it's a little bit more technical. It is not

5  just moisture, ash, sulfur. If you look at this

6  document he sent me over --

7  Q Which document, what page?

8  A Page 15. It is ash, mineral. It

9  talks about the elements in the coal. It gets

10  very technical. It talks about the reactives

11  and the inert balance. It's the solar heated

12  oven, how it is going to expand in the coke oven

13  when you coke it. That coal is used to make

14  coke. Is it going to expand, is it going to

15  contract. All of that information is vital in

16  coking coal.

17  Q Let's go back to Page 16 for a

18  second. I take it you received an e-mail from

19  Alma Energy, which was forwarded, it looks like,

20  from a guy at an e-mail address called

21  Brett@KCMTG.com. Do you see that?

22  A Yes.

23  Q It looks like it says Brett

24  Morehouse and Investments. Do you know who that

25  is?

2  A No.

3  Q Do you know if he is involved with

4  Alma in any way, shape or form?

5  A No.

6  Q Do you know if he is involved with

7  Pikeville Energy Group, LLC?

8  A No.

9  Q I take it that the e-mail sent on

10  December 17, Page 16, had attached to it
11  Page 15, the Gallagher Coal Research Center,
12  Inc. report?
13  A Correct.
14  Q Did this give you the information
15  that you needed, this report?
16  A Yes.
17  Q So you looked at the report and
18  then what happened?
19  A It looked like very good coal.
20  Q It looks like the next
21  communication we have written is not until
22  January 7, 2009. Do you see that?
23  A Yes.
24  Q It looks like you sent an e-mail
25  to Darrell saying, "Returned your call. No
2   answer."
3   A "I just returned your call. No
4   answer. I'm in the office all day."
5   Q "Give me your number. Please call
6   me." Is that correct?
7   A That is correct.
8   Q Do you know if you had any
9   conversations with Mr. Williams between
10  December 17, 2008 and January 7, 2009, when you
11  sent the e-mail marked as Page 14?
12  A January 7 and what?
13  Q The date you got the Gallagher
14  report, which is December 17, 2008, some almost
15  three-week period.
16  A I think -- I'm not a hundred
17  percent sure. I think on December 17 we may
18  have discussed where are you going to load this
19  coal, and when is the coal going to be
20  available.
21  Q Were you aware at this time that
22  Alma Energy was basically not even mining much
23  coal?
24  A I didn't know.
25  Q Were you aware that Alma Energy

2   did not mine a lump of coal in January, February

3   or March of 2009?

4   A I wasn't aware of that.

5   Q So you think you had a discussion

6   as to where the coal was going to be loaded

7   between December 17, 2008 and January 7, 2009?

8   A Well, in order for me to ask for

9   quality and to get quality like this, my next

10  step is where are we going to try to load the

11  coal and how much tonnage is available.

12  Q Did you ask Mr. Williams those

13  questions?

14  A I can't recall, but I would think

15  we had discussed that.

16  Q Well, if you look at Page 14, your

17  e-mail dated January 7, 2009, the next one,

18  which is Page 13, is some three weeks later on

19  January 28.

20  A Yes.

21  Q You are asking him again to please

22  call you and you are giving him your office

23  number and extension, correct?

24  A Yes.

25  Q Do you think you had a

2   conversation between the 7th and the 28th of

3   January of 2009?

4   A Yes. I think we might have had a

5   conversation about trying to load the coal on

6   the Norfolk Southern Railway.

7   Q What was discussed?

8   A Maybe -- not maybe, but probably

9   trying to -- I think he was indicating that he

10  was going to try to load the coal at Mingo

11  Logan, which is a mine. That is where you can

12  load the coal on the Norfolk Southern.

13  Q At this time, as of January 28,

14  2009, was there any kind of agreement in place

15  for Integrity to buy coal from Alma Energy?

16  A No.

17  Q How about Pikeville Energy Group,

18 LLC?

19 A I don't know who that is.

20 Q You have never spoken to anybody

21 at Pikeville?

22 A No.

23 Q Have you ever had any

24 communication in writing from anybody at

25 Pikeville Energy Group?

2  A No.

3  MR. FISHER: For the record,

4  Brent Morehouse is with Pikeville

5  Energy Group.

6 Q Did you ever have a conversation

7 with Mr. Morehouse?

8 A No.

9 Q Other than the e-that mail you

10 received which attached, I think, the Gallagher

11 report, had you ever --

12 A The Gallagher report that was sent

13 to Alma Energy, that Alma Energy forwarded to me

14 on December 17.

15 Q That didn't come directly from

16 Mr. Morehouse, correct?

17 A No.

18 Q As of January 28, 2009, were you

19 discussing the terms with any degree of

20 certainty, terms of purchasing coal from Alma

21 Energy?

22 A I think around that time we were

23 trying to determine where he was going to load

24 the coal. And Mingo Logan was an option to load

25 at that facility.

2 Q Did you have discussions in terms

3 of quantity that would be provided?

4 A I think we were trying to do 50

5 cars.

6 Q Did you discuss a price for the 50

7 cars?

8 A Might have discussed back in

9 January -- we probably talked about the market

10  coming down a little bit. I remember Darrell

11  telling me he needed to have his $80 as his

12  bottom line number because of his cost.

13  Q There were no draft purchase

14  orders being circulated between Alma Energy and

15  Integrity, correct?

16  A Not at that time.

17  Q Well, there was only one that we

18  have ever seen, and that was way back in May of

19  2008.

20  A Yes, the one which he didn't reply

21  to at that time.

22  Q The next communication is on

23  January 29, 2009. You sent Mr. Williams an

24  e-mail marked as Page Number 12.

25  A Yes, I see this.

2  Q Do you remember that?

3  A Yes, I remember.

4  Q Why was it sent; was it sent at

5   your suggestion or did someone ask you to send

6   it?

7  A I spoke to Darrell, I believe,

8  that same day. And he asked me to send him an

9  e-mail relative to what we might be able to do

10  going forward.

11  Q Did you ask him why he wanted such

12  an e-mail?

13  A No.

14  Q At that time were you aware it was

15  going to be attached to a motion to extend time

16  to get confirmation --

17  A I wasn't aware of that.

18  Q Let me finish the question. At

19  that time did he ever tell you "I'm going to

20  take your e-mail and I'm going to attach it to a

21  motion to continue a confirmation hearing, to

22  buy more time to get Alma's Chapter 11 plan

23  confirmed"?

24  A No.

25  Q If he told you he wanted to do

2   that with your e-mail, would you have agreed to

3   send the e-mail?

4  MR. SNYDER: I object to

5   the question. He is leading the

6  witness with regard to what was

7  said. I would ask you not to lead

8  the witness.

9  Q You can answer the question.

10  MR. GARTLAND: I will ask

11  the questions any way I see fit.

12  Q Would you have sent the e-mail if

13  he told you "By the way, I want you to send me

14  an e-mail because I want to attach it to a

15  pleading to file in my bankruptcy case with Alma

16  Energy"?

17  A I don't know. I would have

18  consulted with my attorney.

19  Q Now, let's look at the e-mail. It

20  says, "Thanks for taking some time from your

21  busy schedule to discuss your coal products for

22  2009." Do you see that?

23  A Sorry?

24  Q It says, "Thanks for taking some

25  time from your busy schedule to discuss your

2   coal products for 2009." Do you see that?

3   A Yes.

4   Q Were you aware that the Alma

5   Energy mines were shut down completely?

6   A No.

7   Q What did he tell you about his

8   coal products?

9  MR. FISHER: This is Hayden

10  Fisher on behalf of Pikeville

11  Energy. I'm going to object to

12  the question to the extent it

13  assumes facts not in evidence. I

14  think the record is that the mines

15  were in a nonproducing status

16  while waiting for a contract, not

17  that they were shut down.

18  MR. GARTLAND: Well, there
19  was no coal.
20  Q Did he tell you there was no coal
21  being produced by Alma Energy?
22  A Did he tell me there was no coal
23  being produced?
24  Q Right, they were not mining any
25  coal.
2  A I didn't know what they were doing
3  at that time, to be honest with you. He told me
4  that they were going to be in a position to have
5  coal, and that's all I needed to hear.
6  Q What did he tell you about the
7  coal products for 2009?
8  A He indicated that it would be a
9  six dry ash, .70 sulfur, 32 to 35 dry vol, one
10  hundred percent metallurgical. And it would be
11  washed product that I can use in my blends to
12  market anywhere.
13  Q Now it says, "Integrity is very
14  interested in purchasing coal from your group in
15  2009. Once we settle our contractual business
16  for year 2009, we will be in touch with Alma
17  Energy." Do you see that?
18  A Yes.
19  Q Has Integrity settled its
20  contractual business for 2009, as we sit here
21  today?
22  A No.
23  Q When do you think that Integrity
24  will settle its contractual business for 2009?
25  A There are some settlements, and
2  there are some settlements that have not been
3  settled yet, that will probably be settled in
4  the second half of April, maybe first half of
5  April.
6  Q When you are talking "Be back in
7  touch with you," is that what you were thinking
8  of, is when you finished settling your
9  contractual business, that's when you would get

10  back to him?

11  A Yes. It was going to be on the

12  new business stuff sometime in April.

13  Q April of 2009?

14  A Yes.

15  Q So at this time, on January 29,

16  2009, you were the person at Integrity, if

17  anybody, and only you were going to be the one

18  to enter into a contract to buy coal from Alma,

19  correct?

20  A That is correct.

21  Q On January 29, 2009, you had no

22  present intention of purchasing coal from Alma;

23  is that a fair statement?

24  A On January 29, 2009 I had no

25  present --

2   Q No present intention at that

3    moment in time of buying coal from Alma because

4    you needed to figure out what your needs were

5    going to be; is that a fair statement?

6   A That is a fair statement.

7   Q You write another paragraph, "Our

8    goal will be to use your coal products as a

9   component in our overall portfolio of coals in

10  which we market coals inland to domestic steel

11  mills and plants. We also are very well-aware

12  that we can use your coal products to be a

13  viable component in the coal blends that we

14  export to various countries in the overseas

15  markets. Again, thanks for making the time, and

16  let's stay in touch."

17  I take it the way you close that

18  e-mail, you were saying let me figure out what

19  Integrity's needs are for 2009. If I need coal

20  from Alma, I will be back in touch with you; is

21  that a fair statement?

22  A That is a fair statement.

23  Q Apparently the next page, Page 11,

24  is Darrell William's response. "Thanks, Robert.

25  I will stay in touch." Do you see that?

2  A Yes.

3  Q Did you hear from Mr. Williams

4  after January 30, 2009, but before February 5 of

5  2009? That is the day you and I had a

6  conversation.

7  A Yes, I think there was an e-mail.

8  Q I don't see it in the documents

9  that you have produced.

10  A The e-mail on February 3.

11  Q Let's talk about that. That's the

12  one that is marked Page 2, right?

13  A Yes, marked Page 2. It is a

14  nine-page e-mail. It goes from two to ten.

15  Q Tell me about that e-mail.

16  A Basically Darrell sending me an

17  e-mail telling me that he is working with Reed

18  Crackower.

19  Q Do you know who Reed Crackower is?

20  A No, I don't know who he is. But

21  he is a bridge financer, according to Darrell,

22  in which NRP will eventually be doing the

23  financing.

24  Q He is a bridge financer?

25  A Yes, it looks like he is a bridge

2  financer that is linking Darrell to NRP, who is

3  overseeing it or eventually going to be doing

4  the financing on the coal that he is trying to

5  bring on line.

6  Q Tell me what your understanding of

7  this e-mail was on February 3, 2009.

8  A My understanding of this e-mail is

9  that he called me to let me know he had

10  financing, and that he was going to need for us

11  to market his products. And that he felt very

12  comfortable with Integrity as taking the lead to

13  market his products because we know the export

14  market. He was giving me some assurances that

15  he had financing in place, and that Reed was

16  very knowledgeable with mining and had knowledge

17  of the coal business. He also said that I could

18 e-mail Reed if I needed to confirm the
19 information that he was providing me.
20 Q It looks like he is asking you to
21 e-mail Reed as soon as possible, and let him
22 know that Greg Licata is interested in doing a
23 venture. Do you see that?
24 A Yes.
25 Q Did that ever happen?
2 A No. If you look further down on
3 the handwritten portion here, he was looking for
4 Integrity to market, sell coal. Then there's
5 "or," which means he was hoping or thinking that
6 Integrity would be interested in getting
7 involved in having a share of this company, two
8 to three percent of the company.
9 Q Did you talk about a price for two
10 to three percent?
11 A No. That would be something I
12 would have to go talk to the owner of the
13 company about.
14 Q Did you ever do that?
15 A The owner of the company was not
16 interested in that. The owner was interested in
17 marketing the product in our blends.
18 Q Is that why you put an X through
19 that "will get two to three percent"? Somebody
20 put an X through that. Did you do that?
21 A I did that after knowing that we
22 weren't interested in taking any type of share
23 in the company.
24 Q Did you do that before or after
25 you talked to Greg?
2 A After.
3 *** Q I take it from what you are
4 telling me, there was no way Integrity was going
5 to spend money to buy an equity interest in Alma
6 Energy?
7 *** A Greg wasn't interested in doing
8 anything like that.
Q Did he tell you why?

10  *** A Just no interest to have that type
11  of liability on the mining side. We are
12  primarily exporters and traders if you will, and
13  we don't get involved with mining projects like
14  that, investing money.
15  *** Q So at this time did Mr. Williams
16  tell you Alma Energy wasn't conducting mining
17  operations?
18  *** A I don't recall, but over here it
19  says "the projections are 100 million tons
20  expected after core drill." That gives me the
21  impression that coal was not being mined at that
22  particular time, but could commence as early as
23  March of 2009. It indicates that here in the
24  e-mail as well, the handwritten "20,000 tons a
25  month."
[Mr. Eduardo went on to say that at the time of the call:]
"Q   Did he keep on talking to you?
5   A I don't think the conversation was
6   long. I think he brought something to my
7   attention. I was displeased with what he had to
8   say. I believe I called Darrell for an
9   explanation. And I think at that time we were
10  trying to actually figure out where we are going
11  to try to load 50 cars. I think we were trying
12  to do a deal for 50 cars, is where we were at at
13  that time. I was displeased of the fact that my
14  e-mail was being used for that."

210. Mr. Gartland characterized his short phone conversation with Mr. Eduardo as a

"discussion', stating to the Court that so "I picked up the phone and had a discussion with him

this morning ..."  By any definition of "discussion" the dialogue between Alma, Williams, and

Morehouse for Pikeville Energy Group LLC, and Mr. Eduardo of Integrity were discussions, and

the statement by Gartland to the Court that "there are no discussions, period." was false.

211. Furthermore, Gartland stated to this Court that he had learned from Mr. Eduardo that "Williams has never followed through on anything he has promised to do". In fact Mr. Eduardo testified that:

> 17 "Q Mr. Gartland said, referring to
> 18 you, "He said over the years Mr. Williams has
> 19 contacted them about potentially selling coal.
> 20 Mr. Williams has never followed through on
> 21 anything he has promised to do." Mr. Gartland
> 22 said that that was what you said on the phone
> 23 with him. Is that a correct, fair statement of
> 24 what you told him on the phone?
> 25 A I don't recall saying that."

Mr. Eduardo further testified:

> 14 "Q Did Mr. Gartland explain that this
> 15 was being used in the bankruptcy court as a list
> 16 of potential sales for coal?
> 17 MR. GARTLAND: Objection.
> 18 A I don't remember if he
> 19 specifically said that. All I know is he said,
> 20 "Is this your e-mail?" I said, "Yes." He said,
> 21 "Your e-mail was actually being attached to
> 22 something and it had to do with a legality."
> 23 Right then and there I was upset, and I couldn't
> 24 believe that this had occurred. I think I tried
> 25 to rush Mr. Gartland off the phone …"

212. During a subsequent phone call Mr. Eduardo said to Mr. Williams - "I, I think what we probably need to do is to concentrate on maybe making this thing go away, uh, before we go forward." …"we just don't want to get dragged into this, uh, this going back, and forth thing here with, with you and Consol… Capital."… "And uh, I'll see what he has to say, but, you know, I, I don't know if he's going to be too positive on that thing with this pending thing being out here." …How do we go forward doing business when we got this cloud over our heads?"

213. The fact is that when Williams, Alma, and Pikeville Energy entered into discussions with a major buyer of metallurgic coal, Integrity, and identified that buyer to the Court, Halle and the Halle Related Entities immediately called Integrity to "verify" the contents of the email. Gartland stated that Mr. Eduardo verified the email. Then Mr. Gartland then went on to state to Mr. Eduardo that Alma had involved him in a legality "Your e-mail was actually being attached to something and it had to do with a legality." and Mr. Eduardo stated that "I didn't know that it was going to be thrown into some court, some legality, and that I was going to be dragged into something."

214. It is clear from Mr. Eduardo's testimony that Mr. Gartland, on behalf of Halle and the Halle Related Entities, told Mr. Eduardo that it was not simply going to buy coal from Alma and Williams, but that Integrity and he had been "thrown into some court, some legality." Integrity did not contact Williams or Alma, as Mr. Eduardo said he would, when the 2009 contracts were settled in June 2009.

215. The Halle and the Halle Related Entities, Shelton, and Gartland, owed a duty to the Plaintiff not to breach, aid, abet, or counsel the breach of a contract, agreement, or settlement in which the Defendants participated in the drafting and execution; not to engage in false, fraudulent, misleading, or deceptive acts or practices in the representation of their clients; and not to act with malice or in bad faith with the intent to harm the Plaintiff.

216. The Halle and the Halle Related Entities, Shelton, and Gartland, violated those and other duties owed to the Plaintiff by intentionally and fraudulently communicating with Integrity Sales, in bad faith, and with malice violating the terms of the Settlement Agreement, which was the direct and proximate cause of actual and consequential damages to the Plaintiff.

217. The relationship between Alma, Williams, Pikeville, Blackberry, Fisher, Richard, Morehouse, Nathan, and Nathans Welding included opportunities not directly related to the Alma mines that depended in part upon the success of the Alma mines.  Specifically, these included the acquisition of other coal properties and mining rights; the acquisition of other mineral rights; and, ultimately, real estate development opportunities.

218. Anticipating Halle and the Halle Related Entities wrongful termination of the Coal Sales Agreement, Alma, Pikeville, Nathan Williams, and Darrell Williams determined that the best course when coal prices began falling to $40 per ton in late 2008 and early 2009, was to shut down production for six to twelve months as provided for in the Settlement Agreement if Halle did in fact terminate, wrongfully or by giving 30 days notice:

> "kk. If the market price for coal goes below $60 per ton, the mines may close and go idle until the market price of coal increases to above $60 per ton. The time of closure shall start when coal stops being produced. The time period that the mines are idle shall not exceed twelve (12) consecutive months. Prior to shutting down any mine, Alma and/or Alma's operator or any of its contractors shall give THC or its designee the option to buy the coal for $60 per ton with THC picking up the difference in the cost of trucking that Alma is paying Hampden Coal or other purchaser of Alma's production. If THC decides to exercise the option, the mines will continue to operate. This option shall be at the sole and absolute discretion of THC."

and at the same time to seek a purchaser for Alma so that Alma could propose a Plan that paid all creditors 100% on the dollar on their claims at the time of sale of Alma.

As a direct and proximate cause of Halle and the Halle Related Entities false and fraudulent acts, tortious interference, and abuse of process, including continuing efforts directly and through the UST, to cause this case to be Converted to Chapter 7, it proved difficult or impossible to sell Alma to any party, despite reserves of 3.5 million tons of metallurgical coal which Mr. Eduardo characterized the specifications of as:

17  Q So you looked at the report and

18  then what happened?

19  A It looked like very good coal.

…

6  Q What did he tell you about the

7  coal products for 2009?

8  A He indicated that it would be a

9  six dry ash, .70 sulfur, 32 to 35 dry vol, one

10  hundred percent metallurgical. And it would be

11  washed product that I can use in my blends to

12  market anywhere. …"

219. It was determined by Williams and Alma that the Halle and the Halle Related

Entities false and fraudulent acts, tortious interference, and abuse of process, was an "anchor" on

the sale of Alma, and that Alma would have to be marketed with other desirable properties if it

was to be successfully sold.

220. Williams, Nathan, Pikeville, Blackberry, Morehouse, Fisher, Richard, and

Morehouse actively began acquiring rights to mineral interests and sought outside investors to

purchase a "bundle" of properties which included Alma. After extensive talks with a number of

potential participants, an Edward Green, a member of Exigent Leasing Limited Partnership,

agreed to market Alma as part of a package that included coal interests known as Money Branch,

Williamson, James H Taylor, Kennesaw, Tierney, and Alma. On Williams formed Sutcliffe

Energy Corporation on September 29, 2008, to facilitate this option. The combined properties

contained over one hundred million tons of metallurgical grade coal and were forecasted to yield

hundreds of millions of dollars in profits for the benefit of Alma, Williams, Pikeville,

Blackberry, Sutcliffe, Nathan, Fisher, Richard, Morehouse, Green, and others..

221. Halle and the Halle Related Entities, Gartland, Simmons, and Shelton, caused

Integrity Coal and Appalachian Fuels not to do business with Alma and Pikeville, on February 5,

2008 with respect to Integrity Coal and in May of 2008 with respect to Appalachian Fuels, and

caused other known and as of yet unknown companies not to do business with Williams, Alma,

or Pikeville.

222.  Halle and the Halle Related Entities, Gartland, Simmons, and Shelton, knew of the

bona fide contractual and business relationships between Alma, Williams, Nathan, and

Blackberry, Pikeville, Appalachian Fuels, Alpha Natural Resources, and Integrity Coal, and

knew that Alma, Williams, Nathan, and Blackberry, Pikeville, Sutcliffe, Richard, Fisher,

Morehouse, Green, Street, Roulett, and others had a reasonable expectation of economic gain

from the relationships.

223.  By seeking conversion of Alma to Chapter 7 in violation of the terms of the

Settlement Agreement, and by pursuing other wrongful acts against Alma, Williams, Nathan, and

Blackberry, Pikeville, Sutcliffe, Richard, Fisher, Morehouse, Green, Street, and Roulett, Halle

and the Halle Related Entities, Gartland, Shelton, and Simmons, violated duties owed to the

Plaintiff by falsely, fraudulently, and tortiously interfering with the business relationships, and

were the direct and proximate cause of loss or diminution of the value of these opportunities, all

of said actions constituting abuse of process.

224. On March 27, 2009, an agreement (the "Voting Agreement") (Exhibit J) was

proposed by Halle and the Halle Related Entities, Gartland to Pikeville Energy, Blackberry, and

the Williams.

225. The Voting Agreement was conceived, drafted, proposed, transcribed, and tendered

to Pikeville Energy, Blackberry, and the Plaintiff by Gartland, on behalf, and for the benefit, of

the Halle Entities and Gartland, Shelton, and Simmons.

226. The proposed Voting Agreement included a deadline of 5 pm on March 31, 2009,

for Pikeville Energy, Blackberry, and the Plaintiff to agree to, execute, and return the Voting

Agreement.

227. The proposed Voting Agreement provided that in consideration for release of all

claims of Pikeville Energy, Blackberry, and Williams against Wise DelCotto, Gartland, Shelton,

Jones Walters, Halle, and the Halle Related Entities, the Halle Related Entities would vote for

and support confirmation of the Plan of Reorganization of Alma pending for hearing on April 8,

2009.

228. Paragraph 12 of the Voting Agreement provided:

"12. In the event that the Alma asserts any Claims against the
Halle Related Parties or their respective members, officers,
directors, shareholders, interest holders, employees and/or legal
counsel, then Pikeville and Blackberry shall defend against and
hold harmless the Halle Related Parties and their respective
members, officers, directors, shareholders, interest holders,
employees and/or legal counsel from any and all such asserted
Claims."

229. Halle, the Halle Related Entities, and Gartland, had repeatedly stated to the

Bankruptcy Court and to parties-in-interest that without Pikeville Energy's financial support

Alma could not survive and would have no money to pay for legal services or to operate the

mines.

230. Halle, the Halle Related Entities, Gartland, Simmons, and Shelton, knew that if

Pikeville Energy restricted or cut off funding to Alma, neither Alma nor Williams would have

sufficient resources to operate the mines even if a coal purchase contract could be obtained that

would otherwise allow Alma to pay the claims of creditors under a Plan of Reorganization, and

that without funds from Pikeville, Alma, Williams, Nathan, and Blackberry, would not be able to

prosecute claims against the Halle and the Halle Related Entities Gartland, Simmons, and

Shelton.

231. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, knew that the

inclusion of paragraph 12 in the Voting Agreement resulted in Pikeville Energy being

contractually liable to hold harmless Halle, the Halle Entities, Gartland, Shelton, Simmons, Wise

DelCotto, and Jones Walters from any and all Claims of Alma against them, defined in the

Voting Agreement as:

> "For purposes of this Agreement, Claim or Claims means any and
> all liabilities, obligations, claims, actions, demands, causes of
> action, suits, counterclaims, defenses, debts, sums of money due or
> owed, accounts, covenants, contracts, agreements, any
> amendments or modification thereto, arrangements, promises,
> obligations, warranties, trespasses, torts, injuries and losses of
> whatever kind, character, type, nature and description, in law or in
> equity, whether asserted or unasserted, known or unknown,
> anticipated or unanticipated, suspected or unsuspected, absolute,
> fixed, conditional or contingent, matured or unmatured, liquidated
> or unliquidated in amount, due or to become due and whether
> arising in contract, tort, or otherwise, which originated in whole or
> in part at any time before the date of this Agreement."

232. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, knew or should

have known that paragraph 12 of the Voting Agreement would result in Pikeville Energy

refusing to fund the prosecution of Alma's adversary complaint against the Halle Entities, and

refusing to fund prosecution of any claims of Alma against Halle, the Halle Related Entities,

Gartland, Shelton, and Simmons, for the simple reason that Pikeville Energy would be liable to

the Halle Entities for all sums awarded to Alma as a result of wrongful acts of the Halle, the

Halle Related Entities, Gartland, Shelton, and Simmons.

233. Halle, the Halle Related Entities, Gartland, Shelton, Simmons, with knowledge and intent to coerce, bribe, extort, and defraud Alma, Creditors of Alma, and other parties-in-interest, did not include Alma as a party to the Voting Agreement; did not file the proposed Voting Agreement with, or seek approval of, the Bankruptcy Court; and did not give notice to creditor's of Alma of the effect of the Voting Agreement on Alma's Claims against the Halle, the Halle Related Entities, Gartland, Shelton, and Simmons.

234. Furthermore, Paragraph 7 of the Voting Agreement states that:

"7. Neither Pikeville or any member or person or individual purporting to act on behalf of Pikeville, nor Blackberry or any or person or individual purporting to act on behalf of Blackberry, nor Williams or any or person or individual purporting to act on behalf of Williams shall file an objection to the $174,809.37 Claim or the $143,898.89 Claim."

The Claims referred to are Claims of Halle Entities in the Alma bankruptcy case which Alma objected to and / or sought to offset in the pending Adversary Case, the prosecution of which depended on Pikeville Energy continuing to provide operating funds to Alma.

235. In consideration of Pikeville Energy, Blackberry, and Williams executing the Voting Agreement, it provided that:

"2. By no later than Tuesday, March 31, 2009, at 5:00 p.m. (Eastern Standard Time), each of the Parties shall execute and deliver this Agreement to Michael J. Gartland, Esq. ("Attorney Gartland") by imaging and e-mailing the same to him at mgartland@wisedel.com or by faxing Attorney Gartland an executed copy at 859-281-1179.

3. Provided that each of the Parties executes and delivers this Agreement to Attorney Gartland by no later than Tuesday, March 31, 2009, at 5:00 p.m. (Eastern Standard Time), pursuant to the provisions of paragraph 2 of this Agreement: (1) THC shall file a Notice of Withdrawal of the Conversion Motion; (2) THC and Halle shall file a Notice of Withdrawal of the Objection; (3) THC

shall cast a ballot with respect to the $174,809.37 Claim to accept the Plan and deliver such ballot to counsel for the Debtor by no later than April 1, 2009, at 5:00 p.m.; and (4) Halle shall cast a ballot with respect to the $143,898.89 Claim to accept the Plan and deliver such ballot to counsel for the Debtor by no later than April 1, 2009, at 5:00 p.m. Thereafter, neither THC, Halle nor KCVI (the only Parties to this Agreement who are or were creditors of the Debtor and have entered an appearance in the Chapter 11 Case in such capacities) shall file a motion or otherwise seek to dismiss the Chapter 11 Case or convert such case to a case under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), nor shall they file an opposition to, or oppose confirmation of, the Plan.

4. Provided that each of the Parties executes and delivers this Agreement to Attorney Gartland by no later than Tuesday, March 31, 2009, at 5:00 p.m. (Eastern Standard Time), pursuant to the provisions of paragraph 2 of this Agreement, then: (1) Pikeville shall be released of all obligations imposed under the Subpoena For Rule 2004 Examination dated March 12, 2009, which was served on Pikeville on March 12, 2009; (2) the Debtor shall be released of all obligations imposed under the Subpoena For Rule 2004 Examination dated March 12, 2009; which was served on the Debtor on March 12, 2009; and (3) Blackberry shall be released of all obligations imposed under the Subpoena For Rule 2004 Examination dated March 13, 2009, which was served on Blackberry on March 19, 2009.

5. In the event that the Debtor files a motion to continue the April 8, 2009 hearing or any subsequent hearing on confirmation of the Plan, neither THC, Halle nor KCVI shall file an opposition to or oppose any such motion.

6. At any hearing on confirmation of the Plan, neither THC, Halle nor KCVI shall request that the Bankruptcy Court hear evidence relative to the plan confirmation requirements of Sections 1129(a)(1)-(16) of the Bankruptcy Code, nor shall THC, Halle or KCVI object to any offers of proof relative to such requirements and sections of the Bankruptcy Code."

236. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, agreed not to oppose the Debtor's Plan of Reorganization so long as Pikeville Energy, Blackberry, and Williams agreed to release all claims against the Halle, the Halle Related Entities, Gartland, Shelton, Simmons, and Wise DelCotto; waive any objections to claims by the Halle Entities against Alma; and by implication and design cause Alma to do the same by refusing to fund Alma's operations if it did not drop the claims.

237. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons understood that Pikeville would most likely recover its investment in Alma only if Alma's Plan of Reorganization was confirmed. If Alma was liquidated Pikeville would probably receive nothing, because unless the unlikely event occured where Pikeville's claim is allowed as an administrative claim, any claim it had would be subordinated to the claims of unsecured creditors. Therefore Halle, the Halle Related Entities, Gartland, Shelton, and Simmons proposal to Pikeville was to execute the Voting Agreement and have an opportunity to recover the $2,000,000 to $3,000,000 it invested, or to refuse to sign the Voting Agreement and lose all of its investment.

238. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, also understood that with Alma no longer producing coal, Williams depended on Pikeville and Sutcliffe, in which Pikeville was a member, as the source of his only income. Therefore Pikeville was the only party with the economic leverage to require Williams to sign the Voting Agreement to keep receiving funds.

239. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons knew, or should have known, that paragraph 12 of the Voting Agreement constituted a per se violation of Title 18 §152 (6) of the United States Code –

Concealment of assets; false oaths and claims; bribery:

"A person who - …

 (6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11; … shall be fined under this title, imprisoned not more than 5 years, or both."

240. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons violated Title 18 §152 (6) by offering Pikeville the opportunity to avoid losing millions of dollars by agreeing to stop funding the prosecution of Alma's claims against Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, and allowing the $174,809.37 and $143,898.89 Claims of Halle Entities, without notice to the Bankruptcy Court, Alma's creditors, or other parties-in-interest. The Voting Agreement that Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, drafted "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11."

241. Gartland, Shelton, and Simmons, with knowledge and intent to defraud the Alma and Williams, conspired with the Halle and the Halle Related Entities to fraudulently coerce and bribe Pikeville and Williams into executing the Voting Agreement in violation of Title 18 §152, so as to obtain reward, advantage, and promise thereof for acting or forbearing to act in the Alma case to the benefit of Halle, the Halle Related Entities, Gartland, Shelton, and Simmons.

242. Halle, through Gartland, Simmons, and Shelton, with knowledge and intent to defraud Williams and Alma, conspired with the Halle Related Entities to fraudulently coerce and bribe Williams into executing the Voting Agreement in violation of Title 18 §152, so as to

prevent objection to a claim against the estate of Alma, and used such claim in the Alma case in a personal capacity or through an attorney; so as to knowingly and fraudulently receive a material amount of property from Alma after the filing of the case under Title 11, with intent to defeat the provisions of Title 11.

243. Despite almost certain loss of their investment, Pikeville chose not to join in the conspiracy and not to commit a criminal act by violating Title 18.  If Pikeville had chosen to protect its investment by taking the unethical and unlawful course of executing the Voting Agreement, the existence and terms of the Voting Agreement would not have been disclosed to Alma's Creditors or the Bankruptcy Court, and Alma's Creditors and the Bankruptcy Court would never have known why Halle and the Halle Related Entities had a change of heart and voted for the plan. Pikeville would have had an opportunity to recover its investment, if the Plan did not succeed the Alma Creditors would never have known why Pikeville did not fund the pursuit of valid claims against Halle, and why Halle got everything and they received nothing.

244. The Plaintiff asserts that on refusal of the Plaintiff to violate Title 18 §152, Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, carried through on their threat to pursue conversion of Alma's case to Chapter 7, by directly soliciting the assistance of the United States Trustee and by providing information to the United States Trustee that Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, knew or should have known was false and misleading.

245. Plaintiff further asserts that Pikeville Energy and Williams promptly provided a copy of the Voting Agreement to the United States Trustee through counsel for both Alma and Pikeville Energy, and that it was received by Mr. Dougherty.

246. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, owed to Williams, Alma, and this Court, the duty, among others, not to violate Rules of Professional Conduct; not to act in collusion with or as part of an enterprise; not to conspire with, aid, or abet a wrongdoer in fraudulent or other tortious acts against the Plaintiff; and not to violate, aid, abet, or counsel the violation of state or federal statutes or common law, including Title 18 §152 et seq of the United States Code.

247. Gartland, Simmons, and Shelton, intentionally violated those duties by fraudulently proposing execution by Williams and Pikeville of the Voting Agreement that was a per se violation of Title 18 §152 et seq of the United States Code.

248. Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, violation of the duties and pursuit of conversion of the case to Chapter 7 in violation of the terms of the Settlement Agreement was the direct and proximate result of actual and consequential damages to the Williams, Alma, Nathan, Nathan's Welding, Pikeville, Blackberry, Sutcliffe, Fisher, Richard, Green, Street, and Roulett.

249. At some unknown time or times, Halle, the Halle Related Entities, Gartland, Shelton, and/or Simmons, communicated with the United States Trustee and falsely and fraudulently sought conversion of the Alma case to Chapter 7, wrongfully and fraudulently violating the terms of the Settlement Agreement which allowed Alma to cease production for twelve months when market conditions deteriorated, all of said acts constituted abuse of process.

250. Furthermore the wrongful and fraudulent actions of Halle and the Halle Related Entities were the direct and proximate cause of Alma, Williams, Blackberry, and Nathan having no funds available to pay accounting and reporting expenses in the Chapter 11 case, and no funds available to defend false and fraudulent allegations made by Halle Related Entities to the UST

and this Court that Alma had mismanaged operations at the Alma mines. As a direct result of the wrongful and fraudulent acts of the Halle and the Halle Related Entities, Alma, Williams, Nathan, Pikeville, and Blackberry were unable to effectively defend against the UST's Motion to Convert, and the case was converted to Chapter 7.

251. Thereafter Halle and the Halle Related Entities purchased from the Chapter 7 Trustee claims against them by the Debtor, Alma Energy LLC, so as to extinguish liability o Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, to Alma for wrongful acts.

252. The Halle Related Entities then wrongfully and fraudulently filed claims, under color of acting for Alma and the Chapter 7 Trustee, against Nathan Williams, Darrell Williams, Pikeville, Blackberry, Richard, and Nathan's Welding LLC, asserting claims against them on behalf of Halle Related Entities included in the Settlement Agreement.

253. Any sums received pursuant to claims purportedly prosecuted under authority of the Chapter 7 Trustee will be paid to Halle and the Halle Related Entities, said entities having acted intentionally so that unsecured creditors will receive little or no dividend. Furthermore, with the intent to diminish the bankruptcy estate, Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, named as defendants parties which Gartland stated Halle knew to be "judgment proof", resulting in the Chapter 7 Trustee expending bankruptcy estate assets with no possibility of return. The wrongful acts by Halle, the Halle Related Entities, Gartland, Shelton, and Simmons, constitute an abuse of process intended to punish Nathan Williams, Darrell Williams, Blackberry, Pikeville, Richard, and Nathan's Welding LLC for opposing Halle, all at the expense of the bankruptcy estate.

254. Halle and the Halle Related Entities, without written notice of demand for negotiation and with total disregard of the requirement they drafted in the Settlement Agreement

requiring submission to mediation, conspired, aided, abetted, and otherwise intentionally and

fraudulently, violated the Settlement Agreement, by acts and deeds including the filing of the

following pleadings in Bankruptcy Court:

4/7/08 (docket #286) Objection Filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 241 Motion to Approve, filed by Alma Alma Energy, LLC). (Gartland, Michael) (Entered: 04/07/2008)

5/14/08 (docket #338) Objection Filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 335 Motion to Approve,, Motion to Shorten Time, filed by Alma Alma Energy, LLC). (Attachments: # 1 Continuation of Main Document Exhibit 1# 2 Continuation of Main Document Exhibit 2) (Gartland, Michael) (Entered: 05/14/2008)

5/14/08 (docket #339) Affidavit Re: Stephen Fleischman's Support of Objection, filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 338 Objection, filed by Creditor Kentucky Coal Venture I, LLC, Creditor THC Kentucky Coal Venture LLC, Creditor Warren E Halle). (Gartland, Michael) (Entered: 05/14/2008)

5/30/08 (docket #350) Motion to Continue Hearing Scheduled for June 12, 2008, filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 331 Disclosure Statement filed by Alma Alma Energy, LLC). (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 05/30/2008)

6/5/08 (docket #360) Motion for 2004 Examination of Pikeville Energy Group, LLC, filed by THC Kentucky Coal Venture LLC. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 06/05/2008)

6/9/08 (docket #374) Chapter 11 Plan of Reorganization "THC Kentucky Coal Venture I LLC's Competing Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code" Filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered: 06/09/2008)

6/9/08 (docket #375) Disclosure Statement for Competing Plan of Reorganization Filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered: 06/09/2008)

6/9/08 (docket #377) Motion to Approve THC's Disclosure Statement, filed by THC Kentucky Coal Venture LLC (RE: related document(s) 375 Disclosure Statement filed by Creditor THC Kentucky Coal Venture LLC). Hearing scheduled for 6/12/2008 at 02:00 PM at Lexington Ctroom, 3rd

Floor.(Attachments: # 1 Proposed Order)(Gartland, Michael)(Entered: 06/09/2008)

6/9/08 (docket #378) Motion to Shorten Notice of Hearing, filed by THC Kentucky Coal Venture LLC (RE: related document(s) 377 Motion to Approve, filed by Creditor THC Kentucky Coal Venture LLC). Hearing scheduled for 6/12/2008 at 02:00 PM at Lexington Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 06/09/2008)

6/10/08 (docket #380) Amended Motion to Approve (to include service list), filed by THC Kentucky Coal Venture LLC (RE: related document(s) 377 Motion to Approve, filed by Creditor THC Kentucky Coal Venture LLC). Hearing sch. for 6/12/2008 at 02:00 PM at HNRC Lexington

6/10/08 (docket #382) Objection Filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 241 Motion to Approve, filed by Alma Alma Energy, LLC). (Attachments: # 1 Continuation of Main Document Exhibit 1) (Gartland, Michael) (Entered: 06/10/2008)

6/10/08 (docket #385) Objection Filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 359 Motion to Approve, filed by Alma Alma Energy, LLC). (Gartland, Michael) (Entered: 06/11/2008)

06/11/2008 (docket #386) Objection Filed by THC Kentucky Coal Venture LLC (RE: related document(s) 384 Objection, filed by Creditor Nathans Welding LLC, Creditor Nathan Williams, Interested Party Darrell Williams. (Gartland, Michael) (Entered: 06/11/2008)

06/25/2008 (docket #407) THC Kentucky Coal Venture I LLC's Motion for Order Compelling Operator to Install Scale Facilities at Alma's Mining Site, as Required by Paragraph 3.2 of Interim Mining Agreement and License Agreement filed by THC Kentucky Coal Venture LLC. Hearing scheduled for 7/1/2008 at 10:00 AM at Lexington Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 06/24/2008)

06/25/2008 (docket #410) Certificate of Service of Subpoena issued to D. Hayden Fisher on 6/12/08, filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered: 06/26/2008)

06/25/2008 (docket #411) Certificate of Service of Subpoena issued to Mike Francisco on 6/12/08, filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered: 06/26/2008)

12/03/2008 (docket #450) Response Filed by THC Kentucky Coal Venture LLC (RE: related document(s) 443 Motion to Limit Notice,, Motion to Dismiss Case,,

Motion for Miscellaneous Relief, filed by U.S. Trustee U.S. Trustee). (Barber, T.)
(Entered: 12/03/2008)

12/12/2008 (docket #460) Motion to Terminate Mining Operations, filed by THC
Kentucky Coal Venture LLC. Hearing scheduled for 12/23/2008 at 02:30 PM at
Lexington Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Barber, T.)
(Entered: 12/12/2008)

12/31/2008 (docket #481) Motion to Convert Case From Chapter 11 to 7, filed by
THC Kentucky Coal Venture LLC Fee Amount 15. Hearing scheduled for
1/21/2009 at 02:00 PM at Lexington Courtroom, 3rd Floor. (Attachments: # 1
Proposed Order) (Gartland, Michael) (Entered: 12/31/2008)

1/05/2009 (docket #484) Supplemental Document Statement in Support of
Motion to Terminate Mining Operations, filed by THC Kentucky Coal Venture
LLC (RE: related document(s) 460 Motion for Miscellaneous Relief filed by
Creditor THC Kentucky Coal Venture LLC). (Barber, T.) (Entered: 01/05/2009)

1/06/2009 (docket #487) Notice of Hearing of Motion for Order Pursuant to 11
U.S.C. Section 1112(b) Converting the Alma's Chapter 11 Case to a Case Under
Chapter 7 of the Bankruptcy Code [Doc. No. 481] Filed by Kentucky Coal
Venture I, LLC (RE: related document(s) 481 Motion to Convert Case from 11 to
7 filed by Creditor THC Kentucky Coal Venture LLC). (Barber, T.) (Entered:
01/06/2009)

1/29/2009 (docket #500) Objection to Confirmation of Plan Filed by Warren E
Halle, THC Kentucky Coal Venture LLC. (Attachments: # 1 Continuation of
Main Document Exhibits 1-3)(Gartland, Michael) Modified on 1/30/2009 to
create document relationship to doc #474 (kfa). (Entered: 01/29/2009)

2/2/2009 (docket #510) Objection Filed by Warren E Halle, THC Kentucky Coal
Venture LLC (RE: related document(s) 506 Motion to Continue/Reschedule
Hearing filed by Alma Alma Energy, LLC). (Gartland, Michael) (Entered:
02/02/2009)

2/6/2009 (docket #522) Amended Notice of Hearing Filed by Kentucky Coal
Venture I, LLC (RE: related document(s) 481 Motion to Convert Case from 11 to
7 filed by Creditor THC Kentucky Coal Venture LLC). (Barber, T.) (Entered:
02/06/2009)

3/5/2009 (docket #543) Motion for Order Authorizing Warren E. Halle and THC
Kentucky Coal Venture I LLC to Conduct Rule 2004 Examinations of Integrity
Coal Sales, Inc. and Robert Edouard and to Compel Production of Documents in
Connection Therewith filed by Warren E Halle, THC Kentucky Coal Venture
LLC, (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered:
03/05/2009)

3/9/2009 (docket #547) Motion for Order Authorizing Warren E. Halle and THC Kentucky Coal Venture I LLC to Conduct Rule 2004 Examination of Alma Energy, LLC and to Compel Production of Documents in Connection Therewith filed by Warren E Halle, THC Kentucky Coal Venture LLC. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 03/09/2009)

255.  Alma, and Nathan Williams as the sole member and Darrell Williams for services other than as owner operator, could have shared in at least a ten dollars profit per ton on over 20 million tons of coal over as long as a twenty year period if Halle and the Halle Related Entities had not falsely, fraudulently, tortiously interfered with, and abused the legal process with regard to, Alma, Nathan Williams, Darrell Williams, Blackberry, Pikeville, Sutcliffe, and other related entities' business; had not wrongfully purchased the Glen Alum and Logan properties for the benefit of an entity other than KCVI; had not schemed to financially destroy Nathan Williams, Darrell Williams, Blackberry, Pikeville, Sutcliffe, and other related entities; and had not acted in a manner to carry out their enterprise with the intent of forcing Alma out of business, all to the detriment of Alma, Nathan Williams, Darrell Williams, Blackberry, Pikeville, Sutcliffe, and other related business entities.

256. Summary – the following table provides a partial history of Alma / Halle relationships:

| Date | Event | Member/Employee | Consultants |
|---|---|---|---|
| April 2005 | Alma is formed | Nathan Williams, Joe Street, Jerry Roulett | Darrell Williams |
| January 2006 | Alma seeks to expand | Nathan Williams, Joe Street, Jerry Roulett | Darrell Williams Tony Gannacone |
| August 2006 | KCVI formed – Halle invests | Nathan Williams | Darrell Williams |
| September 2006 | Alma / Halle declare defaults | " | " |
| February 2007 | Alma / Halle modify contracts | " | " |
| March 2007 | Alma / Halle modify contracts | " | " |
| April 2007 | Alma / Halle modify contracts | " | " |
| May 2007 | Halle files Maryland Complaint | " | " |
| June 2007 | Alma files prior Chapter 11 Case | | |
| August 2007 | Alma files current Ch 11 / 7 Case | Nathan Williams | Darrell Williams |

| | | Steven Singleton | |
|---|---|---|---|
| September 2007 | BSD1 DIP financing and mining agreements | " | " |
| November 2007 | Alma/Halle Settlement Agreement | " | " |
| February 2008 | Settlement Agreement approved | " | |
| March 2008 | Financing – Pikeville Energy | " | Darrell Williams Gary Richard Brett Morehouse |
| May 2008 | Alma/Pikeville / Blackberry file motion to commence mining | " | Darrell Williams Harold Meek Gary Richard Brett Morehouse |
| June 2008 | Alma/Halle mining / coal purchase agreement approved | " | " |
| October 2008 | Alma mines and sells coal to Halle for $127 a ton | Nathan Williams | " |
| November 2008 | Halle terminates purchase contract | " | " |
| February 2009 | High Maf agrees to provide funds | " | Darrell Williams Harold Meek Brett Morehouse |
| May 2009 | Case converted to Ch 7 | " | " |

# The RICO Enterprise

257. The Rico Enterprise is a group involved in the Coal Industry consisting of a wealthy business man; four Corporations and one business entity that he owns or controls; several of his most trusted employees; two Florida Coal Salespersons and their Companies; and three Attorneys who perform work for the business man and / or his companies, all of these persons or businesses are associated in Fact and this Group operates coal mines, and sells and ships coal across state lines, which had and has an effect on Interstate Commerce. Hereinafter the Rico Enterprise is referred to as The Halle Group.

# The RICO Members

258. Defendant RICO Members  and their relationship to the Enterprise Members during the active period of the illegal activities of the Enterprise

1.Warren E. Halle — ("Halle") owns or controls THC, KCVI, WVCVI, KWV, NextGen,

2. THC Kentucky Coal Venture I LLC — ("THC") corporation owned or controlled by Halle

3, Kentucky Coal Venture I LLC — ("KCVI") corporation owned or controlled by Halle

4. WV Coal Venture I LLC — ("WVCVI") corporation owned/controlled by Halle

5. KWV Operations LLC — ("KWV") corporation owned or controlled by Halle

6. NextGen Coal — ("NextGen") entity owned or controlled by Halle

Non Defendant RICO Members:

a. Stephen Fleischman — ("Fleischman") officer or controller of THC, KCVI, WVCVI, KWV, NextGen

b. Ken Adamson — ("Adamson") employee or agent of KWV

c. Michael Gartland — ("Gartland") attorney for THC, KCVI, WVCVI, KWV

d. Roger Simmons — ("Simmons") attorney for THC, KCVI, WVCVI, KWV, and Halle

e. Billy Shelton — ("Shelton") attorney for KCVI and Halle

f. Consol Capital LLC — ("Consol") aka NextGen

g. Tony Gannacone III — ("Gannacone") sales agent for NextGen

h. Jodi Waber — ("Waber") sales agent for NextGen

i. Reynolds Maragni, — ("Maragni") broker or agent for Halle

j. Robert Alen Myers. — ("Myers") broker or agent for Gannacone and Halle

k. The Halle Companies — ("Halle Companies") corporation owned or controlled by Halle

# Predicate Acts

259. **Predicate Act 1** Fraud – a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; and 18 U.S.C.  § 1343 (Wire Fraud) and 18 U.S.C. Chapter 63 (Mail Fraud).

As alleged in Paragraph 16,19, and otherwise herein - . The Halle Group knowingly and intentionally made materially false, fictitious, and fraudulent statements and assurances in the Framework Agreement to Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett, and communicated the statements by wire or mail.

260. **Predicate Act 2** Fraud - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; and 18 U.S.C.  § 1343 (Wire Fraud) and 18 U.S.C. Chapter 63 (Mail Fraud).

As alleged in Paragraph 17, 18, and 19 and otherwise herein -  The Halle Group knowingly and intentionally made materially false, fictitious, and fraudulent statements and assurances in the LLC and Mining Agreements to Alma, Williams, Nathan, Nathan's Welding, Street, and Roulett.

261. **Predicate Act 3**    Fraud -  a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63. Crime or Fraud - There has been a pattern of fraudulent acts by the Halle Group by making false misrepresentations in relation to a case under Title 11 which violates 18 U.S. C. 152 (2) and 18 U.S.C. 157.

As alleged in Paragraphs 36, 37, 38, and otherwise herein - From the date of the JV Agreements August 9, 2006, to the date of the ruling of this Court regarding "cash flow" on November 20, 2007, KCVI wrongfully deducted 15% of the gross sales price of coal produced by Alma. The excess amount intentionally deducted by KCVI was approximately $750,000. A significant portion of the wrongfully deducted 15% of gross sales was, directly or indirectly, invested by the Halle Group in racketeering activities, namely procuring and operating coal properties in Glen Alum and Logan West Virginia coal properties.

262. **Predicate Act 4**    Fraud, Wire Fraud, and / or Mail Fraud – a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 65, 66, 67, 68, 69, 70, and otherwise herein – The Halle Group Members, including Simmons, Shelton and KCVI filed a motion in the Maryland Case on July 23, 2007, for contempt against Darrell Williams and Nathan Williams. This motion was emailed and or mailed to parties and was repeated to parties outside the legal proceedings and not in relation to those proceedings. The Halle Group, including Simmons and Gartland, repeated the false and fraudulent allegation that 4.7 million dollars or 5 million dollars were owed by or in the possession of Darrell Williams and Nathan Williams. The Halle Group, Mr. Simmons, and Gartland falsely and fraudulently stated that no business records whatsoever were provided to Halle, and that Nathan Williams and Darrell Williams provided no financial statements. "Despite their personal receipt of $5 million in KCVI funds, Nathan Williams and Darrell Williams provided no documentation of their receipt or use thereof…"

263. **Predicate Act 5** - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 69, 71, 72, and otherwise herein - The Halle Group Members Halle and Shelton committed fraud by misleading the Maryland Court and later this Court and parties outside the legal proceedings and not in relation to those proceedings. The Halle Group made false and fraudulent statements as to the distribution of $4,704,554.75 by Halle and Mr.

Shelton. The predicate acts of Simmons, Shelton, Gartland, and the Halle Group damaged

Darrell Williams and Nathan Williams.

264. **Predicate Act 6**   Fraud  -  a person or entity who knowingly and fraudulently

makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152

(2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or

device a material fact, makes any materially false, fictitious, or fraudulent statement or

representation, or makes or uses any false writing or document knowing the same to contain any

materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; and 18

U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 69 71, and 72 - Tony Gannacone, a licensed financial broker,

and Billy Shelton, an attorney for KCVI, had a Fiduciary Duty to step forward and correct false

and fraudulent statements by the Halle Group in the Maryland case and in this Court as they

knew that Alma, Darrell Williams, and Nathan Williams were never in possession of the 4.7 or 5

million Dollars.

265. **Predicate Act 7**   Threat of Murder **-** Racketeering**,** is a predicate act under 18

U.S.C §1961(1); KRS 508.075.

As alleged in Paragraphs 191, 192, 193, and otherwise herein - On June 15th 2008 in the

afternoon at Bluegrass airport general Aviation building Halle Group Member Warren Halle

threatened to have Darrell Williams killed if Williams rejected a coal deal with the Halle Group

(Coal Sales Agreement) or screwed up the coal deal.

266. **Predicate Act 8**  Fraud, Bribery / Extortion - a person or entity who knowingly and

fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18

U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick,

scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement

or representation, or makes or uses any false writing or document knowing the same to contain

any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018;

Racketeering  under 18 U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 150, 191, 224, and otherwise herein – Halle Group Members

Michael Gartland, Stephen Fleischman, and Halle conspired and devised a scheme to bribe or

extort execution the following items - A Coal Sales Contract, Transfer of Coal Leases, and

release of claims under a Voting Agreementfor violating a Settlement Agreement in return

member KCVI would not act in case under Title 11.

 After approval by the US Bankruptcy Court of the Settlement Agreement on February 8, 2008,

and without written notice of demand for negotiation and endeavor to settle the dispute by

mediation, Halle proceeded to commit Fraud and violate the letter and spirit of the Settlement

Agreement by fraudulently and tortiously interfering with operation of Alma's mines, both

directly and through his proxy – Tony Gannacone, and Consol Capital LLC d/b/a NextGen Coal,

through wrongful fraudulent acts in this Court, and wrongful fraudulent and predicate acts

outside the proceedings. Fraud, Wire Fraud, and / or Mail Fraud – a person or entity who violates

falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any

materially false, fictitious, or fraudulent statement or representation, or makes or uses any false

writing or document knowing the same to contain any materially false, fictitious, or fraudulent

statement violates 18 U.S.C. §§ 1001 and 1018; 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

267. **<u>Predicate Act 9</u>**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 4/7/08 (docket #286) Objection Filed by Warren E Halle, Kentucky Coal

Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 241 Motion to

Approve, filed by Debtor Alma Energy, LLC). (Gartland, Michael) (Entered: 04/07/2008).

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

268. **Predicate Act 10**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 5/14/08 (docket #338) Objection Filed by Warren E Halle, Kentucky Coal

Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 335 Motion to

Approve,, Motion to Shorten Time, filed by Debtor Alma Energy, LLC). (Attachments: # 1

Continuation of Main Document Exhibit 1# 2 Continuation of Main Document Exhibit 2)

(Gartland, Michael) (Entered: 05/14/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

269. **Predicate Act 11**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 5/14/08 (docket #339) Affidavit Re: Stephen Fleischman's Support of

Objection, filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal

Venture LLC (RE: related document(s) 338 Objection, filed by Creditor Kentucky Coal Venture

I, LLC, Creditor THC Kentucky Coal Venture LLC, Creditor Warren E Halle). (Gartland,

Michael) (Entered: 05/14/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

270. **Predicate Act 12**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process 5/30/08 (docket #350) Motion to Continue Hearing Scheduled for June 12, 2008, filed by Warren E Halle, Kentucky Coal Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 331 Disclosure Statement filed by Debtor Alma Energy, LLC). (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 05/30/2008).

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

271. **Predicate Act 13**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process 6/5/08 (docket #360) Motion for 2004 Examination of Pikeville Energy Group, LLC, filed by THC Kentucky Coal Venture LLC. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 06/05/2008)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

272. **Predicate Act 14**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process 6/9/08 (docket #374) Chapter 11 Plan of Reorganization "THC Kentucky Coal Venture ILLC's Competing Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code" Filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered: 06/09/2008).

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

273. **Predicate Act 15**   Fraud, Wire Fraud and Mail Fraud  and Abuse of Process 6/9/08 (docket #375) Disclosure Statement for Competing Plan of Reorganization Filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered: 06/09/2008).

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

274. **Predicate Act 16**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process 6/9/08 (docket #377) Motion to Approve THC's Disclosure Statement, filed by THC Kentucky Coal Venture LLC (RE: related document(s) 375 Disclosure Statement filed by Creditor THC Kentucky Coal Venture LLC). Hearing scheduled for 6/12/2008 at 02:00 PM at Lexington Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 06/09/2008).

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

275. **Predicate Act 17**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process 6/9/08 (docket #378) Motion to Shorten Notice of Hearing, filed by THC Kentucky Coal Venture LLC (RE: related document(s) 377 Motion to Approve, filed by Creditor THC Kentucky Coal Venture LLC). Hearing scheduled for 6/12/2008 at 02:00 PM at Lexington Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 06/09/2008).

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

276. **Predicate Act 18.**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 6/10/08 (docket #380) Amended Motion to Approve (to include service list),

filed by THC Kentucky Coal Venture LLC (RE: related document(s) 377 Motion to Approve,

filed by Creditor THC Kentucky Coal Venture LLC). Hearing scheduled for 6/12/2008 at 02:00

PM at HNRC Lexington.

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

277. **Predicate Act 19.**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 6/10/08 (docket #382) Objection Filed by Warren E Halle, Kentucky Coal

Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 241 Motion to

Approve, filed by Debtor Alma Energy, LLC). (Attachments: # 1 Continuation of Main

Document Exhibit 1) (Gartland, Michael) (Entered: 06/10/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

278. **Predicate Act 20**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 6/10/08 (docket #385) Objection Filed by Warren E Halle, Kentucky Coal

Venture I, LLC, THC Kentucky Coal Venture LLC (RE: related document(s) 359 Motion to

Approve, filed by Debtor Alma Energy, LLC). (Gartland, Michael) (Entered: 06/11/2008)

279. **Predicate Act 21**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process  06/11/2008 (docket #386) Objection Filed by THC Kentucky Coal Venture LLC (RE: related document(s) 384 Objection, filed by Creditor Nathans Welding LLC, Creditor Nathan Williams, Interested Party Darrell Williams).(Gartland, Michael) (Entered: 06/11/2008)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

280. **Predicate Act 22**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process 06/25/2008 (docket #407) THC Kentucky Coal Venture I LLC's Motion for Order Compelling Operator to Install Scale Facilities at Debtor's Mining Site, as Required by Paragraph 3.2 of Interim Mining Agreement and License Agreement filed by THC Kentucky Coal Venture LLC. Hearing scheduled for 7/1/2008 at 10:00 AM at Lexington Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 06/24/2008)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

281. **Predicate Act 23.**  Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process 06/25/2008 (docket #410) Certificate of Service of Subpoena issued to D. Hayden Fisher on 6/12/08, filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered: 06/26/2008)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

282. **Predicate Act 24**  Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 06/25/2008 (docket #411) Certificate of Service of Subpoena issued to Mike

Francisco on 6/12/08, filed by THC Kentucky Coal Venture LLC. (Gartland, Michael) (Entered:

06/26/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

283. **Predicate Act 25**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 12/03/2008 (docket #450) Response Filed by THC Kentucky Coal Venture

LLC (RE: related document(s) 443 Motion to Limit Notice,, Motion to Dismiss Case,, Motion

for Miscellaneous Relief, filed by U.S. Trustee U.S. Trustee). (Barber, T.) (Entered: 12/03/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

284. **Predicate Act 26**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 12/12/2008 (docket #460) Motion to Terminate Mining Operations, filed by

THC Kentucky Coal Venture LLC. Hearing scheduled for 12/23/2008 at 02:30 PM at Lexington

Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Barber, T.) (Entered: 12/12/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

285. **Predicate Act 27**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process 12/31/2008 (docket #481) Motion to Convert Case From Chapter 11 to 7, filed

by THC Kentucky Coal Venture LLC Fee Amount 15. Hearing scheduled for 1/21/2009 at 02:00 PM at Lexington Courtroom, 3rd Floor.(Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered:12/31/2008)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

286. **<u>Predicate Act 28</u>**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process  1/05/2009 (docket #484) Supplemental Document *Statement in Support of Motion to Terminate Mining Operations*, filed by THC Kentucky Coal Venture LLC (RE: related document(s) 460 Motion for Miscellaneous Relief filed by Creditor THC Kentucky Coal Venture LLC). (Barber, T.) (Entered: 01/05/2009)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

287. **<u>Predicate Act 29</u>**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process   1/06/2009 (docket #487) Notice of Hearing *of Motion for Order Pursuant to 11 U.S.C. Section 1112(b) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code [Doc. No. 481]* Filed by Kentucky Coal Venture I, LLC (RE: related document(s) 481 Motion to Convert Case from 11 to 7 filed by Creditor THC Kentucky Coal Venture LLC). (Barber, T.) (Entered: 01/06/2009).

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

288. **Predicate Act 30**   **F**raud, Wire Fraud and Mail Fraud, Tortious Interference,  and
Abuse of Process    1/29/2009 (docket #500) Objection to Confirmation of Plan Filed by Warren
E Halle, THC Kentucky Coal Venture LLC. (Attachments: # 1 Continuation of Main Document
Exhibits 1-3)(Gartland, Michael) Modified on 1/30/2009 to create document relationship to doc
#474 (kfa).(Entered: 01/29/2009)

The filing of this document was in direct violation of the terms of the Settlement
Agreement and constituted an abuse of process. The document contained false and fraudulent
statements, or was based on false and fraudulent acts.

289. **Predicate Act 31**     Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and
Abuse of Process    2/2/2009 (docket #510) Objection Filed by Warren E Halle, THC Kentucky
Coal Venture LLC (RE: related document(s) 506 Motion to Continue/Reschedule Hearing filed
by Debtor Alma Energy, LLC). (Gartland, Michael) (Entered: 02/02/2009)

The filing of this document was in direct violation of the terms of the Settlement
Agreement and constituted an abuse of process. The document contained false and fraudulent
statements, or was based on false and fraudulent acts.

290. **Predicate Act 32**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and
Abuse of Process    2/6/2009 (docket #522) Amended Notice of Hearing Filed by Kentucky Coal
Venture I, LLC (RE: related document(s) 481 Motion to Convert Case from 11 to 7
filed by Creditor THC Kentucky Coal Venture LLC). (Barber, T.) (Entered: 02/06/2009)

The filing of this document was in direct violation of the terms of the Settlement
Agreement and constituted an abuse of process. The document contained false and fraudulent
statements, or was based on false and fraudulent acts.

291. **Predicate Act 33**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process   3/5/2009 (docket #543) Motion for Order Authorizing Warren E. Halle and THC Kentucky Coal Venture I LLC to Conduct Rule 2004 Examinations of Integrity Coal Sales, Inc. and Robert Edouard and to Compel Production of Documents in Connection Therewith filed by Warren E Halle, THC Kentucky Coal Venture LLC, (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 03/05/2009)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

292. **Predicate Act 34**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process   3/9/2009 (docket #547) Motion for Order Authorizing Warren E. Halle and THC Kentucky Coal Venture I LLC to Conduct Rule 2004 Examination of Alma Energy, LLC and to Compel Production of Documents in Connection Therewith filed by Warren E Halle, THC Kentucky Coal Venture LLC. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 03/09/2009)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

293. **Predicate Act 35**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process  3/10/2009 (docket #550) Motion for 2004 Examination of Pikeville Energy, filed by Warren E Halle, THC Kentucky Coal Venture LLC. (Attachments: # 1 Proposed Order) (Gartland, Michael) (Entered: 03/10/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

294. **Predicate Act 36**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process      3/10/2009 (docket #553) Motion for 2004 Examination of Blackberry

Energy, LLC, filed by Warren E Halle, THC Kentucky Coal Venture LLC. (Attachments: #1

Proposed Order) (Gartland, Michael) (Entered: 03/10/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts

295. **Predicate Act 37**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process      3/24/2009 (docket #571) Objection Filed by Warren E Halle, THC

Kentucky Coal Venture LLC (RE: related document(s) 570 Motion for Miscellaneous Relief

filed by Debtor Alma Energy, LLC, Creditor Pikeville Energy Group, LLC). (Barber, T.)

(Entered: 03/24/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts

296. **Predicate Act 38**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process    4/1/2009 (docket #583) Emergency Motion Seeking An Order Compelling

Pikeville Energy Group, LLC to Produce Documents, filed by Warren E Halle, THC Kentucky

Coal Venture LLC. (Attachments: # 1 Continuation of Main Document Exhibit A# 2

Continuation of Main Document Exhibit B# 3 Proposed Order) (Barber, T.) (Entered:

04/01/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts

297. **Predicate Act 39**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process   4/1/2009 (docket #586) Motion Seeking an Order Compelling Alma Energy,

LLC and Blackberry Energy, LLC to Produce Documents, filed by Warren E Halle, THC

Kentucky Coal Venture LLC. Hearing scheduled for 4/8/2009 at 02:00 PM at Lexington

Courtroom, 3rd Floor. (Attachments: # 1 Proposed Order) (Barber, T.) (Entered: 04/01/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts

298. **Predicate Act 40**     Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process    4/1/2009 (docket #587) Objection to Confirmation of Plan Filed by Warren

E Halle, Kentucky Coal Venture I, LLC. (Attachments: # 1 Continuation of Main Document

Exhibit 1# 2 Continuation of Main Document Exhibit 2)(Gartland, Michael) Modified on

4/2/2009 to create document relationship to Amended Plan # 533 (kfa). (Entered: 04/01/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts

299. **Predicate Act 41**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process    4/6/2009 (docket #590) Objection Filed by Warren E Halle, THC  Kentucky

Coal VentureLLC (RE: related document(s) 581 Motion to Continue/Reschedule Hearing filed

by Debtor Alma Energy, LLC). (Gartland, Michael) (Entered: 04/06/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

300. **Predicate Act 42**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process   4/8/2009 (docket #601) Notice of Filing of Filing of Affidavit, Agreement

and Other Documents Filed by Pikeville Energy Group, LLC. (Attachments: # 1 Continuation of

Main Document Affidavit of D. Hayden Fisher# 2 Continuation of Main Document Proposed

Voting Agreement# 3 Continuation of Main Document Schedule A to Proposed Agreement# 4

Continuation of Main Document Examination of Darrell Williams# 5 Continuation of Main

Document Affidavit of Troy Francisco) (Lisle, Charles) (Entered: 04/08/2009)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

301. **Predicate Act 43**   Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process  4/10/09 (docket #615) Amended Notice of Hearing Filed by Warren E Halle,

THC Kentucky Coal Venture LLC (RE: related document(s) Motion to Convert Case from 11 to

7 filed by Creditor THC Kentucky Coal Venture LLC). (Barber, T.) (Entered: 04/10/2009).

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

302. **Predicate Act 44**      Tony Gannacone III, both individually and on behalf of

Consol Capital LLC as a member of the Unsecured Creditors Committee (appointed 11/15/07),

as a proxy for Halle, and as part of a single enterprise, actively opposed reorganization of Alma,

through his activity on the Unsecured Creditors Committee, the filing and pursuit of false claims,

the submission of false affidavits, and other acts intended to prevent the Debtor from

successfully reorganizing. Fraud, Wire Fraud, and / or Mail Fraud – a person or entity who

violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes

any materially false, fictitious, or fraudulent statement or representation, or makes or uses any

false writing or document knowing the same to contain any materially false, fictitious, or

fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; 18 U.S.C.  § 1343 and 18 U.S.C.

Chapter 63.

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

303. **Predicate Act 45**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process  11/6/2007 (docket #162)    Objection Filed by Consol Captial, LLC, Tony

Gannacone, III (RE: related document(s) 73 Motion to Dismiss Case, filed by Creditor Kentucky

Coal Venture I, LLC). (Kennedy, Ellen) Modified on 11/7/2007

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

304.**Predicate Act 46**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process   11/7/2007 (docket #163) See corrective entry #163 (kfa, ). (Entered:

11/06/2007) Corrective Entry PDF document appears to support the motion to dismiss filed

9/13/07 not oppose it as filed in ECF by Ellen Kennedy (RE: related document(s) 162 Objection

filed by Interested Party Tony Gannacone, III, Creditor Consol Captial, LLC) (kfa, ) (Entered:

11/07/2007)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

305. **Predicate Act 47**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process  01/09/2008 (docket #194)  Objection Filed by Unsecured Creditors

Committee (RE: related document(s) 184 Motion to Compromise Controversy under Rule 9019,,

Motion to Approve, filed by Debtor Alma Energy, LLC). (kfa) (Entered: 01/09/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

306. **Predicate Act 48**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process  01/21/2008 (docket #196)  Supplemental Document Letter from Unsecured

Creditors Committee, filed by Alma Energy, LLC (RE: related document(s) 173 Memorandum

of Opinion,, Order (Generic), Order (Generic)). (Snyder, Paul) (Entered: 01/21/2008)

The filing of this document was in direct violation of the terms of the Settlement

Agreement and constituted an abuse of process. The document contained false and fraudulent

statements, or was based on false and fraudulent acts.

307. **Predicate Act 49**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and

Abuse of Process   05/05/2008 (docket #326)  Response Filed by Consol Capital, LLC (RE:

related document(s) 278 Objection to Claim filed by Debtor Alma Energy, LLC). (Attachments: # 1 Continuation of Main Document Affidavit of Tony Gannacone III) (Kennedy, Ellen) (Entered: 05/05/2008)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

308. **<u>Predicate Act 50</u>**    Fraud, Wire Fraud and Mail Fraud, Tortious Interference,  and Abuse of Process  12/28/2008 (docket #51 – Adv 07-7025)  Motion to Dismiss Case, filed by Tony Gannacone III. Hearing scheduled for 1/10/2008 at 02:15 PM at Lexington Courtroom, 3rd Floor. (Attachments: # 1 Continuation of Main Document Exhibit A – Affidavit of Tony Gannaconne III# 2 Continuation of Main Document Exhibit B - Emails - exhibit to MTD# 3 Proposed Order) (Kennedy, Ellen) (Entered: 12/28/2007)

The filing of this document was in direct violation of the terms of the Settlement Agreement and constituted an abuse of process. The document contained false and fraudulent statements, or was based on false and fraudulent acts.

309. **<u>Predicate Act 51</u>**    Wire Fraud - Fraud   a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; and 18 U.S.C.  § 1343 (Wire Fraud) and 18 U.S.C. Chapter 63 (Mail Fraud).

As alleged in Paragraphs 72, 73, and otherwise herein - Member Halle directed member Shelton to draft a false and fraudulent closing statement on August 9, 2006, and wire monies to Robert Alan Myers (Myers), a person who was not named on the closing statement to receive any funds from the trust account. The Money was actually wired to Myers on Aug 11th 2006, and came from the operator's portion of funds. Member Shelton should have wired $100,000 to Tony Gannacone III,  instead only a 1/3 of that amount went to Member Gannacone. The Halle Group made false and fraudulent statements regarding this payment to Williams, Nathan, Street, and Roulett for the purpose of inducing them to enter into the JV Agreements.

310. **Predicate Act 52**   Fraud, Wire Fraud and Mail Fraud, Illegal Funds and Racketeering -   a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 73 and otherwise herein - On or about August 11th 2006, Member Myers, acting as agent for Reynolds (Ren) Maragni, paid member Maragni the sum of $66,666.66. The Halle Group misrepresented and concealed the payment to Maragni, who is a convicted felon and an alleged money launderer for organized crime. Williams alleges that illegal funds were invested in Alma, Glen Alum, and KCVI by The Halle Group.

311. **Predicate Act 53**   Fraud and Racketeering - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18

U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering under 18 U.S.C §1961(1); and 18 U.S.C. § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 78 and otherwise herein - Member Warren Halle devised a scheme to defraud Alma Energy and Darrell Williams so as to obtain the contractual rights provided to them in the Joint Venture Agreements as amended by economic coercion by not paying funds due to Alma and the Joint Venture KCVI. Halle wanted to purchase Glen Alum Coal properties outside of the joint venture of KCVI and needed the JV Agreements changed to facilitate that goal. The Halle Group utilized false and fraudulent statements and tortious interference to economically coerce Alma and declare Alma and Williams in Default under the JV Agreements

312. **Predicate Act 54**        Fraud and Racketeering - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering under 18 U.S.C §1961(1); and 18 U.S.C. § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 97 and otherwise herein - The Halle Group Member Gannacone wrongfully ceased his efforts efforts to obtain additional financing for Alma and Williams based on false and fraudulent statements made by Halle to Gannacone.

313. **<u>Predicate act 55</u>**   Fraud and Racketeering - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 54, 55, 56, 57, and otherwise herein - Member Halle assisted by Member Shelton fraudulently and wrongfully purchase the Glen Alum and Logan Coal properties outside the joint Venture KCVI. Glen Alum was a project "brought to" Halle and KCVI by Williams under the terms of the JV Agreements for the benefit of Alma and KCVI, and was developed by Williams and Alma during a time when Alma was a member of KCVI and Williams was the Exclusive Agent for KCVI.

314. **<u>Predicate Act 56</u>**   Fraud and Racketeering - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63, KRS 508.075, 508.078, 508.080.

As alleged in Paragraphs 76 and otherwise herein - Member Halle instructed Member

Gannacone to threaten Darrell Williams and Nathan Williams so that they would agree to change

the August JV Agreements.


315. **<u>Predicate Act 57</u>**   Fraud,  Tortious Interference Fraud and Racketeering – a

person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a

material fact, makes any materially false, fictitious, or fraudulent statement or representation, or

makes or uses any false writing or document knowing the same to contain any materially false,

fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18

U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 76 and otherwise herein -  The Halle Group through false and

fraudulent acts economically coerced Darrell Williams, Nathan Williams, and Alma into giving

up valuable rights in the August  JV Agreement.

316. **<u>Predicate Act 58</u>**   Fraud - a person or entity who violates falsifies, conceals, or

covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious,

or fraudulent statement or representation, or makes or uses any false writing or document

knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18

U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18

U.S.C. Chapter 63.

As alleged in Paragraphs 83, 84, 85, 86, 87 and otherwise herein -  Member Halle and

The Halle Group conspired to devise a fraudulent scheme and commit fraud by theft and

economic and physical coercion against Alma, Williams, and Nathan by improperly processing

Alma coal, delaying payments to Alma and Williams, and by wrongfully and tortuously

interfering with Alma and Williams' Management team.

In an affidavit Sid Young, Alma's manager for Glen Alum, stated in part:

"1. … I was hired as Alma Energy's Project Manager to manage the Glen

Alum Properties which were owned by West Virginia Coal Ventures I, LLC.

2. During my short stay there I was asked to ride to Logan West Virginia

with Warren Halle and other employees of Warren Halle to look at some other

coal properties owned by Warren Halle. During the ride there, they talked about

how their plans for the property over the next months were going to put Alma

Energy out of business and that I should go to work with them. The group then

opined that if I came on board with them, they would not need Alma nor would

they have to pay the $1.65 per ton fee. I replied to them I was not interested.

3. They opined that they could stock pile Alma's Coal for a long time until

some 3rd party coal was washed, and by dragging out Alma, then they would have

no real obligation to pay Alma, and that not being paid in full would put Alma out

of business…"

317. **<u>Predicate Act 59</u>** Extortion and Bribery—18 U.S.C. § 152(6) Subsection (6) of

Section 152, Tortious Interference, Fraud, and Racketeering -  a person or entity who knowingly

and fraudulently makes a false oath or account in or in relation to any case under title 11 violates

18 U.S.C. §152 (2); a person or entity who which violates falsifies, conceals, or covers up by any

trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent

statement or representation, or makes or uses any false writing or document knowing the same to

contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and

1018; and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 224 through 247 and otherwise herein  - The Halle Group

conspired to defraud Alma, Creditor's of Alma, Street, Roulett, and to bribe and extort

participation in a criminal enterprise by Williams, Nathan, Pikeville Energy, and Blackberry,

through a document drafted by Member Gartland labeled the Voting Agreement. Mr. Gartland

emailed this document from Kentucky across state lines to Hayden Fisher in Virginia, the

attorney for and a member of Pikeville Energy.  The Voting agreement constitutes a criminal act

under 18 USC 152 (6), and for the reason it was emailed and transmitted by wire across state

lines constituted wire fraud.

Extortion and Bribery—18 U.S.C. § 152(6) Subsection (6) of Section 152 is a very broad

statute which covers all aspects of bribery and extortion in bankruptcy cases. Subsection (6),

provides: "A person who...knowingly and fraudulently gives, offers, receives, or attempts to

obtain any money or property, remuneration, compensation, reward, advantage, or promise

thereof for acting or forbearing to act in any case under title 11;...shall be fined...and

imprisoned...or both."

There is no requirement that the act or forbearance from acting be unlawful itself. Acting

or not acting with the requisite criminal intent is sufficient. For example, a bidder agreeing to

withdraw the bid in return for money is covered. United States v. Weiss, 168 F. Supp. 728 (W.D.

Pa. 1958).

In the Voting Agreement members THC and KCVI  agree to both act and refrain from

acting in a case under title 11 if several entities sign the Document which basically releases all

claims known and unknown against Michael Gartland, Wise Delcotto, Billy Shelton, JWTS,

KCVI, WVCVI, NextGen,  Warren Halle, KCVI and THC.

There was no signature line for the Debtor, Alma Energy LLC, on the Voting Agreement.

Since the Debtor was intentionally not included. The voting agreement would have made it

impossible for the Debtor and Williams to pursue claims against the Halle entities for any

wrongful conduct covered in the agreement, no matter how egregious and no matter how much it harmed Alma, Williams, Nathan, Nathan's Welding, Street, or Roulett.

318. **<u>Predicate Act 60</u>**     Tortious Interference, Fraud, and Racketeering - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates, falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraph 61 and otherwise herein - Member Halle induced Member Gannacone to remove, conceal and falsify records, accounting books, receipts from Darrell Williams, Alma Energy, and Nathan's Welding office located in Belfry Ky.

319. **<u>Predicate Act 61</u>**     Tortious Interference, Fraud, and Racketeering - a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); a person or entity who violates, falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraph 61, and otherwise herein  - Halle devised a scheme to extort or fraudulently induce Debbie Reynolds ("Reynolds") and / or Nathan Williams into signing

Nathan's Welding permits over to member Halle. Gannacone called Reynolds, the mother of

Nathan Williams telling her that Halle would give Nathan and Reynolds money if Nathan would

sign over the Mining Permits under which Alma mines for the benefit of Alma, Alma's

Creditors, Darrell Williams, Street, and Roulett. Gannacone, acting for Halle and the Halle

Related Entities, and falsely and fraudulently telling Nathan that if he did not do so Nathan

would lose his house and would face criminal prosecution and go to jail.

320. **<u>Predicate Acts  62</u>**        Theft of a motor vehicle and personal items and Extortion -

a person or entity who violates falsifies, conceals, or covers up by any trick, scheme, or device a

material fact, makes any materially false, fictitious, or fraudulent statement or representation, or

makes or uses any false writing or document knowing the same to contain any materially false,

fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18

U.S.C §1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63; KRS 514.030, 514.040,

514.080.

As alleged in Paragraphs 127, 128, 129, 130, 131, 132, and otherwise herein  - Michael

Gartland, Billy Shelton, Steve Fleischman and Roger Simmons wrongfully and illegally took

possession of a Chevy Suburban that Darrell Williams was driving, which had valuable

personalty in the car, including but not limited to a laptop computer containing confidential

business documents and related paper files. There was no lien on the title to the vehicle, which

was licensed in Kentucky, and there was no valid perfected security agreement.

321. **<u>Predicate Act 63</u>**      a person or entity who knowingly and fraudulently makes a

false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2);

which violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact,

makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses

any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering under 18 U.S.C §1961(1); and 18 U.S.C. § 1343 and 18 U.S.C. Chapter 63. KRS 514.030, 514.040, 514.070.

As alleged in Paragraphs 77, 88, 96, 120, and otherwise herein – The Halle Group delayed processing, sale, and payment for coal to cause Alma to become insolvent. In June 2007 payments for two shipments sold in interstate commerce to ABC and Tonawanda were delayed, with the full amount owed not being paid or accounted for. The Halle Group violated 18 U.S.C. §659, and 18 USC §2314 and / or 18 USC §2315. The 2 train loads of Coal had a value of at least $600,000, a portion of which was converted by the Halle Group to their own use.

322. **Predicate Act 64**  a person or entity who knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); which violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering under 18 U.S.C §1961(1); and 18 U.S.C. § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraphs 191, 196, 197, 198, 199 - On June 15th 2008, the Halle Group fraudulently induced Alma, Nathan Williams, and Darrell Williams to enter into a Coal Sales Agreement with no intention to honor the said agreement. On or about May 21, 2008, Member Gartland emailed Paul Snyder, the Debtors Attorney, and demands to have a Coal purchase agreement signed or KCVI would file its own plan of reorganization, which violated the Settlement Agreement.

323. **Predicate Act 65**  a person or entity who knowingly and fraudulently makes a false

oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); which

violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes

any materially false, fictitious, or fraudulent statement or representation, or makes or uses any

false writing or document knowing the same to contain any materially false, fictitious, or

fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C

§1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

As alleged in Paragraph 201 and otherwise herein - The Halle Group's Members KWV

Operation and WVCVI fraudulently analyzed Alma's product, reducing the amount that

Pikeville Energy and Alma Energy were paid. The Fraudulent Data (Daily Tonnage and

Trucking Report) was faxed or emailed daily, constituting (Wire Fraud) and the fraudulent

payment amounts to Pikeville were wired from a bank (Wire Fraud).

324. **Predicate Act 66**  a person or entity who knowingly and fraudulently makes a false

oath or account in or in relation to any case under title 11 violates 18 U.S.C. §152 (2); which

violates falsifies, conceals, or covers up by any trick, scheme, or device a material fact, makes

any materially false, fictitious, or fraudulent statement or representation, or makes or uses any

false writing or document knowing the same to contain any materially false, fictitious, or

fraudulent statement violates 18 U.S.C. §§ 1001 and 1018; Racketeering  under 18 U.S.C

§1961(1); and 18 U.S.C.  § 1343 and 18 U.S.C. Chapter 63.

The Halle Group conspired to and used funds acquired from acts of Racketeering,

including funds obtained by and through Reynolds Maragni, funds acquired by fraudulently

withholding 15% of gross sales, and funds not paid over to Alma from interstate coal sales,  to

damage Alma, Williams, Nathan, Nathan's Welding, Pikeville, Blackberry, Street, Roulett,

Fisher, Richard, Morehouse, and Sutcliffe by tortious interference, fraudulent conduct, and

intentional violations of the Settlement Agreement, both directly and through agents and proxies.

Through such acts of Racketeering The Halle Group eventually purchased Alma's assets and

claims using proceeds from the illegal activities. The illegal purpose and activity of using fraud

and misrepresentation to "wipe out" the equity of Alma represented a plan or scheme to defraud

Darrell Williams and Nathan Williams. This scheme was devised by The Halle Group in 2006

and carried out by members Halle and Gartland, and The Halle Group, prior to actually causing

sufficient economic damage to Alma and Williams that the Alma bankruptcy case was converted

to chapter 7.

325. **Other Predicate Acts** – Certain additional acts described in Paragraphs 1 through

256 herein constitute predicate acts under Title 18 USC Chapter 96, and violations Title 18

U.S.C.  §§1962 (a), (b), (c), and/or (d). The Plaintiff expects to identify additional predicate acts

through discovery in this matter. Alma, Williams, Nathan, Nathan's Welding, Street, Roulett,

Pikeville, Blackberry, Fisher, Richard, and Morehouse were damaged by said acts in an amount

not known but estimated to be over 80 million dollars, at a minimum $2 dollars per raw ton of

Coal times the Alma, Logan, and Glen Alum coal properties coal reserves of 40 million tons.

Williams is entitled to have his damages tripled and to be awarded Attorney fee's under

Title 18 USC Chapter 96. Williams also asks that all defendants be divested of ill gotten gains

and the Halle entities be removed from Glen Alum, Logan, and Alma properties, with all general

creditors of Alma and the Williams to be paid from the proceeds.

Darrell Williams hereby Amends Count Nine of his Crossclaims and Counterclaims to

make the following specific Claims under 18 U.S.C.  §1962.

# Pattern of Racketeering

326. The Enterprise and Members of the Enterprise engaged in a pattern of racketeering activity by performing at least two racketeering acts pursuant to a common scheme, plan, or motive since January 1, 2006, against the persons or entities named herein.

The Halle Group engages in the above stated Predicate Acts as a regular way of doing business.

a) As a regular way of doing business during the period from August 2006 to August 2010 the Halle Group committed a pattern of separate violations of 18 U.S.C. 1962 Sections (a), (b), (c), and (d); 18 U.S.C. §§ 1001 and 1018; and 18 U.S.C.  § 1343 (Wire Fraud); 18 U.S.C. Chapter 63 (Mail Fraud); and of Title 18 §152, with respect to the following individual entities and persons:

Alma Energy LLC

Blackberry Energy LLC

Pikeville Energy Group LLC

Joe Street

J B Roulette

Darrell Williams

Nathan Williams

Nathan's Welding LLC

Sutcliffe Energy Corporation

Brett Morehouse

Gary Richard

Hayden Fisher

Edward Green

Homer Preece

Sid Young

Anthony Preston

P.A Heaberlin

b)  As a regular way of doing business the Halle Group prepares and approves contractual

agreements with unconscionable provisions with the intention of causing defaults by the other

parties so as to gain an economic advantage over parties with which it does business.

c)  As a regular way of doing business the Halle Group acts in bad faith through intentional

misrepresentations and fraudulent acts with the intention of gaining an economic advantage over

parties with which it does business.

d)  As a regular way of doing business the Halle Group acts in bad faith through intentional

misrepresentations and fraudulent acts with the intention of gaining an economic advantage over

employees and agents.

## AMENDED COUNT IX - FIRST RICO CLAIM FOR RELIEF

### (Violation of 18 U.S.C. 1962 (a) against each of the Defendants)

Darrell Williams repeats, realleges, and declares all Answers and Claims contained in his Answer to the Plaintiff's Amended Complaint (Docket #81); his First Amended Answer to the Plaintiff's Amended Complaint and Counterclaims - Crossclaims (Docket #94); his Second Amended Answer to the Plaintiff's Amended Complaint and Counterclaims – Crossclaims (Docket #158); and Paragraphs 1 through 326 herein, as though fully set forth herein.

Claimant Darrell Williams is a "person" within the meaning of 18 U.S.C. §1961 (3) and §1964 (c).

Each of the Defendants is a "person" under 18 U.S.C. §§1961 (3), 1962 (a).

The Halle Group as defined herein, including Warren Halle, THC, KCVI, WVCVI, and KWV, constitute the "Enterprise" within the meaning of 18 U.S.C. §1961 (3) and §1962(a).

The Enterprise engaged in or had some effect on Interstate Commerce as alleged herein. Defendant Warren Halle committed multiple, repeated, and continuous violations of Interstate Fraud, Wire Fraud, Bank Fraud, Extortion, Attempted Extortion, Extortion, Theft of Interstate shipments, and Bankruptcy Fraud. Defendants THC, KCVI, WVCVI, and KWV, committed multiple, repeated, and continuous violations of Fraud, Wire Fraud, Bank Fraud, Extortion, Attempted Extortion, Theft of Interstate shipments, and Bankruptcy Fraud.

The Defendants derived income from the pattern of racketeering alleged herein. Defendant Warren Halle used money that THC unlawfully received through racketeering activities to set up subsidiaries and or affiliates WVCVI, KWV, and NextGen, that also committed acts of Racketeering, and damaged Alma, Darrell Williams, Nathan Williams, Nathan's Welding, Street, and Roulett.

As a result, the claimant Darrell Williams has been damaged and sustained substantial damages to his business or property within the meaning of 18 U.S.C. §1964 (c) including but not limited to Exclusive Agent payments, Coal Broker payments, Finders Fee's payments, and has suffered substantial and irreparable loss of business opportunity with consumers and customers.

The wrongful acts as stated above have damaged Darrell Williams in an amount estimated to be in excess of 80 million dollars, calculated as two dollars per ton of Coal from the Alma, Logan and Glen Alum coal properties (containing 40 million tons of coal reserves).

Williams asks for his damages, tripled, and Attorney fees and costs. Williams also asks that all Defendants be stripped and divested of all ill gotten gains and that The Halle Group be removed from Glen Alum, Logan, and Alma properties and all creditors of Alma be paid from the proceeds.

### AMENDED COUNT X - SECOND RICO CLAIM FOR RELIEF

(Violation of 18 U.S.C. 1962 (d) by conspiring to commit 1962 (a)

against each of the Defendants)

Darrell Williams repeats, realleges, and declares all Answers and Claims contained in his Answer to the Plaintiff's Amended Complaint (Docket #81); his First Amended Answer to the Plaintiff's Amended Complaint and Counterclaims - Crossclaims (Docket #94); his Second Amended Answer to the Plaintiff's Amended Complaint and Counterclaims – Crossclaims (Docket #158); and Paragraphs 1 through 326 herein, as though fully set forth herein.

Claimant Darrell Williams is a "person" within the meaning of 18 U.S.C. §1961 (3) and §1964 (c).

Each of the Defendants is a "person under 18. U.S.C. §1961 (3), §1962 (a), and §1962 (a) and (d)

The Halle Group, including Warren Halle, THC, WVCVI, KWV Operations, and KCVI constitute an Enterprise within the meaning of 18 U.S.C. §1961 (4) and §1962(a) which was engaged in activities affecting Interstate commerce at all times relevant to this complaint.

Defendants conspired among themselves within the meaning of 18 U.S.C. §1962 (d) to violate 18 U.S.C. §1962 (a), that is, defendants conspired among themselves so that income would be received, directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. §1961 (1) in which defendants participated within the meaning of  18 U.S.C. §1961 (1), §1961 (5), and §1962 (a) to wit multiple, repeated, and continuous violations effecting interstate commerce of Fraud, Wire Fraud, Bank Fraud, Extortion, Attempted Extortion, Extortion, Theft of Interstate shipments, and Bankruptcy Fraud.

As a result, the cross claimant Darrell Williams has been damaged and sustained substantial losses to his business or property within the meaning of 18 U.S.C. §1964 (c) including but not limited to Exclusive Agent payments, Coal Broker payments, Finders Fee's payments, and has suffered substantial and irreparable loss of business opportunities' and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

The wrongful acts as stated above have damaged Darrell Williams in an amount estimated to be in excess of 80 million dollars, calculated as two dollars per ton of Coal from the Alma, Logan and Glen Alum coal properties (containing 40 million tons of coal reserves).

Williams asks for his damages, tripled and Attorney fees and costs. Williams also asks that all defendants be stripped and divested of all ill gotten gains and the Halle Related Entities be removed from Glen Alum, Logan and Alma properties and all creditors of Alma be paid from the proceeds.

## <u>AMENDED COUNT XI - THIRD RICO CLAIM FOR RELIEF</u>

(Violation of 18 U.S.C. §1962 (b) against each of the Defendants)

Darrell Williams repeats, realleges, and declares all Answers and Claims contained in his Answer to the Plaintiff's Amended Complaint (Docket #81); his First Amended Answer to the Plaintiff's Amended Complaint and Counterclaims - Crossclaims (Docket #94); his Second Amended Answer to the Plaintiff's Amended Complaint and Counterclaims – Crossclaims (Docket #158); and Paragraphs 1 through 326 herein, as though fully set forth herein.

Claimant Darrell Williams is a "person" within the meaning of 18 U.S.C. §1961 (3) and §1964 (c).

Each of the Defendants is a "person under 18. U.S.C. §1961 (3), §1962 (a), and §1962 (b).

The Halle Group, including Warren Halle, THC, KCVI and WVCVI, KWV, constitute an "Enterprise" within the meaning of  18 U.S.C. §1961 (3) and §§1962(a) or (b).

Defendant Warren Halle used ill gotten gains that THC received through Racketeering activities to set up subsidiaries and or affiliates WVCVI and KWV, NextGen, who also committed acts of Racketeering, to wit multiple, repeated, and continuous violations affecting interstate commerce of Fraud, Wire Fraud, Bank Fraud, Extortion, Attempted Extortion, Extortion, Theft of Interstate shipments, and Bankruptcy Fraud.

Through the pattern of racketeering activity the Defendants acquired, maintained, and controlled the Enterprise.

As a result, the cross claimant Darrell Williams has been damaged and sustained substantial to his business or property within the meaning of 18 U.S.C. §1964 (c) including but not limited to exclusive agent payments, Coal Broker payments and opportunities' and

substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

The wrongful act as stated above have damaged Darrell Williams in an amount estimated to be in excess of 80 million dollars, calculated as two dollars per ton of Coal from the Alma, Logan and Glen Alum coal properties (containing 40 million tons of coal reserves).

Williams asks for his damages, tripled and Attorney fees and costs. Williams also asks that all defendants be stripped and divested of all ill gotten gains and the Halle Related Entities be removed from Glen Alum, Logan and Alma properties and all creditors of Alma be paid from the proceeds.

## AMENDED COUNT XII - FOURTH RICO CLAIM FOR RELIEF

(Violation of 18 U.S.C.  1962 (d) by conspiring to

commit a violation under §1962 (b) against each of the Defendants)

Darrell Williams repeats, realleges, and declares all Answers and Claims contained in his Answer to the Plaintiff's Amended Complaint (Docket #81); his First Amended Answer to the Plaintiff's Amended Complaint and Counterclaims - Crossclaims (Docket #94); his Second Amended Answer to the Plaintiff's Amended Complaint and Counterclaims – Crossclaims (Docket #158); and Paragraphs 1 through 326 herein, as though fully set forth herein.

Claimant Darrell Williams is a "person" within the meaning of 18 U.S.C. §1961 (3) and §1964 (c).

Each of the Defendants is a "person under 18. U.S.C.  §1961 (3), §1962 (a), (b), and (d).

The Halle Group, including Warren Halle, THC, KCVI and WVCVI, KWV, constitute an "Enterprise" within the meaning of  18 U.S.C. §1961 (3) and §§1962(a) or (b).

Defendants conspired among themselves within the meaning of 18 U.S.C. 1962 (d) to violate 18 U.S.C. 1962 (b) that is, defendants conspired among themselves to acquire an interest

in or maintain, directly or indirectly a interest in or control of  KCVI, WVCVI, THC, KWV, and

NEXTGEN COAL,  through a pattern of activity unlawful under 18 U.S.C. §1961 (1) in which

defendants participated within the meaning of  18 U.S.C. §1961 (1) to wit multiple, repeated, and

continuous violations affecting interstate commerce of Wire Fraud, Bank Fraud, Extortion,

Attempted Extortion, Extortion, Theft of Interstate shipments, and Bankruptcy Fraud. Each

Defendant agreed to participate, directly or indirectly, in the affairs of the Enterprise through a

pattern of racketeering activity.

As a result, the cross claimant Darrell Williams has been damaged and sustained

substantial to his business or property within the meaning of 18 U.S.C. §1964 (c) including but

not limited to exclusive agent payments, Coal Broker payments and opportunities' and

substantial and irreparable loss of goodwill and business opportunity with consumers and

customers.

The wrongful acts as stated above have damaged Darrell Williams in an amount

estimated to be in excess of 80 million dollars, calculated as two dollars per ton of Coal from the

Alma, Logan and Glen Alum coal properties (containing 40 million tons of coal reserves).

Williams asks for his damages, tripled and Attorney fees and costs. Williams also asks

that all defendants be stripped and divested of all ill gotten gains and the Halle Related Entities

be removed from Glen Alum, Logan and Alma properties and all creditors of Alma be paid from

the proceeds.

## <u>AMENDED COUNT XIII - FIFTH RICO CLAIM FOR RELIEF</u>

### (Violation of 18 U.S.C.  §1962 (c))

Darrell Williams repeats, realleges, and declares all Answers and Claims contained in his

Answer to the Plaintiff's Amended Complaint (Docket #81); his First Amended Answer to the

Plaintiff's Amended Complaint and Counterclaims - Crossclaims (Docket #94); his Second

Amended Answer to the Plaintiff's Amended Complaint and Counterclaims – Crossclaims

(Docket #158); and Paragraphs 1 through 326 herein, as though fully set forth herein.

Claimant Darrell Williams is a "person" within the meaning of 18 U.S.C. §1961 (3) and

§1964 (c).

Each of the Defendants is a "person under 18. U.S.C.  §1961 (3), §1962 (c).

The businessman, Halle; and 5 corporations or entities that he controls, KCVI, WVCVI,

THC, KWV, and NEXTGEN COAL; two trusted employees, Fleischman and Adamson; two

contract salespersons, Gannacone and Waber; and three attorneys, Gartland, Simmons, and

Shelton, all of which are associated in fact with Coal Mining operations herein described which

have an effect on interstate and foreign commerce, constitute an "Enterprise" as identified herein

within the meaning of  18 U.S.C. §1961 (3) and §§1962(c), named the Halle Group Enterprise.

Defendants conspired among themselves within the meaning of 18 U.S.C. §1962 (c) to

violate 18 U.S.C. §1962 (c) that is, Defendants conspired among themselves to acquire an

interest in or maintain, manage, operate, directly or indirectly conduct the affairs of the Glen

Alum Enterprise through a pattern of activity unlawful under 18 U.S.C. §1961 (1) in which

defendants participated within the meaning of  18 U.S.C. §1961 (1) To wit multiple, repeated,

and continuous violations which had an effect on interstate and foreign commerce of Fraud, Wire

Fraud, Bank Fraud, Extortion, Attempted Extortion, Theft of Interstate shipments, Bankruptcy

Fraud and the Threat of Murder.

The Defendants were associated with or employed by the Halle Group Enterprise,

engaged in a pattern of racketeering activity as alleged herein, and conducted or participated in

the conduct of the Halle Group Enterprise through the pattern of racketeering.

As a result, the cross claimant Darrell Williams has been damaged and sustained

substantial to his business or property within the meaning of 18 U.S.C. §1964 (c) including but

not limited to exclusive agent payments, Coal Broker payments and opportunities' and

substantial and irreparable loss of goodwill and business opportunity with consumers and

customers.

The wrongful act as stated above have damaged Darrell Williams in an amount estimated

to be in excess of 80 million dollars, calculated as two dollars per ton of Coal from the Alma,

Logan and Glen Alum coal properties (containing 40 million tons of coal reserves).

Williams asks for his damages, tripled and Attorney fees and costs. Williams also asks

that all defendants be stripped and divested of all ill gotten gains and the Halle Related Entities

be removed from Glen Alum, Logan and Alma properties and all creditors of Alma be paid from

the proceeds.

### AMENDED COUNT XIV - SIXTH RICO CLAIM FOR RELIEF

(Violation of 18 U.S.C.  §1962 (d) by conspiring to commit a violation
under §1962 (c) against each of the Defendants)

Darrell Williams repeats, realleges, and declares all Answers and Claims contained in his

Answer to the Plaintiff's Amended Complaint (Docket #81); his First Amended Answer to the

Plaintiff's Amended Complaint and Counterclaims - Crossclaims (Docket #94); his Second

Amended Answer to the Plaintiff's Amended Complaint and Counterclaims – Crossclaims

(Docket #158); and Paragraphs 1 through 326 herein, as though fully set forth herein.

Claimant Darrell Williams is a "person" within the meaning of 18 U.S.C. §1961 (3),

§1964 (c) and 1964 (d) .

Each of the Defendants is a "person under 18. U.S.C.  §1961 (3), §1962 (a), (c), and (d).

The businessman, Halle; and 5 corporations or entities that he controls, KCVI, WVCVI, THC, KWV, and NEXTGEN COAL; two trusted employees, Fleischman and Adamson; two contract salespersons, Gannacone and Waber; and three attorneys, Gartland, Simmons, and Shelton, all of which are associated in fact with Coal Mining operations herein described which have an effect on interstate and foreign commerce, constitute an "Enterprise" as identified herein within the meaning of 18 U.S.C. §1961 (3) and §§1962(c), named the Halle Group Enterprise.

Defendants conspired among themselves within the meaning of 18 U.S.C. §1962 (c) to violate 18 U.S.C. §1962 (d) that is, Defendants conspired among themselves to acquire an interest in or manage direct participate maintain, conduct the affairs of, directly or indirectly a interest in or control over the Halle Group Enterprise through a pattern of activity unlawful under 18 U.S.C. §1961 (1) in which defendants participated within the meaning of 18 U.S.C. §1961 (1) to wit multiple, repeated, and continuous violations which had an effect on interstate and foreign commerce of Fraud, Wire Fraud, Bank Fraud, Extortion, Attempted Extortion, Theft of Interstate shipments, Bankruptcy Fraud and the threat of murder.

As a result, the cross claimant Darrell Williams has been damaged and sustained substantial to his business or property within the meaning of 18 U.S.C. §1964 (c) including but not limited to exclusive agent payments, Coal Broker payments and opportunities' and substantial and irreparable loss of goodwill and business opportunity with consumers and customers.

The wrongful act as stated above have damaged Darrell Williams in an amount estimated to be in excess of 80 million dollars, calculated as two dollars per ton of Coal from the Alma, Logan and Glen Alum coal properties (containing 40 million tons of coal reserves).

Williams asks for his damages, tripled and Attorney fees and costs. Williams also asks

that all defendants be stripped and divested of all ill gotten gains and the Halle Related Entities

be removed from Glen Alum, Logan and Alma properties and all creditors of Alma be paid from

the proceeds.

Respectfully submitted this the 23rd day of August, 2010.


/s/ Dennis E Kelley
Dennis E.  Kelley, Attorney
418 Eighth St Ste 101
PO Box 1176
Huntington, WV 25714-1176
kelleylawoffice@windstream.net
(304) 521-1453


The foregoing has been served by electronic service on:

T. Kent Barber on behalf of Defendant KWV Operations, LLC
kbarber@dlgfirm.com, dlgecf@dlgfirm.com;dlgecfs@gmail.com

Richard Boydston on behalf of Defendant Steve Singleton
rb2@gdm.com

Michael J. Gartland on behalf of Counter-Defendant THC Kentucky Coal Venture I LLC
mgartland@dlgfirm.com, dlgecf@dlgfirm.com;dlgecfs@gmail.com

John Thomas Hamilton on behalf of Defendant Consol Capital, LLC
jhamilton@gmalaw.com, cfeeback@gmalaw.com;lsanders@gmalaw.com

Charles J. Lisle on behalf of Cross-Claimant Pikeville Energy Group, LLC
cjlisle99@msn.com

John Lucian on behalf of Plaintiff Phaedra Spradlin
lucian@blankrome.com

James D. Lyon on behalf of Attorney James Pruitt
jdlyonlaw@aol.com

Grahmn N. Morgan on behalf of Defendant Brett Morehouse
grahmn.morgan@dinslaw.com, jane.courtney@dinslaw.com

Christopher G. O'Brien on behalf of Counter-Claimant Darrell Williams
cobrien@beginbankruptcy.com

Gregory R Schaaf on behalf of Plaintiff Phaedra Spradlin
lexbankruptcy@gdm.com, shm@gdm.com;awc2@gdm.com

Paul Stewart Snyder on behalf of Plaintiff Alma Energy, LLC
ps@ws5.com

Phaedra Spradlin
luloq25@windstream.net,
KY30@ecfcbis.com;ps@trustesolutions.com;deasmith724@yahoo.com;mmsmock@yahoo.com

Jim G. Vanover on behalf of Defendant Blackberry Energy, LLC
attorneys@vhblaw.com

Notice will not be electronically sent to:

D. Hayden Fisher


Roger C. Simmons on behalf of Defendant KWV Operations, LLC
Jodi Lynn Foss on behalf of Plaintiff THC Kentucky Coal Venture I LLC

Brian M. Maul on behalf of Defendant KWV Operations, LLC
Gordon & Simmons LLC
603B W Patrick Street
Frederick, MD 21701

Charles Hill

Peycon Energy, LLC

/s/ Dennis E Kelley