KENTUCKY COAL VENTURE I LLC

Limited Liability Company Agreement

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is entered into, and shall be effective as of the 9ᵗʰ day of August, 2006, by and among Alma Energy, LLC, a Virginia limited liability company ("Alma") and THC Kentucky Coal Venture I, LLC, a Maryland limited liability company ("Halle") (each a "Member" and, together, the "Members") pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del.C. §18-10, et. seq. (as amended from time to time, the "Act"), on the following terms and conditions:

ARTICLE 1.

GENERAL

1.1    Formation. The Members hereby agree to form Kentucky Coal Venture I LLC (the "Company") as a limited liability company under, and pursuant to, the provisions of the Act and upon the terms and conditions set forth in this Agreement. The fact that the Certificate of Formation of the Company (as amended from time to time, the "Certificate") is on file in the office of the Secretary of State of the State of Delaware shall constitute notice that the Company is a limited liability company. Simultaneously with the execution of this Agreement and the formation of the Company, each of the Members shall be admitted as members of the Company. The rights and liabilities of the Members shall be as provided under the Act, the Certificate and the Agreement.

1.2    Name of the Company. The name of the Company shall be "Kentucky Coal Venture I LLC", or such other name as the Manager may from time to time determine, and all business of the Company shall be conducted in such name. The Manager shall cause to be filed on behalf of the Company such assumed or fictitious name certificate or certificates as may from time to time be required by law.

1.3    Business of the Company. The business of the Company shall be to acquire, maintain, transfer, sell, or otherwise dispose of coal leases, surface leases, mining agreements, permit agreements and other agreements that allow it to produce and sell coal, sandstone and other mineral products from mining operations located in Pike County, Kentucky, any other lawful activity that Manager directs the Company to engage in, and to engage in all activities incident or related thereto.

1.4    Place of Business of the Company. The principal place of business of the Company shall be at 2900 Linden Lane, Suite 300, Silver Spring, MD 20910. The registered office of the Company in the State of Delaware is initially located at The Company Corporation, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The Manager may at any time and from time to time, change the location of the Company's principal place of business and may establish such additional place or places of business of the Company as it may from time to time determine.

USIDOCS 5757314v9

1.5     Duration of the Company. The term of the Company shall commence on the date the Certificate is filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed in accordance with Article 8 hereof.

1.6     Names and Addresses of Members. The names and addresses of the Members are set forth on Schedule A hereto.

1.7     Ownership of Company Property. The interest of each Member in the Company is personal property. All property owned by the Company shall be deemed owned by the Company as an entity and no Member, individually, shall have any ownership of such property. While this Agreement remains in effect, no Member nor any successor-in-interest to any Member, shall have the right to have the property of the Company partitioned or to file a complaint or institute any proceeding at law or in equity to have the property of the Company partitioned, and each Member, on behalf of himself, his successors, representatives, heirs and assigns, waives any such right. It is the intention of the Members that during the term of this Agreement, the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the right of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of his interest in the property of the Company shall be subject to the limitations and restrictions of this Agreement.

1.8     Not Responsible for Independent Commitments. Neither the Company nor any Member shall be responsible or liable for any indebtedness or obligation of any Member incurred either before or after the execution of this Agreement unless such responsibilities, liabilities, indebtedness or obligations were incurred pursuant to the terms of this Agreement.

1.9     Delivery of Documents. Except as otherwise provided herein, the Manager shall not be obligated to deliver or mail copies of the Company's limited liability company agreement or any amendment thereto to the Members. Such documents will be made available for inspection at the offices of the Company as provided in Section 5.1 hereof.

1.10     No Partnership. The Members intend that the Company not be a general partnership, limited partnership or joint venture, and that no Member be considered to be a partner or joint venturer of any other Member, for any purposes other than foreign and domestic federal, state, provincial and local income tax purposes, and this Agreement shall not be construed to suggest otherwise.

1.11     Limited Nature of Alma Membership; Representations of Alma. The Members agree that Alma is a Member of the Company solely for purposes of participating in certain distributions of cash and decisions regarding the sale of certain Company assets. Except as and to the extent expressly set forth in Sections 3.2, 3.3, and 8.3, Alma shall have no economic interest in the Company or its assets (including, without limitation, distribution of cash or allocations of gain and loss). Except as and to the extent set forth in Section 4.3 regarding any Property Sale, Alma shall have no right to control the operations and actions of Manager or the Company. In the event (i) Alma resigns, is deemed to resign, or withdraws as "Operator" pursuant to the provisions of the Mining Agreement between Alma and the Company dated on or about the date hereof (as the same may be amended, the "Mining Agreement"), (ii) there exists

USIDOCS 5757314v9

any Operator Event of Default under the Mining Agreement, or (iii) is in default any of its obligations under this Agreement and such default continues for ten (10) business days (with regard to matters which may be cured by payment of money) or thirty (30) business days (with regard to any other matter), then Halle shall have the right, exercisable at any time thereafter at Halle's sole option, to acquire, or as Manager to cause the Company to acquire, all of the interests of Alma in and to the Company for the sum of one dollar ($1.00) and, in connection therewith, Alma shall be deemed to have released the Company, its Manager and its Members from and against all claims, known or unknown, past, present or future, arising from its membership in the Company and the Company's entry into the Mining Agreement. Alma represents and warrants to the Manager, Members and the Company that (i) all coal leases, surface leases, mining agreements, permit agreements and other agreements that allow Alma to produce and sell coal, sandstone and other mineral products from mining operations located in Pike County, Kentucky are listed on the attached Exhibit 1.11 (the "Rights"), (ii) Alma holds transferable title to all of the Rights free and clear of all liens, claims, encumbrances, and other restrictions, and (iii) no default exists under the Rights or any agreements relating thereto, and all obligations of Alma in connection with the rights now due and payable have been satisfied in full.

      1.12    <u>Limited Liability of Members and Managers</u>. No Member in its capacity as a Member or Manager in its capacity as a Manager shall be personally liable for any debts, liabilities or obligations of the Company. The obligations of each Member and Manager under this Agreement shall be enforced solely against such party's interest in the Company. No Member shall be required to lend or contribute any sums to the Company on account of the liabilities or the obligations of the Company or otherwise.

ARTICLE 2.

CAPITAL CONTRIBUTIONS AND PROFITS AND LOSSES

      2.1    <u>Capital Contributions</u>.

          (a)    Upon execution of this Agreement, Halle shall contribute to the Company the sum of $4,704,554.75 by depositing such funds in the Company's bank account or making the payments set forth on Exhibit 2.1(a) and shall have an initial Capital Account as set forth on the attached Schedule A. By executing this Agreement, Alma shall be deemed to have transferred to the Company all of its right, title and interest in and to the Rights, and further agrees, at its sole cost and expense (which shall not be deemed a capital contribution and shall not increase its Capital Account) promptly following the written request of Manager, to take such further actions, obtain such consents and registrations and execute and register and record such deeds, assignments and additional instruments as may be reasonably necessary or convenient to implement and carry out, evidence and insure such contribution. As set forth in the Mining Agreement, all obligations under the Rights shall remain with Alma, as Operator. The Members acknowledge that the admission of Alma as a member in the Company constitutes full and adequate consideration for the contributions of the Rights and, as such, the deemed value of such the Capital Account of Alma upon immediately after giving effect to the contribution of the Rights shall be $0.00.

-3-

(b)     Except as provided in this Section 2.01, no Member shall be obligated or permitted to contribute any additional capital to the Company. No interest shall accrue on any contributions to the capital of the Company, and no Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any other payment in respect of its Interest, including without limitation as a result of the withdrawal of such Member from the Company, except as specifically provided in this Agreement.

(c)     In the event that at any time (or from time to time) the Manager determines that additional funds in excess of the capital contributions described in Section 2.01(a) are required to be made to the Company and available financing, including, without limitation, acquisition indebtedness and permanent financing, are required to fund operations, obligations, liabilities, expenses or expenditures of the Company, the Manager may, but shall not be required to, at its sole option (i) make a capital contribution as a Member of the Company in the amount of such required additional funds or (ii) acting for and on behalf of, and in the name of, the Company, cause the Company to borrow such required additional funds, with interest payable at then-prevailing rates, from commercial banks, savings and loan associations and/or lending institutions or persons, or the Manager (or its affiliates) may, but shall not be required to, personally lend such funds to the Company. Notwithstanding anything contained here to the contrary, it is understood and agreed that in the event that the Manager lends funds to the Company, such loans, together with interest thereon at the rate which is one percent (1.0%) per annum in excess of the prime rate of interest in effect from time to time at Bank of America, N.A., (but in no event less than ten percent (10%) per annum), shall be repaid to the Manager before any distribution of Cash Flow, Sale Proceeds or Refinancing Proceeds is made to any Member.

2.2    Definitions. For purposes of this Agreement, the following terms shall have the meanings ascribed to them in this Section 2.02:

(a)     "Adjusted Capital Account" means, for each Member, such Member's Capital Account balance increased by such Member's Share of Minimum Gain.

(b)     "Capital Account" means a separate account maintained for each Member and adjusted in accordance with Regulations under Section 704 of the Code. To the extent consistent with such Regulations, the adjustments to such accounts shall include the following:

(i)     There shall be credited to each Member's Capital Account the amount of any cash (which shall not include imputed or actual interest on any deferred contributions) actually contributed by such Member to the capital of the Company, the fair market value (without regard to Code Section 7701(g)) of any property contributed by such Member to the capital of the Company (net of any liabilities secured by such property that the Company is considered to assume or take subject to under Code Section 752) and such Member's share of the Net Profits and Gross Income of the Company and of any items in the nature of income or gain separately allocated to the Members; and there shall be charged against each Member's Capital Account the amount of all cash distributions to such Member, the fair market value (without regard to Code Section 7701(g)) of any property distributed to such Member by the Company (net of any liability secured by such property that the Member is considered to assume or take subject to under Code Section 752) and such Member's share of the

Net Losses of the Company and of any items in the nature of losses or deductions separately allocated to the Members.

(ii)    If the Company at any time distributes any of its assets in-kind to any Member, the Capital Account of each Member shall be adjusted to account for that Member's allocable share of the Net Profits, Net Losses or Gross Income that would have been realized by the Company had it sold the assets that were distributed at their respective fair market values (taking Code Section 7701(g) into account) immediately prior to their distribution.

(iii)    In the event any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(c)    "Carrying Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Carrying Value of any asset contributed to the Company shall be such asset's gross fair market value at the time of such contribution (except as set forth in Section 2.01(a) above to the contrary);

(ii)    The Carrying Values of all Company assets shall be adjusted to equal their respective gross fair market values upon an election by the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) to adjust the Members' Capital Accounts;

(iii)    If the adjusted basis of any asset acquired by the Company is determined by reference to the adjusted basis of any other asset of the Company, the Carrying Value of the acquired asset shall be determined by reference to the Carrying Value of the other asset rather than its adjusted basis; and

(iv)    If the Carrying Value of an asset has been determined pursuant to clause (i), (ii) or (iii) of this subsection (c), such Carrying Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes except that depreciation deductions shall be computed in accordance with Section 2.02(j)(i) hereof.

(d)    "Code" means the Internal Revenue Code of 1986, as amended.

(e)    "Company Capital" means an amount equal to the sum of all of the Members' Adjusted Capital Account balances determined immediately prior to the allocation to the Members pursuant to Sections 2.03(a)(ii) or 2.03(b)(i) of any Net Profits or Net Losses, increased by the aggregate amount of Net Profits to be allocated to the Members pursuant to Section 2.03(a)(ii) or decreased by the aggregate amount of Net Losses to be allocated to the Members pursuant to Section 2.03(b)(i).

(f)    "Economic Risk of Loss" means the risk as determined under Treasury Regulation Section 1.752-2 (taking all applicable "grandfathering" rules into account) that a partner or person related to a partner will suffer an economic loss as a result of the failure of the partnership to repay a liability.

US1DOCS 5757314v9

(g)     "Excess Negative Balance" for a Member means the excess, if any, of (i) the negative balance in a Member's Capital Account after reducing such balance by the net adjustments, allocations and distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) which, as of the end of the Company's taxable year are reasonably expected to be made to such Member, over (ii) the sum of (A) the amount, if any, which the Member is required to restore to the Company upon liquidation of such Company's interest in the Company (or which is so treated pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c)), (B) the Member's Share of Minimum Gain and (C) that portion of any indebtedness of the Company (other than Member Nonrecourse Debt) with respect to which the Member bears the Economic Risk of Loss that such indebtedness would not be repaid out of the Company's assets if all of the Company's assets were sold at their respective Carrying Values as of the end of the fiscal year or other period and the proceeds from the sales together with any amounts described in clause (A), above, were used to pay the Company's liabilities.

(h)     "Gross Income" means, for each fiscal year or other period, an amount equal to the Company's gross income as determined for federal income tax purposes for such fiscal year or period but computed with the adjustments specified in Section 2.02(j)(i), (ii) and (iii).

(i)     "Minimum Gain" means the amount determined by computing with respect to each Nonrecourse Debt of the Company, the amount of Gross Income, if any, that would be realized by the Company if it disposed of the property securing such debt in full satisfaction thereof, and by then aggregating the amounts so computed. For purposes of determining the amount of such Gross Income with respect to a liability, the Carrying Value of the asset securing the liability shall be allocated among all the liabilities that the asset secures in the manner set forth in Treasury Regulation Section 1.704-2(d)(2).

(j)     "Net Profits" and "Net Losses" mean the taxable income or loss, as the case may be, for a period (or from a transaction) as determined in accordance with Code Section 703(a) computed with the following adjustments:

(i)     Items of gain, loss, and deduction shall be computed based upon the Carrying Values of the Company's assets rather than upon the assets' adjusted bases for federal income tax purposes, and, in particular, the amount of any deductions for depreciation or amortization with respect to an asset for a period shall equal such asset's Carrying Value multiplied by a fraction the numerator of which shall be the amount of depreciation or amortization with respect to such asset allowable for federal income tax purposes for such period and the denominator of which shall be such asset's adjusted basis;

(ii)     Any tax-exempt income received by the Company shall be included as an item of gross income;

(iii)     The amount of any adjustments to the Carrying Values of any assets of the Company pursuant to Code Section 743 shall not be taken into account;

(iv)     Any expenditure of the Company described in Code Section 705(a)(2)(B) (including any expenditures treated as being described in Section 705(a)(2)(B)

-6-

pursuant to Treasury Regulations under Code Section 704(b)) shall be treated as a deductible expense; and

       (v)     The amount of Gross Income specially allocated to any Members pursuant to Section 2.04 or 2.05 shall not be included in the computation.

       (k)     "Nonrecourse Debt" means any Company liability to the extent that the liability is nonrecourse for purposes of Treasury Regulation Section 1.1001-2.

       (l)     "Nonrecourse Deductions" for a taxable year means deductions funded by Nonrecourse Debt (as determined under Treasury Regulation Sections 1.704-2(c) and 1.704-2(i)(2)) for such year and are generally equal to the excess, if any, of (i) the net increase in Minimum Gain during such year over (ii) the sum of (A) the aggregate distributions of proceeds from Nonrecourse Debts attributable to increases in Minimum Gain during such year and (B) increases in Minimum Gain during such year attributable to conversions of liabilities into Nonrecourse Debts.

       (m)     "Member Nonrecourse Debt" means any Nonrecourse Debt to the extent that a Member bears the Economic Risk of Loss associated with the debt.

       (n)     "Share of Minimum Gain" means, for each Member, the sum of such Member's share of Minimum Gain attributable to Nonrecourse Debt other than Member Nonrecourse Debt (computed in accordance with Treasury Regulation Section 1.704-2(g)) and such Member's share of Minimum Gain attributable to Member Nonrecourse Debt (computed in accordance with Treasury Regulation Section 1.704-2(i)(5)).

    2.3     General Allocations of Net Profits and Net Losses.

       (a)     Except as provided in Sections 2.04 and 2.05 below (which shall be applied first), the Net Profits of the Company for any year (or other fiscal period) shall be allocated among the Members as follows:

       (i)     First, to any Members having negative Adjusted Capital Account balances, in proportion to and to the extent of such negative balances; and

       (ii)     The balance, if any, to the Members in such proportions and in such amounts as would result in the respective Adjusted Capital Account balance of each Member equaling, as nearly as possible, such Member's share of the then Company Capital determined by calculating the amount the Member would receive if an amount equal to the Company Capital were distributed to the Members in accordance with the provisions of Section 3.02 hereof.

       (b)     Except as provided in Sections 2.04 and 2.05 below (which shall be applied first), any Net Losses of the Company for any year (or other fiscal period) shall be allocated among the Members as follows:

       (i)     First, to each Member with a positive Adjusted Capital Account balance, in the amount of such positive balance; provided, however, that if the amount of Net

Losses to be allocated is less than the sum of the Adjusted Capital Account balances of all Members having positive Adjusted Capital Account balances, then the Net Losses shall be allocated to the Members in such proportions and in such amounts as would result in the respective Adjusted Capital Account balance of each Member equaling, as nearly as possible, such Member's share of the then Company Capital determined as set forth in Section 2.03(a)(ii) above; and

(ii)    The balance, if any, to the Members pro rata in accordance with and to the extent of the liabilities of the Company to which such Members bear the Economic Risk of Loss.

(c)    If the amount of Net Profits allocable to the Members pursuant to Section 2.03(a)(ii) or the amount of Net Losses allocable to them pursuant to Section 2.03(b)(i) is insufficient to allow the Adjusted Capital Account balance of each Member to equal such Member's share of the Company Capital, such Net Profits or Net Losses shall be allocated among the Members in such a manner as to decrease the differences between the Members' respective Adjusted Capital Account balances and their respective shares of the Company Capital in proportion to such differences.

(d)    Allocations of Net Profits and Net Losses provided for in this Section 2.03 shall generally be made as of the end of the fiscal year of the Company.

2.4    Allocations of Nonrecourse Deductions and Minimum Gain.

Notwithstanding the provisions of Section 2.03 above, the following allocations of Gross Income and Nonrecourse Deductions shall be made in the following order of priority:

(a)    If in any year there is a net decrease in the amount of Minimum Gain attributable to either (i) Nonrecourse Debt that is not Member Nonrecourse Debt or (ii) Member Nonrecourse Debt, then each Member shall first be allocated items of Gross Income for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in such Minimum Gain (determined in accordance with Treasury Regulation Sections 1.704-2(g)(2) and 1.704-2(i)(5)) to the minimum extent required by, and in the manner specified in, Treasury Regulation Sections 1.704-2(f) and 1.704-2(i)(4).

(b)    All Nonrecourse Deductions of the Company for any year other than Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated in the same manner and proportions as are the Net Profits or Net Losses of the Company for such year.

US1DOCS 5757314v9

(c)     All Nonrecourse Deductions of the Company for any year attributable to Member Nonrecourse Debt shall be allocated to the Members who bear the Economic Risk of Loss with respect to the debt.

2.5     Overriding Allocations of Net Profits and Net Losses.

Notwithstanding the provisions of Section 2.03 above, but subject to the provisions of Section 2.04 above, the following allocations of Net Profits and Net Losses and items thereof shall be made:

(a)     If, during any year a Member receives any adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and, as a result of such adjustment, allocation or distribution, such Member's Capital Account has an Excess Negative Balance, then items of Gross Income for such year (and, if necessary, subsequent years) shall first be allocated to such Member in an amount equal to such Member's Excess Negative Balance.

(b)     In no event shall Net Losses of the Company be allocated to a Member if such allocation would cause or increase an Excess Negative Balance in such Member's Capital Account.

(c)     In the event that Net Profits, Net Losses or items thereof are allocated to one or more Members pursuant to subsections (a) or (b) above, subsequent Net Profits and Net Losses will first be allocated (subject to the provisions of subsections (a) and (b)) to the Members in a manner designed to result in each Member having a Capital Account balance equal to what it would have been had the original allocation of Net Profits, Net Losses or items thereof pursuant to subsections (a) or (b) not occurred.

(d)     Except as otherwise provided herein or as required by Code Section 704, for tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to the Members in the same manner as are Net Profits and Net Losses; provided, however, that if the Carrying Value of any property of the Company differs from its adjusted basis for tax purposes, then items of income, gain, loss, deduction or credit related to such property for tax purposes shall be allocated among the Members so as to take account of the variation between the adjusted basis of the property for tax purposes and its Carrying Value in a manner provided for under Code Section 704(c).

ARTICLE 3.

CASH DISTRIBUTIONS

3.1     Definitions. For purposes of this Agreement,

(a)     "Cash Flow" means, with respect to any fiscal period, the sum of all cash receipts of the Company from operations and any and all other sources, including amounts released from reserves and capital contributions, but excluding Sale Proceeds, less the sum of the following amounts:

-9-

(i)    cash disbursements for insurance, property and business taxes, legal expenses, sales or brokerage commissions, management expenses, utilities, repairs and maintenance, accounting, statistical or bookkeeping services or equipment, salaries, advertising and promotion, and any and all other items which are customarily considered to be "operating expenses";

(ii)    payments of interest, principal and premium under any indebtedness of the Company, including without limitation (A) loans incurred by the Company, and (B) any mortgages or security agreements encumbering any assets of the Company;

(iii)    payments made for capital construction, acquisitions, alterations or improvements at any of the Properties; and

(iv)    amounts reasonably set aside as reserves by the Manager for working capital, contingent liabilities or replacement or any of the expenditures described in clauses (i), (ii) and (iii) above, or as otherwise reasonably deemed necessary to meet the current or anticipated future needs of the Company.

(b)    "Net Capital Investment" means for each Member as of any date, the amount by which such Member's aggregate capital contributions to the Company exceed the aggregate amounts previously distributed to such Member pursuant to Section 3.2(a) and 3.3(a) as of such date; provided, that in no event shall the Net Capital Investment for any Member be less than zero and provided, further, that after giving effect to its contribution of the Rights the aggregate Net Capital Investment of Alma shall be zero dollars ($0.00).

(c)    "Sale Proceeds" means the excess of all cash receipts arising from the sale or other disposition of all or any portion of the assets of the Company (other than the sale of coal, sandstone or other mineral products ("Products") in the ordinary course of the Company's business (such sales, the "Product Sales"), or any proceeds realized from condemnation or other insured casualty, but excluding proceeds from business interruption insurance, if any, over the sum of: (i) the amount of cash disbursed or to be disbursed in connection with or as an expense of such sale or other disposition, (ii) the amount necessary for the payment of all debts and obligations of the Company arising from or otherwise related to such sale or other disposition or to which are then to be paid, and (iii) any amounts used for the purposes described in Sections 3.01(a)(i), (a)(ii) or (a)(iii) above or reasonably set aside for the reserves described in Section 3.01(a)(iv) above.

3.2    <u>Distributions of Cash Flow</u>. Cash Flow shall be distributed to and among the Members at such times as may be determined by the Manager (provided, with regard to distributions of Cash Flow arising from Product Sales, Manager shall use its commercially reasonable efforts to distribute such Cash Flow on the next business day following its receipt by the Company of the Daily Report (as defined in the Mining Agreement) setting forth such Product Sales and the report from the bank maintaining the Cash Management Account (as defined in the Mining Agreement) that such proceeds have been received) in the following amounts and order of priority:

(a)    first, until $500,000 in the aggregate has been distributed in accordance

-10-

with this Section 3.2(a), to the extent such Cash Flow arises from Product Sales of coal, to Halle an amount equal to $0.50 per ton of all coal Product Sales from and after the date of this Agreement;

(b)    second, to the extent such Cash Flow arises from Product Sales of coal, 85% to Alma and 15% to Halle; provided, however, that, should Alma as Operator under the Mining Agreement fail to timely provide the Company with a Daily Report (as and when required under the Mining Agreement), all of the Cash Flow arising from Product Sales of coal that should have been reported in such Daily Report shall be forfeited by Alma and paid to Halle; and provided, further, that, with regard to each distribution of Cash Flow pursuant to a day's Product Sales of coal, the percentage of Cash Flow distributable to Halle pursuant to this Section 3.2(a) with regard to such day's Product Sales of coal shall increase by one percent (1%), and the percentage of Cash Flow distributable to Alma pursuant to this Section 3.2(a) for such day's Product Sales of coal shall decrease by one percent (1%), for every increase of two dollars ($2.00) in gross sales price of coal achieved by the Company over $60.00 per ton (by way of example, and not of limitation, if the Company achieves Cash Flow from Product Sales of coal at $70.50 per ton distributable to the Members pursuant to this Section 3.2(a), such Cash Flow shall be distributed 20% to Halle and 80% to Alma); and

(c)    third, to the extent such Cash Flow arises from Product Sales of materials other than coal, 80% to Alma and 20% to Halle (provided, however, that, should Alma as Operator under the Mining Agreement fail to timely provide the Company with a Daily Report (as and when required under the Mining Agreement), all of the Cash Flow arising from Product Sales that should have been reported in such Daily Report shall be forfeited by Alma and paid to Halle); and

(d)    fourth, the balance, if any, to Halle.

3.3    Distributions of Sale Proceeds.  Any Sale Proceeds, or net proceeds upon liquidation of the Company shall be distributed to and among the Members, within 30 days after the event giving rise to such amounts, in the following amounts and order of priority:

(a)    first, to the Members, in proportion to and to the extent of the amount of their respective Net Capital Investments; and

(b)    second, the balance, 25% to Alma and 75% to Halle.

3.4    Certain Payments to the Internal Revenue Service Treated as Distributions.

(a)    For purposes of this Section 3.05, the Company may assume that any Member who fails to provide to the Manager satisfactory evidence of its tax status for United States federal income tax purposes is a foreign person taxable as corporation.

(b)    Notwithstanding anything to the contrary herein, to the extent that the Company is required, or elects, pursuant to applicable law, either (i) to pay tax (including estimated tax) on a Member's share of Company items of income or gain, whether or not distributed, or (ii) to withhold and pay over to the tax authorities any portion of a distribution otherwise distributable to a Member, the Manager may pay over such tax or such withheld

US1DOCS 5757314v9

amount to the tax authorities, and such amount shall be treated as a distribution to such Member at the time it is paid to the tax authorities.

3.5    Offset Rights; Payment Direction. In the event Alma, as Operator under the Mining Agreement, fails to fund any of the costs of the Operations (as defined in the Mining Agreement) to be funded by Operator thereunder, and Manager causes the Company, as Owner under the Mining Agreement or otherwise, to fund all or any portion of such amounts, Manager shall have the right to offset against any sums otherwise due Alma hereunder and apply such amounts instead in reduction of the amounts so expended. Alma shall have the right to instruct Manager in writing to pay any amounts due and owing to Alma hereunder to a third party identified in such writing.

ARTICLE 4.

MANAGEMENT OF THE COMPANY

4.1    Decision-Making. Except as otherwise provided herein, the management and control of the Company shall be vested exclusively in Halle (the "Manager"). The Manager may exercise all powers of the Company and do all such lawful acts as are not by statute, the Certificate or this Agreement directed or required to be exercised or done by the Members. In so doing, the Manager shall have the right and authority to take all actions that it deems necessary, useful or appropriate for the arrangement and conduct of the business and affairs of the Company. The Manager may be, but shall not be required to be, a Member of the Company. Halle may remove the Manager, upon written notice to the Manager but under no circumstances shall Alma or its successors or assigns have any right to remove or replace the Manager. If at any time there shall be no Manager, the management and control of the business and affairs of the Company shall be vested in the Halle (and all matters and authority delegated to the Manager in this Agreement shall be performed by the Halle), who shall act by a majority in number of the Members.

4.2    Buy-Sell Procedure.

(a)    If at any time the Members cannot, after good faith negotiations, agree with respect to sale of any material asset of the Company (other than a sale of Products, including without limitation, bulk sales of Products) (a "Property Sale") (such disagreement, a "Sale Deadlock") the either member (such Member, the "Notifying Member") may provide the other Member with written notice of its intent ("Notice of Intent") to invoke the procedure set forth in this Section (the "Buy-Sell Procedure") if agreement cannot be reached by the Manager with respect to such Sale Deadlock within ten (10) days following delivery of such Notice of Intent. If agreement is not reached by the Manager with respect to such Sale Deadlock within such ten (10) day period, the Notifying Member may invoke the Buy-Sell Procedure within thirty (30) days of the end of such ten (10) day period. The invoking Member (the "Invoking Member") shall provide the other Member (the "Other Member") with notice (the "Buy-Sell Notice") that it is invoking the Buy-Sell procedure and shall set forth in such notice a value for all of the Company Assets (defined below) in accordance with paragraph (g) below.

(b)    The Other Member then will have the right, exercisable for sixty

-12-

(60) days following delivery of the Buy-Sell Notice, to elect by delivery of notice to the Invoking Member to purchase 100% of the Invoking Member's membership interest in the Company at a purchase price determined in accordance with paragraph (g) below. Such purchase price shall be payable only in cash.

(c)    If the purchase right set forth in paragraph (b) above is not exercised by the Other Member on or prior to the 60th day following delivery of the Buy-Sell Notice, the Invoking Member will be obligated to purchase 100% of the Other Member's membership interest at the purchase price determined in accordance with paragraph (g) below. Such purchase price shall be payable only in cash.

(d)    A Member purchasing the other Member's membership interest pursuant to paragraph (b) or (c) above (a "Purchasing Member") shall set a Closing Date for such purchase that is within 90 days of the earlier of (y) the date of delivery of the notice described in paragraph (b) above or (z) the 61st day following delivery of the Buy-Sell Notice. The Purchasing Member shall provide the other Member (a "Selling Member") with notice specifying the Closing Date at least 30 days prior to such Closing Date.

(e)    If the sale hereunder of a Member's membership interest would cause a default under any agreement or document to which the Company is a party or require any consent or authorization thereunder, it shall be the responsibility of the Purchasing Member to use commercially reasonable efforts to obtain such waivers, consents, amendments or other modifications or approvals (the "Requisite Consents") as are necessary to avoid the occurrence of or cure such default. If a Purchasing Member fails to close its purchase within the applicable time period specified in paragraph (d) above (the "Failing Member"), the Selling Member (the "Non-Failing Member") shall have the right (in addition to any and all other remedies available at law or equity), to be exercised by notice to the Failing Member delivered within 30 days following the Failing Member's failure to close, either (i) to purchase the Failing Member's membership interest for a purchase price equal to 90% of the purchase price the Non-Failing Member would have been obligated to pay the Failing Member pursuant to paragraph (b) or (c) above, or (ii) to elect to have the disputed Sale Deadlock, and all future Sale Deadlocks, if any, resolved by a commercially accepted dispute resolution mechanism selected by the Non-Failing Member. If the right to purchase is exercised, the Non-Failing Member shall close its purchase in accordance with paragraph (d) above except that the time periods specified in paragraph (d) will begin on the last day the Failing Member could have closed in compliance therewith.

(f)    The Members shall pay their own expenses in connection with the sale of a Member's membership interest in the Company pursuant to the Buy-Sell Procedure. The Selling Member shall execute and deliver such assignments and other documents as shall be necessary to convey its membership interest in the Company to the Purchasing Member, with any required transfer tax stamps affixed. In the event the Selling Member shall fail or refuse to execute any such instruments, the Purchasing Member is hereby granted an irrevocable power of attorney to execute and deliver on behalf of the Selling Member all such required instruments of transfer.

(g)    The Invoking Member shall set forth in the Buy-Sell Notice a value for 100% of the assets of the Company ("Company Assets") and shall provide that the purchase

USIDOCS 5757314v9

price payable to the Invoking Member or the Other Member pursuant to paragraph (b) or (c) above, respectively, shall equal the amount the Selling Member would receive if the Company Assets were sold, subject to all then existing encumbrances, on an all-cash basis to a third party for the value specified for the Company Assets and the Company were liquidated in accordance with the provisions of Section 8.3 hereof, but without taking into account any transfer or franchise taxes or other expenses of the sale or liquidation.

(h)    Except as otherwise provided for in the last sentence of this subsection (h), if either Member sells its membership interest to the other Member pursuant to this Agreement, then the Purchasing Member shall use good faith and commercially reasonable efforts to obtain a release by all third-party creditors of the Company releasing the Selling Member and its affiliates from all direct or indirect, absolute or contingent liability for the debts and obligations of the Company, including any obligation under any guarantee given as security for any such liability and any indemnification obligations. The Purchasing Member shall provide to the Selling Member a release of any claims, obligations and liabilities owed to the Purchasing Member or the Company by the Selling Member; provided, however, the Selling Member and its affiliates shall not be released from any claims, obligations or liabilities incurred by such Selling Member and/or its affiliate under this Agreement or under any agreement or document to which the Company is a party, including any guarantee, if such claim, obligation and liability arose prior to the sale of the Selling Member's membership interest, and such Selling Member and/or its affiliate shall remain fully liable therefor.

(i)    If the Purchasing Member acquires the membership interest in the Company of the Selling Member pursuant to this Section and as a result thereof, any other indebtedness of the Company becomes due and payable, or any other interest, premiums or other amounts in respect of such indebtedness become due and payable, the Purchasing Member shall pay all such indebtedness, interest, premiums or other amounts, at the time of the closing on the acquisition of such other Member's membership interest.

4.3    Powers. Management of the Company shall be by the Manager, who shall have all necessary power to carry out the management of the Company for the purposes set forth in Section 1.3 hereof. The Manager shall have all of the authority, rights, and powers which they deem necessary or appropriate to effect the purposes of the Company, including, by way of illustration but not by way of limitation, the following:

(a)    to enter into, execute, and deliver on behalf of the Company all documents to be executed from time to time by the Company or in their own behalf, including, without limitation, any contracts, agreements, and other undertakings as they may deem necessary or advisable to carry out the business and affairs of the Company;

(b)    to possess, transfer or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, securities and other assets held or owned by the Company, including the right to sell or dispose of all or any part of such securities and other assets;

-14-

   (c) to borrow from any reputable lender, on behalf of the Company, such funds as may be necessary for the operations of the Company and to pledge such of the Company's assets as may be necessary to secure such borrowings;

   (d) to employ such agents, employees, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and affairs of the Company, and to pay such fees, expenses, salaries, wages and other compensation to such persons as he may determine;

   (e) to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms and conditions as he may determine, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

   (f) to deposit, withdraw, invest, pay, retain, and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

   (g) to make such elections under the Internal Revenue Code of 1986, as amended (the "Code"), and other relevant tax laws to treat items of Company income, gain, loss, deduction and credit, and all other relevant matters, as the Members deem necessary or appropriate, including, without limitation, elections referred to in Section 754 of the Code, selection of the manner and method of determining depreciation of the capital assets of the Company, determination of which items of cash outlay are to be capitalized or expended for tax and accounting purposes, and selection of the method of accounting and book procedures to be used by the Company; and

   (h) to serve as tax matters partner for the Company pursuant to Section 6221-6231 of the Code.

The sole limitation on the authority of the Manager to direct the affairs of the Company, take actions on its behalf and control all and any part of its operations and decision shall be that any Property Sale shall require the advance, written consent of all Members, which shall be deemed granted if not rejected in writing delivered to Manager within five (5) days following delivery of Manager's written request therefor.

  4.4 <u>Services of the Manager</u>.  During the existence of the Company, the Manager shall devote such time and effort to the Company business as may be necessary to promote adequately the interests of the Company and the mutual interests of the Members; however, it is specifically understood and agreed that the Manager shall not be required to devote full time to Company business and may at any time and from time to time engage in and possess interests in other business ventures of any and every type and description, independently or with others, and neither the Company nor any Member shall by virtue of this Agreement have any right, title or interest in or to such independent ventures.

  4.5 <u>Liability of the Manager; Indemnification</u>.  Manager shall not be liable, responsible or accountable in damages or otherwise to the Company or any of the Members for any act or omission performed or omitted by Manager in good faith on behalf of the Company and in a manner reasonably believed by the Manager to be within the scope of the authority granted to it by this Agreement and in the best interests of the Company if it shall not have been

USIDOCS 5757314v9

guilty of gross negligence or willful misconduct with respect to such acts or omissions. The Manager shall be indemnified by the Company for any act performed by the Manager, within the scope of the authority conferred upon Manager; provided, however, such indemnity shall be payable only if the Manager (a) acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company and the Members, and (b) was not guilty of gross negligence or willful misconduct with respect to such act. Any indemnity under this Section 4.5 shall be paid from, and only to the extent of, the assets of the Company.

4.6    Bank Accounts. The Company shall maintain bank accounts in such bank or banks as the Manager may designate for the deposit and disbursement of all funds of the Company. All funds of the Company shall be promptly deposited in such accounts. Funds of entities other than the Company may be deposited in such accounts; provided, however, that funds of the Company deposited in such accounts shall be accounted for separately. The Manager from time to time shall authorize signatories for such accounts. Notwithstanding anything to the contrary contained herein, any funds of the Company which are not required in connection with the business of the Company may be invested in such short-term government securities, certificates of deposit, high grade commercial paper and similar money market obligations as may be deemed appropriate by the Manager.

4.7    Power of Attorney. Each Member hereby makes, constitutes and appoints Manager, severally, with full power of substitution and resubstitution, such Member's true and lawful attorney-in-fact for such Member's and in such Member's name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish and record (a) all certificates of formation or similar certificates and other certificates and instruments (including counterparts of this Agreement) that the Manager may deem necessary to be filed by the Company under the laws of the Sate of Delaware or any other jurisdiction in which the Company is doing or intends to do business; (b) any and all amendments, restatements or changes to this Agreement and the instruments described in clause (a), as now or hereafter amended, which the Manager, may deem necessary to effect a change or modification of the Company in accordance with the terms of this Agreement, including without limitation, amendments, restatements or changes to reflect (i) any amendments adopted by the Members in accordance with the terms of this Agreement, (ii) the admission of any substituted Member and (iii) the disposition by any Member of its interest in the Company; (c) all certificates of cancellation and other instruments that the Mangers deem necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Agreement; (d) such elections for federal and state income tax purposes as the Manager may in its sole and absolute discretion deem to be in the best interest of the Company and the Members; (e) such instruments necessary to evidence the transfer of Alma's interest under the circumstances described in Section 1.11 above, and (f) all other instruments which may be required or permitted by law to be filed on behalf of the Company. Each member authorizes each such attorney-in-fact to take any further action that such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof. Notwithstanding the foregoing, except as provided in Article 3, the Manager may not effect any amendment to this Agreement which alters any Member's interest in allocations of gain or loss

USIDOCS 5757314v9

or cash distributions without the consent of such Member. The power of attorney granted to each Manger pursuant to this Section 4.7: (a) is a special power of attorney coupled with an interest and is irrevocable; (b) may be exercised by any such attorney-in-fact by listing the Members executing any agreement, certificate, instrument or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Members; and (c) shall survive and not be affected by the subsequent bankruptcy, insolvency, dissolution or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company and shall extend to such Member's or assignee's, successors and assigns.

ARTICLE 5.

RECORDS AND REPORTS

5.1    Record Keeping. The Manager shall keep true and accurate records and books of account reflecting all transactions and other matters related to the Company's business in such form as usually maintained by persons engaged in businesses of a like character. The Company books and records shall be maintained at the office of the Company and shall be open to inspection and examination by the Members or their duly authorized representatives at all reasonable times during usual business hours.

5.2    Tax Information and Financial Reports. Within 75 days after the end of each fiscal year, the Manager shall cause the Company to send each Member such information as shall be necessary to prepare the Federal income tax return and any state and local tax return required of such Member as a result of the operations of the Company.

ARTICLE 6.

FISCAL YEAR

6.1    Fiscal Year. The fiscal year of the Company shall be the calendar year unless the Manager decide otherwise.

ARTICLE 7.

ASSIGNMENT

7.1    Assignment of Member's Interest.

(a)    Except in the case of transfers by will or intestacy or as set forth below in this Article 7, no Member may sell, transfer, assign, pledge, or otherwise dispose of all or any part of his interest in the Company (whether voluntarily, involuntarily or by operation of law) unless all of the following conditions shall have been satisfied:

(i)    The Manager shall have previously consented to such assignment in writing, which consent shall be in the sole discretion of the Manager;

-17-

(ii)     No such assignment shall be made which, in the opinion of counsel to the Company, may result in the termination of the Company for purposes of Section 708 (or any successor thereto) of the Code; and

(iii)     No such assignment shall be made if, in the opinion of counsel to the Company, such assignment may not be effected without registration under the Securities Act of 1933, as amended (the "Securities Act"), or would result in the violation of any applicable federal or state securities laws, or would subject the Company to additional material regulatory requirements (including without limitation the Investment Company Act of 1940, as amended).

(b)     An assignee of all or any portion of the interest of a Member shall become a substituted Member entitled to all the rights of a Member in respect of its interest in the Company hereunder, if, and only if, all of the following conditions are satisfied:

(i)     the assignor gives the assignee such right;

(ii)     the Manager consent to such substitution, which consent shall be deemed given in the case of a transfer by will or intestacy but shall otherwise be in the sole discretion of the Manager;

(iii)     the assignee pays to the Company all costs and expenses incurred in connection with such substitution, including specifically, without limitation, costs incurred in amending the Company's then current Operating Agreement; and

(iv)     the assignee executes and delivers such instruments, in form and substance satisfactory to the Manager, as the Manager may deem necessary or desirable to effect such substitution and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement.

(c)     Unless an assignee becomes a substituted Member in accordance with the provisions set forth above, he shall not be entitled to any of the rights granted to a Member hereunder, other than the right to receive all or part of the share of distributions pursuant to Article 2 hereof to which his assignor would otherwise be entitled.

(d)     There shall be no restrictions on the ability of the Manager to transfer their interests or rights under this Agreement.

7.2     Effectiveness of Assignment. The Company and the Manager shall be entitled to treat the record owner of any Company interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written assignment of such interest has been received and accepted by the Manager and recorded on the books of the Company. The Manager may refuse to accept an assignment until the beginning of the next fiscal year. In no event shall any Company interest, or any portion thereof, be sold, transferred or assigned to an incompetent person, and any such attempted sale, transfer or assignment shall be void and ineffective and shall not bind the Company or the Manager.

US1DOCS 5757314v9

7.3     Other Assignment Void. Any purported assignment or transfer of an interest in the Company not permitted by this Article 7 shall be null and void and of no effect whatsoever.

ARTICLE 8.

DISSOLUTION AND TERMINATION

8.1     Events of Dissolution. The Company shall be dissolved by the first to occur of the following (or as otherwise provided by the Act):

(a)     on a date designated by the Manager;

(b)     upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of the Manager, if there are then no successor Manager, or the occurrence of any other event which, pursuant to the Act, terminates the continued membership of the Manager in the Company, if there are then no successor Manager;

(c)     upon the sale of all or substantially all of the Company's assets; or

(d)     upon the entry of a decree of judicial dissolution under the Act.

No Member shall voluntarily dissolve the Company prior to the occurrence of an event specified in subsection (a), (b), (c),or (d) above.

8.2     Election to Continue the Company Business. Notwithstanding the occurrence of an event specified in Section 8.1(b), the Company shall not be dissolved and its business and affairs shall not be discontinued, and the Company shall remain in existence as a limited liability company under the laws of the State of Delaware, if the Manager or all of the Members, elect within forty-five (45) days of the event causing dissolution, to continue the Company and the Company business. In such event, if there is no remaining Manager, any Member may obtain from the Company a list of all of the Members and their addresses and a meeting may be called and held to consider the continuation of the Company's business. If such election is made by the Members, they shall choose new Manager.

8.3     Winding Up by Members. Upon dissolution of the Company pursuant to Section 8.1, unless the Company and its business are continued in accordance with Section 8.2, the Company's business shall be wound up, and its assets shall be distributed in liquidation to the Members (after payment of the Company's debts then due and payable, including debts to Members) pro rata in accordance with their then respective capital accounts. If assets of the Company are to be distributed in kind, they shall be distributed on the basis of their fair market value as determined by the Manager in their sole discretion on the date of distribution.

8.4     Distribution Prior to Termination. Upon the dissolution of the Company for any reason, during the period of winding up of its business and prior to the liquidation of the Company, the Members shall continue to receive any cash distributions and to share net profits and net losses for all tax and other purposes as provided in Article 2 hereof.

-19-

8.5    Orderly Liquidation.  A reasonable time shall be allowed for the orderly
liquidation of the assets of the Company and the discharge of liabilities to creditors so as to
enable the Members to minimize the losses normally attendant upon a liquidation.

ARTICLE 9.

NOTICES

9.1    In Writing; Address.  All notices, demands, consents and reports provided for in
this Agreement shall be in writing and shall be given to the Members at their respective
addresses set forth on Schedule A hereto or at such other address as any of the Members hereto
may hereafter specify in writing.  A copy of all notices, demands, consents and reports to the
Company shall be given to each Member.

9.2    Method.  All notices or other communications shall be delivered by hand or
mailed by United States registered or certified mail, return receipt requested, postage prepaid,
deposited in a United States post office or a depository for the receipt of mail regularly
maintained by the post office.  The date of any notice delivered hereunder shall be the date of
mailing or the date of hand delivery.

9.3    Copies.  A copy of any notice, service of process, or other document in the nature
thereof which in any way relates to the Company or the applicability of any provision of this
Agreement received by any Member from anyone other than any other Member shall be
delivered by the receiving Member to the other Members as soon as practicable.

ARTICLE 10.

MISCELLANEOUS

10.1    Additional Documents and Acts.  In connection with this Agreement, as well as
all transactions contemplated by this Agreement, each Member agrees to execute and deliver
such additional documents and instruments, and to perform such additional acts as may be
necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and
conditions of this Agreement, and all such transactions.  All approvals of any party hereunder
shall be in writing.

10.2    Severability.  The invalidity of any part of this Agreement shall not invalidate the
remainder of this Agreement or the remainder of any provision herein.

10.3    Interpretation.  This Agreement and the rights and obligations of the respective
parties hereunder shall be interpreted in accordance with the laws of the State of Maryland.

10.4    Pronouns.  All pronouns and any variations thereof shall be deemed to refer to the
masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or
entities may require.

10.5    Entire Agreement.  This instrument contains all of the understandings and
agreements of the parties hereto with respect to the subject matter of this Agreement and the

-20-

rights, interests, understandings, agreements and obligations of the respective parties pertaining to the Company and may not be amended except by written consent of at least 2/3 in interest of the Members.

10.6    References to this Agreement.    Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

10.7    Headings.    All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provisions of this Agreement.

10.8    Record Title.    Record title to any real or personal property of the Company may be held in the name of the Company or its nominee.

10.9    Binding Effect.    Except as herein otherwise expressly stipulated to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective distributees, successors, heirs and assigns.

10.10    Counterparts.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement, binding on all the Members notwithstanding that all Members have not signed the same counterpart. This Agreement may be executed by facsimile or other electronic transmission of signatures.

10.11    Third Party Beneficiaries.    The provisions of this Agreement are solely for the benefit of the parties hereto and no third party shall have any rights to enforce the provisions of this Agreement.

ARTICLE 11.

REPRESENTATIONS OF MEMBERS

11.1    Representations of Members.    Each Member represents and warrants to the Manager and the Company as follows:

(a)    His, her or its acquisition of his, her or its interest in the Company is made as a principal for his, her or its own account for investment purposes only and not with a view to the resale or distribution of such interest or any portion thereof within the meaning of the Securities Act.

(b)    He, she, or it is relying on his, her or its own business and financial knowledge and experience in making a decision to enter into and execute this Agreement.

(c)    He, she, or it is aware of the restrictions on transfer of his, her or its interest hereunder and that, except as specifically provided herein, such interest will at no time be freely transferable.

-21-

(d)      He, she, or it is fully aware of the restrictions on resale of his, her or its interests under this Agreement, the Securities Act and applicable state securities laws.

(e)      He, she, or it is fully familiar with the nature of and risks attending the acquisition, ownership and transfer of the interests in the Company, including the restricted transferability and illiquidity of the interests, the exceptions to the limited liability of Members under the Act and the tax consequences of acquisition, ownership and transfer of the interests.

11.2      <u>Restrictions on Sale</u>.  Each Member agrees that (in addition to complying with the restrictions provided in Article 7 hereof) he will not sell, assign or transfer his interest or any part thereof unless the interest has been registered under the Securities Act, or such sale, assignment or transfer is, in the opinion of counsel to the Company, exempt from such registration and, in any event, he will not sell, assign or transfer his interest or any part thereof to any party who does not likewise represent, warrant and agree to the requirements of this Article 11.

-22-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first day stated above.

MEMBERS:

THC KENTUCKY COAL
VENTURE I LLC
a Maryland limited
liability company

By: _Warren E. Halle_____
　　 Warren E. Halle, President

ALMA ENERGY, LLC, a
Virginia limited liability
company

By:_____
　　 Name:
　　 Title:

-23-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first day stated above.

MEMBERS:

THC KENTUCKY COAL
VENTURE I LLC
a Maryland limited
liability company


By:_____
   Warren E. Halle, President


ALMA ENERGY, LLC, a
Virginia limited liability
company


By: *Nathan Williams*_____
   Name: *Nathan Williams*
   Title: *member*

MANAGER:

THC KENTUCKY COAL
VENTURE I LLC, a
Maryland limited liability
company

By: _Warren E Halle_____
    Warren E. Halle
    President

US1DOCS 5757314v9

## SCHEDULE A

### Members

| Name and Address | Capital Contribution |
|---|---|
| THC Kentucky Coal Venture I, LLC | $ 4,704,554.75 |
| 2900 Linden Lane, Suite 300 Silver Spring, MD 20910 | |
| Alma Energy, LLC | $0.00 |
| HC 67 Box 75 | |
| Oakwood, Virginia 24631 | |

Exhibit 1.11

RIGHTS

1. Partial Assignment and Assumption Agreement dated June 28, 2005 from Martin County Coal Corporation to Alma Energy, LLC. Assignor obtained its rights pursuant to an Amended and Restated Lease dated February 22, 1993 from Pocahontas Development Corporation.

2. Partial Assignment and Assumption Agreement dated June 29, 2006 from Martin County Coal Corporation to Alma Energy, LLC. Assignor obtained its rights pursuant to an Amended and Restated Lease dated February 22, 1993 from Pocahontas Development Corporation.

3. Permit Transfer Agreement dated June 29, 2006 from Stone Mining Company to Nathan's Welding, LLC, which transfers Kentucky Surface Coal Mining and Reclamation Permit No. 898-5758 to Nathan's Welding, LLC.

4. Permit Agreement between Nathan's Welding, LLC and Alma Energy, LLC dated June 29, 2006 giving Alma Energy, LLC the irrevocable right to mine, by itself or its designees, on all permits held by Nathan's Welding, LLC.

**EXHIBT 2.1(a)**

| PAYEE | AMOUNT |
|---|---|
| Grundy NB (Right Fork Payoff) | $1,513,222.59 |
| Grundy NB (Netley Deep Mine Payoff) | $1,916,332.16 |
| WestRiver Machinery / Joe Street & J.B. Roulett | $1,025,000.00 |
| Alma Energy, LLC (Working Capital) | $250,000.00 |
| | |
| Total Capital Contribution | $4,704,554.75 |