## MINING AGREEMENT

This Agreement is made as of August 7, 2006 ("**Effective Date**") between Kentucky Coal Venture I LLC, a Delaware limited liability company ("**Owner**") and Alma Energy, LLC, a Virginia limited liability company ("**Alma**"), and joined by Darrell Williams, an individual with a primary business address of 59 Davis Branch Road, Stone, Kentucky ("**Williams**").

## RECITALS

A.      Owner owns or controls certain assets in Pike County, Commonwealth of Kentucky, which properties are described in **Exhibit A** and defined in **Exhibit D**.

B.      Alma shall provide exploration, evaluation, development, mining, marketing and sales services to Owner in connection with the exploitation of mineral resources within the Properties, and Owner is willing to grant such rights to Alma.

NOW THEREFORE, in consideration of the covenants and conditions contained herein, Owner and Alma agree as follows:

## ARTICLE I
## NAME, DEFINITIONS AND CROSS-REFERENCES

**1.1      Definitions**. The terms defined in **Exhibit D** and elsewhere shall have the defined meaning wherever used in this Agreement, including in Exhibits.

**1.2      Cross-References**. References to "**Exhibits**," "**Articles**," "**Sections**" and "**Subsections**" refer to Exhibits, Articles, Sections and Subsections of this Agreement. References to "**Paragraphs**" and "**Subparagraphs**" refer to paragraphs and subparagraphs of the referenced Exhibits.

## ARTICLE II
## PURPOSES AND TERM

**2.1      General**. Owner and Alma hereby enter into this Agreement for the purposes hereinafter stated. All of the rights and obligations of the Parties in connection with the Assets and all Operations shall be subject to and governed by this Agreement and the LLC Agreement.

**2.2      Purposes**. This Agreement is entered into for the following purposes and for no others, and shall serve as the exclusive means by which each of the Parties accomplishes such purposes:

(a)      to evaluate the possible Development and Mining of the Properties, and, if justified, to engage in Development and Mining,

(b)      to engage in Operations on the Properties,

(c)    to engage in marketing and sale of Products,

(d)    to complete and satisfy all Legal Compliance obligations and Continuing Obligations affecting the Properties, and

(e)    to perform any other activity necessary, appropriate, or incidental to any of the foregoing.

**2.3**    **Limitation**.  Unless the Parties otherwise agree in writing, the Operations shall be limited to the purposes described in Section 2.2, and nothing in this Agreement shall be construed to enlarge such purposes or to change the relationships of the Parties as independent contractors and not partners (limited or general) or joint venturers.  Except as expressly set forth herein, (i) Operator shall have no authority to enter into contracts on behalf of Owner, dispose of any Property or Asset or enter into any agreement to do the same, or otherwise bind Owner, or (ii) Owner shall have no authority to conduct, control or carry out the Operations.  Unless and until Owner enters into a Budget providing for such expenditure, in no event shall Owner be required to expend more than $4,704,554.75 pursuant to the terms of this Agreement.

**2.4**    **Term**.  The term of this Agreement shall be for twenty (20) years from the Effective Date and for so long thereafter as Products are produced from the Properties on a continuous basis, and thereafter until all materials, supplies, equipment and infrastructure have been salvaged and disposed of, any required Legal Compliance is completed and accepted and the Parties have agreed to a final accounting, unless the Operations are earlier terminated or this Agreement is otherwise terminated as herein provided.  For purposes hereof, Products shall be deemed to be produced from the Properties on a "**continuous basis**" so long as production in commercial quantities is not halted for more than 365 consecutive days without the consent of the Parties.

**ARTICLE III**
**OPERATOR**

**3.1**    **Appointment**.  The Owner hereby appoints Alma as the Operator with overall management responsibility for Operations and operational control over the Mining and sale of Products.  Alma hereby agrees to serve until it resigns as provided in Section 3.4, or withdraws in accordance with Section 6.3, or is removed as Operator following an Operator Event of Default.

**3.2**    **Powers and Duties of Operator**.  Subject to the terms and provisions of this Agreement, the Operator shall have the following powers and duties, which shall be discharged in accordance with adopted Programs and Budgets.

(a)    The Operator shall manage, direct, perform and control Operations, and shall prepare and present to the Owner proposed Programs and Budgets as provided in Article IV.

(b)    The Operator shall implement the decisions of the Owner, shall make all expenditures necessary to carry out adopted Programs, and shall promptly advise the Owner if it lacks sufficient funds to carry out its responsibilities under this Agreement.

2

(c)      The Operator shall: (i) purchase or otherwise acquire all material, supplies, equipment, water, utility and transportation services required for Operations, such purchases and acquisitions to be made to the extent reasonably possible on the best terms available, taking into account all of the circumstances; (ii) obtain such customary warranties and guarantees as are available in connection with such purchases and acquisitions; and (iii) keep the Assets free and clear of all Encumbrances, except any such Encumbrances listed in **Paragraph 1.1** of **Exhibit A** and those existing at the time of, or created concurrent with, the acquisition of such Assets, or mechanic's or materialmen's liens (which shall be contested, released or discharged in a diligent matter) or Encumbrances specifically approved by the Owner.

(d)      The Operator shall conduct such title examinations of the Properties and cure such title defects pertaining to the Properties as may be advisable in its reasonable judgment.

(e)      The Operator shall: (i) make or arrange for all payments required by leases, licenses, permits, contracts and other agreements related to the Assets; (ii) pay all taxes, assessments and like charges on Operations and Assets except taxes determined or measured by a Party's sales revenue or net income and taxes, including production taxes, attributable to a Party's share of Products, and shall otherwise promptly pay and discharge expenses incurred in Operations; *provided, however*, that if authorized by the Owner, the Operator shall have the right to contest (in the courts or otherwise) the validity or amount of any taxes, assessments or charges if the Operator deems them to be unlawful, unjust, unequal or excessive, or to undertake such other steps or proceedings as the Operator may deem reasonably necessary to secure a cancellation, reduction, readjustment or equalization thereof before the Operator shall be required to pay them, but in no event shall the Operator permit or allow title to the Assets to be lost as the result of the nonpayment of any taxes, assessments or like charges; and (iii) do all other acts reasonably necessary to maintain the Assets.

(f)      The Operator shall: (i) apply for all necessary permits, licenses and approvals; (ii) comply with all Laws, ensure that the Operations are conducted in compliance with all Laws, and ensure that all of its agents, employees, subcontractors and other parties engaged in connection with the performance of the Operations comply with all Laws; (iii) notify promptly the Owner of any allegations of violation thereof; and (iv) prepare and file all reports or notices required for or as a result of Operations. In the event of any such violation, the Operator shall timely cure or dispose of such violation on behalf of both Parties through performance, payment of fines and penalties, or both, and the cost thereof shall be borne entirely by Operator unless expressly provided for to the contrary in a Budget.

(g)      The Operator shall prosecute and defend, but shall not initiate without consent of the Owner, all litigation or administrative proceedings arising out of Operations. The Owner shall have the right to participate, at its own expense, in such litigation or administrative proceedings. The Owner shall approve in advance any settlement of any such litigation or proceedings.

(h)      The Operator shall provide insurance for the benefit of the Parties as provided in **Exhibit E**.

3

(i)     The Operator shall have the right to carry out its responsibilities hereunder through agents, Affiliates or independent contractors.

(j)     The Operator shall perform or cause to be performed all assessment and other work, and shall pay all Governmental Fees required by Law in order to maintain the unpatented mining claims, mill sites and tunnel sites included within the Properties. The Operator shall have the right to perform the assessment work required hereunder pursuant to a common plan of exploration and continued actual occupancy of such claims and sites shall not be required.  The Operator shall timely record with the appropriate county and file with the appropriate United States agency any required affidavits, notices of intent to hold and other documents in proper form attesting to the payment of Governmental Fees, the performance of assessment work or intent to hold the claims and sites, in each case in sufficient detail to reflect compliance with the requirements applicable to each claim and site.

(k)     If authorized by the Owner, the Operator may: (i) locate, amend or relocate any unpatented mining claim or mill site or tunnel site, (ii) locate any fractions resulting from such amendment or relocation, and (iii) apply for patents or mining leases or other forms of mineral tenure for any such unpatented claims or sites.

(l)     The Operator shall, in accordance with the applicable Program, market, sell, transport and deliver the Products, provided, however, that without prior written authorization from the Owner, the Operator shall not, except as part of an Ordinary Course Sale: (i) Transfer or otherwise dispose of any material Asset; or (ii) enter into any sales contracts or commitments for Product, except for contracts or commitments for Ordinary Course Sales, and, provided further, the Operator shall deposit all revenue received by Operator from the Operations into a Cash Management Account not later than the business day next following Operator's receipt of such amounts.

(m)     The Operator shall keep and maintain all required accounting and financial records and activities pursuant to the procedures described in **Exhibit B** and in accordance with customary cost accounting practices in the mining industry, and shall ensure appropriate separation of accounts unless otherwise agreed by the Parties.

(n)     The Operator shall keep the Owner advised of all Operations by submitting in writing to the members of the Owner:  (i) the daily reports required pursuant to **Exhibit B**; (ii) monthly progress reports that include statements of expenditures and comparisons of such expenditures to the adopted Budget; (iii) periodic summaries of data acquired; (iv) copies of any other in-house or third party reports concerning Operations; and (v) such other reports as any member of the Owner may reasonably request.  At all reasonable times the Operator shall provide the Owner and Owner's agents with access to, and the right to inspect and, at such Party's cost and expense, copies of the Existing Data and all maps, drill logs and other drilling data, core, pulps, reports, surveys, assays, analyses, production reports, operations, technical, accounting and financial records, and other Business Information, to the extent preserved or kept by the Operator.  In addition, the Operator shall allow the Owner, at the latter's sole risk, cost and expense, and subject to reasonable safety regulations, to inspect the Assets and Operations at all reasonable times, so long as the non-managing Party does not unreasonably interfere with Operations.

4

(o)     The Operator shall prepare a Legal Compliance plan for all Operations consistent with the requirements of any applicable Laws or contractual obligations and shall include in each Program and Budget sufficient funding to implement the Legal Compliance plan and to satisfy the financial assurance requirements of any applicable Law or contractual obligation pertaining to Legal Compliance. To the extent practical, the Legal Compliance plan shall incorporate concurrent reclamation of Properties disturbed by Operations.

(p)     The Operator shall undertake to perform Continuing Obligations, whether before or after termination of the Operations. Subject to Owner's approval, the Operator shall have the right to delegate performance of Continuing Obligations to persons having demonstrated financial capacity and skill and experience in relevant disciplines. As part of each Program and Budget submittal, the Operator shall specify in such Program and Budget the measures to be taken for performance of Continuing Obligations and the cost of such measures. The Operator shall keep the other Party reasonably informed about the Operator's efforts to discharge Continuing Obligations. Authorized representatives of each Party shall have the right from time to time to enter the Properties to inspect work directed toward satisfaction of Continuing Obligations and audit books, records, and accounts related thereto.

(q)     The Operator shall undertake all other activities reasonably necessary to fulfill the foregoing, and to implement the policies, objectives, procedures, methods and actions determined by the Owner as reasonably required for the full exploitation of the Assets.

**3.3     Standard of Care**. The Operator shall discharge its duties under this Agreement and conduct all Operations in a good, workmanlike and efficient manner, in accordance with sound mining and other applicable industry standards and practices, and in accordance with Laws and with the terms and provisions of leases, licenses, permits, contracts and other agreements pertaining to the Assets. Without limiting the foregoing, Operator shall carry out the exploration and mining of the Properties, marketing and sale of the Products, and general conduct of the Operations with the same degree of diligence, industry and care as though it were doing so for its own account.

**3.4     Resignation; Deemed Offer to Resign**. The Operator may resign upon not less than six (6) months' prior notice to the Owner. If any of the following shall occur, the Operator shall be deemed to have resigned upon the occurrence of the event described in each of the following Subsections.

(a)     The existence of an Operator Event of Default;

(b)     The Operator fails after notice from Owner to pay or contest in good faith its bills and debts within thirty (30) days of the delinquency of such obligations;

(c)     A receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for a substantial part of its assets is appointed and such appointment is neither made ineffective nor discharged within sixty (60) days after the making thereof, or such appointment is consented to, requested by, or acquiesced in by the Operator;

5

(d)    The Operator commences a voluntary case under any applicable bankruptcy, insolvency or similar law now or hereafter in effect; or consents to the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official of any substantial part of its assets; or makes a general assignment for the benefit of creditors; or takes corporate or other action in furtherance of any of the foregoing;

(e)    The retirement, death, incapacity or default of Williams; or

(f)    Entry is made against the Operator of a judgment, decree or order for relief affecting its ability to serve as Operator, or a substantial part of its assets by a court of competent jurisdiction in an involuntary case commenced under any applicable bankruptcy, insolvency or other similar law of any jurisdiction now or hereafter in effect.

**3.5    Replacement of Operator by Operator's Nominee.**  The Owner will agree to permit replacement of the Operator by a nominee of Operator if, prior to the resignation of Operator (or the event giving rise to the deemed resignation of Operator), Operator designates a replacement Operator and a replacement for Williams, each of whom has (i) been deemed acceptable by Owner in its sole discretion and in writing as to capability, reputation, experience, financial capacity and other matters deemed relevant by Owner in its sole discretion, and (ii) has entered into a joinder of this Agreement and the LLC Agreement, as applicable, whereby such replacement Operator and replacement of Williams assumes all past, present and future obligations of Operator and Williams hereunder and under the LLC Agreement.

**3.6    Payments To Operator.**  Notwithstanding anything to the contrary contained in this Agreement, the Operator shall be solely responsible for the cost of performing the Operations from its own funds except for those expenses that Owner has agreed to fund in writing and which are expressly identified in a Budget approved by the Owner, in which case Owner shall be responsible for funding such items only to the extent provided for in such Budget and the related Program.

**3.7    Transactions With Affiliates.**  If the Operator engages Affiliates to provide services hereunder, or sells an Assets pursuant to the terms of this Agreement, it shall do so on terms no less favorable than would be the case in arm's-length transactions with unrelated persons.

**3.8    Owner's Right to Perform following Default.**  Following any deemed resignation by Operator as a result of its default under this Agreement, Owner may, but without any obligation to do so and without notice to or demand on Operator and without releasing Operator from any obligation hereunder, make any payment or do any act required of Operator hereunder in such manner and to such extent as Owner may deem necessary to protect the Assets and to comply with Laws regarding the Operations and the Assets. The cost and expense thereof (including reasonable attorneys' fees to the extent permitted by Law), with interest thereon at an annual rate equal to three percent (3%) over the Prime Rate shall be due and payable to Owner upon demand. As provided for by the LLC Agreement, Owner shall have the right to pay any such costs from amounts otherwise distributable to Operator thereunder.

6

**3.9    Pledge of Assets.**  Operator represents and warrants that it is the sole owner of the Pledged Assets listed on the attached **Exhibit C** and that it holds good and transferable right, title and interest in and to the Pledged Assets free and clear of all Encumbrances.  Operator does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Owner and its successors and assigns the assets listed on the attached **Exhibit C** (the "**Pledged Assets**") as security for Operator's performance of its obligations under this Agreement, and, to the extent permitted by Laws, Operator expressly grants to Owner, as secured party, a first priority security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions, such that this Agreement constitutes a security agreement. Operator authorizes Owner to file a UCC-1 Financing Statement evidencing the security interest granted hereby.  If an Operator Event of Default shall occur, Owner, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Pledged Assets or any part thereof, and to take such other measures as Owner may deem necessary for the care, protection and preservation of the Pledged Assets. Upon request or demand of Owner after the occurrence and during the continuance of an Operator Event of Default, Operator shall, at its expense, assemble the Pledged Assets and make it available to Owner at a convenient place reasonably acceptable to Owner.  Operator shall pay to Owner on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Owner in protecting its interest in the Pledged Assets and in enforcing its rights hereunder with respect to the Pledged Assets after the occurrence and during the continuance of an Operator Event of Default.  Any notice of sale, disposition or other intended action by Owner with respect to the Pledged Assets sent to Operator in accordance with the provisions hereof at least ten (10) business days prior to such action, shall, except as otherwise provided by applicable Laws, constitute reasonable notice to Operator.  The proceeds of any disposition of the Pledged Assets, or any part thereof, may, except as otherwise required by applicable Laws, be applied by Owner to the payment of the any amounts due and owing by Operator to Owner or in reduction of any damages incurred by Owner as a result of Operator's default hereunder, in such priority and proportions as Owner in its discretion shall deem proper. Operator's (debtor's) principal place of business is as set forth in Section 10.1 hereof and the address of Owner (secured party) is as set forth in Section 10.1 hereof.  Operator shall, upon demand of Owner and from time to time, will execute and deliver to Owner such mortgages, deeds of trust, chattel mortgages, financing statements, security agreements or other instruments of further assurance reasonably requested by Owner to evidence, attach, effect and perfect its first priority security interest in an to the Pledged Assets, and shall cause all such instruments of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Owner in, the Pledged Assets. Operator will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of any such instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of any such instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by Laws so to

7

do. The mortgage, grant, bargain, sale, pledge, assignment, warrant, transfer and conveyance made pursuant to this Section 3.9 and the security interest granted hereby are upon the express condition that, if Halle (as defined in the LLC Agreement) shall have received the return of its Net Capital Investment (as defined in the LLC Agreement) and, at such time, no Operator Event of Default shall then exist, the mortgage, grant, bargain, sale, pledge, assignment, warrant, transfer and conveyance made pursuant to this Section 3.9 and the security interest granted hereby shall, at upon the written request of Operator subject to the delivery to Owner of reasonable instruments and agreements for execution, be subordinated to a first-priority lien securing debt to Operator advanced by a bona fide, third-party lending institution and used to fulfill Operator's obligations under this Agreement.

    **3.10    Representation of Operator and Williams**. As a material inducement to the Company's entry into the Agreement, Operator and Williams represent that: (i) Williams has 20 years of experience in conducting matters similar to the Operations in the Area of Interest and has the knowledge and expertise to carry out his obligations as set forth in Article VII below, (ii) _____, the individuals who collectively Control the Operator (collectively, the "Principals"), have 40 years of experience conducing matters similar to the Operations in the Area of Interest and have the knowledge and expertise to cause Operator to carry out its responsibilities under the Agreement, (iii) Williams and Operator have all power and authority to enter into this Agreement and perform their obligations hereunder, (iv) neither Williams nor the Principals, nor any Affiliate of any of them, has been convicted, accused of or subject to any investigation regarding any violation of Kentucky Revised Statutes, Title XXVIII (Mines and Minerals), §§ 349, 350, 352, 353; United States Code, Title 30 (Mineral Lands and Mining), Chapter 22 (Mine Safety and Health), §§ 801-878; Code of Federal Regulations, Title 30 (Mineral Resources), Chapter I (Mine Safety and Health Administration), §§ 56-58, 62, 70-72, 74, 75, 77, and 90, or any similar state or county law, ordinance or regulation, or been party to any lawsuit or insurance claim alleging violations of prudent mine safety practices or Laws relating thereto, (v) neither Williams nor the Principals, nor any Affiliate of any of them, been convicted, accused of or subject to any investigation regarding any violation of any Environmental Law, (vi) the assets listed on the attached Exhibit B constitute all of the assets of Alma Energy, LLC used in the mining business within the Area of Interest, (vii) upon execution of this Agreement, Joe Street and J.B Roulette, each a Principal, shall make a working capital loan to Operator in the amount of $500,000 which is by its terms subordinate, in priority, payment and performance, to the obligations of the Operator under this Agreement; and (viii) none of the assets encumbered by that certain UCC Financing Statement filed with the Secretary of State of the State of Kentucky, #2005-2111096-37, as amended, are used or are intend to be used by Operator in connection with the Operations contemplated by the Initial Plan or otherwise in the Area of Interest.

**ARTICLE IV**
**PROGRAMS AND BUDGETS**

    **4.1    Initial Program and Budget**. The initial Program and Budget to which both Parties have agreed is hereby adopted and is attached as **Exhibit F**. In no event shall Owner's obligation in connection with the initial Program and Budget exceed Four Million Dollars ($4,000,000.00) without the advance, written consent of Owner which may be withheld in Owner's sole and absolute discretion.

**4.2** **Operations Pursuant to Programs and Budgets**. Except to the extent expressly provided for in a Budget, all Operations shall be conducted at the sole cost and expense of Operator. The terms of an adopted Budget shall establish (i) Operator's representation and warranty as to the cost of completing the related Program, and (ii) the commitment of Operator to advance, at a minimum, the amount of funds described therein as being advanced by Operator, and (iii) the maximum amount of Owner's obligation to pay expenses in connection with such Program, including the purposes and schedule for such payments.

**4.3** **Presentation of Programs and Budgets**. Proposed Programs and Budgets shall be prepared by the Operator for a period of one (1) year or any other period as approved by the Owner, and shall be submitted to the Owner for review and consideration. Each Program and Budget adopted by the Owner, regardless of length, shall be reviewed at least once a year at a meeting of the Owner. During the period encompassed by any Program and Budget, and at least three (3) months prior to its expiration, a proposed Program and Budget for the succeeding period shall be prepared by the Operator and submitted to the Owner for review and consideration.

**4.4** **Review and Adoption of Proposed Programs and Budgets**. Within thirty (30) days after submission of a proposed Program and Budget, the Owner shall submit in writing to the Operator:

(a)    Notice that the Party approves any or all of the components of the proposed Program and Budget;

(b)    Modifications proposed by the Party to the components of the proposed Program and Budget; or

(c)    Notice that the Party rejects any or all of the components of the proposed Program and Budget.

**4.5** **Budget Overruns; Program Changes**. The Operator shall be responsible for all cost overruns and expenditures beyond those that Owner is obligated to bear pursuant to the applicable Budget. Except for those expenses set forth in a Budget as to be borne by Owner, Owner shall have no obligation to advance funds to Operator.

**4.6** **Emergency or Unexpected Expenditures**. In case of emergency, the Operator shall, at its sole cost and expense and without claim for reimbursement from Owner, take all action necessary to protect life or property, to protect the Assets or to comply with Laws.

## ARTICLE V
## ACCOUNTS AND SETTLEMENTS

**5.1** **Monthly Statements**. The Operator shall promptly submit to the Owner monthly statements of account reflecting in reasonable detail the charges and credits to the Business Account and the Cash Management Account during the preceding month.

**5.2    Cash Calls.**  On the basis of each adopted Program and Budget, the Operator shall submit to Owner on a weekly basis during the term of each Program a billing for estimated cash requirements for the next week chargeable to Owner pursuant to the Budget. Within three (3) business days after receipt of each billing and evidence that Operator has expended all previous funds received by Owner in accordance with the Budget (other than those amounts requisitioned for items not yet due and payable, provided, however, in no event shall Owner be required to fund cash requirements if more than $5,000 of funds previously funded by Owner then remain unexpended) and that Operator has expended the funds required to be expended by Operator pursuant to such Budget, Owner shall pay such amount to Operator for use as set forth in the Budget.  At Owner's sole option, Owner may fund any cash calls upon Owner in excess of $5000 by direct check to third party vendors or joint check to operator and third party vendors.

**5.3    Failure to Meet Cash Calls.**  A Party that fails to meet cash calls in the amount and at the times specified in Section 5.2 shall be in default, and the amounts of the defaulted cash call shall bear interest from the date due at an annual rate equal to three (3%) percentage points over the Prime Rate, but in no event shall the rate of interest exceed the maximum permitted by Law.  Such interest shall accrue to the benefit of and be payable to the non-defaulting Party.

**5.4    Cover Payment.**  If a Party defaults in making a contribution or cash call required by an adopted Program and Budget, the non-defaulting Party may, but shall not be obligated to, advance some portion or all of the amount in default on behalf of the defaulting Party (a "**Cover Payment**").  Each and every Cover Payment shall constitute a demand loan bearing interest from the date of the advance at the rate provided in Section 5.3.  If more than one Cover Payment is made, the Cover Payments shall be aggregated and the rights and remedies described herein pertaining to an individual Cover Payment shall apply to the aggregated Cover Payments.  The failure to repay such loan upon demand shall be a default.

## ARTICLE VI
## WITHDRAWAL AND TERMINATION

**6.1    Termination by Expiration or Agreement.**  This Agreement shall terminate as expressly provided herein, unless earlier terminated by written agreement.

**6.2    Termination by Deadlock.**  If the Owner fails to adopt a Program and Budget for six (6) months after the expiration of the all currently adopted Program and Budget, either Party may elect to terminate this Agreement by giving ten (10) days notice of termination to the other Party.

**6.3    Withdrawal.**  A Party may elect to withdraw from this Agreement by giving notice to the other Party of the effective date of withdrawal, which shall be the later of the end of the then current Program or thirty (30) days after the date of the notice.  Upon such withdrawal, except as set forth herein, this Agreement shall terminate and Operator shall return all cash in the Business Account to Owner.

US1DOCS 5755378v10

**6.4** **Continuing Obligations and Legal Liabilities**. Upon any expiration or termination of the Agreement (whether by withdrawal, resignation (other than a resignation in which Operator is replaced by a replacement Operator approved by Owner in accordance with the terms of this Agreement and such replacement Operator assumes all obligations of Operator hereunder), default termination or otherwise) Operator shall remain liable for all liabilities to Owner under this Agreement and to third persons arising from the Operations (whether such arises before or after such withdrawal), including Legal Liabilities and Continuing Obligations.

**6.5** **Default of Operator; Remedies**. The Operator shall be in default under this Agreement in the event that either or both of Operator or Williams are in breach of any of their respective obligations hereunder or Operator shall be in default of its obligations under the LLC Agreement and (i) if such default risks life or limb or creation of Legal Liabilities, such default is not cured immediately upon Operator or Williams becoming aware of such default, (ii) if such default may be cured by payment of money, such default is not cured within ten (10) business days following Operator's or Williams receipt of written notice of such default, or (iii) if such default cannot be cured by payment of money and does not risk life or limb or creation of Legal Liabilities, Operator fails to promptly commence cure within ten (10) business days of Operator's or William's receipt of written notice of such default and diligently and continuously continue such cure through completion, provided that such cure must occur within thirty (30) days following Operator's or William's receipt of written notice of such default. Following such Operator Event of Default, in addition to all rights and remedies at law or in equity or otherwise available to Owner under this Agreement, Owner shall have the right to terminate this Agreement immediately by written notice to Operator, which termination shall not waive, diminish or relinquish any other rights of Owner with regard to such Operator Event of Default or otherwise under this Agreement.

**6.6** **Default of Owner; Remedies**. The Owner shall be in default under this Agreement in the event that Owner is in breach of any of its obligations hereunder and (i) if such default may be cured by payment of money, such default is not cured within ten (10) business days following Owner's receipt of written notice of such default, or (iii) if such default cannot be cured by payment of money, Owner fails to promptly commence cure within ten (10) business days following its receipt of written notice of such default and diligently and continuously continue such cure through completion, provided that such cure must occur within thirty (30) days following Owner's receipt of written notice of such default. Following such Owner Event of Default, in addition to all rights and remedies at law or in equity or otherwise available to Operator under this Agreement, Operator shall have the right to terminate this Agreement immediately by written notice to Owner, which termination shall not waive, diminish or relinquish any other rights of Operator with regard to such Owner Event of Default or otherwise under this Agreement.

**6.7** **Right to Data After Termination**. After termination of this Agreement, each Party shall be entitled to make copies of all applicable information acquired hereunder before the effective date of termination not previously furnished to it, but a terminating or withdrawing Party shall not be entitled to any such copies after any other termination or withdrawal.

11

## ARTICLE VII
## NON-COMPETITION

**7.1    Non-Compete Covenants (Pre-Termination).**    Neither Williams nor Operator, nor the Affiliates of either of them, shall, within the Area of Interest, directly or indirectly compete with Owner or Operator in the business of locating, acquiring, leasing, selling assets similar to the Assets, brokering the lease or sale of assets similar to the Assets or in the business of locating, acquiring, extracting, mining, transporting or selling materials similar to the Products or brokering the locating, acquiring, extracting, mining, transporting or selling materials similar to the Products.    If Williams or Operator, or the Affiliate of a either of them, breaches this Section 7.1, Williams or Operator, as applicable, shall be obligated to offer to convey to the Owner, without cost, any such property or interest so acquired (or ensure its Affiliate offers to convey the property or interest to the Owner).    Such offer shall be made in writing and can be accepted by the Owner at any time within ten (10) days after the offer is received by such Owner.    Failure of an Affiliate of Operator or Williams to comply with this Section 7.1 shall be a breach by Operator of this Agreement.

**7.2    Non-Compete Covenants (Post-Termination).**    Following termination of this Agreement or the withdrawal or resignation of such party, neither Operator nor Williams, nor any Affiliate of either of them (including the Principals), shall, within the Area of Interest, directly or indirectly compete with Owner or Operator in the business of locating, acquiring, leasing, selling assets similar to the Assets, brokering the lease or sale of assets similar to the Assets or in the business of locating, acquiring, extracting, mining, transporting or selling materials similar to the Products or brokering the locating, acquiring, extracting, mining, transporting or selling materials similar to the Products, for a period of five (5) years following the withdrawal, resignation or termination of Williams or Operator, as applicable.    If Williams or Operator, or the Affiliate of a either of them, breaches this Section 7.2, Williams or Operator, as applicable, shall be obligated to offer to convey to the Owner, without cost, any such property or interest so acquired (or ensure its Affiliate offers to convey the property or interest to the Owner).    Such offer shall be made in writing and can be accepted by the Owner at any time within ten (10) days after the offer is received by such Owner.    Failure of an Affiliate of Operator or Williams to comply with this Section 7.2 shall be a breach by Operator of this Agreement.

## ARTICLE VIII
## ENGAGEMENT OF WILLIAMS

**8.1    Engagement of Williams.**    Williams shall be the exclusive agent of the Owner for purposes of investigating and overseeing the future acquisition of additional mining properties, mining permits, leases, surface agreements, mining agreements, coal sales agreements and any and all other necessary documents similar to the Assets related to the mining of materials similar to the Product, subject to the Owner's consent to such acquisitions, which may be withheld in the sole discretion of Owner.    Williams understands and agrees that his obligations under the this Agreement will represent a full time commitment by him to the Owner of this Agreement and require that he remain at or in the vicinity of the Properties and the Operations.    Williams acknowledges that his interests in Owner granted on or about the date of

12

this Agreement represent complete and adequate consideration for his obligations undertaken pursuant to this Agreement.

**8.2     Scope of Obligation.**    Williams shall use his best efforts to procure additional, profitable mining properties and operations for the Owner's consideration and approval throughout the term of the Agreement. In the event additional mining properties are procured and approved by the Owner pursuant to this Agreement, the Owner shall hold all such as Assets in the same manner as provided for herein.

**8.3     No Authority to Bind Owner.**    Williams shall have no authority, express or implied, to bind the Company pursuant to the terms of this Agreement and shall not represent or warrant that he has such authority to any person or entity.

## ARTICLE IX
## INDEMNIFICATION

Operator ("Indemnitor") shall indemnify, defend and hold harmless Owner from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Owner in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Owner shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Owner in any manner relating to or arising out of (i) any breach by Indemnitor or Williams of its obligations under, or any material misrepresentation by Indemnitor contained in, this Agreement or the LLC Agreement, (ii) the conduct of the Operations, (iii) the breach or claimed breach of any Laws or other failure of to comply with all Laws with regard to Owner, Operator, the Operations, the Assets, or otherwise, (iv) the failure to pay royalties or any other claims arising under the Rights or (v) the entry upon any Asset by Operator, Williams or the Affiliates, agents, invitees, employees or permittees of any of them or those of their Affiliates (collectively, the "Indemnified Liabilities"); provided, however, that Indemnitor shall not have any obligation to Owner hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Owner. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Indemnitor shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Owner.

## ARTICLE X
## GENERAL PROVISIONS

**10.1     Notices.**    All notices, payments and other required or permitted communications ("**Notices**") to either Party shall be in writing, and shall be addressed respectively as follows:

|  |  |
|---|---|
| If to Owner: | c/o Halle Enterprises, Inc.<br>2900 Linden Lane<br>Suite 300 |

13

|                | Silver Spring, MD 20910 |
| ---: | :--- |
| Attention: | Warren E. Halle |
| Telephone: | (301) 495-1520 |
| Facsimile: | (301) 299-5670 |

|                | Wilmer Cutler Pickering Hale and Dorr LLP |
| ---: | :--- |
| With a Copy to: | 1875 Pennsylvania Ave., N.W. |
|                | Washington, DC 20006 |
| Attention: | Steven S. Snider, Esq. |
| Telephone: | (202) 663-6405 |
| Facsimile: | (202) 663-6363 |

|                | HC 67 Box 75 |
| ---: | :--- |
| If to Alma: | Oakwood, VA 24631 |

|                | |
| ---: | :--- |
| Attention: | |
| Telephone: | |
| Facsimile: | |

|                | Jim Pruett, Esq. |
| ---: | :--- |
| With a Copy to: | P.O. Box 339 |
|                | Pikeville, KY 41502 |

All Notices shall be given (a) by personal delivery to the Party, (b) by electronic communication, capable of producing a printed transmission, (c) by registered or certified mail return receipt requested; or (d) by overnight or other express courier service. All Notices shall be effective and shall be deemed given on the date of receipt at the principal address if received during normal business hours, and, if not received during normal business hours, on the next business day following receipt, or if by electronic communication, on the date of such communication. Either Party may change its address by Notice to the other Party.

**10.2    Gender**. The singular shall include the plural, and the plural the singular wherever the context so requires, and the masculine, the feminine, and the neuter genders shall be mutually inclusive.

**10.3    Currency**. All references to "**dollars**" or "**$**" herein shall mean lawful currency of the United States of America.

**10.4    Headings**. The subject headings of the Sections and Subsections of this Agreement and the Paragraphs and Subparagraphs of the Exhibits to this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

US1DOCS 5755378v10

**10.5   Waiver.** The failure of either Party to insist on the strict performance of any provision of this Agreement or to exercise any right, power or remedy upon a breach hereof shall not constitute a waiver of any provision of this Agreement or limit such Party's right thereafter to enforce any provision or exercise any right.

**10.6   Modification.** No modification of this Agreement shall be valid unless made in writing and duly executed by both Parties.

**10.7   Further Assurances.** Each of the Parties shall take, from time to time and without additional consideration, such further actions and execute such additional instruments as may be reasonably necessary or convenient to implement and carry out the intent and purpose of this Agreement.

**10.8   Entire Agreement; Successors and Assigns.** This Agreement contains the entire understanding of the Parties and supersedes all prior agreements and understandings between the Parties relating to the subject matter hereof, other than the LLC Agreement. This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties, provided, however, that no Party may assign or otherwise Transfer any of its interests hereunder without the advance, written consent of the other parties hereto, nor may the Principals Transfer any of their right, title and interest in and to Alma, without the advance, written consent of the other Party, which may be withheld in such Party's sole and absolute discretion.

**10.9   Counterparts.** This Agreement may be executed in any number of counterparts (and by facsimile or other electronic transmission of signatures), and it shall not be necessary that the signatures of both Parties be contained on any counterpart. Each counterpart shall be deemed an original, but all counterparts together shall constitute one and the same instrument.

**10.10   Governing Law; Attorneys' Fees.** This Agreement shall be governed by the laws of the State of Maryland (except with the regard to the pledge of the Pledged Assets and the enforcement of the liens thereon, which shall be governed by the laws of the location of such assets). The Parties and Williams acknowledge that the Company's principal office is located in the State of Maryland and its involvement was solicited in the State of Maryland and that this Agreement was negotiated in part in the State of Maryland and last executed in the State of Maryland and hereby submit to the jurisdiction of the United States District Courts for the District of Maryland or the Circuit Court of Montgomery County, Maryland, for the resolution of any dispute hereunder. The Parties and Williams further agree that the prevailing party in any litigation arising from this agreement, between the parties hereto, shall be entitled to recover its attorneys fees and costs from the other party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**OWNER**

KENTUCKY COAL VENTURE I LLC, a Delaware limited liability company

By:   THC Kentucky Coal Venture I LLC, a Maryland limited liability company, its Manager

By:   _Warren E. Halle_
      Warren E. Halle, President

**ALMA**

ALMA ENERGY LLC, a Delaware limited liability company

By:   _____
      Name:
      Title:

JOINDER:  This Agreement is joined by Darrell Williams to evidence his acknowledgement with its terms and his agreement to perform his obligations under Articles VII and VIII and Section 10.10 hereof.

_____
DARRELL WILLIAMS

16

IN WITNESS WHEREOF, the parties hereto have executed this
Agreement as of the Effective Date.

**OWNER**

KENTUCKY COAL VENTURE I LLC, a
Delaware limited liability company

By:   THC Kentucky Coal Venture I LLC,
a Maryland limited liability
company, its Manager


By:   _____

Warren E. Halle, President


**ALMA**

ALMA ENERGY LLC, a Delaware limited
liability company


By:   *Nathan Williams*

Name: *Nathan Williams*
Title: *member*

JOINDER:  This Agreement is joined by Darrell Williams to evidence his
acknowledgement with its terms and his agreement to perform his obligations under
Articles VII and VIII and Section 10.10 hereof.

*Darrell Williams*

DARRELL WILLIAMS


**EXHIBIT A**
To
MINING AGREEMENT

**EXHIBIT A**

To

MINING AGREEMENT

**ASSETS**

1.1     PROPERTIES AND TITLE EXCEPTIONS

1.  Partial Assignment and Assumption Agreement dated June 28, 2005 from Martin County Coal Corporation to Alma Energy, LLC. Assignor obtained its rights pursuant to an Amended and Restated Lease dated February 22, 1993 from Pocahontas Development Corporation.

2.  Partial Assignment and Assumption Agreement dated June 29, 2006 from Martin County Coal Corporation to Alma Energy, LLC. Assignor obtained its rights pursuant to an Amended and Restated Lease dated February 22, 1993 from Pocahontas Development Corporation.

3.  Permit Transfer Agreement dated June 29, 2006 from Stone Mining Company to Nathan's Welding, LLC, which transfers Kentucky Surface Coal Mining and Reclamation Permit No. 898-5758 to Nathan's Welding, LLC.

4.  Permit Agreement between Nathan's Welding, LLC and Alma Energy, LLC dated June 29, 2006 giving Alma Energy, LLC the irrevocable right to mine, by itself or its designees, on all permits held by Nathan's Welding, LLC.

1.2     PERSONAL PROPERTY

(NONE)

**AREAS OF INTEREST**

Pike County, Kentucky

**EXHIBIT A**
**Page 1 of 1**

**EXHIBIT B**
To
MINING AGREEMENT

**ACCOUNTING PROCEDURES**

The financing and accounting procedures to be followed by the Operator and the Parties under the Agreement are set forth below. All capitalized terms in these Accounting Procedures shall have the definition attributed to them in the Agreement, unless defined otherwise herein.

1.1    General Accounting Records. The Operator shall maintain detailed and comprehensive cost accounting records in accordance with these Accounting Procedures, including general ledgers, supporting and subsidiary journals, invoices, checks and other customary documentation, sufficient to provide a record of revenues and expenditures and periodic statements of financial position and the results of Operations for managerial, tax, regulatory or other financial, regulatory, or legal reporting purposes related to the Operations. Such records shall be retained for the duration of the period allowed the Parties for audit or the period necessary to comply with tax or other regulatory requirements. The records shall reflect all obligations, advances and credits of the Parties.

1.2    Business Accounts. The Operator shall maintain one or more separate business accounts for the deposit of all payments made by Owner pursuant to this Agreement and from which all expenses relating to the Operations shall be made, which accounts shall be maintained in the Operator's name. Operator shall cause the banks at which such deposits are maintained to issue monthly statements of account to Owner and to permit Owner to make inquiries from time to time as to account balance and recent transactions.

1.3    Cash Management Accounts. The Operator shall maintain one or more separate Cash Management Accounts for the deposit of all cash receipts for the Operations, and all cash receipts of the Operations (including, without limitation, all proceeds from sales of Products) shall be deposited in a Cash Management Account on the date received by Operator. Operator shall obtain Owner's advance, written approval to the opening, modification, and closure of any such account, and such account shall be in the name of and owned by Owner and Owner shall have all rights of deposit, access, information and withdrawal relating to all Cash Management Accounts. At Owner's option, Operator may have signature control and the right to make withdrawals upon such account, but such rights may be rescinded, suspended, or otherwise revoked by Owner in its sole discretion.

1.4    Daily Reports. The Operator shall maintain a daily ledger of income and expense and backup receipts (the "Daily Report") and shall transmit, via electronic transmission approved by Owner, such Daily Report Owner not later than the close of business on the date following the day covered by such Daily Report. Among other things, the Daily Report shall show the gross sales proceeds received by the Company

**EXHIBIT B**
**Page 1 of 1**

**EXHIBIT C**
To
MINING AGREEMENT

**PLEDGED ASSETS**

(ATTACHED)

**EXHIBIT C**
**Page 1 of 1**

Exhibit C

| ITEM | MODEL # | SERIAL # |
|---|---|---|
| JOY CUTTING MACHINE | 16RB | 18219 |
| JOY CUTTING MACHINE (MINE #2) | 16RB | 17753 |
| FLETCHER ROOF BOLTER (MINE #1) | RRI | 90111 |
| LEE-NORSE ROOF BOLTER (MINE #1) | TD1-24 | 21663 |
| FLETCHER ROOF BOLTER | LTDO | 93078 |
| FACE POWER CENTER (MINE #1) | UNKNOWN | |
| SCHROEDER FACE DRILL (MINE #2) | 2000A-25 | 280 |
| LONG AIR-DOX FACE DRILL | TDF24B | |
| S&S SCOOP (MINE #2) | | 52-1313 |
| S&S SCOOP (MINE #2) | | 482-2194 |
| S&S SCOOP (MINE #2) | 105A | SH105677-51 |
| S&S SCOOP (MINE #2) | | 482-1732 |
| S&S SCOOP | | 482 |
| S&S SCOOP | | 480-1051 |
| S&S SCOOP | | 482-2078 |
| S&S SCOOP | | 482-1910 |
| 11 SETS NEW SCOOP BATTERIES | | |
| 8 SCOOP CHARGERS | | |
| L.L. MAC (MINE #2) THREE-WHEELER | | 139 |
| HIGHLAND FEEDER | | |
| 2000 KVA TRANSFORMER SUB-STATION | | 6947 |
| 3 TRANSFORMER SETS 667 | | 6946 |
| 3 TRANSFORMER SETS 250 | | 6949 |
| SUB STATION COMPLETE (MINE #1) | | 3301 |
| SUB-STATION COMPLETE (MINE #2) | 1000KVA | 3553-01 |
| HIGH-VOLTAGE CABLE (MINE #2) | 1000KVA | |
| 5 FAN (MINE #2) | | |
| JOY MFG. FAN (MINE #1) 5' HIGH PRESSURE | | SF9609 |
| 42' STACKER BELT 600' LONG (BUILT 6" CHANNEL) | | |
| 2000' UNDERGROUND BELT (4000 FT -36") (400-2, PL-NEW) | | |
| 5' X 14' TABOR VIBE RATING SCREEN WITH SCREEN PLANT BLUE | | |
| 300 TPH STOKER PLANT (MODEL ON TRAILER A&T) | | |
| SHOP BUILDING (30' X 40') | | |
| 4 PERSONAL BUGGIES, 3 FOUR WHEELERS, 1 THREE WHEELER (NEW) | | |
| 1 USED THREE WHEELER | | |
| MINE OFFICES - ONE 12' X 60' TRAILER, ONE 8' X 40' BOX TRAILER | | |
| COAL BINS - ONE RAW COAL, ONE STOKER COAL W/ CONCRETE FLOOR | | |
| CATERPILLAR RUBBER TIRE LOADER | 980B | 89P2127 |
| CATERPILLAR RUBBER TIRE LOADER | 988A | 87A-8551 |
| CATERPILLAR OFF HIGHWAY ROAD TRUCK | 25DB | 25D5051 |
| CATERPILLAR OFF HIGHWAY TRUCK | 33DB | 33DB-3108 |
| CATERPILLAR DOZER | D9H | 90V7729 |

Exhibit C Bar

# EXHIBIT D
To
## MINING AGREEMENT
DEFINITIONS

"**Affiliate**" means any person, partnership, limited liability company, joint venture, corporation, or other form of enterprise which Controls, is Controlled by, or is under common Control with a Party.

"**Agreement**" means this Mining Agreement, including all amendments and modifications, and all schedules and exhibits, all of which are incorporated by this reference.

"**Area of Interest**" means the area described in Paragraph 1.3 of Exhibit A.

"**Assets**" means the Properties, Products, Business Information, and all other real and personal property, tangible and intangible, including existing or after-acquired properties owned by Owner and all contract rights held for the benefit of the Parties hereunder.

"**Budget**" means a detailed statement of all costs to be incurred and a schedule of cash advances to be made by the Parties with respect to a Program. No document shall constitute a "**Budget**" hereunder unless expressly approved in writing by Owner.

"**Business Account**" means the account or accounts maintained by the Operator for the Business in accordance with Exhibit B.

"**Business Information**" means the terms of this Agreement, and any other agreement relating to the Operations, the Assets, the Existing Data, and all information, data, knowledge and know-how, in whatever form and however communicated (including, without limitation, Confidential Information), developed, conceived, originated or obtained by either Party in performing its obligations under this Agreement. The term "Business Information" shall not include any improvements, enhancements, refinements or incremental additions to Party Information that are developed, conceived, originated or obtained by either Party in performing its obligations under this Agreement.

"**Cash Management Account**" means the account or accounts maintained by the Operator and owned by Owner in accordance with Exhibit B.

"**Capital Account**" means the account maintained for each Party in accordance with Exhibit C.

"**Confidential Information**" means all information, data, knowledge and know-how (including, but not limited to, formulas, patterns, compilations, programs, devices, methods, techniques and processes) that derives independent economic value, actual or potential, as a result of not being generally known to, or readily ascertainable by, third parties and which is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, including

**EXHIBIT D**
**Page 1 of 6**

without limitation all analyses, interpretations, compilations, studies and evaluations of such information, data, knowledge and know-how generated or prepared by or on behalf of either Party.

"**Continuing Obligations**" mean obligations or responsibilities that are reasonably expected to continue or arise after Operations on a particular area of the Properties have ceased or are suspended, such as future monitoring, stabilization, or Legal Compliance.

"**Control**" used as a verb means, when used with respect to an entity, the ability, directly or indirectly through one or more intermediaries, to direct or cause the direction of the management and policies of such entity through (i) the legal or beneficial ownership of voting securities or membership interests; (ii) the right to appoint managers, directors or corporate management; (iii) contract; (iv) operating agreement; (v) voting trust; or otherwise; and, when used with respect to a person, means the actual or legal ability to control the actions of another, through family relationship, agency, contract or otherwise; and "Control" used as a noun means an interest which gives the holder the ability to exercise any of the foregoing powers.

"**Cover Payment**" shall have the meaning as set forth in Section 5.4 of the Agreement.

"**Development**" means all preparation for the removal and recovery of Products, including construction and installation of a mill or any other improvements to be used for the mining, handling, milling, processing, or other beneficiation of Products, and all related Legal Compliance.

"**Effective Date**" means the date set forth in the preamble to this Agreement.

"**Encumbrance**" or "**Encumbrances**" means mortgages, deeds of trust, security interests, pledges, liens, net profits interests, royalties or overriding royalty interests, other payments out of production, or other burdens of any nature.

"**Environmental Laws**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "**Environmental Law**" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act. The term "**Environmental Law**" also includes, but is not

**EXHIBIT D**
**Page 2 of 6**

limited to, any present and future federal, state and local laws, statutes ordinances, rules, regulations, permits or authorizations and the like, as well as common law, that (a) condition transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Assets; (b) require notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Assets to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; (c) impose conditions or requirements in connection with permits or other authorization for lawful activity; (d) relate to nuisance, trespass or other causes of action related to the Assets; or (e) relate to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Assets.

"**Environmental Liabilities**" means any and all claims, actions, causes of action, damages, losses, liabilities, obligations, penalties, judgments, amounts paid in settlement, assessments, costs, disbursements, or expenses (including, without limitation, attorneys' fees and costs, experts' fees and costs, and consultants' fees and costs) of any kind or of any nature whatsoever that are asserted against either Party, by any person or entity other than the other Party, alleging liability (including, without limitation, liability for studies, testing or investigatory costs, cleanup costs, response costs, removal costs, remediation costs, containment costs, restoration costs, corrective action costs, closure costs, reclamation costs, natural resource damages, property damages, business losses, personal injuries, penalties or fines) arising out of, based on or resulting from (i) the presence, release, threatened release, discharge or emission into the environment of any hazardous materials or substances existing or arising on, beneath or above the Properties and/or emanating or migrating and/or threatening to emanate or migrate from the Properties to off-site properties; (ii) physical disturbance of the environment; or (iii) the violation or alleged violation of any Environmental Laws.

"**Existing Data**" means maps, drill logs and other drilling data, core tests, pulps, reports, surveys, assays, analyses, production reports, operations, technical, accounting and financial records, and other material information developed in operations on the Properties prior to the Effective Date.

"**Exploration**" means all activities directed toward ascertaining the existence, location, quantity, quality or commercial value of deposits of Products, including but not limited to additional drilling required after discovery of potentially commercial mineralization, and including related Legal Compliance.

"**Governmental Fees**" means all location fees, mining claim rental fees, mining claim maintenance payments and similar payments required by Law to locate and hold unpatented mining claims.

"**Hazardous Substances**" means any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including, but not limited to, petroleum and

**EXHIBIT D**
**Page 3 of 6**

petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives

"**Law**" or "**Laws**" means all applicable federal, state and local laws (statutory or common), rules, ordinances, regulations, grants, concessions, franchises, licenses, orders, directives, judgments, decrees, and other governmental restrictions, including permits and other similar requirements, whether legislative, municipal, administrative or judicial in nature, applicable to Owner, Operator, Williams, the Operations, or any Assets, including, without limitation, (i) all Environmental Laws, and (ii) Kentucky Revised Statutes, Title XXVIII (Mines and Minerals), §§ 349, 350, 352, 353; United States Code, Title 30 (Mineral Lands and Mining), Chapter 22 (Mine Safety and Health), §§ 801-878; Code of Federal Regulations, Title 30 (Mineral Resources), Chapter 1 (Mine Safety and Health Administration), §§ 56-58, 62, 70-72, 74, 75, 77, and 90. The terms "**Law**" or "**Laws**" includes any amendments of or successors to the foregoing.

"**Legal Compliance**" means actions performed or required to be performed during or after Operations to comply with the requirements of all Laws, including, without limitation, Environmental Laws, or contractual commitments related to reclamation of the Properties or other compliance with Environmental Laws.

"**Legal Liabilities**" means any and all claims, actions, causes of action, damages, losses, liabilities, obligations, penalties, judgments, amounts paid in settlement, assessments, costs, disbursements, or expenses (including, without limitation, attorneys' fees and costs, experts' fees and costs, and consultants' fees and costs) of any kind or of any nature whatsoever that are asserted against either Party, by any person or entity other than the other Party, alleging liability (including, without limitation, liability for studies, testing or investigatory costs, restoration costs, corrective action costs, property damages, business losses, personal injuries, penalties or fines) arising out of, based on or resulting from actual or alleged violations of Laws. The term Legal Liabilities shall include all Environmental Liabilities.

"**LLC Agreement**" shall mean the Limited Liability Company Agreement of Owner, as amended from time to time.

"**Mining**" means the mining, extracting, producing, beneficiating, handling, milling or other processing of Products.

"**Operator**" means the Party appointed under Article III of the Agreement to manage Operations, or any successor Operator appointed in accordance with the terms of this Agreement.

"**Operator Event of Default**" means a default by Operator or Williams that remains uncured beyond the expirations of the periods set forth in Section 6.5.

"**Operations**" means the activities carried out under this Agreement.

**EXHIBIT D**
**Page 4 of 6**

"**Ordinary Course Sale**" means any sale of Products to third-party purchasers on arms-length, market standard conditions. Except to the extent expressly authorized by Owner, a sale or contract for sale of Product shall constitute an Ordinary Course Sale only if (i) the Operator and the Company can deliver the Product in the required quantity and quality as and when required through exploitation of the Assets in the ordinary course of the Operations subject to an existing Program and in full Legal Compliance and in compliance with any other contracts to which Owner or the Company is party, (ii) the contract requires delivery of Products alone and not any other Assets, (iii) the Company's obligations under the sale or contract of sale can be fulfilled within three (3) months in the ordinary course of the Operations, and (iv) the Company's obligations in connection with the sale or contract of sale are limited to delivery of Products by Operator.

"**Owner**" means the committee established under Article VII of the Agreement.

"**Owner Event of Default**" means a default by Owner that remains uncured beyond the expirations of the periods set forth in Section 6.6.

"**Party**" means Owner or Alma, or any permitted successor or assign of Owner or Alma under the Agreement.

"**Party Information**" means all information, data, knowledge and know-how, in whatever form and however communicated (including, without limitation, Confidential Information), which, as shown by written records, was developed, conceived, originated or obtained by a Party: (a) prior to entering into this Agreement, or (b) independent of its performance under the terms of this Agreement.

"**Pledged Assets**" shall mean those assets listed on the attached **Exhibit C**.

"**Principals**" shall have the meaning ascribed to it in Section 3.10.

"**Prime Rate**" means the interest rate quoted and published as "Prime" as published in *The Wall Street Journal*, under the heading "Money Rate," as the rate may change from day to day.

"**Products**" means all coal, sandstone, ores, minerals and mineral resources produced from the Properties.

"**Program**" means a description in reasonable detail of Operations to be conducted and objectives to be accomplished by the Operator for a period determined by the Owner. No document shall constitute a "**Program**" hereunder unless expressly approved in writing by Owner.

"**Program Period**" means the time period covered by an adopted Program and Budget.

"**Project Financing**" means any financing approved by the Owner and obtained by the Parties for the purpose of placing a mineral deposit situated on the Properties into commercial production, but shall not include any such financing obtained individually by either Party to finance payment or performance of its obligations under the Agreement.

"**Properties**" means those interests in real property described in Paragraph 1.1 of Exhibit A and all other interests in real property within the Area of Interest that are acquired and held subject to the Agreement.

"**Transfer**" means, when used as a verb, to sell, grant, assign, create an Encumbrance, pledge or otherwise convey, or dispose of or commit to do any of the foregoing, or to arrange for substitute performance by an Affiliate or third party either directly or indirectly; and, when used as a noun, means such a sale, grant, assignment, Encumbrance, pledge or other conveyance or disposition, or such an arrangement.

**EXHIBIT D**
**Page 6 of 6**

**EXHIBIT E**
To
MINING AGREEMENT


INSURANCE


The Operator shall maintain  obtain and maintain, or cause to be maintained, insurance for Operator, Owner and the Assets providing at least the following coverages:

(i)    comprehensive all risk insurance on the Assets, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Property waiving all co insurance provisions; and (C) providing for no deductible in excess of Ten Thousand and No/100 Dollars ($10,000) for all such insurance coverage;

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property or the Operations, such insurance (A) to be on the so called "occurrence" form with a combined limit of not less than Ten Million and No/100 Dollars ($10,000,000) in the aggregate and Two Million and No/100 Dollars ($2,000,000) per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Owner in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in this Agreement to the extent the same is available;

(iii)    at all times during which structural construction, repairs or alterations are being made with respect to the Assets, and only if the other coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so called builder's risk completed value form (1) on a non reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Assets, and (4) with an agreed amount endorsement waiving co insurance provisions;

(iv)    umbrella liability insurance in an amount not less than Ten Million and No/100 Dollars ($10,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;


**EXHIBIT E**
**Page 1 of 3**

(v)    motor vehicle liability coverage for all owned and non owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000.00);

(vi)    worker's compensation insurance with respect to any employees of Operator, as required by Laws (provided, that Operator shall ensure that all of its subcontractors and agents carry sufficient worker's compensation insurance such that such subcontractors and employees comply with Laws);

(vi)    upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Owner from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located or for Operations similar to the Operation.

All insurance provided for in this Exhibit E shall be obtained under valid and enforceable policies (collectively, the "Policies" or in the singular, the "Policy"), and shall be subject to the approval of Owner as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the Commonwealth of Kentucky and having a claims paying ability rating of "A" or better (and the equivalent thereof) by S&P. The Policies described in this Exhibit E (other than those strictly limited to liability protection) shall designate the Company as loss payee. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Owner, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Owner of payment of the premiums due thereunder (the "Insurance Premiums"), shall be delivered by Operator to Owner.

All Policies provided for or contemplated by Exhibit E, shall name Operator as the insured (except for the insurance referenced in Clause (i) above, which shall name the Company as insured) and Owner as the additional insured, as its interests may appear.

All Policies provided for in Exhibit E shall contain clauses or endorsements to the effect that:

(a)    no act or negligence of Operator, or anyone acting for Operator, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Owner is concerned;

(b)    the Policies shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' notice to Owner and any other party named therein as an additional insured;

(c)    the issuers thereof shall give notice to Owner if the Policies have not been renewed fifteen (15) days prior to its expiration; and

**EXHIBIT E**
**Page 2 of 3**

      (d)      Owner shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

US1DOCS 5755378v10

**EXHIBIT F**
To
MINING AGREEMENT


INITIAL BUDGET AND PROGRAM
(Attached)


**EXHIBIT F**
**Page 1 of 1**

US1DOCS 5755378v10

# PROGRAM

Explore, develop and conduct mining operations at AE Right Fork Mine and Netley Deep Mine and sell all products produced by these activities, over the period commencing August, 2006 and ending August 31, 2007

## BUDGET

### SOURCES

| | |
|---|---|
| Owner Payments | $4,704,554.75 |
| Operator Payments*** | $500,000.00 |
| Total Sources | $5,204,554.75 |

### USES

| Category | Date to be Expended | Total Amount | Owner Portion | Operator Portion |
|---|---|---|---|---|
| Acquire AE Right Fork (Payoff GNB Note) | August, 2006 | $1,513,222.59 | $1,513,222.59 | $0.00 |
| Acquire Netley Deep Mine (Payoff GNB Note) | August, 2006 | $1,916,332.16 | $1,916,332.16 | $0.00 |
| Westriver & Partners Equipment Payoff | August, 2006 | $1,025,000.00 | $1,025,000.00 | $0.00 |
| Initial Production Startup Costs* | August, 2006 | $250,000.00 | $250,000.00 | $0.00 |
| Additional Production Startup Costs *** | As approved by Halle | $0.00 | $0.00 | $0.00 |
| Alma Energy LLC > This is balance that is left from 500K Operator Portion | | $254.09 | | $254.09 |
| Royal Machine Works** | | $7,882.00 | | $7,882.00 |
| Roger Petroleum** | | $16,894.00 | | $16,894.00 |
| Right Fork Energy** | | $138,017.00 | | $138,017.00 |
| Blizzards Ind Supply** | | $34,645.91 | | $34,645.91 |
| United Ind Supply** | | $92,307.00 | | $92,307.00 |
| Pruitt & DeBourber** | | $110,000.00 | | $110,000.00 |
| Tony Gannacone III** | | $100,000.00 | | $100,000.00 |
| | Total Uses | $5,204,554.75 | $4,704,554.75 | $500,000.00 |

*Will be given to Operator from Owner as needed and approved by Owner.

** Alma Energy Vendor Payables.

***All additional production costs borne by Operator.

## APPROVED

| THC KENTUCKY COAL VENTURE I LLC | ALMA ENERGY, LLC |
|---|---|
| By: THC Kentucky Coal Venture I LLC | By: |
| By: _Warren E. Halle_ | Nathan Williams Member |
| Warren E. Halle, Manager | |

| PROGRAM | |
|---|---|
| Explore, develop and conduct mining operations at AE Right Fork Mine and N | |
| and sell all products produced by these activities, over the period commencin | |
| | |
| **BUDGET** | |
| **SOURCES** | |
| | |
| Owner Payments | $4,704,554.75 |
| Operator Payments*** | $500,000.00 |
| | |
| Total Sources | $5,204,554.75 |
| | |
| **USES** | |
| Category | Date to be Expended |
| Acquire AE Right Fork (Payoff GNB Note) | August, 2006 |
| Acquire Netley Deep Mine (Payoff GNB Note) | August, 2006 |
| Westriver & Partners Equipment Payoff | August, 2006 |
| Initial Production Startup Costs* | August, 2006 |
| Additional Production Startup Costs*** | As approved by Halle |
| Alma Energy LLC > This is balance that is left from 500K Operator Portion. | |
| Royal Machine Works** | |
| Roger Petroleum** | |
| Right Fork Energy** | |
| Blizzards Ind Supply** | |
| United Ind Supply** | |
| Pruitt & DeBourben** | |
| Tony Gannacone III** | |
| | Total Uses |
| *Will be given to Operator from Owner as needed and approved by Owner. | |
| ** Alma Energy Vendor Payables. | |
| ***All additional production costs borne by Operator. | |
| **APPROVED** | |
| THC KENTUCKY COAL VENTURE I LLC | ALMA ENERGY, LLC |
| By: THC Kentucky Coal Venture I LLC | |
| | By: *Nathan Williams* |
| By: _____ | Nathan Williams Member |
| Warren E. Halle, Manager | |

| | | |
|---|---|---|
| | | |
| etley Deep Mine | | |
| g August, 2006 and ending August 31, 2007 | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total Amount** | **Owner Portion** | **Operator Portion** |
| $1,513,222.59 | $1,513,222.59 | $0.00 |
| $1,916,332.16 | $1,916,332.16 | $0.00 |
| $1,025,000.00 | $1,025,000.00 | $0.00 |
| $250,000.00 | $250,000.00 | $0.00 |
| $0.00 | $0.00 | $0.00 |
| $254.09 | | $254.09 |
| $7,882.00 | | $7,882.00 |
| $16,894.00 | | $16,894.00 |
| $138,017.00 | | $138,017.00 |
| $34,845.91 | | $34,845.91 |
| $92,307.00 | | $92,307.00 |
| $110,000.00 | | $110,000.00 |
| $100,000.00 | | $100,000.00 |
| $5,204,554.75 | $4,704,554.75 | $500,000.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |