# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
### PIKEVILLE DIVISION

IN RE:

ALMA ENERGY, LLC                                      CASE NO. 07-70370

DEBTOR

PHAEDRA SPRADLIN, SOLELY IN HER
CAPACITY AS THE CHAPTER 7 TRUSTEE
OF ALMA ENERGY, LLC,
AND THC KENTUCKY COAL VENTURE I LLC                   PLAINTIFFS

V.                                      ADVERSARY CASE NO. 09-7005

DARRELL K. WILLIAMS, ET AL.                           DEFENDANTS

## <u>MEMORANDUM OPINION</u>

This case presents what appears to be a question of first impression in this or any other

court.  This Court entered two merits judgments in this action.  One was appealed; the other

wasn't.  On appeal, the District Court held this Court lacked jurisdiction over this action and

vacated the appealed judgment; the Sixth Circuit, in an unpublished opinion, affirmed.  Now, the

judgment losers in the unappealed judgment have moved to set it aside as void for lack of

subject-matter jurisdiction.  Must this Court grant their motion?  The answer to this question, the

Court concludes, is surprisingly no.  Rather, the Court may only grant their motion if, at the time

it entered the judgment, it lacked even an arguable basis to assert jurisdiction.

Applying this standard, the Court is confronted with another novel question: can a claim

implicate a bankruptcy court's core jurisdiction even though it fails to implicate the court's non-

core jurisdiction?  The District Court and Sixth Circuit thought not, and this Court respects that

holding as law of the case.  But the Court finds that at the time it entered the judgment movants

seek to set aside, whether claims could "arise under" the Code or "arise in" in a bankruptcy case

in spite of not being "related to" a bankruptcy case was unsettled.   Specifically, it finds that at

the time it entered its judgment, there was an arguable basis to assert arising-under or arising-in

jurisdiction over all but four of the claims decided therein, even though there was no arguable

basis for related-to jurisdiction over any of the claims the judgment adjudicated.   Therefore, the

Court will only set aside its judgment in part.

I.    Facts and Procedural History

As every court to consider this case has successively observed, "'[t]his case has a

'tortured history' that winds through a 'scrambled maze of facts and allegations.'"   *Spradlin v.

Richard ("Spradlin III")*, 572 F. App'x. 420, 422 (6th Cir. 2014) (quoting *Spradlin v. Pikeville

Energy Grp., LLC ("Spradlin II")*, No. 12-111-ART, 2012 WL 6706188, at *1 (E.D. Ky. Dec.

26, 2012)) (quoting *Spradlin v. Williams* ("*Spradlin I*"), Case No. 07-70370, Adv. No. 09-7005,

2012 WL 243746, at *2 (Bankr. E.D. Ky. Jan. 24, 2012)).   For purposes of this opinion, only a

general, albeit detailed, overview of the history of the adversary proceeding and the consent

judgment entered against Nathan and Darrell Williams therein, along with the history of their

efforts to set aside that judgment, are required.

A.   The Adversary Proceeding

1.   The Original Complaint

The story of this adversary proceeding begins with two adversary proceedings that

preceded it.   Alma Energy, LLC ("Alma"), a coal company, filed a Chapter 11 bankruptcy

petition in this Court on August 13, 2007.   In the following weeks, Alma filed two adversary

proceedings against Warren Halle and several entities he controlled (the "Halle Entities"), one of

which was THC Kentucky Coal Venture I LLC ("THC").   Those adversary proceedings were

settled on December 14, 2007, in an agreement (the "2007 Settlement Agreement") approved by this Court on February 8, 2008.

On May 4, 2009, Alma, believing the Halle Entities had breached the 2007 Settlement Agreement, filed this adversary proceeding against the Halle Entities. Though the Williamses were named as defendants (along with a host of others), no relief was sought from either of the Williamses or any other defendants besides Halle and the Halle Entities; they were named strictly as putatively necessary parties. *See* Doc. 1 at 7, ¶ 18; *Spradlin II*, 2012 WL 6706188, at *2. In fact, the complaint alleged that Halle and the Halle Entities defrauded Alma and the Williamses, that the Halle Entities tortiously interfered with contracts between Alma and the Williamses by slandering the Williamses, that the Halle Entities breached a duty of good faith and fair dealing owed to Alma and the Williamses, and that the Halle Entities breached a contract with Alma and the Williamses, "entitling Alma, Nathan Williams [and] Darrell Williams . . . to compensatory damages." Doc. 1. at 62, ¶ 195.

2.   The 2009 Settlement Agreement and the First Amended Complaint.

Just sixteen days after Alma filed the adversary proceeding, this Court converted Alma's bankruptcy case from a Chapter 11 case to a case under Chapter 7. Phaedra Spradlin was appointed as the Chapter 7 trustee. Several months later, on September 15, 2009, Spradlin entered into a settlement with Halle and the Halle Entities (the "2009 Settlement Agreement"), which this Court approved on October 30, 2009. The 2009 Settlement Agreement settled Alma's claims against the Halle Entities. Critically for purposes of this opinion, it also sold any claims Alma might have against Darrell and Nathan Williams and the other non-Halle defendants named in the complaint to THC, and transferred all proceeds of those claims to THC. In return, THC agreed to indemnify Alma's estate against any counterclaims that might be brought against

Alma in connection with the transferred claims.

On April 12, 2010, THC and Spradlin, "with Spradlin along for the ride in name only," *Spradlin II*, 2012 WL 6706188, at *3, filed an amended complaint (the "First Amended Complaint"). The First Amended Complaint, for the first time in this action, made claims against the non-Halle defendants named in the original complaint, including Darrell and Nathan Williams. The claims against the Williamses were as follows. Counts I, II, V and VI were federal-law fraudulent transfer claims under 11 U.S.C. § 548. Counts III, IV, VII and VIII were state-law fraudulent conveyance claims, brought pursuant to Spradlin's avoidance power under 11 U.S.C. § 544. Count XI was a claim for conversion against Nathan Williams. Counts IX, X and XII were claims for breach of fiduciary duty, arising out of the Williamses' alleged fraudulent transfers and conversion. Count XIV was a civil conspiracy claim against multiple defendants, including the Williamses, for stripping the Debtor's assets by way of a post-petition mining agreement (the "Mining Order") that this Court approved.

A flurry of crossclaims, filed both by the Williamses and their codefendants, followed in the First Amended Complaint's wake. The only crossclaims of note here are Pikeville Energy Group, LLC's cross-claims (because they would later become the subject of an appeal that bears on this opinion). Pikeville's cross-claims were dismissed on the merits on August 9, 2010.

3. The Consent Judgment

On November 1, 2010, this Court entered a consent judgment (the "Consent Judgment) against the Williamses, Nathan's Welding, LLC, and Blackberry Energy, LLC (two entities controlled by Nathan Williams). The Williamses, in their individual capacities, admitted to all allegations against themselves, and to their liability under all claims against themselves. Nathan Williams, in his capacity as the sole member and representative of Nathan's Welding and

4

Blackberry, admitted to all allegations against those companies and to their liability under all claims against those companies. The Consent Judgment awarded damages to THC in the amount of $1,575,000.00–an amount unapportioned amongst the multiple claims as to which the Williamses admitted liability–for which the Williamses, Nathan's Welding and Blackberry Energy were jointly and severally liable. It awarded judgment against the Williamses, Nathan's Welding and Blackberry for all counterclaims and crossclaims they had asserted. And, it provided that the judgment was a final judgment under Fed. R. Civ. P. 54(b).

4.    The Second Amended Complaint

Having obtained a consent judgment against the lead defendants of the First Amended Complaint, THC filed a second amended complaint on November 11, 2010 (the "Second Amended Complaint") against the non-Williams defendants of the First Amended Complaint, along with several new defendants. The Second Amended Complaint, like the conspiracy count in the First Amended Complaint, alleged that a number of individuals and entities used the Mining Order to strip assets from and exploit the Debtor, thereby committing a variety of state-law torts.

On January 7, 2011, several defendants moved to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction. They argued that because the 2009 Settlement Agreement deprived the Debtor's estate of any financial interest in the adversary proceeding, this Court lacked jurisdiction under 28 U.S.C. § 1334(b). THC and Spradlin argued in opposition that the Court's jurisdiction should be determined at the time of filing of the adversary proceeding, and that at that point, the Court had jurisdiction because the proceeding would have benefited the Debtor's estate. Alternatively, they argued their claims fell within this Court's arising-in jurisdiction because the Second Amended Complaint's claims arose from this Court's

Mining Order.

On January 24, 2012, after an abeyance to conduct an unsuccessful mediation that lasted from February 11, 2011 to August 25, 2011, this Court dismissed the Second Amended Complaint with respect to the defendants seeking dismissal.  (The Court subsequently granted a follow-on motion to dismiss filed by a defendant that had not joined in the prior motion, and dismissed the Second Amended Complaint in its entirety.)

The Court initially framed the jurisdictional issue before it as a "question of whether a court can lose subject-matter jurisdiction"–or stated less abstractly, whether the 2009 Settlement Agreement, which postdated Alma's original complaint, could deprive the Court of jurisdiction. *Spradlin I,* 2012 WL 243746, at \*8.  The Court allowed that it had related-to jurisdiction at the time Alma's original complaint was filed.   But it then held that it was possible for a bankruptcy court to lose subject-matter jurisdiction over an adversary proceeding as a result of post-filing events, and especially possible in this case given THC's substantial amendments to Alma's original complaint.  *Id.* at \*9.

Having resolved to consider the 2009 Settlement Agreement for purposes of the jurisdictional analysis, the Court held that the 2009 Settlement Agreement deprived it of jurisdiction by depriving the estate of any stake in the proceeding.  *Id.* at \*11.  Finally, considering the plaintiffs' arguments that, if not related to, their claims were still core arising-in proceedings, the Court concluded in a sentence that that was impossible:

> Because the Court does not have at least "related to" jurisdiction, it does not have subject-matter jurisdiction.  Therefore, we do not get to the parties' core vs. noncore arguments…

*Id.* at \*13.

5.   Subsequent Appeals

THC and Spradlin appealed the dismissal of the Second Amended Complaint to the

District Court in *Spradlin II*.  The District Court affirmed this Court's dismissal of the Second

Amended Complaint, but crucially did so on substantially different grounds.

The District Court, unlike this Court, accepted the plaintiffs' argument that post-filing

events generally cannot divest a bankruptcy court of jurisdiction it had at the outset of an

adversary proceeding.  *Spradlin II*, 2012 WL 6706188, at *5.  But, following a Supreme Court

case, it held that "[w]hen plaintiffs voluntarily amend their complaint, federal courts measure

jurisdiction at the time the amended complaint was filed."  *Id.* (citing *Rockwell Int'l Corp. v.

United States*, 549 U.S. 457 (2007)).  Under this rule, because the 2007 Settlement Agreement

predated the filing of the Second Amended Complaint, the court could consider the effects of the

2007 Settlement Agreement on jurisdiction.   Considering those effects, the court affirmed this

Court's conclusion that the 2007 Settlement Agreement, by depriving the Debtor's estate of any

stake in the Second Amended Complaint or any liability for responsive counterclaims, deprived

this Court of related-to jurisdiction.  *Id.* at *7-8.

The District Court also addressed the plaintiffs' argument that this Court had "-arising-in

jurisdiction over the Second Amended Complaint because its claims arose out of this Court's

Mining Order.  Like this Court, the District Court peremptorily dismissed that argument:

> The plaintiffs also dedicate a substantial portion of their brief to arguing that the
> Bankruptcy Court had "arising in" jurisdiction over the complaint. The Court need not
> address this issue.  Because the Bankruptcy Court did not have "related to" jurisdiction it
> logically could not have "arising in" jurisdiction. *See Mich. Emp't Sec. Comm'n v.
> Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*,  930 F.2d 1132, 1141 (6th Cir.
> 1991) (reasoning that, if a matter is not at least "related to" a bankruptcy proceeding, it
> cannot arise in or arise under that proceeding). The Bankruptcy Court therefore did not
> err in declining to find "arising in" jurisdiction over the claims against Pikeville Energy,
> Richard, and Morehouse.

*Id.* at *9 (citation omitted and citation to *Wolverine Radio* altered from the short form).

After deciding THC and Spradlin's dismissal of the Second Amended Complaint, the District Court next took up Pikeville Energy Group's appeal of this Court's merits dismissal of its cross-claims. *See Pikeville Energy Group, LLC v. Spradlin*, No. 12-113-ART, 2013 WL 1718801 (E.D. Ky. Apr. 19, 2013). In that opinion, the District Court reversed this Court's order overruling Pikeville's motion to extend time to file a statement of issues and designation of items to be included in the record on appeal, *id.* at *2-6, and denied THC's motion to dismiss Pikeville's appeal, *id.* at *6 n.7. Thus reaching the merits of Pikeville's appeal, the District Court vacated this Court's merits dismissal of Pikeville's claims, holding that this Court lacked subject-matter jurisdiction over them. In reaching that conclusion, the District Court reasoned that, under the logic of *Spradlin II*, the 2009 Settlement Agreement deprived this Court of jurisdiction over the *First* Amended Complaint (in response to which Pikeville's cross-claims were filed), not just the Second. *See Pikeville Energy Group*, 2013 WL 1718801, at *7 n.8 (reasoning that "[w]hile the Court's opinion [in *Spradlin II*] focuses on the second amended complaint, the first amended complaint had the same basic dynamic: the estate had no stake in the amended complaint that would create subject-matter jurisdiction").

Hoping to reinstate this Court's merits dismissal of Pikeville's cross-claims (apparently for the sake of its preclusive effect in state-court actions), THC and Spradlin appealed the District Court's denial of their motion to dismiss Pikeville's appeal, and its reversal of this Court's denial of Pikeville's motion to extend time to designate the record and state issues. *See Spradlin III*, 572 F. App'x at 427. THC and Spradlin did not, however, appeal *Spradlin II*, nor the District Court's holding that this Court lacked jurisdiction over Pikeville's cross-claims. *See id.* at 425 (describing the District Court's "conclusion that the bankruptcy court lacked

jurisdiction over [Pikeville's] cross-claims" as "unchallenged").

The Sixth Circuit, puzzled by THC and Spradlin's efforts to reinstate a merits judgment on counterclaims over which this Court concededly lacked jurisdiction, not only declined to reverse the District Court's procedural rulings on Pikeville's appeal, but vacated them. Reasoning that "'[w]ithout jurisdiction [a] court cannot proceed at all in any cause,'" *id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)) (internal quotation marks omitted), the Sixth Circuit held that the absence of jurisdiction over Pikeville's cross-claims deprived the District Court of jurisdiction to enter procedural rulings on Pikeville's appeal. *See id.* at 425-27.

In so ruling, the Sixth Circuit necessarily held that this Court lacked jurisdiction over the First Amended Complaint and Pikeville's cross-claims. Explaining that holding, the court wrote that "[a]s soon as the 2009 Settlement Agreement was approved, the bankruptcy estate lost any interest in the outcome of the Adversary Proceeding and the bankruptcy court lost subject-matter jurisdiction over THC's claims and [Pikeville]'s cross-claims." *Id.* at 426. This sentence was the entirety of the court's jurisdictional analysis.

B.  The Williamses' Efforts to Set Aside the Consent Judgment.

Having recounted the tortured history of this adversary proceeding, the Court turns to the somewhat less tortured history of Darrell and Nathan Williamses' efforts to set aside the November 1, 2010 Consent Judgment. On February 10, 2011, just over three months after the Consent Judgment was entered, the Williamses filed a motion seeking relief from judgment (the "Rule 60(b) Motion").

The Rule 60(b) Motion, drafted by counsel, tells a lurid and none-too-clear tale of a "'godfather' like figure" [Doc. 526 at 2] and "reputed Colombo capo" [*id.* at 4] with a "gangster

movie persona" [*id*. at 5] who intimidated the Williamses into entering into the Consent

Judgment by way of death threats.  More conventionally, the motion alleged that Halle and the

Halle Entities committed fraud on the court, that the Williamses were coerced and intimidated by

Michael Gartland, THC's counsel, into entering in the Consent Judgment by means of reports to

the IRS and threats of criminal complaints, and finally argued that THC lacked derivative

standing to file the First Amended Complaint.  On this point, the Williamses argued that under

Sixth Circuit precedent, a party who claims derivative standing must make a claim that would

benefit the estate, and that THC therefore lacked derivative standing because the estate would

not benefit from THC's claims on account of the 2009 Settlement Agreement.  The motion did

not explicitly mention subject-matter jurisdiction.

      The day after the Williamses filed the Rule 60(b) Motion, this Court entered an order

holding this adversary proceeding in abeyance pending mediation amongst the parties to the

Second Amended Complaint.  Therefore, when the Williamses noticed the Rule 60(b) Motion for

hearing, the Court struck the hearing, citing the abeyance as the reason.  Having been denied a

hearing on their motion, on March 18, 2011 the Williamses (still represented by counsel) moved

to be permitted to participate in the mediation.  In their motion the Williamses argued that they

were "in the untenable position of having their motion under FRCP 60, *which includes a*

*challenge to the subject matter jurisdiction of the Bankruptcy Court*, stayed pending mediation,

while at the same time the Halle related entities move forward to enforce the very judgment that

is being challenged." [Doc. 538 at 3] (emphasis added).  The Court denied the Williamses'

motion within hours, noting that the Williamses entered into a final judgment and were no longer

parties to the adversary proceeding.

      Denied both a hearing on their motion to set aside the Consent Judgment and access to

10

the mediation for which that hearing was denied, the Williamses rapidly turned to higher courts.

On March 31, 2011, the Williamses filed a pro se "Complaint for Declaratory Judgment Holding

Bankruptcy Court Judgment Void for Lack of Subject Matter Jurisdiction and Other Substantive

Reasons."  This filing forcefully argued that the 2009 Settlement Agreement deprived this Court

of jurisdiction over the subsequently filed First Amended Complaint.  Notably, the Williamses

interwove the Rule 60(b) Motion's derivative standing argument into their jurisdictional

argument, arguing that the First Amended Complaint's inability to benefit the estate deprived

THC of derivative standing, which in turn deprived this Court of jurisdiction.

On August 25, 2011, this Court lifted the abeyance in the adversary proceeding after

mediation proved unsuccessful, thus at least theoretically re-opening the courthouse door to the

Williamses.  But rather than re-notice their Rule 60(b) Motion, the Williamses continued to

prosecute their declaratory judgment action in district court.  On December 5, 2011, the District

Court dismissed the Williamses' complaint, citing a forum-selection clause in the settlement

agreement preceding the Consent Judgment, which shunted off all litigation over the settlement

agreement to Maryland.  *See Williams v. THC Kentucky Coal Venture I LLC*, No. 7:11-CV-45-

KKC, 2011 WL 6027722 (E.D. Ky. Dec. 5, 2011).

After unsuccessfully moving to vacate the dismissal, the Williamses appealed to the Sixth

Circuit.  In an order entered on June 21, 2013, the Sixth Circuit affirmed.  *Williams v. THC

Kentucky Coal Venture I LLC*, No. 12-6055 (6th Cir. June 21, 2013).  The Sixth Circuit wrote

that "the deficiency in the Williamses' filing [wa]s more fundamental than venue."  *Id.* at 2.

"Regardless of the forum," the court reasoned, the Williamses could not bring a collateral action

challenging this Court's jurisdiction, though the court allowed that the Williamses could have

appealed the Consent Judgment for lack of subject-matter jurisdiction.  *Id.* at 2-3 (citing *Verzilli*

11

*v. Flexon, Inc.*, 295 F.3d 421 (3d Cir. 2002)).

Having failed to undo the Consent Judgment collaterally, the Williamses returned to this Court, filing a "Renewal of Motion for a Ruling" on January 10, 2014 (the "Renewal Motion"). The Renewal Motion seeks a ruling on the Williamses' still-pending Rule 60(b) Motion. The Renewal Motion, like the Williamses' motion to participate in mediation, asserts that the Rule 60(b) Motion challenged the Consent Judgment on jurisdictional grounds. And like the Williamses' pro se complaint in district court, it links the Williamses' derivative standing argument, made explicitly in the Rule 60(b) Motion, to a larger jurisdictional concern. *See* Doc. 715 at 7. (claiming that the Rule 60(b) Motion argued "that after November 2, 2009 the US Bankruptcy Court did not have subject-matter jurisdiction over the THC claims, and that THC did not have standing to raise claims for the Trustee, because Halle, not the Alma Bankruptcy Estate, would get all the money."). In addition to framing the Rule 60(b) Motion as a partly jurisdictional attack from the start, the Renewal Motion argues at some length that the Consent Judgment is void for lack of jurisdiction under Fed. R. Civ. P. 60(b)(4), relying heavily on the decisions in *Spradlin I* and *Spradlin II*. Finally, the Renewal Motion is silent on the Rule 60(b) Motion's allegations of fraud and coercion, and requests the Court to grant the Rule 60(b) Motion without further hearing.

Spradlin and THC quickly objected to the Renewal Motion. In their objection, the plaintiffs declined to address the jurisdictional arguments of the Renewal Motion, or the derivative standing argument contained in the Rule 60(b) Motion itself. Instead, contending that the Rule 60(b) Motion rested solely on Rule 60(b)(3), which addresses judgments obtained by fraud and misconduct, the plaintiffs solely addressed themselves to the Williamses' allegations of fraud, coercion and intimidation and denied those allegations in vitriolic terms. *See, e.g.*, AP

Doc. 716 at 16 ("These allegations could only be made by an insane person.").

The Williamses filed a response to this objection ("Response").  Again, the Williamses claimed that the Rule 60(b) Motion had argued jurisdiction from the start, noting that it "talked about standing" and reading the motion's discussion of derivative standing to argue "that if you don't have standing because the estate does not get anything from the claims then there is no subject-matter jurisdiction."  [Doc. 718 at 6.]  However, the Williamses argued in the alternative that even if the Rule 60(b) Motion did *not* raise jurisdiction, this Court was obliged to set aside the Consent Judgment as void because the Renewal Motion raised it.

Plaintiffs, belatedly apprehending the thrust of the Renewal Motion, moved to strike a portion of the Response, or, in the alternative, to file a surreply attached to the motion.  (The latter request was granted; the former has not been ruled on.)  In their surreply, plaintiffs argued that the Williamses raised jurisdiction for the first time in the *Response*, not in the Rule 60(b) Motion or even the Renewal Motion.  Having taken that line, plaintiffs argued that this Court should strike the portions of the Response arguing jurisdiction, both because it raised jurisdiction for the first time in the equivalent of a reply brief, and because the Williamses were time-barred by Rule 60(c)(1) from making the equivalent of a Rule 60(b)(4) motion more than three years after judgment.  In the alternative, plaintiffs argued that Rule 60(c)(1) would likewise bar the Court from treating the Renewal Motion as a timely Rule 60(b)(4) motion.  Though opposing what they viewed as an untimely attempt to set aside the judgment on jurisdictional grounds, nowhere in their surreply did plaintiffs argue that the Renewal Motion or Response should be denied on the merits if treated as a timely Rule 60(b)(4) motion.

Finally, the parties being in agreement that a hearing was unnecessary, the Court entered an order taking the Rule 60(b) Motion and Renewal Motion under submission.

II.     Discussion

At the outset, the Court stresses what this opinion is not about–the allegations of fraud, coercion, and intimidation contained in the Rule 60(b) Motion.  The Williamses did not renew those allegations in the Renewal Motion and, by requesting that the Court grant the Rule 60(b) Motion without the evidentiary hearing that would be needed to test those allegations, have effectively abandoned them.  What the Renewal Motion does place before the Court is a request to set aside the Consent Judgment as void for lack of jurisdiction.  Plaintiffs argue that this request is untimely.  The Court therefore turns to the question of timeliness.

A.  Timeliness

Rule 60(c)(1), applicable in bankruptcy proceedings under Fed. R. Bankr. P. 9024, requires all motions under Rule 60(b) to be brought within "a reasonable time."  While many of the circuits do not meaningfully enforce this limitation with respect to Rule 60(b)(4) motions, reasoning that a void judgment is void forever, the Sixth Circuit does, with a stringency unusual among the courts of appeals.  As plaintiffs correctly note, and as discussed in greater detail below, the Sixth Circuit has often treated three years as the approximate point past which Rule 60(b)(4) motions will typically be deemed untimely.  Thus, whether the Williamses raised jurisdiction for the first time just three months after judgment in the Rule 60(b)(4) Motion as the Williamses contend, or three years and two months after judgment in the Renewal Motion or Response, is a critical (though not necessarily dispositive) point.  If the Williamses are correct, jurisdiction was timely raised; if the plaintiffs are correct, the question becomes, at least, closer.

1.  The Rule 60(b) Motion

The Williamses base their claim that the Rule 60(b) Motion raised jurisdiction solely on its discussion of derivative standing.  At first blush, a discussion of derivative standing is not a

promising place in which to locate a hidden jurisdictional argument.  Derivative standing, unlike

Article III standing, is not truly a jurisdictional concept, but rather a merits question concerning

the circumstances under which the Code permits a creditor to file an adversary proceeding on

behalf of a debtor in bankruptcy.  *See Hyundai Translead, Inc. v. Jackson Truck & Trailer

Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 238-45 (6th Cir. 2009); *Canadian Pacific

Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group)*, 66 F.3d 1436, 1441-42 (6th Cir.

1995); *cf. Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4

(2014) (explaining that statutory standing is not jurisdictional).  Further, the Rule 60(b) Motion's

discussion of derivative standing never cited Rule 60(b)(4) or the bankruptcy courts'

jurisdictional statutes, or mentioned jurisdiction by name.

Two factors, however, convince the Court that the Rule 60(b) Motion did raise

jurisdiction.  The first, and by itself insufficient, factor is the striking resemblance between the

derivative standing argument in the Rule 60(b) Motion and the jurisdictional arguments that

would ultimately win the day in *Spradlin I* and *Spradlin II*.  Both share the same factual

underpinning–that the 2009 Settlement Agreement deprived the estate of any benefit from the

adversary proceeding.  Compare the following two passages from the Rule 60(b) Motion and

*Spradlin II*.  Here are the Williamses on derivative standing:

> In the Sixth Circuit . . . the estate must receive the benefit of the claim or derivative
> standing does not exist.  In the settlement agreement THC is the only party that benefits,
> unsecured creditors receive nothing, no matter how much THC recovers. . .  THC has no
> derivative standing whatsoever to pursue claims in the name of a Trustee where any and
> all proceeds with respect to the litigation and/or liquidation of such claims and causes of
> action shall belong to THC and only THC.

Doc. 526 at 15 (internal quotation marks omitted).  Here is the District Court on jurisdiction:

> [T]he Estate had no stake whatsoever in those damage claims because the 2009
> Settlement transferred the Estate's right to any and all proceeds from them to THC and
> only THC.  So the outcome of the proceeding could not enlarge the Estate's assets or

otherwise positively affect the administration of the estate in any way.  Therefore, the damages claims were not related to the bankruptcy under § 1334(b).

*Spradlin II*, 2012 WL 6706188, at *4 (internal quotation marks omitted) (citation omitted).

The shared factual premise (Alma's estate getting nothing) between the Williamses' derivative standing argument and their co-defendants' successful jurisdictional arguments is, by itself, insufficient to convert the former into the latter; one factual premise can support a host of distinct legal theories.

But what does give the resemblance between the two arguments some weight is that the Williamses have consistently understood themselves to be making a jurisdictional argument in the Rule 60(b) Motion.  This is not a new development.  As discussed above, when the Williamses sought access to pending court-ordered mediation after being denied a hearing on the Rule 60(b) Motion, the same counsel that drafted the Rule 60(b) Motion stated that it "includes a challenge to the subject matter jurisdiction of the Bankruptcy Court."  [Doc. 538 at 3.]  He said so just a month after filing the Rule 60(b) Motion.  To what could he have been referring if not the derivative standing argument?  Two weeks later, and just six weeks after the Williamses moved for 60(b) relief, the Williamses filed an action in district court that expressly argued the 2009 Settlement Agreement deprived this Court of jurisdiction, and that treated derivative standing as jurisdictional.  *See* Doc. 717 Ex. 8 at 11-12 ("The common sense prerequisite to Bankruptcy Court jurisdiction is a benefit of the estate . . . Under *Gibson Group*, a party seeking derivative standing must establish, inter alia, a colorable claim that would benefit the estate.") (internal quotation marks omitted).  Finally, the Renewal Motion and Response continue to treat the Rule 60(b) Motion as jurisdictional, and continue to conceive of the derivative standing argument as a jurisdictional argument.  *See* Doc. 718 at 6 ("The Motion talked about standing, the way I read it is that if you don't have standing because the estate does not get anything from

the claims then there is no subject-matter jurisdiction.").

In fine, it is tolerably clear to the Court that the derivative standing argument in the Rule 60(b) Motion was an inartful attempt to raise jurisdiction, on the same ground (namely the 2009 Settlement Agreement) that would prove so successful for the Williamses' codefendants.   It is also clear that, had this Court not denied the Williamses a hearing on their motion, because of an abeyance to conduct a mediation in which the Williamses could not participate, the Williamses would have clarified the jurisdictional thrust of their derivative standing argument at that hearing, and in pre-hearing briefing–as they began to do in the motion to participate in the mediation.

The Court will therefore treat the Rule 60(b) Motion as a Rule 60(b)(4) motion, filed just over three months after entry of the Consent Judgment.  Plaintiffs have not argued that three months exceeds the "reasonable time" limitation of Rule 60(c)(1), and the shortest delay that the Sixth Circuit has ever found unreasonable is eleven months.  *See Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905-06 (6th Cir. 2006) (affirming a district court's treatment of a Rule 60(b)(4) motion filed eleven months after judgment as untimely under an abuse-of-discretion standard); *cf. In re Abdur'Rahman*, 392 F.3d 174, 185 (6th Cir. 2004), *vac'd on other grounds sub nom. Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005) (Rule 60(b)(6) motion filed within four months of judgment deemed timely).  The Court, therefore, deems the motion timely filed.

2.   The Renewal Motion

The Court recognizes that reasonable minds could disagree with its construction of the Rule 60(b) Motion, and will therefore consider, in the alternative, whether the Renewal Motion timely raised jurisdiction.  While this question is closer, the Court ultimately concludes the Renewal Motion is also a timely 60(b)(4) motion.

17

First, a minor chronological point is in order. Plaintiffs assert that the Williamses first raised jurisdiction in their Response, not in the Renewal Motion itself. The Renewal Motion clearly raises jurisdiction at great length and the Court is puzzled by plaintiffs' patently false claims to the contrary. *See, e.g.*, Doc. 715 at 17 ("Based on this Court's previous rulings that it lacked subject matter jurisdiction over the claims of THC in the amended complaints, as affirmed by the US District Court, we ask the Court to apply the same law to us that it applied to all other Defendant's [sic], and grant our pending Motion to . . . vacate the Judgment entered November 1, 2010 against us.") Therefore, assuming that the original Rule 60(b) Motion did not raise jurisdiction, the operative date for considering the timeliness of the request the Williamses are now making under Rule 60(b)(4) is January 10, 2014, not January 29, as plaintiffs assert.

Whether the three years, two months, and nine days that elapsed between the entry of the Consent Judgment and the filing of the Renewal Motion satisfies Rule 60(c)(1)'s "reasonable time" limitation depends on the following principles and law. The Sixth Circuit has repeatedly held that the reasonableness of the time in which a motion to vacate a judgment under Rule 60(b)(4)-(6) "'depends on the facts of a given case including the length and circumstances of the delay, the prejudice to the opposing party by reason of the delay, and the circumstances compelling equitable relief.'" *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 942-43 (6th Cir. 2013) (quoting *Olle v. Henry Wright Corp.*, 910 F.2d 357, 365 (6th Cir. 1990)).

Against this backdrop, the Sixth Circuit has frequently held that delays of about three to five years, unexcused by any extenuating circumstances, are untimely. *See Gen. Med., P.C. v. Horizon/CMS Health Care Corp., 475* F. App'x 65, 75-76 (6th Cir. 2012) (60(b)(6) motion filed more than four years after consent judgment untimely); *Blatchy v. Butcher*, 129 F. App'x. 173, 179 (6th Cir. 2005) (60(b)(6) motion filed three years and ten months after judgment untimely);

18

*United States v. Dailide*, 316 F.3d 611, 617 (6th Cir. 2003) (60(b)(4) motion filed three years and

eleven months after consent judgment untimely); *Ohio Cas. Ins. Co. v. Pulliam*, No. 95-6522,

1999 WL 455336, at *3-4  (6th Cir. June 23, 1999) (60(b)(4) motion filed three years and three

months after judgment untimely); *Richard v. Allen*, No. 95-3451, 1996 WL 102419, at *1 (6th

Cir. Mar. 7, 1996) (60(b)(4) motion filed almost four years after judgment untimely); *Suttles v.

City of Chattanooga, Tenn.*, 886 F.2d 1316 (6th Cir. 1989) (unpublished table decision) (60(b)(4)

motion filed over two-and-a-half years after judgment untimely).  On the other hand, the Sixth

Circuit has suggested that a delay of only two years is generally reasonable.  *See Olle*, 910 F.2d

at 365 (collecting cases holding two-year delays reasonable); *Gen. Med., P.C.*, 475 F. App'x at

76 (approvingly citing *Olle*'s citation of these cases); *but see Days Inn*, 445 F.3d at 905-06

(affirming a district court's denial of a Rule 60(b)(4) motion filed eleven months after judgment

as untimely under an abuse-of-discretion standard).

 Turning, then, to the "length and circumstances of the delay" in this case, *Bridgeport

Music*, 714 F.3d at 942, the Court makes two points on the appropriate measure of the delay's

length.  First, the Court observes that six of the 38 months of delay are not fairly chargeable to

the Williamses.  The Williamses filed a Rule 60(b) motion a day before this adversary

proceeding was put into abeyance for mediation, and were told they could not schedule a hearing

on that motion during the pendency of the abeyance.  The abeyance lasted six months and

fourteen days.  It would have been futile for the Williamses, who were not parties to the

mediation and had no way of knowing when it would end, to file a Rule 60(b)(4) motion during

the abeyance.  Even plaintiffs concede this.  *See* Doc. 716 at 12 ("The Williamses could have

pursued the Rule 60(b)(3) Motion any time after August 25, 2011, when this Court entered the

Order Lifting Abeyance of Proceedings.")  Thus, the amount of the delay chargeable to the

Williamses is not three years, two months and nine days, but two years, seven months and

twenty-five days–placing the delay in this case on the razor's edge of what the Sixth Circuit has

held reasonable, even before accounting for any extenuating circumstances.

Second, any discussion of the Renewal Motion's timeliness is complicated by the fact

that the issues raised in the Renewal Motion were litigated for two years in *Spradlin I* and

*Spradlin II*.  On January 7, 2011, only two months after the entry of the Consent Judgment,

several defendants moved to dismiss the Second Amended Complaint for lack of jurisdiction on

the same ground that the Williamses now move to set aside the Consent Judgment–that the 2009

Settlement Agreement deprived the Court of jurisdiction.  That motion was not decided in

*Spradlin I* until a year later.  And the appeal of *Spradlin I* was not decided until December 26,

2012, just under two years after the motion to dismiss was filed.

Had the Williamses filed, in 2011, a separate 60(b)(4) motion from the original Rule

60(b) Motion seeking to set aside the Consent Judgment for the same reasons that their

codefendants sought to dismiss the Second Amended Complaint, this Court would almost

certainly have held that motion in abeyance pending the outcome of the motion to dismiss, or

consolidated it with the latter.  And had the Williamses filed a 60(b)(4) motion after *Spradlin I*,

this Court would almost certainly have held it in abeyance pending the outcome of the appeal in

*Spradlin II*.  Given that the Williamses had already timely moved to set aside the judgment under

Rule 60(b)(3), it was reasonable for the Williamses to wait for the outcome of *Spradlin I* and *II*,

rather than filing a Rule 60(b)(4) motion that would likely have been held in abeyance pending

the outcome of that litigation.  Thus, while the time between the conclusion of the abeyance in

August 2011 and the District Court's entry of judgment in *Spradlin II* in December 2012 is

chargeable to the Williamses, that period of delay was not unreasonable.

The Court is then left with the reasonableness of the delay *after* the entry of judgment in *Spradlin II*–a period spanning one year and fifteen days. Certainly it would have been ideal had the Williamses speedily moved for relief on the basis of *Spradlin II*; had they done so, their motion would clearly have been timely. But several factors convince the Court that the delay between *Spradlin II* and the filing of the Renewal Motion was reasonable.

First, the length of time between the two simply wasn't very long. The year the Williamses waited to avail themselves of the law announced in *Spradlin II* is shorter than the two-year delays the Sixth Circuit has indicated are usually reasonable, and much shorter than all but one of the delays the Sixth Circuit has held were not.

Second, the Williamses had once been denied a hearing on a Rule 60(b) motion and may have been shy about returning to this Court. To be sure, the Court's order striking the Williamses' hearing in the Rule 60(b) Motion stated the hearing was struck on account of the abeyance for mediation, which ended in August 2011. But that reasoning would have seemed strange to a trained lawyer, much less to two pro se litigants, when the Court subsequently prohibited the Williamses from participating in the mediation. As the Williamses understandably saw things in their pro se complaint in district court, "the . . . Court left the William's [sic] with no remedy and no forum in which to be heard, denying their right to due process." [Doc. 717, Ex. 8 at 9.] Given this Court's refusal to hear the Rule 60(b) Motion, the Williamses reasonably could have been reluctant to file another 60(b) motion; given the Williamses' lack of legal training, their decision to instead pursue a collateral attack on the Consent Judgment in the District Court was likewise reasonable. Within just six months of losing their appeal in the Sixth Circuit, the Williamses returned to this Court.

Third, and last, when the Williamses filed their Renewal Motion, they had already timely moved to set aside the judgment. One Rule 60(b) motion, it is true, does not relate back to the time of filing of another. *See JGB Enters., Inc. v. United States*, 71 Fed. Cl. 468, 470-71 (Fed. Cl. 2006); *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1177 (10th Cir. 2005). But the fact that a Rule 60(b) motion laid pending on this Court's docket when the Williamses filed the Renewal Motion does affect whether the timing of that filing was reasonable. Lying in wait for three years to set aside a judgment is simply not the same thing as quickly moving to set aside a judgment and then raising, three years later, new grounds to set aside the same judgment while the original motion remains pending. Rule 60(c)(1)'s reasonable time requirement is motivated by a "concern with finality," *Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1117 (D.C. Cir. 2011),[1] that is implicated with less force when movants are already in the process of attempting to set aside a judgment. In the case of a delay of just three years and two months, only two years and eight months of which are chargeable to movants and much of which is excusable on account of pending related proceedings, as discussed above, the fact of the Williamses' pending Rule 60(b) motion tips the scales.

For the foregoing reasons, the Court holds, in the alternative to its holding above that the Rule 60(b) Motion was a timely 60(b)(4) motion, that the Renewal Motion was a timely 60(b)(4) motion. Accordingly, the Court denies the Plaintiffs' motion to strike a portion of the Williamses' Response as time-barred.

---

[1] *See also Richard*, 1996 WL 102419, at *1 (holding that "[w]hat constitutes 'reasonable time' depends upon . . . the interest in finality") (quoting *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981)).

B.  Merits

1.  Standard of Review

At long last, the Court turns to the merits of the Williamses' Rule 60(b)(4) motion.  It is

often said that a judgment is void under Rule 60(b)(4) "'if the court that rendered it lacked

jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due

process of law.'"  *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir. 1995) (quoting *In re

Edwards*, 962 F.2d 641, 644 (7th Cir.1992)).  *See also United Student Aid Funds, Inc. v.

Espinosa*, 555 U.S. 260, 271 (2010) ("Rule 60(b)(4) applies . . . where a judgment is premised

either on a  . . . jurisdictional error or on a violation of due process that deprives a party of notice

or the opportunity to be heard.").

From this general definition of 60(b)(4) voidness, it would seem that the Consent

Judgment is void if the Court lacked subject-matter jurisdiction to enter it, and that the Court

must therefore set it aside because the Sixth Circuit held that this Court lacked jurisdiction over

the First Amended Complaint in *Spradlin III*.  But as so often in the law, it is not so simple.  As

it turns out, a judgment is only void, with certain exceptions, if the court that rendered it lacked

an *arguable basis* for jurisdiction.  Though this standard's applicability is tested by the unusual

circumstances of this case–intervening appellate holdings establishing that this Court lacked

jurisdiction–the Court concludes it still governs here for the reasons that follow.

a.  The Sixth Circuit's Voidness Cases

In *Commodities Export Co. v. U.S. Customs Service*, 957 F.2d 223 (6th Cir. 1992), the

Sixth Circuit considered whether it was required to give res judicata effect to a merits judgment

of the Court of International Trade (CIT) that a litigant contended was void for lack of subject-

matter jurisdiction.  The court acknowledged that "until the late nineteenth century, the judgment

of a court which lacked power of the subject matter of the action was deemed null and void." *Id.*
at 226.  But the court wrote that under more recent cases of the Supreme Court, "two doctrines"–
res judicata, and the "bootstrap" principle, which states that federal courts have the power to
determine their jurisdiction–"intersect to produce the general rule that jurisdictional
determinations are given res judicata effect." *Id.*  Thus, the court reasoned, unless some
exception to the normal rule that jurisdictional determinations are given res judicata effect
applied, the CIT's determination that it had jurisdiction was entitled to res judicata effect,
thereby disposing of the claim that the CIT's judgment was void.  Citing the Restatement
(Second) of Judgments, the court wrote that a jurisdictional determination was not entitled to res
judicata effect only when, inter alia, "the subject matter of the action was so plainly beyond the
court's jurisdiction that its entertaining the action was a *manifest abuse of authority*."  *Id.* at 228
(quoting Restatement (Second) of Judgments § 12 (1982)).

The court then applied this standard, holding that though the case "present[ed] a difficult
jurisdictional question capable of being resolved in either party's favor, it is not plausible to
argue that the CIT 'manifestly abused its authority' by asserting jurisdiction." *Id.*  It therefore
gave res judicata effect to the CIT's jurisdictional determination and declined to treat the CIT's
judgment as void–without ever resolving the question of whether or not the CIT had subject-
matter jurisdiction.

In *Eglinton v. Loyer (In re G.A.D., Inc.)*, 340 F.3d 331 (6th Cir. 2003), the Sixth Circuit
applied a virtually identical standard for voidness to a 60(b)(4) motion to set aside a bankruptcy
court judgment for want of jurisdiction.  The court, relying on a series of circuit cases (though
oddly, not *Commodities Export*), held "that a Rule 60(b)(4) motion will succeed only if the lack
of subject matter jurisdiction was 'so glaring as to constitute a total want of jurisdiction,' or 'no

arguable basis for jurisdiction existed.'" *Id.* at 336 (quoting *Kocher v. Dow Chem. Co.*, 132 F.3d

1225, 1230 (8th Cir. 1997) (quoting *Kansas City S. Ry. v. Great Lakes Carbon Corp.*, 624 F.2d

822, 825 (8th Cir. 1980) (en banc) and *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986))

(citations omitted). The court then proceeded to conclude that the movant "ha[d] not shown a

total want of jurisdiction," and affirmed the denial of the Rule 60(b)(4) motion without

determining that the bankruptcy court had jurisdiction. *Id.* The Sixth Circuit has not departed

from that standard since.[2]

Having determined that the Sixth Circuit applies an arguable basis test to 60(b)(4)

motions that assert judgments are void for lack of subject-matter jurisdiction, the Court could

apply that test to the Consent Judgment without further ado. However, the Court is given pause

by the unique posture of the 60(b)(4) motion in this case–a case in which the Court's jurisdiction

over the claims adjudicated in the Consent Judgment has been settled by appellate courts, and

found wanting. The Sixth Circuit's decision in *Spradlin III* that this Court lacked jurisdiction

over the First Amended Complaint is, after all, law of the case, binding in subsequent

---

[2] The Sixth Circuit has not always hewn to the "total want," "arguable basis" or "manifest abuse" standard. In a decision issued a year prior to *G.A.D.*, *General Star National Insurance Company v. Administratia Aisgurarilor de Stat*, 289 F.3d 434 (6th Cir. 2002), the Sixth Circuit considered a Romanian governmental agency's 60(b)(4) motion seeking to set aside a default judgment on the basis of foreign sovereign immunity. The Sixth Circuit appears to have accepted the agency's "contention that [if] the district court lacked subject matter jurisdiction," the judgment would be "thereby render[ed] void," *General Star.*, 289 F.3d at 437, citing *Antoine*'s definition of 60(b)(4) voidness for the proposition that a judgment is void "if the court that rendered it lacked jurisdiction over the subject matter." *Id.* (quoting *Antoine*, 66 F.3d at 108) (internal quotation marks omitted). The court did not inquire into whether the district court below had an arguable basis for jurisdiction, asking only whether it had jurisdiction *simpliciter*. *Id.* at 437-40. Finding the district court did have jurisdiction, it affirmed. *Id.* at 440.

*General Star* has no bearing in this case for two reasons. First, of course, a panel of the Sixth Circuit cannot overrule an earlier one's published decision, *see Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 298 (6th Cir. 2008), and the Sixth Circuit held ten years prior in *Commodities Export* that a judgment was only void if the court that entered it manifestly abused its authority by asserting jurisdiction. Second, the arguable basis rule, as it is applied in the nine other circuits that have adopted it, does not apply to 60(b)(4) motions seeking relief from default judgments entered against non-appearing defendants. *See Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1182 nn.2-3 and accompanying text (D.C. Cir. 2013) (noting the default judgment exception to the arguable basis rule and distinguishing *General Star* from *G.A.D.* on this ground). Thus, *General Star* does not conflict with *Commodities Export* or *G.A.D.*, but rather merely illustrates the exception to *Commodities Export*'s otherwise generally applicable rule.

proceedings in this adversary proceeding–including, it would seem, the Williamses' 60(b)(4)

motion. *See Goldberg v. Maloney*, 692 F.3d 534, 538 (6th Cir. 2012) ("Once an appellate court

'decides upon a rule of law, that decision should continue to govern the same issues in

subsequent stages in the same case.'") (quoting *Scott v. Churchill*, 377 F.3d 565, 569-70 (6th Cir.

2004)).  One could easily posit, then, that intervening, post-judgment law of the case on

jurisdiction, especially law of the case propounded by appellate courts, constitutes an exception

to the generally applicable arguable basis rule.

To the Court's knowledge, no court has ever addressed a factual situation like this one, or

decided whether there is a law of the case exception to the arguable basis rule.  In order to

answer this question of first impression, it is necessary to say a bit more about the basis for the

arguable basis rule.  Once that is cleared up, the Court can assess whether the theory underlying

the arguable basis rule is hospitable to a law of the case exception, or hostile to one.  As it will

turn out, that theory–essentially a theory of res judicata–is irreconcilable with a law of the case

exception, and compels the Court to apply the arguable basis rule with full force to this case.

b.  The Theory of the Arguable Basis Rule

As the Supreme Court approvingly observed four years ago, in a case involving 60(b)(4)

relief from a bankruptcy court order, "[f]ederal courts considering Rule 60(b)(4) motions that

assert a judgment is void because of a jurisdictional defect generally have reserved relief only for

the exceptional case in which the court that rendered judgment lacked even an 'arguable basis'

for jurisdiction." *Espinosa*, 559 U.S. at 271 (quoting *Nemaizer*, 793 F.2d at 65).  Indeed, ten of

the eleven numbered circuits have adopted some formulation of the arguable basis rule, *see Bell

Helicopter Textron*, 734 F.3d at 1182 n.3 (collecting cases from all but the Ninth Circuit), while

the D.C. Circuit appears, in a recent case, to have begrudgingly accepted the arguable basis rule

in cases where the party moving under 60(b)(4) "had appeared in the challenged proceeding." *Id.* at 1182.

Merely citing this "formidable phalanx of case law," *id.* (internal quotation marks omitted), however, only begs the question: wherefore the arguable basis rule?  Initially, the arguable basis rule may seem peculiar–a pseudo-qualified immunity for courts that act extrajurisdictionally.  It also appears to be in tension with much of modern jurisdictional law, under which subject-matter jurisdiction is unwaivable, can be raised at any time, and under which jurisdiction's "absence . . . altogether deprives a federal court of the power to adjudicate the rights of the parties." *Gonzales v. Crosby*, 545 U.S. 524, 533 (2005) (citing *Steel Co.*, 523 U.S. at 94).  *See Bell Helicopter Textron*, 734 F.3d at 1180 (quoting *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340 (1828)) (observing that the arguable basis rule appears to conflict with the Supreme Court's "long instruct[ion] that judgments in excess of subject-matter jurisdiction 'are not voidable, but simply void.'")  Under that law, if a court lacks jurisdiction to issue a judgment, how can its judgment be anything but void?

The arguable basis rule, however, does not conflict with the rule that judgments rendered without jurisdiction are void.  As the Sixth Circuit explained in *Commodities Export*, the arguable basis rule is an outgrowth of "the rule that principles of res judicata apply to jurisdictional determinations–both subject matter and personal." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 n.9 (1982).  *See also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009) (holding that "'even subject-matter jurisdiction may not be attacked collaterally'" so long as parties are "given a fair chance to challenge . . . subject-matter jurisdiction") (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 n.9 (2004)) (alteration omitted); *Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376 (1940) (holding

that federal courts' "determinations of [jurisdictional] questions, while open to direct review, may not be assailed collaterally.").

Because a court's determination that it has subject-matter jurisdiction to enter a judgment is res judicata–that is, only susceptible to direct review, not collateral attack–60(b)(4) motions (a form of collateral attack) premised on a lack of subject-matter jurisdiction would seem to always be foreclosed by res judicata.  Courts finessed this paradox by carving out an exception to the preclusive effect of jurisdictional determinations when those determinations were inarguably wrong.  The arguable basis rule is that exception, as many of the cases (including *Commodities Export* and the cases relied upon in *G.A.D.*) have recognized.  *See Bell Helicopter Textron*, 734 F.3d at 1182 (explaining the arguable basis rule as a corollary to res judicata); *United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir. 2000) (describing the arguable basis rule as a "narrowly tailored" "exception to the general rule barring collateral attacks on subject matter jurisdiction"); *Nemaizer*, 793 F.2d at 65 (grounding the arguable basis rule on *Chicot*'s holding that "if the parties *could* have challenged the court's power to hear a case, then res judicata principles serve to bar them from later challenging it collaterally"); *Kansas City S. Ry. Co.*, 624 F.2d at 825 (citing *Chicot* in support of the arguable basis rule); *see also* Restatement (Second) of Judgments § 12 cmts. a-d (1982) (offering an extended treatment of the arguable basis rule in res judicata terms).

Properly understood, then, the arguable basis rule does not propound, in tension with hornbook jurisdictional law, that a judgment which a court lacked jurisdiction to enter is valid so long as the jurisdictional question was one on which reasonable jurists could differ.  The arguable basis rule follows the traditional rule that a judgment which a court lacked jurisdiction to enter is void, but gives preclusive effect to a court's determination that it had jurisdiction

28

except in cases of clear jurisdictional errors.

    c.   A Law of the Case Exception?

Armed with this understanding of the arguable basis rule, the Court is prepared to answer whether the rule permits of a law of the case exception.  That is, does an appellate determination that a trial court lacked jurisdiction over an action void unappealed merits judgments (or unappealed portions of same) in that action, or does the arguable basis rule apply to 60(b) motions to set aside those judgments?  The answer is that the arguable basis rule still controls.  There can be no law of the case exception to the arguable basis rule, because there is no law of the case exception to res judicata.  A reversal or vacatur of a judgment in an appeal brought by one party does not upset that judgment or like judgments' preclusive effect as to non-appealing parties.

The classic cite for the proposition that nonappealing parties cannot use co-parties' successful appeals to defeat the preclusive effect of adverse judgments is *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394 (1981).  In *Moitie*, seven plaintiffs filed multiple parallel antitrust suits, stating identical claims, which were consolidated in district court.  *Id.* at 395-96.  The district court dismissed all seven on the merits for failure to state claims.  *Id.* at 396.  Five plaintiffs appealed the dismissal to the Ninth Circuit, which reversed.  *Id.* at 397.  But two, Brown and Moitie, refiled similar actions in state court.  *Id.* at 396.  The defendants in those actions removed them to federal court and moved to have them dismissed on the ground of res judicata.  *Id.*  The district court dismissed on that ground, and Brown and Moitie appealed the dismissal.  *Id.* at 396-97.

In their appeal, Brown and Moitie argued that the original merits dismissal was not res judicata in their removed state-court actions because the Ninth Circuit had reversed it as to the

other five plaintiffs, on grounds applicable to their original actions.  The Ninth Circuit agreed, holding that "'non-appealing parties may benefit from a reversal when their position is closely interwoven with that of appealing parties,'" and that under such circumstances "the doctrine of res judicata must give way to 'public policy' and 'simple justice.'"  *Id.* at 398.

In an 8-1 decision, the Supreme Court reversed.  Rejecting what it called the Ninth Circuit's "novel exception to the doctrine of res judicata," *id.*, it wrote that there was "no general equitable doctrine . . . which countenances an exception to the finality of a party's failure to appeal merely because his rights are 'closely interwoven' with those of another party."  *Id.* at 400.  While noting that Brown and Moitie's argument for escaping res judicata was particularly weak because they sought "to be the windfall beneficiaries of an appellate reversal procured by other independent parties, who ha[d] no interest in [Brown and Moitie's] case," *id.*, the Court approvingly quoted cases holding that whenever "less than all of the several co-parties appeal from an adverse judgment, a reversal as to the parties appealing does not necessitate or justify a reversal as to the parties not appealing."  *Id.* at 399 n.4 (quoting *Nat'l Assoc. of Broadcasters v. FCC*, 554 F.2d 1118, 1124 (D.C. Cir. 1976)).

*Moitie*'s holding, it is true, does not quite stand for the proposition that there is no *law of the case* exception to res judicata.  The actions in which Brown and Moitie sought an exception to res judicata were the removed state-court actions, which were completely independent from the actions in which the Ninth Circuit's reversal on which Brown and Moitie relied was issued.  Thus, Brown and Moitie could not have argued that the Ninth Circuit's reversal was law of the case in their cases.

However, *Moitie*'s principle–that there is no exception to res judicata for unappealing parties whose rights are interwoven with those of parties who win on appeal–has been applied in

a host of situations where a law of the case exception to res judicata, were there one, would

apply.  That is to say, *Moitie* has often been applied when the case in which the appellate ruling

on which a nonappealing party sought to rely was entered, and the case in which that party

sought to rely on it, were one and the same.  Most often in such cases, a merits judgment is

reversed on merits grounds in some respect, in an appeal brought only by some co-plaintiffs or

some co-defendants.  The nonappealing plaintiffs or defendants then seek relief from the

judgment, and are denied on the basis of res judicata.  *See*, *e.g.*, *Winterthur Int'l Am. Ins. Co. v.*

*Garamendi*, CIV.S000779WBSJFM, 2005 WL 3440266 (E.D. Cal. Dec. 14, 2005), at *3-4

(relying on *Moitie* in denying non-appealing plaintiffs' motion to set aside an order awarding

them no fees, even after, in an appeal by their co-plaintiffs, the Ninth Circuit held fees should

have been awarded); *In re Fine Paper Antitrust Litig.*, 840 F.2d 188, 194-95 (3d Cir. 1988)

(relying on *Moitie* in affirming a district court's denial of non-appealing fee petitioners' motion

to set aside a fee order, even after the Third Circuit held on an appeal by co-fee petitioners that

the district court employed an improperly stingy methodology in calculating fees); *Annat v.*

*Beard*, 277 F.2d 554 (5th Cir. 1960) (affirming a district court's denial of a non-appealing

defendant's motion to set aside a judgment in a condemnation proceeding, even after the Fifth

Circuit previously held in co-defendants' appeal that the district court used the wrong maps to

determine the parties' rights).

       These cases may seem distinguishable from this one, because they involve appellate

determinations that a judgment was incorrect on the merits, while this case involves an appellate

jurisdictional determination that goes to the Consent Judgment's voidness.  However, the *Moitie*

principle, while most often applied in the context of merits reversals, has been applied both to

jurisdictional determinations and to other matters that implicate voidness.  While no case

precisely addresses the question here–whether an appellate determination that a court lacked

jurisdiction over an action voids unappealed merits judgments entered in that action–three cases

come close.  Together, they persuade the court that there is no more a law of the case exception

to the res judicata effect of jurisdictional rulings than there is a law of the case exception to the

res judicata effect of merits rulings.

The first is *Abatti v. C.I.R.*, 859 F.2d 115 (9th Cir. 1988).  A number of taxpayers filed

consolidated cases in the Tax Court arguing a single tax issue, and all agreed to be bound by the

opinion in the lead case.  *Id.* at 116.  The Tax Court granted summary judgment against the

taxpayers, some of whom appealed.  The Ninth Circuit reversed on procedural grounds in *Heintz*

*v. C.I.R.*, 770 F.2d 874 (9th Cir. 1985), faulting the Tax Court for depriving the taxpayers of a

"full and fair opportunity to ventilate the issues involved in the motion" by granting summary

judgment on the basis of an issue first raised in the final round of simultaneous briefing.  *Id.* at

876.  The non-appealing taxpayers then sought relief from the judgment under a Tax Court

analogue to Rule 60(b).  *Abatti*, 859 F.2d at 117.  The Tax Court denied, and the moving

taxpayers appealed.  On appeal, they argued that *Heintz* "necessarily applie[d] to them because

reversal of the Tax Court decision was based on denial of due process"–which if true would go

to the Tax Court judgment's voidness.  *Id.* at 119.  The Ninth Circuit devoted just a sentence to

this argument.  "In fact," the court wrote, "the decision was reversed because summary judgment

was entered prematurely, but the distinction is unimportant because the judgment in *Heintz* does

not benefit non-appealing parties *regardless of its basis.*"  *Id.* at 119-20 (emphasis added).  The

court then cited *Moitie* and concluded its opinion.

The second case, *In re Mutual Fund Market-Timing Litigation*, 468 F.3d 439 (7th Cir.

2006) (Easterbrook, J.), involved the res judicata effect of a jurisdictional determination.

Multiple plaintiffs brought a slew of lawsuits against mutual funds for failing to protect themselves against market-timing arbitrageurs.  In one of these lawsuits, the *Parthasarathy* action, four plaintiffs filed a state-court action against three mutual funds.  *Id.* at 443.  The defendant funds removed the action to federal court; the district court remanded.  *Id.*  One of the three funds appealed the remand.  *Id.*  That appeal was consolidated with the appeal of a remand of a similar action, *id.*, and in the consolidated appeals the Seventh Circuit held that the state-law market-timing claims arose under federal securities law and were preempted by the Securities Litigation Uniform Standards Act.  *See Kircher v. Putnam Funds Trust*, 403 F.3d 478 (7th Cir. 2005) (*Kircher II*).  The two non-appealing funds in *Parthasarathy* then filed a second notice of removal; the district court, following the Seventh Circuit's ruling, declined to remand again and ruled for defendants on the merits.  *Id.* at 443.   Plaintiffs appealed.  *Id.*

On their appeal, the Seventh Circuit, citing *Moitie*, reversed.  It reasoned that "the district court should have remanded without regard to the conclusion of *Kircher II*–for the [non-appealing] defendants are bound by the district court's adverse decision, notwithstanding the fact that . . . this court (in *Kircher II*) . . . held that the district judge's 2004 decision was mistaken. Litigants who do not appeal from an adverse decision are stuck with it, even if some other party to the same case appeals and wins." *Id.*  Thus, even though the district court's error was jurisdictional–that the *Parthasarathy* action was "outside federal jurisdiction" when it wasn't, *id.*–its erroneous determination was given res judicata effect by the Seventh Circuit.  Unlike this case, *Mutual Fund Market-Timing Litigation* involved an errant decision that a court *lacked* jurisdiction, not that it had it.  But the case does stand for the proposition that supervening appellate law of the case does not trump the preclusive effect of errant jurisdictional determinations, at least in the negative.

The third case, and the closest to this one, is *Floyd v. D.C.*, 129 F.3d 152 (D.C. Cir. 1997) (Tatel, J.). In *Floyd*, retired Secret service agents filed a lawsuit against the United States and the District of Columbia, seeking increased retirement benefits. In district court, the United States argued that it had not waived its sovereign immunity to the agents' suit. *Id.* at 155. The district court disagreed and granted summary judgment to the agents. *Id.* The United States appealed; the District of Columbia did not. *Id.*

On appeal, the United States switched positions on sovereign immunity, taking the position that it *had* waived its sovereign immunity. *Id.* at 155-56. But the D.C. Circuit, treating sovereign immunity as jurisdictional, raised the issue sua sponte. *Id.* at 155. Having raised it, it held that the United States and District of Columbia had not waived their sovereign immunity, and that the district court erred. *Id.* at 156-57. The court then considered whether to vacate the district court's judgment in its entirety or only vacate it as to the United States.

Citing a circuit precedent cited in *Moitie*, the court wrote that "[b]ecause parties failing to appeal are not usually entitled to the benefits of a reversal obtained by appealing co-parties, dismissing the United States would normally leave intact the . . . judgment against the District of Columbia." *Id.* at 157 (citation omitted). The court wrote this even though the district court erred in holding it had jurisdiction (at least by the D.C. Circuit's lights, given its jurisdictional classification of the sovereign immunity issue). Solely because of "the unusual circumstances of th[e] case," namely the "inextricably intertwine[d]" interests of the District and United States, the court exercised its discretion to vacate the judgment in its entirety. *Id.* Besides that purely discretionary act, the only distinction between *Floyd* and this case is that the D.C. Circuit did not directly speak to what the outcome of a 60(b) motion by the District would have been, but only spoke to the immediate effects of its ruling.

Given these well-reasoned cases from three circuits, and the absence of any authority to the contrary, the Court cannot find an exception to the *Moitie* principle for jurisdictional determinations or other determinations that go to a judgment's voidness.  Doing so would contradict the Supreme Court's guidance that "principles of res judicata"–of which the *Moitie* principle is one–"apply to jurisdictional determinations."  *Ins. Corp. of Ireland, Ltd.*, 456 U.S. at 703 n.9.  Still less can the Court find that the *Moitie* principle does not apply in law of the case scenarios.  Rather, it appears well-settled that appellate law of the case on any issue, merits or otherwise, will not upset the res judicata effect of a judgment as to unappealing parties.

Because that is so, the arguable basis rule applies to this Court's review of the Williamses' 60(b) motion to set aside the Consent Judgment.  In this case, this Court entered two judgments pursuant to the First Amended Complaint–the Consent Judgment, and the dismissal of Pikeville's cross-claims.  Only the latter was appealed, and in that appeal, both the District Court and Sixth Circuit held this Court lacked jurisdiction over the First Amended Complaint.  But for the reasons just stated, that law of the case, though it would require dismissal of any pending claims under the First Amended Complaint, does not supervene the preclusive effect of the un-appealed Consent Judgment's erroneous jurisdictional determination.  The lone exception to its preclusive effect is the arguable basis test, which allows the Court to set aside its determination if it lacked an arguable basis to assert jurisdiction at the time it entered the Consent Judgment.  It is to that inquiry that the Court turns.

d.   The Arguable Basis Rule Applied

As recounted above, the Consent Judgment entered judgment in plaintiffs' favor against the Williamses on all counts of the First Amended Complaint.  That complaint added a raft of claims against the Williamses, who in the original complaint were only named as necessary

parties and portrayed as victims of the Halle Entities' fraud. And, that complaint was filed after Spradlin completely assigned the Debtor's claims to the Halle Entities. Given these facts–the wholly new claims of the First Amended Complaint, and that they were filed after the Debtor assigned away any potential recovery from them–the District Court and Sixth Circuit had no difficulty concluding that this Court lacked jurisdiction over the First Amended Complaint.

As to some bases for bankruptcy jurisdiction, these facts not only deprived this Court of jurisdiction, but rendered its lack of jurisdiction unarguable. In spite of this Court's struggle over the issue in *Spradlin I*, there was no remotely arguable basis on which to conclude that this Court had related-to jurisdiction over the First Amended Complaint. The wholesale amendment of the original complaint unarguably both permitted and required the Court to consider the jurisdictional effects of the Trustee's preceding assignment, which deprived the Debtor's estate of any interest in the First Amended Complaint and therefore deprived this Court of related-to jurisdiction.

But the assignment and subsequent amendment did not unarguably deprive this Court of arising-under or arising-in jurisdiction–collectively, "core" jurisdiction–over most of the claims in the First Amended Complaint. The District Court, and implicitly the Sixth Circuit, rested their holdings that this Court lacked core jurisdiction on an interpretation of § 1334 under which a bankruptcy court that lacks related-to, or non-core, jurisdiction over a matter necessarily lacks core jurisdiction. This Court must treat that interpretation as correct within the confines of this case because it was necessary to the District Court's and Sixth Circuit's determinations that this Court lacked jurisdiction over the First Amended Complaint. But at the time this Court entered the Consent Judgment, that reading of § 1334 was neither settled law of the Sixth Circuit, nor unarguably correct. Rather, reasonable arguments could then, and can still now be made for a

36

contrary view–that a bankruptcy court can have core jurisdiction over matters outside its non-core jurisdiction.

1.    Related-to Jurisdiction

The statute from which bankruptcy courts derive their jurisdiction, 28 U.S.C. § 1334, confers jurisdiction over four types of matters on the district courts, the last of which are "civil proceedings . . . related to a case under title 11."  28 U.S.C. § 1334(b).  This Court's opinion in *Spradlin I* and the District Court's affirmance of that opinion in *Spradlin II*, which dealt with jurisdiction over the Second Amended Complaint, primarily dealt with this basis for jurisdiction, while the District Court's opinion in *Pikeville Energy Group*, holding that this Court lacked jurisdiction over the First Amended Complaint, said its result followed from the reasoning of *Spradlin II*.  So the Court's analysis of whether it had an arguable basis for asserting jurisdiction over the First Amended Complaint begins with related-to jurisdiction.

As *Spradlin I* and *Spradlin II* both set forth, the Sixth Circuit's test for related-to jurisdiction is whether "the outcome of a proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *In re Wolverine Radio Co.*, 930 F.2d at 1141 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  Neither this Court nor the District Court had any difficulty concluding that once the estate assigned its entire interest in this adversary proceeding to the Halle Entities, along with any liability for counterclaims, this proceeding could no longer conceivably affect the Debtor's estate.  Thus, assuming that jurisdiction could be determined as of the time of the 2009 Settlement Agreement, which predated the First Amended Complaint, there was no arguable basis for related-to jurisdiction over the First Amended Complaint.

The difficulty this Court and the District Court had in *Spradlin I* and *II*, however, was

whether they *could* consider the jurisdictional effects of the 2010 Assignment–which postdated

the filing of the original complaint in this adversary proceeding.  This Court concluded it could

in *Spradlin I*, but only after wrestling with a deep split of authority on whether post-filing events

can divest a bankruptcy court of jurisdiction over an adversary proceeding it possessed at the

time of filing.  Were the contested proposition that post-filing events generally can divest a

bankruptcy court of jurisdiction the only basis on which to consider the 2009 Settlement

Agreement, this Court's related-to jurisdiction over the First Amended Complaint would have

been arguable.

However, the theory on which this Court relied in *Spradlin I* was not the only ground on

which to consider the 2009 Settlement Agreement.  The other ground on which to consider the

Agreement was the undisputable rule of law on which the District Court relied, settled by the

Supreme Court years before the Consent Judgment was entered, that jurisdiction over an

amended complaint is measured as of the time of filing of *that* complaint, not the time of filing

of its predecessor.  *See Spradlin II*, 2012 WL 6706188, at *5 (citing *Rockwell Int'l Corp*, 549

U.S. at 473-74).  That rule has especially compelling application in this case, where the

Williamses went from being alleged victims in the first complaint to, in the First Amended

Complaint, defendants from whom relief was sought on thirteen new counts.  Assessing

jurisdiction over these claims as of the time of the filing of the first complaint would clearly be

wrong.  Thus, since the 2009 Settlement Agreement was unarguably a factor that this Court was

required to consider in determining its jurisdiction, and since it unarguably eliminated any

conceivable effect on the administration of Debtor's estate, this Court unarguably lacked related-

to jurisdiction over the First Amended Complaint.

2.  Arising-in or Arising-Under Jurisdiction

a.  Whether Arising-In and Arising-Under Matters Were Unarguably Always

Related-to at the Time of the Consent Judgment

As discussed above, both this Court and the District Court concluded this Court lacked

arising-in or arising-under jurisdiction over the Second Amended Complaint because it lacked

related-to jurisdiction.  According to both *Spradlin I* and *II*, a bankruptcy court can never have

core (arising-in or arising-under) jurisdiction over a matter if it lacks related-to jurisdiction over

that matter.  The District Court applied this reasoning to the First Amended Complaint in

*Pikeville Energy Group*.  And the Sixth Circuit, in affirming the District Court's jurisdictional

holding on the First Amended Complaint in *Spradlin III*, appears to have implicitly relied on the

same premise, as the entirety of its jurisdictional analysis was confined to an application of the

test for related-to jurisdiction.  If it were unarguably the law at the time of the Consent Judgment

that a bankruptcy court lacked core jurisdiction over any matter in which it lacked related-to

jurisdiction, this Court would unarguably have lacked core jurisdiction to enter the Consent

Judgment.  If that proposition was not unarguably law at the time of the Consent Judgment, there

at least may have been an arguable basis for core jurisdiction over the claims the Consent

Judgment adjudicated.

*Spradlin I* and *II* both relied on *Wolverine Radio*, a 1991 Sixth Circuit case, for the

proposition that the absence of core jurisdiction necessarily follows from the absence of related-

to jurisdiction.  *Wolverine Radio* appears to say just that:

> For the purpose of determining whether a particular matter falls within bankruptcy
> jurisdiction, it is not necessary to distinguish between the second, third, and fourth
> categories (proceedings "arising under," "arising in," and "related to" a case under title
> 11).  These references operate conjunctively to define the scope of jurisdiction.
> *Therefore, for purposes of determining section 1334(b) jurisdiction, it is necessary only
> to determine whether a matter is at least "related to" the bankruptcy.*

39

*Wolverine Radio*, 930 F.2d at 1141 (citations omitted) (emphasis added).  But while *Wolverine*

*Radio* says what this Court and the District Court said it said,[3] *Wolverine Radio*'s statement was

dictum.  In *Wolverine Radio*, the Sixth Circuit held that the bankruptcy court below did have

related-to jurisdiction over the matter in question.  *Id.* at 1143.  Thus, the proposition that "for

purposes of determining section 1334(b) jurisdiction, it is necessary *only*" to assess related-to

jurisdiction was not tested by *Wolverine Radio*.  This Court and the District Court were not

wrong to rely on *Wolverine Radio*'s dictum; circuit dicta are persuasive authority.  However, for

purposes of determining whether this Court *unarguably* lacked core jurisdiction over the First

Amended Complaint, *Wolverine Radio*'s status as holding or dictum makes all the difference.

As dictum, *Wolverine Radio*'s statement of the law could have been reasonably argued with at

the time of the Consent Judgment, unless the statute itself, or some other case, made *Wolverine*

*Radio*'s reading of § 1334(b) unarguably correct.

　　　As it turns out, not only has no Supreme Court or published[4] Sixth Circuit case ever held

that related-to jurisdiction is necessary to core jurisdiction, several Sixth Circuit cases and the

text of the relevant statutes would have provided fodder at the time of the Consent Judgment for

a reasonable argument the other way.  The Court begins with the text of § 1334(b).

　　　*Wolverine Radio*'s reading of § 1334(b) is by no means clear from the face of the statute.

First, § 1334(b) is phrased disjunctively, providing that "the district courts shall have original but

not exclusive jurisdiction of all civil proceedings arising under title 11, *or* arising in *or* related to

cases under title 11."  28 U.S.C. § 1334(b) (emphasis added).  That phrasing suggests that

---

[3] Perhaps.  Note that *Wolverine Radio* could be read to mean only that in determining § 1334(b) jurisdiction, it is
"necessary only" to find related-to jurisdiction, not that in determining § 1334(b) jurisdiction, it is "necessary only"
to determine whether there is related-to jurisdiction, yes or no.  That is, the Sixth Circuit may have inartfully been
saying that related-to jurisdiction is a sufficient but not necessary condition for § 1334(b) jurisdiction.

[4] *Stewart v. Henry (In re Stewart)*, 62 F. App'x. 610 (6th Cir. 2003), like *Spradlin III* an unpublished case, appears
to have applied *Wolverine Radio*'s dictum in an outcome-determinative fashion.

arising-under, arising-in and related-to jurisdiction are three distinct types of bankruptcy

jurisdiction, not that the first two are subsets of the third.  Nothing in the syntax of § 1334(b)

suggests that "related to" modifies "arising under" or "arising in."

Second, were it the case that arising-under and arising-in matters must be related to, it

would have been unnecessary and misleading to mention arising-under and arising-in jurisdiction

in § 1334(b).  It would have been especially misleading to write that "the district courts shall

have . . . jurisdiction of *all* civil proceedings arising under title 11 [i.e., the Bankruptcy Code]"

had Congress really intended to duplicatively confer jurisdiction over Code-created causes of

action that are "related to" a bankruptcy case.[5]  While the distinction between core and related-to

jurisdiction has great significance in § 1334(c), which addresses abstention, and in 28 U.S.C.

§ 157, which addresses bankruptcy courts' authority over § 1334 matters referred to them by the

district courts, it would have been unnecessary to draw that distinction in a statute granting the

*district* courts *jurisdiction* unless the distinction delineated independent grants of authority to the

district courts.

*Wolverine Radio*'s dictum draws some support from § 157, but not nearly enough to

make it unarguable.  Section 157 lumps arising-in and arising-under matters together as "core

proceedings," 28 U.S.C. § 157(b)(1), while it describes a related-to matter as "a proceeding that

is not a core proceeding but that is otherwise related to a case under title 11."  28 U.S.C. §

157(c)(1).  It is natural enough to think that "core proceedings," over which bankruptcy courts

have the most authority, must at least have the jurisdictional prerequisites of proceedings that are

"not . . . core."  More compellingly, the definition of non-core matters suggests as much when it

---

[5] While it may be objected here that however "arising under" jurisdiction is understood it is duplicative of the district courts' general federal question jurisdiction, *see* 28 U.S.C. § 1331, thereby undercutting arguments from surplusage, the same of course cannot be said of the bankruptcy courts, which "may hear and determine . . . all core proceedings arising under title 11" upon reference from the district courts.  28 U.S.C. § 157(b)(1).

defines them as "not. . . core proceeding[s] but . . . *otherwise* related to." The "otherwise"

implies that all core matters are related to. "Otherwise" means "differently," Webster's New

World Dictionary 959 (3d ed. 1988), so to say that non-core matters are not core but otherwise

related to is to say that they are related to in a different way than core proceedings are.

Section 157's "otherwise" did not, at the time of the Consent Judgment, make *Wolverine*

*Radio*'s reading of § 1334(b) unarguably the law, for two reasons. First, it is contained in a

different statute from the one ultimately in question, whose own terms cut decidedly against

*Wolverine Radio*. Second, "otherwise" can easily be read in harmony with the disjunctive

reading of § 1334(b). "Otherwise" implies that core proceedings are related-to, but it doesn't

necessarily imply that they are related-to in the same way that non-core proceedings are. Indeed,

it suggests just the opposite–that non-core proceedings have a *different* kind of relation to

bankruptcy cases than core proceedings do. Proceedings which arise in a bankruptcy case or

arise under the Bankruptcy Code are, by definition, closely factually related to bankruptcy cases.

Proceedings that lack these close relations to bankruptcy cases but that are "otherwise related

to," the Sixth Circuit has held, must conceivably affect the administration of a bankruptcy estate.

"Otherwise" does not necessarily indicate that core proceedings must have *that* kind of relation

to bankruptcy cases.

In addition to not being clearly supported by statute, *Wolverine Radio*'s reading of §

1334(b) was also repeatedly undercut by the Sixth Circuit in the years before the Consent

Judgment. Just a year after it decided *Wolverine Radio*, the Sixth Circuit described core and

non-core jurisdiction in disjunctive terms. In *Sanders Confectionery Products, Inc. v. Heller*

*Financial, Inc.*, 973 F.2d 474 (6th Cir. 1992), the Sixth Circuit, citing *Wolverine Radio*,

explained that to "fall within . . . bankruptcy jurisdiction . . . a proceeding need only be 'related

to' a case under title 11," and defined "related to" as matters which conceivably affect

bankruptcy estates. *Id.* at 482. But defining arising-under and arising-in proceedings, the court

wrote that they respectively "invoke[] a substantive right created by federal bankruptcy law or . .

. could not exist outside of the bankruptcy." *Id.* at 483. This definition of core proceedings did

not include a requirement that they conceivably affect the bankruptcy estate, and it is easy to

conceive of claims that would satisfy this definition while failing the related-to test–for example,

Code-created fraudulent transfer claims assigned to third parties, like the ones in this case. More

notably, whereas in *Wolverine Radio* the Sixth Circuit wrote that related-to jurisdiction was

necessary to § 1334(b) jurisdiction, in *Sanders* the court only wrote that related-to jurisdiction

was sufficient to satisfy § 1334(b).

      Fourteen years later, in *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314 (6th

Cir. 2006), the Sixth Circuit endorsed in dictum the view that a claim could be core even if there

were no bankruptcy estate for the claim to affect. In *Lowenbraun*, a Chapter 7 trustee filed and

then settled fraudulent transfer claims against a debtor's ex-wife. *Id.* at 317-18. After she paid

the debtor back pursuant to the settlement agreement, the debtor withdrew and squandered the

money. *Id.* at 318. The trustee filed a contempt motion against the debtor and his ex-wife,

which was settled. *Id.* at 318-19. After that settlement, the ex-wife sued the trustee's counsel in

state court for defamation, relying on statements counsel made to several newspapers accusing

her of bankruptcy fraud. *Id.* at 319. The trustee's counsel removed the action to bankruptcy

court and opposed abstention on the ground that the matter "arose in" the debtor's bankruptcy

case. *Id.* The question before the Sixth Circuit was whether that was correct.

      The Sixth Circuit began its analysis by citing *Sanders* for the proposition that core

proceedings either invoke substantive rights created by title 11 or are matters which could not

exist outside of bankruptcy.  *Id.* at 320.  It then concluded the ex-wife's defamation claim was

the latter type of core proceeding.  The debtor's ex-wife argued that her defamation action could

not be core because, having already transferred the funds she was now irrelevant to estate

matters, and because her action could have no conceivable effect on the administration of the

estate.  That is, she argued her action was not core because it was not related to.  In parrying the

first argument, the Sixth Circuit relied on a case, *Kirk v. Hendon* (*In re Heinsohn*), 247 B.R. 237

(E.D. Tenn. 2000), which, in the Sixth Circuit's words, held that an action "was a core

proceeding even though the bankruptcy estate had closed before the plaintiff initiated his suit,"

reasoning that "'there is no bright-line rule dictating that once an estate has been fully

administered a trustee cannot avail himself of the federal court's bankruptcy jurisdiction.'"

*Lowenbraun*, 453 F.3d at 321 (quoting *Heinsohn*, 247 B.R. at 244) (alteration omitted).  This

suggests that related-to jurisdiction is irrelevant to core jurisdiction.

     However, when addressing the ex-wife's contention that her defamation action could not

affect the bankruptcy estate, the court suggested that was not quite right, if only because "the

Contempt Motion, upon which [the ex-wife]'s state law action was based . . . [was] filed . . . to

assist in the administration of the estate."  *Id.* at 321.  Ultimately the Sixth Circuit concluded the

defamation action was core both because it "would not exist but for the bankruptcy proceeding,"

*id.*, and because the action arose from the trustee's estate administration.  Thus, *Lowenbraun*

may not hold that a claim can be core even if it cannot affect a debtor's estate.  But it did

squarely endorse that view in dictum, just as *Wolverine Radio* endorsed the contrary view in

dictum.

     Under this legal landscape, whether *Wolverine Radio*'s reading of § 1334(b) was correct

was completely unsettled at the time this Court entered the Consent Judgment.  Indeed, it was so

unsettled that two months afterwards, the District Court adopted the *disjunctive* reading of §

1334(b), writing:

> Recall that there are three types of matters over which the Court has [bankruptcy]
> jurisdiction–core matters "arising under" title 11, core matters "arising in" a case under
> title 11, or non-core matters "related to" a case under title 11. *Any one of these* will
> suffice to permit referral to the bankruptcy court.

*McKinstry v. Sergent*, 442 B.R. 567, 572 (E.D. Ky. 2011) (citations omitted) (emphasis added).

This Court could hardly be blamed for adopting the same reading two months prior. Therefore,

at the time of the Consent Judgment this Court's unarguable want of related-to jurisdiction over

the First Amended Complaint did not unarguably deprive the Court of core jurisdiction. The

Court must therefore consider whether it had an arguable basis to assert arising-under or arising-

in jurisdiction over any of the claims in the First Amended Complaint.

      b.  Arising-Under Jurisdiction

      In *Sanders*, as discussed above, the Sixth Circuit defined matters "arising under title 11"

as those which "invoke[] a substantive right created by federal bankruptcy law." *Sanders*, 973

F.2d at 483. The First Amended Complaint contained a number of such matters. Counts I, II, V,

and VI of the First Amended Complaint were fraudulent transfer claims brought under § 548; a

provision of title 11 was the sole source of plaintiffs' cause of action. Counts III, IV, VII and

VIII were state-law fraudulent conveyance actions brought pursuant to the trustee's avoidance

power under § 544. Again, a provision of title 11 created the trustee's cause of action (and that

of its assignees) by giving the trustee the power to avoid transfers that are voidable by an actual

lien creditor. *See* 11 U.S.C. § 544. Numerous courts have held on this ground that § 544 actions

are core matters. *See The Cadle Co. v. Moore (In re Moore)*, 739 F.3d 724, 728 (5th Cir. 2014);

*Duck v. Munn (In re Mankin),* 823 F.2d 1296, 1299-1301 (9th Cir. 1987), *overruled on other*

*grounds by Executive Benefits Ins. Agency v. Arkison*, 702 F.3d 553 (9th Cir. 2012). Thus, this

Court had an arguable basis on which to assert jurisdiction to enter judgment on Counts I through

VIII of the First Amended Complaint.  The remaining counts, however, did not arguably arise

under title 11.  Any arguable authority the Court had to assert jurisdiction over them would, by

process of elimination, flow from the Court's arising-in jurisdiction.

       c.   Arising-in Jurisdiction

As discussed above, the Sixth Circuit has both defined "arising in" matters as claims

which generally could not exist outside of bankruptcy, or as claims which "would not exist but

for the bankruptcy proceeding." *Lowenbraun*, 453 F.3d at 321. Of the remaining counts of the

First Amended Complaint on which this Court entered judgment in the Consent Judgment, all

but one do not arguably meet either of these definitions; one, however, does.

The balance of the complaint, with the exception of the conspiracy count, deals with

Nathan Williams's conversion of the Debtor's funds, and the Williamses' breaches of fiduciary

duty in converting and fraudulently conveying the Debtor's funds.  Count XI of the First

Amended Complaint alleged that Nathan Williams converted money from the Debtor post-

petition.  Nathan Williams was a principal of the Debtor and could have converted the Debtor's

funds had a bankruptcy never been filed.  Thus, even on the Sixth Circuit's less demanding

standard for arising-in jurisdiction, *Lowenbraun*'s but-for test, the conversion count did not even

arguably arise in Debtor's case.

Counts IX, X and XII of the First Amended Complaint were state-law breach of fiduciary

duty claims, brought against the Williamses for fraudulently conveying the Debtor's funds pre-

petition, and converting the Debtor's funds post-petition.  As with Count XI, the conversion did

not arguably arise in Debtor's case since it did not depend on the bankruptcy filing, and the

fraudulent conveyances, which preceded the bankruptcy, arose in Debtor's case still less.  Thus,

breaches of fiduciary duty for committing these acts could not arguably arise in Debtor's case.

Count XIV of the First Amended Complaint, however, a state-law conspiracy claim against the Williamses and others for conspiring to use this Court's Mining Order as a means of stripping the Debtor of its assets, did arguably arise in Debtor's case. Several allegations in the conspiracy count convince the Court that it satisfies *Lowenbraun*'s but-for test.

First, the complaint pled that "[w]ithout this Court's approval of the . . . Mining [Order] . . . the conspiracy would not have succeeded." [Doc. 73 at ¶ 224.] Second, the complaint not only alleged that the Williamses conspired to use the Mining Order to strip the Debtor of its assets, but that they conspired to persuade the Court to enter the Mining Order. [*Id.* at ¶¶ 218-23, 225-26.] While a similar conspiracy could have occurred if not for the bankruptcy, the particular conspiracy plaintiffs pled, which included among its ends the entry of a bankruptcy court order, could not have occurred but for the bankruptcy. Because the conspiracy count satisfied one of the Sixth Circuit's tests for arising-in jurisdiction, and because arising-in matters arguably did not have to relate to at the time the Consent Judgment was entered, this Court had an arguable basis to assert jurisdiction over the conspiracy count.

III.    Conclusion

In sum, though the Court lacked an arguable basis to assert related-to jurisdiction over all counts in the First Amended Complaint, and lacked any arguable basis to assert jurisdiction over Counts IX through XII (the conversion and breach of fiduciary duty counts), it did have an arguable basis to assert arising-under jurisdiction over Counts I through VIII (the fraudulent transfer and conveyance counts), and to assert arising-in jurisdiction over Count XIV (the conspiracy count). The Court therefore sets aside its judgment on Counts IX through XII, and denies the motion to set aside its judgment as to Counts I through VIII and Count XIV. All that

remains is what effect this has on the money judgment the Consent Judgment contained.

The Consent Judgment awarded $1,575,000 to THC, unapportioned among the claims on which this Court entered judgment. While the First Amended Complaint contained specific requests for money damages as to many of its counts, it did not do so for the conspiracy count or the breach of fiduciary counts. In any event, the Court is unable to determine how much of the money judgment is attributable to the counts on which the Consent Judgment remains intact simply because the parties may well have agreed to compromise the claims for less than the complaint sought.

Therefore, in an order accompanying this opinion, the Court will order the plaintiffs and the Williamses to file simultaneous status reports addressing how the Court's partial vacatur of its judgment affects the amount of the money judgment, and on any negotiations between the parties to agree to a new amount.

48

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Joe Lee*
**Bankruptcy Judge**
**Dated: Tuesday, October 21, 2014**
**(jl)**